# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **VICKI TIMPA, INDIVIDUALLY,** | § | |
| **AND AS REPRESENTATIVE OF** | § | |
| **THE ESTATE OF ANTHONY** | § | |
| **TIMPA, AND CHERYLL TIMPA** | § | |
| **INDIVIDUALLY AS NEXT FRIEND** | § | **CIVIL ACTION NO.** |
| **OF K.T., A MINOR CHILD**, | § | |
| **Plaintiffs,** | § | **3:16-CV-03089-N** |
| | § | |
| **and** | § | |
| | § | |
| **JOE TIMPA**, | § | |
| **Intervenor-Plaintiff,** | § | |
| **v.** | § | |
| | § | |
| **DUSTIN DILLARD, DANNY** | § | |
| **VASQUEZ, RAYMOND** | § | |
| **DOMINGUEZ, DOMINGO** | § | |
| **RIVERA, KEVIN MANSELL** | § | |
| **GLENN JOHNSON, CRIMINAL** | § | |
| **INVESTIGATIVE UNIT, LLC,** | § | |
| **Defendants**. | § | |

---

### DEFENDANTS DUSTIN DILLARD,
### DANNY VASQUEZ, RAYMOND DOMINGUEZ,
### DOMINGO RIVERA, AND KEVIN MANSELL'S JOINT APPENDIX IN SUPPORT
### OF THEIR MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY

---

Respectfully submitted,

CITY ATTORNEY OF THE CITY OF DALLAS

Christopher J. Caso
Interim City Attorney

s/ *Lindsay Wilson Gowin*
Senior Assistant City Attorney
Texas State Bar No.
lindsay.gowin@dallascityhall.com

Tatia R. Wilson
Senior Assistant City Attorney
Texas State Bar No. 00795793
tatia.wilson@dallascityhall.com

7DN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
Telephone:  214-670-3519
Facsimile:  214-670-0622

*Attorneys for Defendants Dustin Dillard, Raymond Dominguez, Kevin Mansell, Domingo Rivera, and Danny Vasquez*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2020, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send notification to case participants registered for electronic notice. I further certify that to the extent applicable I have served all case participants not registered for electronic notice by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ *Lindsay Wilson Gowin*
Senior Assistant City Attorney

# INDEX

| ITEM | PAGES |
|---|---|
| Exhibit 1: DVD containing all video and audio exhibits | 1 |

    Exhibit 1-A:  Merged Body Camera Video
    Exhibit 1-B:  Timpa's Call to 911
    Exhibit 1-C:  911 Call to Timpa
    Exhibit 1-D:  Motorist's Call to 911
    Exhibit 1-E:  Security Guard's Call to 911
    Exhibit 1-F:  Radio Traffic Clip 1
    Exhibit 1-G:  Radio Traffic Clip 2
    Exhibit 1-H:  Radio Traffic Clip 3
    Exhibit 1-I:  Radio Traffic Clip 4
    Exhibit 1-J:  Radio Traffic Clip 5
    Exhibit 1-K:  Radio Traffic Clip 6
    Exhibit 1-L:  Radio Traffic Clip 7
    Exhibit 1-M:  Radio Traffic Clip 8

| | |
|---|---|
| Affidavit in Any Fact of Officer Dustin Dillard | 2 |
| Affidavit in Any Fact of Senior Corporal Raymond Dominguez | 3 |
| Affidavit in Any Fact of Sergeant Kevin Mansell | 4 |
| Affidavit in Any Fact of Officer Domingo Rivera | 5 |
| Affidavit in Any Fact of Officer Danny Vasquez | 6-7 |
| Affidavit of Dustin Dillard | 8-10 |
| Affidavit of Raymond Dominguez | 11-13 |
| Affidavit of Kevin Mansell | 14-16 |
| Affidavit of Domingo Rivera | 17-19 |
| Affidavit of Danny Vasquez | 20-22 |
| Affidavit of James Flores | 23-25 |
| DF-R Prehospital Care Report Summary | 26-28 |
| Autopsy Report | 29-36 |
| General Order 905.00 | 37 |

Expert Report of Dr. Kimberly Collins                                    38-41

Expert Report of Dr. Mark Kroll                                          42-66

Expert Report of Dr. Steven Bird                                         67-74

Deposition of Officer Dustin Dillard                                     75-108

Deposition of Senior Corporal Raymond Dominguez                          109-162

Deposition of Sergeant Kevin Mansell                                     163-195

Deposition of Officer Domingo Rivera                                     196-201

Deposition of Officer Danny Vasquez                                      202-247

Deposition of DF-R Paramedic James Flores                                218-270

Deposition of Dallas County Medical Examiner Dr. Emily Ogden (excerpted) 271-273

Deposition of Michael Lyman (excerpted)                                  274-278

Deposition of Dr. Kimberly Collins (excerpted)                          279-282

Transcript of Merged Body Camera Video (Exhibit 1-A)                     283-310

# Optical Disc containing Defendants' Exhibits 1-A thru 1-M

Defendants Dustin Dillard, Danny Vasquez, Raymond Dominguez, Domino River and Kevin Mansell's
Joint Motion for Summary Judgment on Qualified Immunity
*Vicki Timpa v. Dustin Dillard et al.*, Civil Action No. 3:16-CV-3089-N

000001

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS          §

COUNTY OF DALLAS          §

BEFORE ME, Angela Arredondo, #7651, on this day personally appeared Dustin Dillard, #10997
Who, after being by me duly sworn, on oath deposes and says:

I, Police Officer Dustin Dillard, badge 10997, have been a Dallas police officer for one year, and I am currently assigned to Northwest Patrol, working Third Watch.  On Wednesday, August 10, 2016, I was working as a two-man element, C517, with Police Officer Danny Vasquez, badge #10489.  I was driving a marked Dallas Police squad car. This car was equipped with a video recording system, but the system was not activated during this incident.  I have been issued a body camera and was wearing a body camera which was activated during this incident.  I was wearing my full Dallas Police uniform, which clearly identified me as a Dallas Police Officer.

At around 10:30 p.m., we responded to 1720 W. Mockingbird Lane, the New Fine Arts, in regards to a potentially mentally disturbed person.  Dispatch reported that the suspect was off his medication.  I arrived in the area and observed Sergeant Mansell with the suspect near a bus stop to the east of New Fine Arts.  The bus stop was within a few feet of the roadway.  The suspect was handcuffed on the ground kicking, screaming, and trying to get up, and Officer Vasquez and I restrained the suspect to control him.  I restrained the suspect by placing my leg on his back and shoulder area.  I applied only the amount of my body weight needed to control the suspect.  The suspect was struggling and officers were telling him to relax, but he continued to scream and struggle while he tried to roll around and get up.  Other officers applied flex cuffs to the suspect's ankles to prevent him from kicking.

Paramedics had arrived to treat the suspect.  At some point a paramedic gave the suspect a shot in his arm.  At some point the suspect stopped screaming, appeared to have gone to sleep, and it was no longer necessary to restrain him and I stopped doing so.  The suspect sounded as if he was snoring.  Paramedics brought a gurney an officers placed the suspect on the gurney.  Paramedics loaded the suspect onto the ambulance and asked Officer Dominquez to start chest compressions.  Officer Dominquez started chest compressions and I later took over chest compressions. Officer Dominquez took over and continued chest compressions.  Paramedics transported the suspect to Parkland Hospital and I remained on scene until I was released by investigators.

_____  #10997
Affiant

"I, Angela Arredondo, Badge Number 7651 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS  17 DAY OF August A.D. 2016

_____  A.Arredondo, #7651
Officer's Signature

DEFS000058

000002

**AFFIDAVIT IN ANY FACT**

THE STATE OF TEXAS                    §

COUNTY OF DALLAS                    §

BEFORE ME, Angela Arredondo, #7651, on this day personally appeared Raymond Dominguez, #8231
Who, after being by me duly sworn, on oath deposes and says:

I, Senior Corporal Raymond Dominguez, badge 8231, have been a Dallas police officer for over fourteen years, and
I am currently assigned to Northwest Patrol, working Fourth Watch.  On Wednesday, August 10, 2016, I was
working as a one-man element, E533, driving a marked Dallas Police squad car.  This car was equipped with a video
recording system, but the system was not activated during this incident.  I have not been issued a body camera and
was not wearing a body camera.  I was wearing my full Dallas Police uniform, which clearly identified me as a
Dallas Police Officer.

At around 10:30 p.m., I responded to a call at 1720 W. Mockingbird Lane, the New Fine Arts, regarding a
potentially mentally disturbed person.  The call details stated that the suspect was off his medication.  I arrived in the
area and observed Sergeant Mansell and Officers Vasquez and Dillard with the suspect near a bus stop to the east of
New Fine Arts.  The suspect was handcuffed and Officers Vasquez and Dillard were restraining the suspect who was
screaming, kicking, and trying to roll around.  I retrieved flex cuffs from Officer Vasquez's squad car and placed
them on the suspect's ankles to prevent him from kicking.  Paramedics had arrived and Officers Vasquez and Dillard
continued to restrain the suspect until paramedics were ready to transport.  The suspect stopped screaming and
appeared to have gone to sleep, and officers loaded him onto a gurney for the paramedics.  Paramedics loaded the
suspect onto an ambulance and one of the paramedics asked me to start chest compressions.  I started chest
compressions as instructed by the paramedic until Officer Dillard took over.  I followed the ambulance to Parkland
Hospital.  I remained at the hospital until doctors informed me that the suspect had died.  I returned to the scene and
remained there until I was released by investigators.



_____
                                                    Affiant

"I, Angela Arredondo, Badge Number 7651 , a police officer for the Dallas Police Department, as described in
Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual
while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government
Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS  15 DAY OF August A.D. 2016

_____
                                Officer's Signature

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS §

COUNTY OF DALLAS §

BEFORE ME, Angela Arredondo, #7651, on this day personally appeared Kevin Mansell, #6570
Who, after being by me duly sworn, on oath deposes and says:

I, Sergeant Kevin Mansell, badge 6570, have been a Dallas police officer for over twenty-five years, and I am currently assigned to Northwest Patrol, working Third Watch. On Wednesday, August 10, 2016, I was working as a one-man element, F540, driving a marked Dallas Police squad car. This car was equipped with a video recording system, but the system was not activated during this incident. I have not been issued a body camera and was not wearing a body camera. I was wearing my full Dallas Police uniform, which clearly identified me as a Dallas Police Officer.

At around 10:30 p.m., I responded to a call regarding a potentially mentally disturbed person at 1720 W. Mockingbird Lane, the New Fine Arts. The call details stated that the suspect was schizophrenic and off his medication. I arrived in the area and observed the suspect and two uniformed private security officers near a bus stop to the east of the New Fine Arts business. I called for an ambulance. The suspect was in handcuffs and on the ground and the security officers were near the suspect. The suspect was rolling around and the security officers were preventing him from rolling into the roadway. The suspect was screaming and kicking into the air. The suspect rolled toward the street and I took hold of the handcuffs and assisted as the security officers moved him back away from the roadway. Officers Dillard and Vasquez arrived and placed handcuffs onto the suspect while removing the private security officer's handcuffs. The suspect was screaming that someone was going to kill him, and officers were telling him to relax. The suspect was trying to roll and stand up, and officers held him to prevent him from getting up and running into the roadway. Officers Rivera and Dominguez had arrived and while the officers were switching handcuffs, the suspect was kicking and officers placed flex cuff restraints on his ankles. DFR had arrived and officers assisted paramedics with placing the suspect onto a gurney for transport. While I called the suspect's emergency contact listed on his driver's license information, I learned from a paramedic that the suspect had become non-responsive. Officers removed the handcuffs for medical treatment and DFR transported the suspect to Parkland Hospital.

I remained on the scene until I was released by investigators.

_____
Affiant

"I, Angela Arredondo, Badge Number 7651 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS 15 DAY OF August A.D. 2016

_____
Officer's Signature

DEFS000057

000004

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS               §

COUNTY OF DALLAS               §

BEFORE ME, Angela Arredondo, #7651, on this day personally appeared Domingo Rivera, #8691
Who, after being by me duly sworn, on oath deposes and says:

I, Police Officer Domingo Rivera, badge 8691, have been a Dallas police officer for over eleven years, and I am currently assigned to Northwest Patrol, working Fourth Watch.  On Wednesday, August 10, 2016, I was working as a one-man element, E535, driving a marked Dallas Police squad car.  This car was equipped with a video recording system, but the system was not activated during this incident.  I have been issued a body camera and was wearing a body camera which recorded this incident.  I was wearing my full Dallas Police uniform, which clearly identified me as a Dallas Police Officer.

At around 10:30 p.m., I responded to 1720 W. Mockingbird Lane, the New Fine Arts, regarding a potentially mentally disturbed person.  The call information stated that the suspect was off his medication.  I arrived and took custody of the suspect's phone and car keys from an employee of New Fine Arts.  I observed Sergeant Mansell and Officers Vasquez, Dillard, and Dominguez with the suspect near a bus stop to the east of New Fine Arts.  The suspect was handcuffed on the ground and officers were restraining the suspect who was screaming, kicking, and trying to roll around.  The suspect kicked me in the right shin and right hand as I tried to restrain his legs.  I assisted Senior Corporal Dominguez in applying flex cuffs to the suspect's ankles to prevent him from kicking.
I went to locate the suspect's car in the New Fine Arts parking lot.  I located the medication and took the medication to the suspect and was informed by Sergeant Mansell that CPR was being done.  I left the medication with Sgt. Mansell and returned to the suspect's vehicle at New Fine Arts.  I was relieved by other officers and I returned to the scene and remained there until I was released by investigators.

_____
Affiant

"I, Angela Arredondo, Badge Number 7651 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS  15 DAY OF August A.D. 2016

_____
Officer's Signature

## AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS                    §

COUNTY OF DALLAS                    §

BEFORE ME, Angela Arredondo, #7651, on this day personally appeared Danny Vasquez, #10489
Who, after being by me duly sworn, on oath deposes and says:

On August 10, 2016, I was on a two-man patrol out of the Northwest Patrol Station with my partner, P.O. Dustin Dillard #10997, operating as Element C517, and driving a marked Dallas Police vehicle. Officer Dillard and I were both wearing Class B Dallas Police uniforms. Officer Dillard was driving the vehicle, and I was the passenger. Both Officer Dillard and I were wearing body cameras, which were activated during the incident described below.

Around approximately 10:30 pm, Officer Dillard and I were added to a call as a cover element at 1720 W. Mockingbird Lane for a signal 46 - CIT. Call notes indicated that the complainant called 911 for assistance, and stated that he was a schizophrenic with depression, off his medication , and was scared about the person he was with at his location. A second call came in to 911 about a white male, later identified as the complainant, Anthony Timpa, running in traffic on Mockingbird Lane, yelling that someone was after him, and attempting to climb onto a DART bus. Call notes additionally indicated that the second caller, a security guard, felt Mr. Timpa may be on drugs, and was concerned for Mr. Timpa's safety.

En route to the location, I heard Sergeant Kevin Mansell #6570 request a DFR ambulance for Mr. Timpa. The ambulance arrived just before Officer Dillard and I at the location. Upon arrival, Officer Dillard and I exited our vehicle, and I activated my body camera. At the scene, next to a bus stop on Mockingbird Lane, I witnessed Mr. Timpa on the ground in handcuffs, surrounded by a security guard and Sgt. Mansell. Mr. Timpa was yelling loudly, and rolling around. Officers at the scene, including Officer Dillard and I, attempted to talk to Mr. Timpa to calm him down. We asked him if he had taken any drugs. I did not hear Mr. Timpa acknowledge my presence, but he began yelling loudly. He made statements such as, "Don't kill me," and, "Let me go." Mr. Timpa began to roll and thrash around, and kick. I became concerned about Mr. Timpa's immediate proximity to the street, and that he might fall into the street, endangering himself, officers, and drivers. Additionally, Mr. Timpa was kicking, causing concern over possible additional injury to the officers trying to assist him. Based on these actions, Officers attempted to keep Mr. Timpa from rolling around, thrashing and kicking, and restrained him for his own safety, and that of officers present. Officer Dillard applied pressure to Mr. Timpa's torso and shoulders to keep him from rolling, and I held Mr. Timpa's lower body. Officer Dillard and other officers continued to try to talk to Mr. Timpa in an effort to calm him down, and to determine what drugs, if any, he might have taken. I did not hear Mr. Timpa respond to these questions, but I heard him continue to yell and attempt to resist officer's efforts to keep him steady. At this point, as officers held Mr. Timpa, and he seemed to be somewhat calmer, I attempted to switch out the witness security guard's handcuffs already on Mr. Timpa with my own. I was intially able to get my handcuffs on Mr. Timpa, though he began to resist when I tried to remove the security guard's handcuffs, though I was eventually able to get those handcuffs off. Around this same time, officers at the scene, I believe Officers Rivera and Dominguez, placed zip-ties on Mr. Timpa's ankles to prevent him from further kicking and causing injury to officers and himself. Mr. Timpa continued to struggle throughout this, including when DFR personnel attempted to obtain blood pressure and other vital signs. During this time, Officer Dillard maintained a position at Mr. Timpa's upper torso and shoulders to prevent his continued attempts to move, and continued to talk to Mr. Timpa in an attempt to calm him and obtain information from him about any drugs or medication he may have taken. Mr. Timpa mostly continued to resist and yell.

Eventually, it appeared that Mr. Timpa fell asleep, and he was heard to snore by officers at the scene. While Mr. Timpa was asleep, DFR personnel administered an injection of some sort - I do not know what was given to Mr. Timpa. Then, while Mr. Timpa remained asleep, officers were instructed to place Mr. Timpa on a gurney, and he was wheeled to the waiting DFR ambulance. Before being placed in the ambulance, officers at the scene checked on Mr. Timpa, expressing concern over whether or not he was breathing. I understood that Mr. Timpa had moved during this time, and appeared to be breathing. As he was placed in the ambulance, I returned to the bus stop to gather Mr. Timpa's property found with him, including a cell phone, and identification information, as well as what I believe was a credit card. I briefly spoke with Sgt. Mansell, at which point I turned off the body camera in order to discuss the incident and what we were doing next. At this time, I learned from Sgt. Mansell that Mr. Timpa stopped

DEFS000061

000006

breathing, and that DFR had begun life saving measures.  I then went into the back of the ambulance to assist and to remove Mr. Timpa's handcuffs and the zip-ties on his ankles to allow DFR personnel to work on Mr. Timpa.  I then exited the back of the ambulance, and began to gather witness information.  The ambulance shortly thereafter left the location, and I had no further invovlement with Mr. Timpa.

_____
Affiant

"I, Angela Arredondo, Badge Number 7651 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS  15 DAY OF August A.D. 2016

_____
Officer's Signature

2

DEFS000062

000007

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
| Defendants. | § | |

## AFFIDAVIT OF DUSTIN DILLARD

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared Dustin Dillard who, being of duly sworn, deposed and stated as follows:

My name is Dustin Dillard. I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude. I have been employed as an officer in the Dallas Police Department ("DPD") from March 2015 through the present. I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, and at all relevant times, I was a public official, a Texas Commission on Law Enforcement (TCOLE) certified peace officer employed by the City of Dallas as a police officer.

On August 10, 2016, I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas.   At the time of my arrival at the scene, I had received the following information about the call I was responding to: (1) that a man had called 911 and told the call-taker that he was schizophrenic and off his meds; and (2) that the man had been running in the road, causing motorists to nearly hit him with their cars.

No one ever touched or applied pressure to Mr. Timpa's head or neck, or inhibited his ability to move his head or neck at any time during the restraint.

During the encounter with Mr. Timpa, I did not know or suspect that he was experiencing excited delirium. Prior to the encounter with Mr. Timpa, I had never encountered a person who was or may have been experiencing excited delirium.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Dustin Dillard

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

14th day of February 2000, to certify which witness my hand and seal of office.

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID#3586603
My Comm. Exp. May 27, 2022

Notary Public in and
For the State of Texas

My commission expires:

5 - 27 - 2022

Affidavit of Dustin Dillard
*Timpa v. City of Dallas et al.*; Civil Action No. 3:16cv3089-N

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
|     Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
|     Defendants. | § | |

## AFFIDAVIT OF RAYMOND DOMINGUEZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared Raymond Dominguez who, being of duly sworn, deposed and stated as follows:

My name is Raymond Dominguez.  I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude. I have been employed as an officer in the Dallas Police Department ("DPD") from April 2002 to present, and was so on August 10, 2016.  I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, and at all relevant times, I was a public official, a Texas Commission on Law Enforcement (TCOLE) certified peace officer employed by the City of Dallas as a senior corporal.

On August 10, 2016, I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas.  During the encounter with Anthony Timpa, the only information I had received about the call was that it reportedly involved a potentially mentally disturbed person who was off his medication.

Chapter 573 of the Texas Health and Safety Code, titled "Apprehension by Peace Officer Without Warrant" allows a peace officer to detain a person without a warrant if the peace officer reasonably believes the person presents a danger to himself or others because of mental illness, and there is not sufficient time to obtain a warrant. Dallas police frequently refer to this statute by its acronym "APOWW."

The only parts of Anthony Timpa's body that I restrained were his legs and feet, and I used only my hands and leg restraints to do so.

During the encounter with Mr. Timpa, I did not know or suspect that he was experiencing excited delirium. Prior to the encounter with Mr. Timpa, I had never encountered a person who was or may have been experiencing excited delirium.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Raymond Dominguez

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

14th day of February 2020, to certify which witness my hand and seal of office.

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID#3586603
My Comm. Exp. May 27, 2022

Notary Public in and
For the State of Texas

My commission expires:

5-27-2022

Affidavit of Raymond Dominguez
*Timpa v. City of Dallas et al.*; Civil Action No. 3:16cv3089-N

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
| Defendants. | § | |

AFFIDAVIT OF KEVIN MANSELL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared Kevin Mansell who, being of duly sworn, deposed and stated as follows:

My name is Kevin Mansell.  I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude.  I was employed as an officer in the Dallas Police Department ("DPD") from September 1990 to August 2019, and was so on August 10, 2016.  I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, and at all relevant times, I was a public official, a Texas Commission on Law Enforcement (TCOLE) certified peace officer employed by the City of Dallas as a sergeant.

On August 10, 2016, I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas.   During the encounter, I entered Anthony Timpa's driver's license information into my in-car computer, and obtained the emergency contact information associated with it.  I called the telephone number listed, and reached Mr. Timpa's father, Intervenor Joe Timpa. I explained the situation to Joe Timpa and Kim Timpa, and asked both of them what medications their son was supposed to be taking.  Kim Timpa named some prescription medications.  Neither Joe Timpa nor Kim Timpa told me that Anthony Timpa could be under the influence of illegal drugs, or that he had a long history of substance abuse.

The New Fine Arts is located at 1720 W. Mockingbird Lane in Dallas, Texas.  The New Fine Arts is one of a chain of adult entertainment stores in which patrons can purchase sex toys and pornography, and watch pornographic videos in private viewing room rented by the hour.  There are three New Fine Arts locations in Dallas.

From October 2012 to September 2014, I was assigned to the City of Dallas 911 Center.  When a person calls 911, he or she speaks with a 911 call-taker. Officers do not speak directly with 911 callers or hear the contents of 911 calls.  Officers receive only the information relayed to them by the dispatcher.

During the encounter with Mr. Timpa, I did not know or suspect that he was experiencing excited delirium. Prior to the encounter with Mr. Timpa, I had never encountered a person who was or may have been experiencing excited delirium.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Kevin Mansell

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

14th day of February 2020 , to certify which witness my hand and seal of office.

Notary Public in and
For the State of Texas

My commission expires:

5-27-2022

Affidavit of Kevin Mansell
*Timpa v. City of Dallas et al.*; Civil Action No. 3:16cv3089-N

000016

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
| Defendants. | § | |

AFFIDAVIT OF DOMINGO RIVERA

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared Domingo Rivera who, being of duly sworn, deposed and stated as follows:

My name is Domingo Rivera. I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude. I was employed as an officer in the Dallas Police Department ("DPD") from August 5, 2005 through present, and was so on August 10, 2016. I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, and at all relevant times, I was a public official, a Texas Commission on Law Enforcement (TCOLE) certified peace officer employed by the City of Dallas as a police officer.

On August 10, 2016, I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas.  During the encounter with Anthony Timpa, the only information I had received about the call was that it reportedly involved a potentially mentally disturbed person who was off his medication. The only parts of Anthony Timpa's body that I restrained were his legs and feet, and I used only my hands and leg restraints to do so.

During the encounter with Mr. Timpa, I did not know or suspect that he was experiencing excited delirium. Prior to the encounter with Mr. Timpa, I had never encountered a person who was or may have been experiencing excited delirium.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Domingo Rivera

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

_____ day of _____, to certify which witness my hand and seal of office.

PATRICIA LAKE
Notary Public
STATE OF TEXAS
ID#3586803
My Comm. Exp. May 27, 2022

Notary Public in and
For the State of Texas

My commission expires:

5-27-2022

Affidavit of Domingo Rivera
*Timpa v. City of Dallas et al.*; Civil Action No. 3:16cv3089-N

000019

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
|     Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
|     Defendants. | § | |

AFFIDAVIT OF DANNY VASQUEZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared Danny Vasquez who, being of duly sworn, deposed and stated as follows:

My name is Danny Vasquez. I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude. I have been employed as an officer in the Dallas Police Department ("DPD") from April 2013 through the present. I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, and at all relevant times, I was a public official, a Texas Commission on Law Enforcement (TCOLE) certified peace officer employed by the City of Dallas as a police officer.

On August 10, 2016, I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas. At the time of my arrival at the scene, I had received the following information about the call I was responding to: (1) that a man had called 911 and told the call-taker that he was schizophrenic and off his meds; and (2) that the man had been running in the road, causing motorists to nearly hit him with their cars.

During the encounter with Mr. Timpa, I did not know or suspect that he was experiencing excited delirium. Prior to the encounter with Mr. Timpa, I had never encountered a person who was or may have been experiencing excited delirium.

During the restraint, I heard Mr. Timpa say something to the effect of "It hurts! Please take it off!" I believed Mr. Timpa might be complaining that the handcuffs were hurting him. I immediately checked the handcuffs to ensure they were not too tight, and double-locked them to prevent him from unintentionally cinching the cuffs tighter as he thrashed and strained against them. Mr. Timpa made no further complaints about pain or discomfort. *See* Appx. Ex. 1-A at 07:16-07:46.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Danny Vasquez

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

14th day of February 2020, to certify which witness my hand and seal of office.

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID#3586603
My Comm. Exp. May 27, 2022

Notary Public in and
For the State of Texas

My commission expires:

5-27-2022

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, INDIVIDUALLY, | § | |
| AND AS REPRESENTATATIVE OF | § | |
| THE ESTATE OF ANTHONY | § | |
| TIMPA, AND CHERYLL TIMPA | § | |
| INDIVIDUALLY AS NEXT FRIEND | § | |
| OF K.T., A MINOR CHILD, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 3:16-CV-03089-N |
| | § | |
| DUSTIN DILLARD, DANNY VASQUEZ | § | |
| RAYMOND DOMINGUEZ, DOMINGO | § | |
| RIVERA, KEVIN MANSELL, GLENN | § | |
| JOHNSON, AND CRIMINAL | § | |
| INVESTIGATIVE UNIT, LLC, | § | |
| Defendants. | § | |

AFFIDAVIT OF JAMES FLORES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALL | § |

BEFORE ME, the undersigned authority, personally appeared James Flores who, being of duly sworn, deposed and stated as follows:

My name is James Flores.  I am above the age of twenty-one years, and have never been convicted of a felony or crime of moral turpitude. I have been employed as a fire-rescue officer with the Dallas Fire-Rescue Department ("DF-R") for approximately 13 years, and was so on August 10, 2016.  I have personal knowledge of the matters set for herein and am competent to make this affidavit in support of my motion for summary judgment. This affidavit is submitted to supplement the information I have provided in prior affidavits, statements and depositions related to this matter.

On August 10, 2016, DF-R Fire-Rescue Officer Curtis Burnley and I responded to a call regarding a potentially mentally disturbed person at the New Fine Arts, 1720 W. Mockingbird Lane, Dallas, Texas. Burnley and I observed the entirety of Mr. Timpa's restraint by officers of the Dallas Police Department, and were able to access Mr. Timpa at all times. Burnley and I are visible at various points in the officers' body camera videos (Appx. 1-A). Both of us were wearing

dark blue DF-R uniforms.  Burnley is the African-American man holding a laptop computer. I am the white male wearing glasses and blue latex gloves.

I have reviewed both the merged body camera video and the transcript thereof included in Defendants' Appendix at Exhibit 1-A and pages 283-310, respectively. I certify that the statements attributed to me in the transcript are accurate based on both my review of Exhibit 1-A and on my recollection of the events depicted therein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

_____

James Flores

SUSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, the this

14th day of February 2020 , to certify which witness my hand and seal of office.

PATRICIA SHAKE
Notary Public
STATE OF TEXAS
ID#3586603
My Comm. Exp. May 27, 2022

Notary Public in and
For the State of Texas

My commission expires:

5-27-2022

Affidavit of James Flores
*Timpa v. City of Dallas et al.*; Civil Action No. 3:16cv3089-N

# Prehospital Care Report Summary

## Dallas Fire-Rescue

**Date:**08/10/2016 **Call #:**2016181036 **Booklet:**13394509 **Branch:** Station 47 **Time Zone:**America/Chicago

**Call Information:**

| | |
|---|---|
| **Disposition:** | Treated/Transported |
| **Unit #:** | RE47 - Rescue 47,  Ground-Ambulance   **Trip Type:** N/A |
| **Run Type to Scene:** | N/A  Emergent (Immediate Response) |
| **Incident Facility:** | PARKLAND HOSP (Hospital) - 5200 HARRY HINES BLVD - DALLAS, TX 75235  **NPI:** 1033250170 |
| **Incident Location:** | 1720 W Mockingbird Ln - Dallas, TX 75235 (DALLAS COUNTY) |
| **Incident Type:** | Hospital |
| | |
| **Receiving Facility:** | PARKLAND HOSP (Hospital) - 5200 HARRY HINES BLVD - DALLAS, TX 75235 |
| **Facility Address:** | 5200 HARRY HINES BLVD - DALLAS, TX 75235 |
| **Destination Type:** | N/A |
| **Dest. Reason:** | N/A |
| **Registration #** | N/A |
| | |
| **Loaded Mileage:** | N/A |
| **Crew Members:** | Curtis Burnley, Licensed; James Flores, Licensed |

**# Patients Transported**
**In My Unit:**
**# Patients at Scene:**

| | |
|---|---|
| **Call Received:** | 22:32:0 |
| **Dispatched:** | 22:32:3 |
| **En Route:** | 22:34:0 |
| **On Scene:** | 22:37:5 |
| **Patient Contact:** | 22:38:5 |
| **Left Scene:** | 23:33:3 |
| **At Destination:** | 23:13:0 |
| **Transfer of Care:** | N |
| **In Service:** | 00:15:0 |

| | |
|---|---|
| **Time On Scene:** | 56 M |
| **Time to Destination:** | 1481 M |
| **Total Time of Run:** | 103 M |

**Moved to Amb By:**   **Transport Position:**   **From Amb By:**

**Call Origin:** N/A   **Lights/Siren:** Scene - Lights and Sirens,  Destination - Lights and Sirens

**Patient Information:**

| | | |
|---|---|---|
| **Name:** | ANTHONY TIMPA | **DOB:**  06/05/1984 |
| **Address:** | 440C YACHT CLUB DR - ROCKWALL, TX 75032 | **Gender:**Male |
| **Phone:** | | **Age:**  32 Years |
| **Email:** | | **Weight:** |
| **SSN:** | -- | **Broselow:** |
| **Driver License:** | 18058857 | |

Other Contact Info
**Name:**          **Phone:**          **Cell Phone:**
**Relationship:**

| | |
|---|---|
| **Current Meds:** | **Comments:** |
| **Env Allergies:** | **Comments:** |
| **Med Allergies:** | **Comments:** |
| **Patient Physician:** | |
| **Advanced Directives:** | |
| **PMH:** | Psychological: Schizophrenia, Psychological: Depression, Psychological: Anxiety |

**Comment:**
**Patient Physical Limitations:**
**Comment:**

**Payer Information:**

**Clinical:**                                                                 **Medical Need:**

| | |
|---|---|
| **Onset Date/Time:** | |
| **Dispatch Reason (EMD):** | UP  Unconscious Person |
| | |
| **Provider Impression:** | Psychiatric Emerg. |
| **Mechanism of Injury:** | |
| **Protocol 1:** | **Protocol 2:** |

**Assessments:**

DEFS000143

000026

## Vitals:

| Time | Employee | Summary |
|------|----------|---------|
| 22:48:49 | Flores, James | **BP:** 150/ 90<br>**Pulse:** 100<br>**Resp:** 20 |

## Treatments/Medications:

| Time | Employee | Summary |
|------|----------|---------|
| 22:51:00 | Flores, James | **Medication  Versed**<br>**Dose:**5 **Unit:** mg  **Route:** Intramuscular  **Success:** N/A |
| 22:55:00 | Burnley, Curtis | **Treatment-  CPR**<br>**Success:** N/A |
| 22:59:00 | Burnley, Curtis | **Treatment-  IV Insertion**<br>**Success:** N/A<br>**IV Fluid Type:** Normal Saline  **IV Size:** 18 ga  **IV Site:** Antecubital-Left |
| 23:03:31 | Burnley, Curtis | **Medication  Epi 1:10,000**<br>**Dose:**1 **Unit:** mg  **Route:** Intravenous  **Success:** N/A |
| 23:45:20 | Burnley, Curtis | **Medication  Epi 1:10,000**<br>**Dose:**1 **Unit:** mg  **Route:** Intravenous  **Success:** N/A |
| 23:50:00 | Burnley, Curtis | **Medication  Narcan 2 mg**<br>**Dose:**1 **Unit:** mg  **Route:** Intravenous  **Success:** N/A |

## Supply

| Qty | Supply |
|-----|--------|

## Medications Wasted:

| Time | Employee | Medication | Amt Wasted | Unit | Box # | Seal # |
|------|----------|------------|------------|------|-------|--------|
| N/A | | Versed | N/A | mg | N/A | N/A |

## EKG Device Incident Number:

## Narrative History Text:

PT WAS FOUND IN HANDCUFFS AND FIGHTING OFFICERS. OFFICERS HAD TO RESTRAINED PT FOR PT'S SAFETY. MEDICS WAITED UNTILL PATIENT WAS CALMED IN ORDER TO OBTAIN VITALS. POLICE REQUESTED THAT PT BE TRANSPORTED BY AMBULANCE. MEDIC ADMINISTERED VERSED TO CALM PT DOWN. PT WAS CARRIED ON TO STRETCHER. IN BACK OF AMBULANCE, MEDICS NOTICED PT WAS NOT BREATHING. CPR WAS INITIATED. CARDIAC DRUGS WERE PUSHED. NO SHOCKABLE RYTHMN SHOWN ON THE MONITOR. PT REMAINED UNRESPONSIVE DURING TRANSPORT

## Unable to Sign:

**Unable to Sign Reason:** Unconscious
**Authorized Representative:**
**Authorized Representative Signature:**  No
**Secondary Documentation:**
**Secondary Documentation Signature:**  No
**Comment:**

**Auth Signature:** No  **Privacy Sig:** No  **Unable to Sign:** Yes  **Refused to Sign:** No

## Signature Image(s):

Authorization Signature

Privacy Notice Signature

Receiving RN / MD Signature - BLAIR RN - 08/10/2016 23:49

Technician Signature - CURTIS BURNLEY - 08/10/2016 23:56

DEFS000144

000027



Technician 2 Signature - JAMES FLORES - 08/10/2016 23:56

**/ Dispatch Service Level: ALS**



# SOUTHWESTERN
## INSTITUTE OF FORENSIC SCIENCES
## AT DALLAS

### Office of the Medical Examiner

### Autopsy Report

**Case: IFS-16-14001 - ME**

**Decedent: Timpa, Anthony Alan**      32 years White Male    DOB: 06/05/1984

Date of Death: 08/10/2016 (Actual)

Time of Death: 11:30 PM (Actual)

Examination Performed: 08/13/2016 07:30 AM

| Body Weight: | 223 lbs | BMI: 31.10 |
|---|---|---|
| Body Length: | 71 in | |

**ORGAN WEIGHTS:**

| | | | | |
|---|---|---|---|---|
| Brain: | 1,450 g | Right Lung: 860 g | Right Kidney: | 170 g |
| Heart: | 480 g | Left Lung: 820 g | Left Kidney: | 180 g |
| Liver: | 1,420 g | Spleen: 380 g | | |

EXTERNAL EXAMINATION

The decedent is received in a sealed body bag with tag number 5125876. The body is identified by toe tags.   Photographs and fingerprints are taken.

When first viewed, the body is clad in a blue hospital gown, which is discarded.  No jewelry is present.  The hands are not bagged.  Received with the body is a brown paper bag containing a pair of blue shorts, cut away white briefs, and a cut away black T-shirt (in two pieces).  The clothing is released.

The body is that of a well-developed, obese white male whose appearance is compatible with the stated age of 32 years.  The body, as received, weighs 223 pounds and is 71 inches long.  Very early decompositional changes are present in the absence of embalming.  The body is cold, rigor is fully developed, and there is well-developed, faintly blanching posterior lividity.

The scalp hair is short, red, and straight.  Beard and mustache stubble is on the face.  An average amount of body hair is in a normal distribution.  The irides are blue-green, the corneae are clear, and there are no petechiae of the bulbar or palpebral surfaces of the conjunctivae.  The conjunctivae are mildly congested.  The ears, nose, and lips are unremarkable.  The teeth are natural and in good condition.  The neck is unremarkable.  The chest is symmetrical, and the abdomen is slightly protuberant. The external genitalia, anus, and perineum are unremarkable.  The penis is circumcised and the testes are descended into the scrotum.  The extremities are well-developed and symmetrical.  The back is normally-formed.



*Accredited by The National Association of Medical Examiners*

**Case:**

Timpa, Anthony Alan

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

IDENTIFYING MARKS AND SCARS

A 3 inch, oblique scar is on the left lower quadrant of the abdomen. A 4 inch, vertical scar is over the left knee.

EVIDENCE OF THERAPY

An endotracheal tube protrudes from the mouth. Defibrillation pads are on the chest and abdomen; a paddle mark underlies the chest defibrillation pad. Intravascular catheters are in the right hand and left antecubital fossa.

The right and left first and second ribs are fractured laterally, consistent with cardiopulmonary resuscitation.

EVIDENCE OF INJURY

1. HEAD AND NECK:

A 1-1/2 x 1/2 inch, red contusion is on the right submental chin.

There are no external injuries of the neck. An anterior neck dissection is performed to reveal a small amount of hemorrhage in the inferior belly of the right omohyoid muscle; this is likely secondary to postmortem blood procurement. A posterior neck dissection is performed to reveal no hemorrhage in the cervical paraspinal muscles.

2. TRUNK:

The right nipple is abraded. A 1/2 inch, faint blue contusion is on the left mid back, and a 1/4 inch, faint blue contusion is on the midline mid back. The skin of the back is reflected to reveal no evidence of subcutaneous or intramuscular hemorrhage.

3. EXTREMITIES:

A 1 inch, red-purple contusion is on the ventral right arm. A 3/4 and a 1/8 inch red abrasion are on the right elbow. Four faint red contusions ranging from 1/2 to 1-1/2 inches are on the dorsal right forearm. A 3/8 x 1/8 inch abrasion is on the medial right wrist, and a 3/4 inch linear abrasion is on the dorsal right wrist. A 1 inch red contusion is on the dorsal right hand.

A 1 inch gray contusion is on the ventral left arm. A 1/4 inch abrasion is on the left elbow. A 1 inch, faint red contusion is on the dorsal left forearm. Spotty red contusion is over the dorsal left wrist, and a 3/4 x 1/4 inch red abrasion is on the medial left wrist.

Approximately seven red abrasions ranging from 1/4 to 3/4 inch are on the lateral right knee. A 1/2 inch linear abrasion and a 1/4 inch red contusion are on the anterior right lower leg. A 1 inch, spotty red contusion is on the right ankle. A 1/8 inch red abrasion is on the right ankle. Puncture marks are on the dorsal right foot and the posterior right ankle.

Eight red abrasions ranging from 1/8 to 1 inch are on the medial left knee and below the left knee. A 1/2 inch red contusion and two punctate abrasions are on the anterior left lower leg. Two puncture marks are on the dorsal left foot.



*Accredited by The National Association of Medical Examiners*

**Timpa, Anthony Alan**

These injuries, having been once described, will not be repeated.

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

EVIDENCE SUBMITTED

The following items are collected, sealed within appropriately labeled containers, and submitted to the Criminal Investigation Laboratory:

- Blood standard
- Head hair standard
- Fingernail clippings.

INTERNAL EXAMINATION

BODY CAVITIES: The thoracic and abdominal organs are in their normal anatomic positions. The body cavities contain no adhesions or abnormal collections of fluid.

HEAD: See EVIDENCE OF INJURY. The scalp, subscalpular area, and skull are unremarkable. The dura and dural sinuses are unremarkable. There are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical, with an unremarkable gyral pattern. The cranial nerves and blood vessels are unremarkable. Sections through the cerebral hemispheres, brainstem, and cerebellum are unremarkable. There are no hemorrhages in the deep white matter or the basal ganglia. The cerebral ventricles contain no blood. The spinal cord, as viewed from the cranial cavity, is unremarkable.

NECK: See EVIDENCE OF INJURY. The soft tissues and prevertebral fascia are unremarkable. The hyoid bone and laryngeal cartilages are intact. The lumen of the larynx is not obstructed.

CARDIOVASCULAR SYSTEM: The intimal surface of the abdominal aorta is free of significant atherosclerosis. The aorta and its major branches and the great veins are normally distributed and unremarkable. The pulmonary arteries contain no thromboemboli. The pericardium, epicardium, and endocardium are smooth, glistening, and unremarkable. There are no thrombi in the atria or ventricles. The foramen ovale is closed. The coronary arterial system is free of significant atherosclerosis. The atrial and ventricular septa are intact. The cardiac valves are unremarkable. The myocardium of the left ventricle has a red-brown outer surface and a pale brown inner surface. There are no focal abnormalities. The left ventricular thickness is 1.4 cm, the right ventricular thickness is 0.3 cm, and the interventricular septum thickness is 1.4 cm. The ventricles are dilated.

RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is smooth and unremarkable, without petechiae. The pleural surfaces are smooth and glistening. The major bronchi are unremarkable. Sectioning of the lungs discloses a purple, severely congested parenchyma.

HEPATOBILIARY SYSTEM: The liver is covered by a smooth, glistening capsule. The parenchyma is tan-brown with areas of yellow-tan and scattered air pockets. The gallbladder contains approximately 10 mL of green-brown bile, with no calculi.

GASTROINTESTINAL SYSTEM: The esophageal mucosa is gray, smooth, and unremarkable. The stomach contains approximately 10 mL of dark brown liquid. There are no tablets or capsules. The gastric mucosa has normal rugal folds, and there are no ulcers. The small and large intestines are externally unremarkable. The appendix is present. The pancreas is



Timpa, Anthony Alan

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

unremarkable externally and upon sectioning.

GENITOURINARY SYSTEM: The capsules of both kidneys strip with ease to reveal smooth and slightly lobulated surfaces. The cortices are of normal thickness, with well-demarcated corticomedullary junctions. A 0.5 cm, fluid-filled cyst is in the cortex of the right kidney. The calyces, pelves, and ureters are unremarkable. The bladder contains approximately 20 mL of yellow urine. The mucosa is gray, smooth, and unremarkable. The prostate gland is unremarkable externally and upon sectioning.

ENDOCRINE SYSTEM: The thyroid and adrenal glands are unremarkable externally and upon sectioning.

LYMPHORETICULAR SYSTEM: The spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red and predominantly liquefied. The cervical, hilar, and peritoneal lymph nodes are unremarkable.

MUSCULOSKELETAL SYSTEM: See EVIDENCE OF THERAPY. The clavicles, sternum, pelvis, and vertebral column have no fractures. The diaphragm is intact.

**MICROSCOPIC EXAMINATION:**

Lungs: Early autolytic and putrefactive changes are present, with loss of cell nuclei, homogenization of airspaces, and bacterial overgrowth without associated vital reaction. Intact airspaces contain edema fluid. There is mild anthracosis.

Liver: Mild chronic inflammation surrounds portal triads, and there are scattered small foci of chronic lobular inflammation. Macrovesicular steatosis occupies approximately 10% of hepatic parenchyma. There is centrilobular congestion.

Kidney: There is mild interstitial scarring.

Heart: Early autolytic and putrefactive changes are present, with loss of cell nuclei and bacterial overgrowth without associated vital reaction. Rare enlarged, hyperchromatic myocyte nuclei are seen. Interstitial fibrosis is mildly increased.

**TOXICOLOGY:**

**Evidence Submitted:**
The following items were received by the Laboratory from Forensic Pathology:

        007: Biohazard Bag
        007-001: Blood, femoral - gray top tube
        007-002: Blood, femoral - gray top tube
        007-003: Blood, femoral - gray top tube
        007-004: Blood, femoral - gray top tube
        007-005: Vitreous - red top tube
        007-006: Skeletal muscle - plastic tube
        007-007: Blood, subclavian - red top tube
        007-008: Urine - red top tube



Timpa, Anthony Alan

**Blood, postmortem**

    **Acid/Neutral Screen (GC/MS)**
        hydroxy oxcarbazepine detected (007-004)

    **Alcohols/Acetone (GC)**
        negative (Item# 007-002)

    **Alkaline Quantitation (GC/FID)**
        trazodone: 0.04 mg/L (Item# 007-001)
        bupropion: 0.15 mg/L (Item# 007-001)

    **Alkaline Screen (GC/MS)**
        dihydrobupropion detected (007-003)
        hydroxybupropion detected (007-003)
        levamisole detected (007-003)
        demethylvenlafaxine detected (007-003)

    **Cocaine and Metabolites (GC/MS)**
        cocaine: 0.647 mg/L (Item# 007-001)

        ecgonine methyl ester: 0.378 mg/L (Item# 007-001)
        benzoylecgonine: 0.843 mg/L (Item# 007-001)

**Vitreous**

    **Alcohols/Acetone (GC)**
        negative (Item# 007-005)

    **Electrolytes (Analyzer)**
        sodium: 139 mEq/L (Item# 007-005)
        potassium: >20.0 mEq/L (Item# 007-005)
        chloride: 115 mEq/L (Item# 007-005)
        glucose: 72 mg/dL (Item# 007-005)
        urea nitrogen: 22 mg/dL (Item# 007-005)

    Note:  A blood specimen was sent to NMS for oxcarbazepine metabolite quantitation.

**REFERRAL TOXICOLOGY:**

                                                 Performing Laboratory

10-hydroxycarbazepine         13 mcg/mL          NMS



*Accredited by The National Association of Medical Examiners*

Case: CFS 1631400-03089-N

Timpa, Anthony Alan

COPY

INSTITUTE OF DALLAS COUNTY FORENSIC SCIENCES

**FINDINGS:**

1. Toxic effects of cocaine:

    a. Cocaine and its metabolites detected in postmortem blood.

    b. Reported history of illicit drug use.

2. By history, the decedent became unresponsive after acting erratically and being subdued by police officers:

    a. Review of surveillance footage, body cam footage, and incident reports show the following to take place on the night of 8/10/16:

      i. The decedent is seen talking on the phone and appearing agitated. The decedent was reportedly on the phone with 911 at this time, stating he was "off his medication."

      ii. The decedent is witnessed to run into a busy street.

      iii. Officers respond to the scene, at which point the decedent has been previously handcuffed by security guards.

      iv. The decedent is seen rolling on the ground, kicking, and yelling at the edge of the street.

      v. Approximately 50 seconds after officers arrive, the decedent is placed on his stomach and an officer places a knee on his back.

      vi. The decedent continues to yell and fight against the officer for approximately 10 more minutes. During this time his feet are also restrained.

      vii. The decedent begins to calm down and is heard "snoring."

      viii. The decedent can be seen moving until approximately 13 minutes after force is applied to his back.

      ix. Approximately 13:30 minutes after pressure is applied, the officer removes pressure.

      x. The decedent is rolled over and placed on a gurney. He appears unresponsive. Once inside the ambulance, he is found to have no pulse and to not be breathing. Cardiopulmonary resuscitation is initiated.

    b. The decedent was transported to the hospital and pronounced shortly after arrival.

3. Cardiac hypertrophy (480 grams).

4. Clinical history of bipolar disorder.

5. Prior history of methamphetamine-induced psychosis.

6. Superficial contusions and abrasions to head, trunk, and extremities.

7. Attempted resuscitation.

**CONCLUSIONS:**



*Accredited by The National Association of Medical Examiners*

**Timpa, Anthony Alan**

Based on the case history and autopsy findings, it is my opinion that Anthony Alan Timpa, a 32-year-old white male, died as a result of sudden cardiac death due to the toxic effects of cocaine and physiologic stress associated with physical restraint. Cardiac hypertrophy and bipolar disorder contributed to his death.

The mechanism of death in cases such as this is sometimes referred to as "excited delirium syndrome (EDS)." Classically, people affected by EDS are witnessed to exhibit erratic or aggressive behavior, and will often "throw off" attempts at restraint, requiring multiple people to subdue them. The person will appear to calm down and will suddenly become unresponsive. Most cases are associated with drug intoxication and/or psychiatric illness.

In this case, several factors likely contributed to the death. The surveillance and body cam footage and witness reports fit the classic scenario of excited delirium syndrome, and cocaine use and psychiatric illness (bipolar disorder) are common predisposing risk factors for EDS. Cocaine leads to increased heart rate and increased blood pressure, making a cardiac arrhythmia more likely. Due to his prone position and physical restraint by an officer, an element of mechanical or positional asphyxia cannot be ruled out (although he was seen to be yelling and fighting for the majority of the restraint). His enlarged heart size also put him at risk for sudden cardiac death.

Although the decedent only had superficial injuries, the manner of death will be ruled a homicide, as the stress of being restrained and extreme physical exertion contributed to his demise.

**MANNER OF DEATH:**      Homicide

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

10/07/2016

Emily Ogden, M.D.
Medical Examiner

10/12/2016

Elizabeth Ventura, M.D.
Medical Examiner

10/12/2016

Candace Schoppe, M.D.
Medical Examiner

10/11/2016

Chester S Gwin, M.D.
Medical Examiner



000035
DEFS000516

Case: ~~CFS-1611601~~ ~~04501~~  Case 3:16-cv-03089-N  Document 151-1  Filed 02/18/20  Page 40 of 50  PageID 1712  Page 8 of 8

Timpa, Anthony Alan



**DALLAS COUNTY**
**INSTITUTE OF FORENSIC SCIENCES**

10/12/2016

Stephen M. Lenfest, M.D.
Medical Examiner

10/10/2016

Tracy J Dyer, M.D., J.D.
Medical Examiner

10/11/2016

Stephen M. Hastings, M.D.
Medical Examiner

10/11/2016

Jill E Urban, M.D.
Medical Examiner

10/10/2016

Janis K Townsend-Parchman, M.D.
Medical Examiner

10/11/2016

Reade A Quinton, M.D.
Deputy Chief Medical Examiner

10/08/2016

Jeffrey J Barnard, M.D.
Director and Chief Medical Examiner



*Accredited by The National Association of Medical Examiners*

0008



# Dallas Police Department General Order

## 905.00 Drug Induced Psychosis/Excited Delirium

**U. RENEÉ HALL**
CHIEF OF POLICE

Revised 03/12/2014

---

**905.00    HANDLING SUSPECTS EXHIBITING SYMPTOMS OF DRUG-INDUCED PSYCHOSIS/EXCITED DELIRIUM, OR A PSYCHOTIC EPISODE**

A.   Individuals who are suffering from drug-induced psychosis/excited delirium often exhibit these types of behavior:
1.   Hallucinations
2.   Sensitivity to light
3.   Paranoia
4.   Delusions of persecution
5.   Unusually great strength
6.   Aggression toward objects
7.   Extremely high body temperature (Hyperthermia)
8.   Dilated pupils
9.   Undressing in public
10.   Hiding behind bushes, trees, or cars
11.   High blood pressure
12.   High pulse rate
13.   Seizures
14.   Thrashing after restraint
15.   Jumping into water
16.   Self-inflicted injury

B.   Subjects suffering from this disorder may collapse and die without warning, and are subject to medical distress within an hour after being restrained.  Subjects will be placed in an upright position (if possible) or on their side as soon as they are brought under control.

C.   Immediately upon recognition by responding officers that a subject is in a state of excited delirium, officers will advise dispatch of the condition and request Dallas Fire Rescue, a supervisor, and additional cover elements. Officers will treat the arrest of a subject as a medical emergency. Officers will not delay the transport of a subject while waiting for supervisory approval. The subject will be transported to a medical facility by Dallas Fire Rescue ambulance. In all instances, an officer will ride in the rear of the ambulance to the medical facility with the subject. Persons believed to be suffering from drug-induced psychosis/ excited delirium will be continuously monitored by police personnel.  Such subjects are not to be left unattended at any time. Supervisors will respond to the call location or will meet the officer and subject at the medical facility where the subject is transported.

D.   All actions taken to subdue a subject believed to be suffering from drug-induced psychosis/excited delirium will be thoroughly documented in all offense/incident and arrest reports.  Officers will also document their observations of the subject's condition, which Dallas Fire Rescue ambulance transported the subject, and where medical treatment was received.

E.   If a subject that has been physically restrained, handcuffed or taken into custody and is transported to a medical facility after experiencing a medical emergency, the arresting or transporting officers will notify the on-call Special Investigation Unit (SIU) supervisor.

000037

KIM A. COLLINS, MD, FCAP
FORENSIC PATHOLOGIST
1333 MARTINS POINT ROAD
WADMALAW ISLAND, SC  29487

August 16, 2019

Mr. Geoff J. Henley
Henley and Henley, P.C.
2520 Fairmount Street Suite 200
Dallas, Texas 75201

Re: Timpa v. City of Dallas, et al.
     Case number: 3:16-cv-03089-N

Dear Mr. Henley:

I am a Forensic Pathologist, board certified in Anatomic Pathology, Clinical Pathology, and Forensic Pathology. I practiced Forensic Pathology from 1995-2008 at the Medical University of South Carolina as a Professor of Pathology and Laboratory Medicine and have served as Director of both the Autopsy Pathology and Forensic Pathology Sections during this time. I also served as Chief Medical Examiner of Charleston County. From 2008 to 2013, I served as a Forensic Pathologist at the Fulton County Medical Examiner's Office in Atlanta, Georgia.

I currently practice at Newberry Pathology Associates in Newberry and Charleston, SC. I perform postmortem investigations and examinations including utilizing the autopsy to determine the cause and manner of death as well as any underlying pathological conditions or trauma. I have performed over 3500 autopsies with microscopic examinations and interpretation of ancillary studies as well as conducted death scene investigations. I have been qualified as an expert in forensic pathology approximately 250 times in state, federal, and military court. I have never been disqualified as an expert in pathology or forensic pathology. On a state and national level, I am past Chair of the College of American Pathologists Autopsy Committee, past President of the South Carolina Society of Pathologists, and an active member of the National Association of Medical Examiners and the American Academy of Forensic Sciences. I am past Chair of the Pathology Biology section of the American Academy of Forensic Sciences. I am immediate past President of the National Association of Medical Examiners and currently serve as Chair of the Board of Directors. I have presented research at numerous national meetings and published in excess of 75 peer-reviewed manuscripts. I serve on the editorial boards of Archives of Pathology and Laboratory Medicine; The American Journal of Forensic Medicine and Pathology; The Journal of Forensic Sciences; Journal of Forensic Science, Medicine, and Pathology; Academic Forensic Pathology Journal; and as Section Editor for the Pathology Text of eMedicine. Please see attached curriculum vitae.

1

I have reviewed the case of Anthony Alan Timpa which includes the following materials:

- Affidavits in Fact
  - Officer Danny Vazquez
  - Officer Domingo Rivera
  - Officer Dustin Dilard
  - Officer Raymond Dominguez
  - Paramedic Curtis Bumley
  - Paramedic James Florez
  - SGT Kevin Mansell
- City of Dallas police department incident reports
- Custody death report
- Incident datasheet IDRs redacted
- Investigative notes of officers Richardson and Arrendondo
- Medical Examiner records
  - Autopsy report IFS-16-14001-ME, Anthony Alan Timpa
  - Autopsy photographs (45)
  - Southwestern Institute of forensic sciences investigation narrative
  - Dallas fire rescue record
  - Medical examiner worksheet for autopsy with diagrams
- Body Cams
  - Danny Vasquez
  - Dustin Dillard

On the evening of August 10, 2016, Mr. Timpa was in an agitated state. He was crying out "help me". 911 was notified, and officers responded. He had already been handcuffed by security guards and was on the ground. While he was handcuffed, the officers rolled him over (prone) and got on his back. The officers then changed out handcuffs as Mr. Timpa was on the ground, repeatedly crying out for help. The officers had him prone with his face to the ground. Mr. Timpa calmed down but was still calling for help. Officers had a knee in his back, hand on the back of his neck, and pressure to both shoulders. According to the body cams of Vasquez and Dillard, Mr. Timpa was restrained in this position with pressure on his back and shoulders and his face to the ground for fourteen minutes. Mr. Timpa became very still. The officers made jokes as he remained unresponsive in the prone "hog tie" position. During this time, he was not assessed by officers or emergency medical services. His face and mouth were not examined to make sure he had access to air. Finally, they turned him over and he was placed on a gurney to take to the waiting ambulance. Emergency medical responders realized he was dead, but they still attempted resuscitation.

At autopsy, Mr. Timpa had a submental (under the chin) abrasion consistent with his body being forced face-down. He had contusions to his arms, left and mid-back, and abrasions on both knees secondary to restraint. He had abrasions and contusions of his wrists due to the handcuffs. He had marked head, neck, and shoulder cyanosis, also noted in the musculature of his upper back.

000039

The cause of death was certified as cocaine toxicity with stress associated with physical restraint, and the manner of death was deemed homicide

Mechanical asphyxia, also referred to as traumatic asphyxia, occurs when a pressure is placed on an individual's torso preventing adequate respirations and circulation to oxygenate the body. In the prone position, an individual is unable to effectively move the diaphragm, chest wall, and abdomen to breathe. Individuals that have been physically exhausted prior to this restraint require even more oxygen for the body's metabolic demand. When restrained in the prone "hog-tie" position, hands behind the back, with pressure placed on the back from several police officers, a victim is unable to meet the work demands of breathing. This is increased when the individual is obese or has a large belly as this mass encroaches on the abdomen and diaphragm and into the chest cavity, as in the case of Mr. Timpa. The body is also unable to adequately circulate blood resulting in engorgement and stagnation of blood flow in the upper body. This causes marked head and neck cyanosis. The face, partially or fully, pressed to the ground further decreases oxygenation. Asphyxia occurs due to the inability of an individual to achieve the work of breathing with the load on his torso and results in insufficient circulation, respiratory muscle fatigue, and acute respiratory failure.

Mechanical restraint asphyxia involves a great deal of pain and suffering. The victim has his hands and legs tied leaving him unable to properly position his own body. Often the restraints themselves are painful and can result in abrasions and contusions, as in the current case. The victim experiences panic as he is unable to extricate himself from the situation and then, when placed prone, from the dangerous restraining position. It can be anticipated that the victim will attempt to move his body in order to breathe. He is unable to inspire air without having to expell a great deal of energy. Mr. Timpa's face was to the ground further impeding breathing. The body cam of Officer Vasquez shows a hand on the back of Mr. Timpa's neck, pressing his face in the ground, resulting in a large submental abrasion. When force is on the back and shoulders, abrasions and painful contusions can result on the back, shoulders, and chest. Not only is this prolonged blunt force painful in and of itself, it also greatly increases the work of breathing. It is extremely difficult to move the chest and abdomen. A victim experiences air hunger, panic, and anxiety as Mr. Timpa did. The air hunger with lack of oxygen increases the respiratory drive. The body's drive to breathe increases, but the body is unable to do so. Mr. Timpa used energy and muscles to work against the pressure on the torso in an attempt to breathe. His lungs fought to expand against the external force and there was increased intrathoracic pressure. When the body is prone and great force is on the back, the head, neck, and shoulders become engorged with blood while the lower part of the body is of normal color. Mr. Timpa had marked cyanosis with a clear line of demarcation across his chest indicative of inadequate circulation to and from the upper body. The blood was unable to return from the upper part of the body for proper circulation. This is indicative of a tremendous amount of pressure to his back. Forceful breathing resulted in muscle fatigue, lowering of the pH, and a build-up of lactic acid in the bloodstream. All of these developments are painful. As decreased oxygen is circulated to the brain, further panic, anxiety, and confusion occur. The body weakens and vision becomes blurred. The death is slow, and the victim experiences considerable pain and the panic of air hunger, as in the case of Mr. Timpa.

3

I agree with the medical examiner's classification of the manner of death as a homicide.  It is my opinion to a reasonable degree of medical certainty that the cause of death of Mr. Anthony Timpa is mechanical asphyxia.


This is an opinion letter to a reasonable degree of medical certainty of my findings based on the information provided.  If any additional records or documentation are received, I reserve the right to amend or supplement my report.

Respectfully,

*Kim A. Collins, MD*

Kim A. Collins, MD
Forensic Pathologist

4

000041

United States District Court
Northern District of Texas
Dallas Division

| | |
|---|---|
| Vicki Timpa, et al<br><br>            Plaintiff,<br><br>        v.<br><br>Dustin Dillard, et al,<br>            Defendants. | No. 3:16-CV-03089-N |

**EXPERT REPORT OF MARK KROLL, PhD, FACC, FHRS, FIEEE, FAIMBE**

This report summarizes my analysis and findings and includes a statement of my opinions. The report also includes data and other information considered by me in forming my opinions and sets out my qualifications (including my CV which is an integral part of this report).

Mark Kroll, PhD, FACC, FHRS, FAIMBE                          1 Nov 2019

Table of Contents:

Figures .................................................................................................3

Tables.................................................................................................3

*Brief Summary of Qualifications*.........................................................4

*A Brief Primer on Arrest-Related Asphyxia Theories* ...........................6

Compression Asphyxia ......................................................................6

Prone and Positional Asphyxia ..........................................................8

Restraint Asphyxia.............................................................................8

Junk Science Under Different Names:.................................................9

*Left Lateral Decubitus Position and the "Recovery" Myth* ..................12

The Missing Miracle .........................................................................12

*Brief Summary of Opinions in This Case* .........................................13

*Timeline*...........................................................................................14

*Details of Opinions*...........................................................................15

*Materials Reviewed or Considered:*..................................................17

*General Comments*...........................................................................18

Previous Testimony ..........................................................................18

Fees: .................................................................................................18

Right To Amend:...............................................................................19

Further Development: .......................................................................19

Specific References: .........................................................................19

Opinion Methodology: .....................................................................19

*References:* .......................................................................................20

## Figures

*Figure 1. True compression deaths typically involve broken ribs and weights > 1000 lb.* ............6
*Figure 2. The human chest can handle a surprising amount of weight.* ..........................7
*Figure 3. Volunteer in prone restrained position connected to spirometer.*[114] .............................7
*Figure 4. A seated position with subject forced to lean forward can interfere with breathing — but only with an obese individual (not shown here).*[120] ...............................................8
*Figure 5. Maximally restrained prone subjects with 225 lb on the back have sufficient ventilation.*[128] .............................................................................................9
*Figure 6. Bowles article extract on curing stroke with LLD position.* ..........................12
*Figure 7. Christopher Lopez in LLD position 30 minutes before death.* ........................12
*Figure 8. Knees on Mr. Timpa's back vs. time in merged video.* ................................15
*Figure 9. Calculated weight force vs. elapsed time in merged video.* ..........................16

## Tables

*Table 1. Restraint Timeline* ......................................................................14

## Brief Summary of Qualifications

I am a Biomedical scientist with a subspecialty in arrest-related-death.[1] My early career was focused on researching and developing electrical devices to diagnose and treat disease. Because of this work, on the effect of electrical shocks on the human body, I became heavily involved with handheld electrical weapons in 2003. That led to research in the related Biomedical issue of prone restraint.

Biomedical Science analyzes the human body as a physics problem. The largest areas are Bioelectricity (e.g. effects of shocks and stimulation) and Biomechanics (e.g. strength of bones and ribs).

My work as a biomedical scientist involves researching, lecturing, and publishing including lectures throughout Europe, South America, and Asia (in over 35 countries) as well as at many of the major universities and medical centers of the United States. Usually, the typical audience member is a cardiologist, medical examiner, or forensic pathologist. With over 380 issued U. S. patents and numerous pending and international patents, I currently hold the most patents on implantable medical devices of anyone in the world. Over 1 million people have had devices with some of these patented features in their chest, monitoring every heartbeat. http://bme.umn.edu/people/adjunct/kroll.html.

In 2010 was awarded the Career Achievement Award by the Engineering in Medicine and Biology Society (EMBS) is the most prestigious award given internationally in Biomedical Engineering.
http://tc-therapeutic-systems.embs.org/whatsnew/index.html

Believed to be the only individual to receive the high "Fellow" honor from both Cardiology and Biomedical societies. To wit:

1997   Fellow, American College of Cardiology
2009   Fellow, Heart Rhythm Society
2011   Fellow, IEEE Engineering in Medicine and Biology Society
2013   Fellow, American Institute for Medical and Biological Engineering

Author of over 200 abstracts, papers, and book chapters and also the co-editor of 4 books.

Relevant paper publications include over 80 papers, books, book chapters, and indexed letters on CEWs and arrest-related death (ARD) as well as numerous scientific meeting abstracts.[1-84] For more details please see CV at:
https://www.dropbox.com/sh/wju0hu6q3ca62xx/AAAlzTlLbKbxu5m34AsMfCrYa?dl=0

---

[1]See current CV for further details and specifics. My curriculum vitae containing details of my relevant formal education, experience, and publications authored is attached and made an integral part of this report.

There have also been many presentations on ARD to scientific, medical, pathology, as well as law enforcement, audiences. These include: 2007 American Academy of Forensic Science (AAFS) conference major presentation in San Antonio, Texas[75] and the 2007 BEMS (Bio-electromagnetic Society) meeting Plenary Address in Kanazawa, Japan.[77]

1. Major invited lecture at the 2006 NAME (National Association of Medical Examiners) conference in San Antonio, Texas.[85]
2. Advanced Death Investigation Course of St. Louis University (2007) as faculty lecturer to full audience.[86]
3. Faculty lecturer to full audience at Institute for the Prevention of In-Custody Death Conferences (2006 and 2007), Las Vegas, Nevada.
4. Oral presentation at the 2014 NAME (National Association of Medical Examiners) conference in Portland, Oregon.

In addition to the major addresses above, there have been lectures and presentations at the U.S. Department of Justice (2007), AAFS (2006), and BEMS (2006). As a direct outgrowth of my ARD research, I have written or edited several publications on the topic of excited (agitated) delirium.[62,73,87-89]

Relevant Committees and Boards:

1. American Society for Testing and Materials) ASTM, Committee: E54 Homeland Security Applications, Subcommittee: E54.08 Operational Equipment, including Less-Lethal Task Group, including: ASTM (draft) Standard WK61808 New Test Method for Correct Performance of Less-Lethal Electroshock Weapons Used by Law Enforcement and Corrections.
2. International Electrotechnical Commission (IEC) (Geneva, Switzerland) TC64 MT4 Committee. This committee is the top international authority for setting the international electrical safety limits for electrocution and other electrical dangers.
3. Axon Enterprise, Inc. (Axon né TASER), corporate and also Scientific and Medical Advisory Board.
4. ANSI (American National Standards Institute) standards committee on electrical weapons.

Courtroom testimony in U.S., Australia, and Canada, and retained expert in the United Kingdom. I have significant research, publications, and testimony in the areas of resuscitation, ARDs (arrest-related death), prone restraint, and biomechanics.