DOMINGO RIVERA

Page 37

1  right?
2      A.  I think so.
3      Q.  Okay.  Were you positioning yourself on
4  that concrete bus bench, or were you leaning over
5  him?  How would you describe how you were moving his
6  legs?
7      A.  So -- so the bench was to my right -- I
8  took the mic off.
9      Q.  Oh, yeah.  Take -- yeah.  Take a moment to
10  repost it.
11      A.  So the bench was to my right, and his feet
12  were just barely under the lip of it, so bringing his
13  feet up and out of -- from under the bench was
14  possible.
15      Q.  Okay.  And so you raised his ankle to your
16  body, and that's how you were able to put the
17  flex-cuffs around his ankle?
18      A.  Yeah.  I don't remember if I raised it or
19  if I -- or if I caught them as he was -- as he was
20  raising them himself.
21      Q.  Okay.
22      A.  But they were definitely -- they weren't up
23  against my body, but they weren't on the ground
24  either.
25      Q.  Okay.  They were elevated --

Page 38

1      A.  Yes.
2      Q.  -- is that right?
3          And -- but you mentioned you pulled
4  them because -- and brought your body -- you know,
5  kind of like you're pulling a ball in if you're
6  catching a football to assert greater control over
7  it?
8      A.  I think so.  I'm not really sure.
9      Q.  Okay.  But his legs came up, you know that
10  much?
11      A.  Yes.  Yes, sir.
12      Q.  Okay.  And you didn't get out there and
13  measure it with a protractor as to whether it was
14  90 degrees or 45 degrees or 60 degrees or anything
15  like that?
16      A.  I did not.
17      Q.  But his legs were elevated, right?
18      A.  Yes.
19      Q.  Undoubtedly so, right?
20      A.  Yes.
21      Q.  Okay.  And during that process you were not
22  paying attention to the positioning of Dustin Dillard
23  or Danny Vasquez; is that right?
24      A.  That is correct.
25      Q.  Okay.  Danny Vasquez would -- I guess

Page 39

1  between Danny Vasquez and Ray Dominguez, they were
2  both within arm's length of you; is that right?
3      A.  Yes.
4      Q.  Dustin Dillard, though, probably was out of
5  arm's length?
6      A.  Yeah.  So he would have been in front and
7  to the left of me (indicating).
8      Q.  You would have -- if you could reach him,
9  you would have had to literally stretch or fall onto
10  Tony in order to reach --
11      A.  I think so.
12      Q.  -- Dustin Dillard; is that right?
13      A.  I've got long arms.  I probably could have
14  reached over there, but, yeah.
15      Q.  Okay.  But he wouldn't have been -- he
16  wasn't like 2 feet from you.  He would have been
17  something on the order --
18      A.  Probably 3 feet.
19      Q.  Three to 4 feet maybe?
20      A.  Yes, sir.
21      Q.  You have probably a 37-inch sleeve length
22  or something like that?
23      A.  Something like that, I guess.
24      Q.  Okay.  The -- okay.  So after you get the
25  flex-cuffs on Tony, is it then you -- did anybody

Page 40

1  tell you, Go -- go search the vehicle, or how did
2  that take place?
3      A.  So after the handcuffs -- I mean after the
4  leg restraints were on, I stood up.  I remembered he
5  had kicked me on my thumb, so I had (indicating), you
6  know, shook it out, as they call it.  And I was in
7  possession of the keys.  I don't remember what time I
8  gave the phone to somebody, but I gave it to
9  somebody.  So I just, you know, presumed the role of
10  securing the car.
11          MR. HENLEY:  Okay.  So I'm going to
12  object to anything nonresponsive to my question
13  regarding who sent you to the car, whether you did it
14  on your own.
15      Q.  (By Mr. Henley)  Did you -- do you know if
16  you're the one who made the decision to go search the
17  car, or did Sergeant Mansell say --
18      A.  I made the decision.
19      Q.  Okay.  And did anybody say -- tell you
20  where the car was?
21      A.  The security guard when I first got there
22  told me where the car was.
23      Q.  Okay.  And so -- but you didn't go
24  immediately to the car.  You went to the officers
25  first, and then --

DOMINGO RIVERA

Page 41

1    A.  Correct.
2    Q.  -- went to look for the car after that; is
3  that right?
4    A.  Correct.
5    Q.  Okay.  When you went to the car, you had
6  the car keys.  Do you know who it was who gave you
7  the car keys?
8    A.  No.
9    Q.  It was one of the security guards?
10    A.  One of the security guards, yes.
11    Q.  You then go through the car, and you found
12  I guess some Advil.  Was that -- was that the
13  over-the-counter container there?
14    A.  Yeah, it was something over the counter.
15    Q.  Okay.  But you also found some prescription
16  drug -- drugs -- or drugs in there; is that right?
17    A.  It was just the one.
18    Q.  Okay.  Do you know what it was that
19  prescription was for?
20    A.  I do not.
21    Q.  Okay.  You never read what it was on your
22  body cam, correct?
23    A.  I did not.
24    Q.  Okay.  And you didn't like position the
25  label in front of the camera or anything like that,

Page 42

1  correct?
2    A.  I might have.  I was mostly looking for a
3  name.  I don't know.
4    Q.  Okay.  Would you -- were you looking for
5  any particular kind of medication that you were
6  suspecting to find or anything like that?
7    A.  No.  I was -- I mean, prescription meds,
8  that's what I was looking for.
9    Q.  Okay.
10    A.  No particular medicine, because, I mean,
11  I'm not -- I don't know.
12    Q.  You're not a pharmacologist, right?
13    A.  Right.
14    Q.  And you're not a neurologist or a
15  psychiatrist, correct?
16    A.  Correct.
17    Q.  But you were looking for some sort of
18  prescription drug associated with mental -- some kind
19  of mental condition; is that right?
20    A.  Any condition.
21    Q.  Okay.  And did the container that you
22  found, did it have any pills or tablets or capsules
23  in it?
24    A.  Yes.
25    Q.  Okay.  And was it taken into custody?

Page 43

1    A.  I don't -- I took it back to the -- I gave
2  it to Sergeant Mansell.
3    Q.  Okay.  And do you know if that medication
4  container that -- was booked into custody or not?
5    A.  I do not.
6    Q.  Okay.  And so you don't know if that
7  container was -- the contents of that container were
8  tested either, would you?
9    A.  No, sir.
10    Q.  Okay.  But you definitely did not book that
11  container into evidence, right?
12    A.  Correct.
13    Q.  But you were the one who seized it, right?
14    A.  Correct.
15    Q.  You gave it to Sergeant Mansell, and you
16  don't know what happened to it after that, right?
17    A.  I do not.  I asked Sergeant Mansell to --
18  just to make sure that the medicine went with the
19  patient to the hospital.  You know, I didn't want
20  them giving him something that would interact with
21  whatever he took or was supposed to be taking, so
22  that's the reason why I brought the medicine back to
23  the scene.
24    Q.  Okay.  And you gave it to Mansell?
25    A.  Yes, sir.

Page 44

1    Q.  So when I was watching the footage, I saw
2  you put one or two items into the console.  Do you
3  remember seeing -- do you remember putting some items
4  in the console?
5    A.  Well, only the things that I took out.
6    Q.  Okay.
7    A.  So I had lifted some stuff to look further
8  down.  I found the big bottle that was like a -- I
9  think a CVS.  I think it was ibuprofen.  And -- you
10  know, and then when I found the medicine, I looked to
11  see if there was any other prescription meds.  So
12  whatever I had taken out, I did put back in.
13    Q.  Okay.  So the items that you put back or
14  put in the console were items that you had removed
15  from the console?
16    A.  Yes.
17    Q.  And that was the console in the center
18  between the driver's seat and the passenger's seat,
19  right?
20    A.  Yes.
21    Q.  Okay.  Was there anything in the driver's
22  seat that you retrieved?
23    A.  No, I don't think so.
24    Q.  Okay.  All right.  And so is it your
25  testimony that you -- there were only two containers,

DOMINGO RIVERA

Page 45

1  one prescription and one over-the-counter?
2      A.  I believe so.  If there was -- if there was
3  more prescription bottles, I would have checked, and
4  if they were the same, then I would have just taken
5  the one with the pills in it.
6      Q.  Okay.  You took those items -- or you took
7  the prescription container back and you gave it to
8  Sergeant Mansell, right?
9      A.  Yes, sir.
10     Q.  And Sergeant Mansell, when you approached
11 him, he told you Tony Timpa just died; is that right?
12     A.  Yes, sir.
13     Q.  And then what did you do next?
14     A.  I looked at the ambulance.  I saw Dominguez
15 doing a chest thrust, and then I think I turned my
16 camera off after that.
17     Q.  Okay.  Now, when you drove up on the scene,
18 had you any idea how long Dustin Dillard had been on
19 top of Tony Timpa?
20     A.  No, sir.
21     Q.  When you drove up on the scene, had you
22 known how long Danny Vasquez was on Dustin Dillard
23 (sic)?
24     A.  No, sir.
25     Q.  Your training is that when you do a

Page 46

1  takedown, you're not supposed to have a knee in
2  somebody's back for a prolonged period of time; is
3  that right?
4      A.  Yes, sir.
5      Q.  And in your mind, prolonged period of time
6  is anything over, what, 30 seconds?
7          MS. GOWIN:  Objection, calls for
8  speculation.  I'm sorry.  Object to form.  Sorry
9  about that.
10     A.  No, I don't know.
11     Q.  (By Mr. Henley)  You would agree with me
12 that it would be more than a minute, though, right?
13         MS. GOWIN:  Object to form.
14     A.  I would -- I don't know.  I guess, yes.  A
15 minute would probably be long enough.
16     Q.  (By Mr. Henley)  Okay.  Five minutes would
17 certainly be long enough, wouldn't it?
18         MS. GOWIN:  Object to form.
19     A.  I think so.
20     Q.  (By Mr. Henley)  You've never had your knee
21 in somebody's back for longer than two minutes, I
22 assume, right?
23     A.  Correct.
24         MS. GOWIN:  Object to form.
25     Q.  (By Mr. Henley)  What's the longest -- and

Page 47

1  I know you don't -- when you're out in the field you
2  don't have a stopwatch on your utility belt, right?
3      A.  Correct.
4      Q.  But your -- you do have -- we all live in
5  the same world and we can count.  I mean, you grew up
6  playing football, didn't you?
7      A.  Sure.
8      Q.  And you know what one Mississippi, two
9  Mississippi, three Mississippi means, right?
10     A.  Yes.
11     Q.  By the time it takes you to say one
12 Mississippi, that's about a second; is that right?
13     A.  Yes.
14     Q.  And I don't assume that you've ever had
15 your knee in the back of somebody for like 500
16 Mississippi?
17         MS. GOWIN:  Object to form.
18     A.  Correct.
19     Q.  (By Mr. Henley)  You probably -- maybe you
20 might have had your knee in somebody's back for like
21 maybe 10 or 15 Mississippi?
22         MS. GOWIN:  Object to form.
23     A.  Correct.
24     Q.  (By Mr. Henley)  Would that be the longest
25 period of time?

Page 48

1      A.  As long as it takes to handcuff someone, I
2  would imagine.
3      Q.  Okay.  And that's about 10 to 15 seconds is
4  probably about the longest it takes to handcuff
5  somebody; is that right?
6      A.  Yes.
7          MS. GOWIN:  Object to form.
8      Q.  (By Mr. Henley)  If you don't have any
9  resistance, it takes -- or any -- if somebody just
10 offers you up their hands, it probably takes, what,
11 less than a second; is that -- well, maybe a couple
12 of seconds?
13     A.  I would say maybe five seconds, yeah.
14     Q.  Okay.  But in this particular case, Tony
15 Timpa was already handcuffed; is that right?
16     A.  Correct.
17     Q.  How much do handcuffs cost?
18     A.  Mine are $50 apiece.
19     Q.  Okay.  You said $50 apiece.  Do you have
20 multiple pairs?
21     A.  I do.
22     Q.  How many pairs do you have?
23     A.  Two.
24     Q.  Okay.  Do you carry two on your belt at all
25 times?

LAURIE PURDY REPORTING SERVICE, INC.

DOMINGO RIVERA

Page 57

1  guess you had it in both hands there for a minute.
2      A. Yeah, I think I switched hands. Yeah. I
3  think that's -- the phone and the keys is what I had.
4      Q. Okay. That's when -- so somebody -- was
5  it -- did the security guard give them to you at the
6  very beginning --
7      A. Yes.
8      Q. -- when you walked up? So before you
9  walked up to these guys?
10     A. As soon as I got out of my car, he was
11 standing there handing me the keys and the phone.
12     Q. All right. Okay.
13         (Video plays.)
14     Q. (By Mr. Henley) Okay. Let's -- so you're
15 going through his -- are you going through his wallet
16 there?
17     A. No. The phone had a pocket in the back.
18     Q. Okay. Is that your voice we hear --
19     A. Yes, sir.
20     Q. -- where it says, "The car is over there"?
21 That's your voice?
22     A. Yes.
23     Q. Okay.
24         (Video plays.)
25     Q. (By Mr. Henley) And Sergeant Mansell is

Page 58

1  standing over there against his squad car -- or
2  against a squad car; is that right?
3      A. Correct.
4      Q. Okay. And his door is open?
5      A. Yes, it is.
6      Q. Okay. Or the car door is open. Do you
7  know if that's his particular unit?
8      A. I do not, but I would presume that it is.
9      Q. Okay. And he said it's his unit. Okay.
10         (Video plays.)
11     Q. (By Mr. Henley) Is that when -- somebody
12 just asked, Anybody have leg restraints? Is that --
13 was that you who said that?
14     A. It sounded like me.
15     Q. Okay.
16     A. I don't know if somebody else had asked and
17 then I re-asked the question to the other officers,
18 but I think that was me.
19     Q. Okay. And that's at -- can you see, by the
20 way --
21     A. 1:45.
22     Q. Okay. And so periodically when I'm asking
23 you questions, we're going to refer to the time or
24 counter so that it can all be in sync. You
25 understand that?

Page 59

1      A. Yes, sir.
2      Q. Okay. And your eyesight may be better than
3  mine, but you're also sitting further away from me --
4  further away from the counter than I am.
5         (Video plays.)
6      Q. (By Mr. Henley) That person who said, I've
7  got zip-cuffs, was that Danny Vasquez?
8      A. I don't know.
9      Q. Okay.
10         (Video plays.)
11     Q. (By Mr. Henley) Now, do you know who went
12 and retrieved the zip-cuffs?
13     A. I do not.
14     Q. Okay.
15         (Video plays.)
16     Q. (By Mr. Henley) At this point in time,
17 about two -- two minutes and eight seconds, what is
18 it that you think that you're doing?
19     A. I don't know. Definitely waiting for
20 the -- for the leg restraints. I think I'm still --
21 it looks like I'm still standing up straight. I
22 don't --
23     Q. Okay.
24     A. -- but that --
25     Q. Okay. Let me play it a little bit and then

Page 60

1  I'm going to end up -- I'm going to probably
2  fast-forward it some more.
3         (Video plays.)
4      Q. (By Mr. Henley) Now, you just changed your
5  position.
6      A. Correct.
7      Q. Are you sitting on the bench at this point
8  in time?
9      A. No. No. I'm kneeling. I guess this is
10 Vasquez here (indicating), and I'm kneeling behind
11 him so I could reach around to restrain the legs.
12     Q. Okay.
13         (Video plays.)
14     Q. (By Mr. Henley) Now, moments ago did you
15 hear somebody say, "Relax, man, relax"?
16     A. That was me right now.
17     Q. Oh, that was your voice?
18     A. Right now? Right now? Just --
19     Q. Well, just a second. Wait. Let me play
20 this.
21     A. I believe so, yeah.
22         (Video plays.)
23     Q. (By Mr. Henley) I don't think I've gone
24 far enough.
25     A. No, you didn't go back far enough.

DOMINGO RIVERA

Page 61

1    Q.  I think it was around 2:08.
2    A.  Yeah, there you go.
3        (Video plays.)
4    Q.  (By Mr. Henley)  At 2:12, "Relax, man,
5  relax," was that you?
6    A.  That's definitely me.
7    Q.  Okay.  All right.
8        (Video plays.)
9    Q.  (By Mr. Henley)  Do you hear that laughter
10  in the background?
11    A.  I sure did.
12    Q.  You sure did?
13    A.  (Witness nods head.)
14    Q.  Whose laughter was that?
15    A.  I don't know.
16    Q.  Okay.  And that was at about 2:18?
17    A.  Yes.
18    Q.  Okay.
19        (Video plays.)
20    Q.  (By Mr. Henley)  So at 2:28, are you --
21  you're not sitting on the bench.  How did you say
22  you're positioned?
23    A.  I'm kneeling.
24    Q.  Kneeling.  Okay.  Is any of your body on
25  top of Tony Timpa's body at this point in time?

Page 62

1    A.  I think I reached in.
2    Q.  Okay.
3    A.  I think so.  I think my -- my right hand
4  might be on his legs at this time.
5    Q.  Okay.  And that's Danny Vasquez right in
6  front of you, right?
7    A.  Yes.
8    Q.  Okay.  And then Dillard would have been
9  above him; is that right?  And I don't think we see
10  Dillard even in the frame of your camera; is that
11  right?
12    A.  I think so.
13        (Video plays.)
14    Q.  (By Mr. Henley)  Oh, unless he's -- oh, now
15  we can actually see more of Dillard; is that right?
16    A.  I think that's him right there, yeah.
17  That's him.
18    Q.  Okay.  And at 2:47, you can see Dillard's
19  foot and his buttocks and his utility belt; is that
20  right?
21    A.  I believe that's Dillard, yeah.
22    Q.  Okay.  And do you see the positioning of
23  his knee -- or the positioning of his legs?
24    A.  Yeah.
25    Q.  Okay.

Page 63

1    A.  From what I'm seeing, that foot is -- I
2  would say the knee is on -- it looks like the knee is
3  on the ground.
4        (Video plays.)
5    Q.  (By Mr. Henley)  Okay.  But now that it's
6  moving, you can see that his knee is actually on his
7  back; is that right?
8    A.  No.
9    Q.  Okay.
10        (Video plays.)
11        MS. GOWIN:  One second.  What mark --
12  what time marker are you at?
13        MR. HENLEY:  Let's see.  That was
14  earlier.  I'm not sure.  You'll have to figure that
15  out.
16        MS. GOWIN:  Okay.  Just a rough.  Two
17  minutes and --
18        (Video plays.)
19        MR. HENLEY:  Two -- someplace between
20  2:40 and two --
21        MS. GOWIN:  That's good.
22    Q.  (By Mr. Henley)  But you can't see that
23  right there?
24    A.  Looks like his knee is on his arm.
25    Q.  On his what?

Page 64

1    A.  On his elbow.
2    Q.  But this isn't -- you've also noticed that
3  Danny Vasquez and Dillard has their own body camera,
4  right?
5    A.  Yes.
6    Q.  Okay.  Moments ago did you hear somebody
7  say, "Get one set of cuffs off of him"?
8    A.  Yeah.  I think that was Sergeant Mansell,
9  but --
10    Q.  Okay.
11    A.  -- I'm not sure what he was referring to.
12    Q.  Okay.  So that was my question, was not so
13  much the identity of the voice, but the idea that
14  there were two cuffs on Timpa at this point in time.
15  Did you -- did you appreciate that at the time?
16    A.  No, I don't -- I don't --
17    Q.  Did you -- did you -- did you not know that
18  they actually had two pairs of handcuffs on him at
19  that point in time?
20    A.  No, I didn't.
21    Q.  Okay.  Did you -- did you understand that
22  the reason -- or one of the stated reasons why Danny
23  Vasquez and Dillard continued to restrain him was to
24  remove the second pair of handcuffs?
25    A.  No.

OFFICER DANNY VASQUEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VICKI TIMPA, Individually, and as )
Representative of the Estate of ANTHONY )
TIMPA, and CHERYLL TIMPA Individually )
as Next Friend of K.T., a minor child, )
                                                )

     Plaintiffs, )
                                                )Civil Action No.
vs. )3:16-CV-03089-N
                                                )

DUSTIN DILLARD, DANNY VASQUEZ, )
RAYMOND DOMINGUEZ, DOMINGO )
RIVERA, KEVIN MANSELL, GLENN )
JOHNSON, CRIMINAL INVESTIGATIVE )
UNIT, LLC, )
                                                )

     Defendants. )

*************************************************
VIDEOTAPED
ORAL DEPOSITION OF
OFFICER DANNY VASQUEZ
SEPTEMBER 19, 2019
*************************************************

     ORAL DEPOSITION OF OFFICER DANNY VASQUEZ,

produced as a witness at the instance of the Intervenor,

and duly sworn, was taken in the above-styled and

numbered cause on the 19th day of September, 2019, from

9:20 a.m. to 4:01 p.m., before Dana Taylor, CSR in and

for the State of Texas, reported by machine shorthand,

at the offices of Dallas City Attorney's Office,

1500 Marilla Street, Suite 7DN, Dallas, Texas 75201,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

OFFICER DANNY VASQUEZ

Page 49

1  means -- you know, indicates or gives clues that they're
2  in an altered mental state?
3        MS. GOWIN: Objection. Vague. Calls for
4  speculation.
5        A. Again, you know, what they're doing. Are --
6  are they doing something to -- trying to harm themselves
7  or trying to harm others in the sense that their actions
8  are leading to that harm.
9        Q. (By Ms. Hutchison) Okay. So give me some
10  examples.
11       A. Running in the middle of the street for no
12  apparent reason. Standing near a bridge. Not near a
13  bridge. Standing on the ledge of a bridge. You know,
14  standing in front of oncoming vehicles purposely, you
15  know, that kind of nature.
16       Q. Anything else? What -- what -- are there any
17  clues that you can look for in someone's conduct to
18  determine if they're under the influence of some kind of
19  substance?
20       A. Oh, that's very variant. It's -- it's hard to
21  tell. So many drugs.
22       Q. Right. Anything that you look for in
23  particular?
24        MS. GOWIN: Objection. Vague. What kind
25  of drugs? What are you talking about?

Page 50

1        A. I mean, again, it's based -- because certain
2  drugs do certain things to certain people. Not
3  everybody reacts the same.
4        Q. (By Ms. Hutchison) So you didn't have any
5  training in your academy training about things to look
6  for to determine if someone is under the influence?
7        A. I remember them being certain things. Un- --
8  what is it? Unhuman -- like, unhumanly strength. Other
9  things that I can't remember off the top of my head.
10       Q. One of the things you -- you talked about, in
11  terms of something that would be out of the ordinary
12  that might clue you in that this person's on something,
13  is running in the middle of the street; correct?
14       A. Not -- that they're under the influence of some
15  narcotic or some drug or some alcohol?
16       Q. Or that they're in an altered mental state for
17  whatever reason?
18       A. It would lead me to believe, yes, that there's
19  some- -- something there.
20       Q. Unless, of course, they're in a -- running a 5K
21  or something, but you're talking about running in the --
22  running in traffic or doing something that's unusual?
23       A. Yes, that would -- to me, that would
24  demonstrate, you know, something mentally there.
25       Q. So when you encounter somebody that's showing

Page 51

1  signs or symptoms of an altered mental state, you -- as
2  an officer, you don't know if that's because they're on
3  something or if it's because they're having some sort of
4  mental health crisis; right?
5        A. That is correct.
6        Q. So you have to -- you don't have to make that
7  determination right then and there; right? I mean, you
8  don't have to make the decision, "Oh, they're on drugs"
9  versus "Oh, they're having a mental health crisis"?
10       A. No.
11       Q. You treat that person in the same way, whether
12  it's somebody that's on drugs or somebody that's having
13  a mental health crisis; right?
14       A. I approach them that way until I figure out
15  what's going on.
16       Q. So do you recall hearing or asking Mr. Timpa if
17  he was on something?
18       A. Yes.
19       Q. Were you one of the officers that was asking
20  him that?
21       A. Yes.
22       Q. And there were also others; right?
23       A. That is correct.
24       Q. And that question was repeated many times over
25  the course of the restraint; correct?

Page 52

1        A. That is correct.
2        Q. And that is because you suspected that he had
3  taken some kind of substance; right?
4        A. That is correct.
5        Q. As a matter of fact, the things he was saying
6  and the way he was acting were an indication that he had
7  taken some kind of substance or was in an altered mental
8  state?
9        A. Yes.
10       Q. Do you remember him ever telling you what he
11  was on?
12       A. No.
13       Q. At the time that you encountered Mr. Timpa, you
14  were wearing a body camera?
15       A. That is correct.
16       Q. And Officer Dillard was wearing one, and
17  Officer Rivera was wearing one?
18       A. I know Dillard was. I'm not sure about
19  Officer Rivera.
20       Q. Okay. Well, I'll just -- I'll just let you
21  know, he was.
22       A. Okay.
23       Q. We -- we have the body cam footage from
24  those -- from those three body cameras?
25       A. Okay.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 53

1    Q. I've tried to kind of synchronize them, but
2  it's not as easy as one might think to do that; so...
3    A. Yes.  We turned them on at different moments.
4    Q. Right.  You turn them on at different moments,
5  and then, you know, one officer's in one position,
6  another's in another, and you hear different things.
7        MS. GOWIN:  And sometimes you can't tell.
8        MS. HUTCHISON:  And sometimes you can't
9  tell.  But I will tell you that I have replayed those
10 three body cam footages for about 30 hours trying to
11 sync them up, so -- I mean, that's off the record, I
12 guess.
13   Q. (By Ms. Hutchison)  But I don't know if you've
14 ever tried to sync up body cam footage, but it's not
15 easy to do.
16   A. I -- I guess not.
17   Q. Your -- the perspective from your body cam
18 footage is different than the perspective from
19 Officer Dillard's body cam footage; correct?
20   A. That is correct.
21   Q. And it's actually, in some instance, easier to
22 see what you're doing from his body cam footage than
23 from your own in some respects, right, because your --
24 your body cam footage -- your body camera is facing
25 outward; correct?

Page 54

1    A. Yes.  Away from me, yeah.
2    Q. Away from you?
3    A. Yes.
4    Q. And Officer Dillard's is facing away from him;
5  right?
6    A. Yes.
7    Q. And so some of Officer -- have you -- have you
8  reviewed your own body cam footage?
9    A. Yes, ma'am.
10   Q. Did you review Officer Dillard's body cam
11 footage?
12   A. Yes.
13   Q. So you can see that, in some instances,
14 Officer Dillard's body cam footage captures your actions
15 better than your own?
16        MS. GOWIN:  Objection.  Calls for
17 speculation.
18   Q. (By Ms. Hutchison)  Did -- did you see that?
19   A. I don't remember seeing myself in his camera.
20   Q. You don't remember seeing yourself in there?
21   A. Just from what I can remember, he's facing his
22 head.
23   Q. I'm sorry.  You said what?
24   A. Dillard's facing Mr. Timpa's head.  So -- and
25 I'm behind Dillard.  So I -- I can't recall.  Maybe at

Page 55

1  some point, yes, maybe.
2    Q. Okay.  Maybe initially when you were -- when
3  you and Officer Dillard were initially --
4    A. Oh, yes; yes, at the very beginning.  Yes.
5    Q. Okay.
6    A. Sorry.
7    Q. That's all right.
8        And so -- so let's talk about that.  When the
9  two of you arrived, you arrived at about the same time
10 as the ambulance; is that true?
11   A. Yes, the ambulance, a couple of minutes -- a
12 minute or seconds ahead of us, yes.
13   Q. And you had received the information through
14 dispatch about -- to some extent, about why you were
15 going out there; right?
16   A. Yes, in the MDC.
17   Q. Say that again.
18   A. The MDC.
19   Q. Okay.
20   A. Our computer.
21   Q. The computer -- the in-car computer?
22   A. Yes.
23   Q. And who was driving?
24   A. Dillard.
25   Q. So were you the one that was reviewing the

Page 56

1  information on the computer?
2    A. That is correct.
3    Q. And what do you recall coming through on that
4  about the scene that you were about to encounter?
5    A. What I can recall was that Sergeant Mansell had
6  asked for cover.  And on the computer, it said that he
7  was -- the subject was depressed and schizophrenic, off
8  medication, and that -- that's the one thing I -- I can
9  remember clearly.
10   Q. Okay.  And you had a generalized idea about
11 what you might encounter with a schizophrenic person;
12 correct?
13   A. Yes.
14   Q. From your training?
15   A. Yes.
16   Q. And they -- they teach you various scenarios
17 about people in an altered mental state, what they might
18 be doing and what you might be encountering; right?
19   A. Yes.
20   Q. And one of those is schizophrenia; right?
21   A. Yes.
22   Q. Because people who are experiencing
23 schizophrenia often have, for example, hallucinations;
24 right?
25   A. I know very little of schizophrenia, but I

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 57

1 believe that's one of them.
2     Q.  Well, basically --
3     A.  Or that's something -- a symptom they have.
4     Q.  Yeah.  And you -- but you know that -- that he
5 was very likely to be in an altered mental state;
6 correct?
7     A.  Correct.
8     Q.  That he wasn't necessarily going to sit down
9 and have a rational conversation with the officers;
10 right?
11    A.  Correct.  Possibly, yes.
12    Q.  You understood that he would be agitated
13 probably, most likely; right?
14    A.  Yes.
15    Q.  And did they tell you what he had been doing
16 before you got there?
17        MS. GOWIN:  Objection.  Vague.
18    A.  I can't remember exactly what came over the MDC
19 or what came in there.  I'm sure I could look at the --
20 and refresh my memory and look at the call sheet.  But I
21 can't remember right now, off the top of my head, what
22 exactly it said.
23    Q.  (By Ms. Hutchison)  Did you know that he had
24 been running in traffic?
25    A.  I can't remember if that's something I read at

Page 58

1 the time.  Honestly, I can't remember.
2     Q.  Okay.  That's fine.
3        So you and Officer Dillard walk up on the
4 scene, and at that time, Mr. Timpa was already
5 handcuffed --
6     A.  Yes.
7     Q.  -- right?
8     A.  Yes.
9     Q.  He was sitting on the ground?
10    A.  He was laying on the ground.
11    Q.  Okay.  He was laying on the ground?
12    A.  Yes.
13    Q.  And initially, when y'all walked up, you were
14 standing there kind of looking at him, assessing the
15 situation; correct?
16    A.  Correct.
17    Q.  And Sergeant Mansell was there; right?
18    A.  Correct.
19    Q.  The security officer who was -- had been
20 involved, I guess, in -- in chasing him down was there;
21 right?
22    A.  Yes.
23    Q.  The two paramedics arrived?
24    A.  Yes.  Before we did, yes.
25    Q.  Yes.  And at some point, Officer Rivera showed

Page 59

1 up; right?
2     A.  Yeah, I -- I don't know when, but yes.
3     Q.  At some point, Officer Dominguez showed up;
4 correct?
5     A.  Yes.
6     Q.  So if you've got Sergeant Mansell, that's one;
7 you, two; Dillard, three; Rivera, four; Dominguez, five.
8 You've got the two paramedics.  You've got the security
9 officer.  So if we're talking about, I guess, officers,
10 if you exclude the two paramedics, that's six; right?
11    A.  I don't know --
12    Q.  Does that sound right?
13    A.  I don't know if you consider a security guard
14 an officer, but, yes, I guess for this case.
15    Q.  Okay.  Well, let's exclude the security guard.
16 There's -- if you exclude the security guard, that's
17 five officers; correct?
18    A.  Yes.
19    Q.  Were there any other that arrived that you can
20 recall?
21    A.  I can't recall anyone else.
22    Q.  Was there any discussion about using the -- the
23 training and experience from the academy with respect to
24 the control team takedown?
25        MS. GOWIN:  Objection.  Vague.

Page 60

1     A.  You're asking me if we spoke about it, about
2 the takedown?
3     Q.  (By Ms. Hutchison)  Yes.  Was there any
4 discussion about how you were going to go about
5 restraining Mr. Timpa?
6     A.  No.
7     Q.  Like, Hey, we've got -- I mean, the -- the
8 control team takedown says you can use three officers to
9 do it; correct?
10    A.  Correct.
11    Q.  So how was it determined that it was you and
12 Officer Dillard that were going -- that were going to
13 initially restrain Mr. Timpa?
14    A.  It was not predetermined.
15    Q.  You were just the ones that jumped in the
16 fight, so to speak?
17        MS. GOWIN:  Objection.
18    A.  I wouldn't --
19        MS. GOWIN:  Misstates the evidence.
20    A.  I wouldn't say "jump in the fight."
21    Q.  (By Ms. Hutchison)  What would you say?
22    A.  But we are the -- me and Dillard were the ones
23 to restrain Mr. Timpa, yes.
24    Q.  Okay.  But how is it that it came to be you and
25 Officer Dillard that were involved in the process?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 61

1    A. We were there.
2    Q. So was Sergeant Mansell. He was standing right
3  there, wasn't he?
4    A. I can't control what he does.
5    Q. Yes, sir, I -- I understand that. But I'm
6  saying, when you walked up, Sergeant Mansell was
7  standing there; correct?
8    A. That is correct.
9    Q. And Officer -- was Officer Dominguez already
10  there?
11    A. I don't recall him already being there, no.
12    Q. Okay. Do you remember how soon Officer
13  Dominguez arrived?
14    A. No, I -- I don't.
15    Q. Okay. Well, was it just you and Officer
16  Dillard that were involved in restraining Mr. Timpa
17  initially?
18    A. From what I can remember, it was me and him.
19  Somebody was at the feet, and I don't recall who that
20  was at Mr. Timpa's feet.
21    Q. Okay. In the initial restraint process?
22    A. Yes.
23    MS. GOWIN: Objection. Vague as to
24  "initial restraint process" because he was already in
25  cuffs.

Page 62

1    MS. HUTCHISON: That's a great point.
2    Q. (By Ms. Hutchison) When you walked up,
3  Mr. Timpa was already handcuffed; right?
4    A. Yes.
5    Q. So that's not even something that you needed to
6  do right then, was it?
7    A. Right then and there, no.
8    Q. So what did you do -- you walked up. Mr. Timpa
9  was laying down, already handcuffed, with the officers
10  standing around him; correct?
11    A. Yes. Mr. Timpa was rolling around.
12    Q. Okay. And he was rolling around, and you knew
13  right away -- well, obviously, you already had the
14  information that he was schizophrenic; correct?
15    A. Correct.
16    Q. And you could look at him and determine that he
17  was in an altered mental state immediately, couldn't
18  you?
19    A. Yes.
20    Q. And he began rolling around; correct?
21    A. Yes.
22    Q. And he rolled towards you; right?
23    A. Correct.
24    Q. And Officer Dillard, I think, claims that he
25  kicked you; right?

Page 63

1    A. I don't know what Officer Dillard has said.
2    Q. You haven't discussed that with him?
3    A. No, ma'am.
4    Q. You've never talked to Officer Dillard about
5  whether or not Mr. Timpa kicked you?
6    A. No.
7    Q. Okay.
8    A. I -- I can't recall talking to him about it,
9  no.
10    Q. All right. So how was it that he kicked you?
11    A. Mr. Timpa did not kick me. He got close but
12  did not kick me.
13    Q. All right. So he never actually came in
14  contact with you, did he?
15    A. No.
16    Q. But he was kind of rolling around, and you and
17  Officer Dillard moved to restrain him; correct?
18    A. Correct.
19    Q. And your purpose in doing that was to restrain
20  him so that he could get some sort of assistance;
21  correct?
22    A. We restrained him. Well, we put him in that
23  prone position for everybody's safety and to assess the
24  situation and take care of what we had to take care of.
25    Q. Right. But he -- he wasn't under arrest, was

Page 64

1  he?
2    A. We were -- I -- in my opinion, we were going to
3  APOWW him, which is to take him to a facility so he can
4  receive treatment for mental illness.
5    Q. Right. You weren't going to charge him with a
6  crime, were you?
7    A. No, ma'am.
8    Q. You weren't going to take him to jail, were
9  you?
10    A. No, ma'am.
11    Q. You were going to take him to get some
12  treatment to assist him; right?
13    A. That is correct.
14    Q. So the very first thing that happened was --
15    MS. GOWIN: It's 10:32. When you get to a
16  good stopping point, I'd like to take a break. We've
17  been going for about -- for over an hour.
18    MS. HUTCHISON: Okay. I mean, I -- now is
19  fine.
20    MS. GOWIN: Okay.
21    MS. HUTCHISON: I don't really have a good
22  stopping point; so...
23    MS. GOWIN: Okay. Thanks.
24    THE VIDEOGRAPHER: Off the record at 10:32.
25    (Break from 10:32 to 10:45.)

LAURIE PURDY REPORTING SERVICE, INC.

## OFFICER DANNY VASQUEZ

Page 65

1       THE VIDEOGRAPHER: On the record at 10:45.
2   Q. (By Ms. Hutchison) So, Officer, I think we
3 left off we were talking about when you arrived at the
4 scene; correct?
5   A. Correct.
6   Q. And I'm going to -- I'm going to -- it's going
7 to take a while -- this process takes a while. I'm
8 going to show you portions of the body cam footage and
9 then ask you about it, and then show you portions and
10 ask you about it. So be patient with me, okay, because
11 I've got to find the places on the -- on the footage.
12   A. Okay.
13   Q. And I'm going to show you on this -- on this
14 iPad. We're going to start with your body cam footage.
15 Okay?
16   A. Okay.
17   Q. Okay. I'm going to let it get to the point
18 where there's audio. Oh, wait. That's -- okay.
19     Now, initially, you have to manually turn your
20 body cam on; correct?
21   A. Correct.
22   Q. How do you do that?
23   A. There's a center button on the camera itself.
24 You just hit it twice. You tap it twice.
25   Q. And at what point are you in your -- what do

Page 66

1 they train you as to at what point to turn the body cam
2 on?
3   A. When you have an encounter with a citizen,
4 subject.
5   Q. So when you were -- actually, you turned yours
6 on in the car?
7   A. No.
8   Q. No?
9   A. It goes --
10   Q. So let me just show you, at the zero mark, of
11 what we've got on the body cam from your body cam
12 footage.
13   A. It goes back 30 seconds.
14   Q. Okay. So you turned it on outside of the car,
15 but it -- it reversed itself to --
16   A. It marks it or, I guess, creates a recording
17 mark time 30 seconds prior.
18   Q. Got you.
19   A. That's why there's no audio until about
20 30 seconds.
21   Q. That makes sense.
22     So let -- I'm going to get to the point where
23 there's audio. Actually, let me back up a little --
24 actually, I'm going to do before audio. So I'm going to
25 show it at 17 seconds.

Page 67

1   A. Okay.
2   Q. Do you see it's 17 seconds?
3   A. Is that my camera?
4   Q. Yes.
5   A. Okay. Yes. Oh, yes, it says 17 seconds.
6 Sorry.
7     (Video plays.)
8   Q. (By Ms. Hutchison) Okay. And that shows that
9 you were walking up onto a scene; right?
10   A. Correct.
11   Q. And at that point, it's -- it's at night;
12 correct?
13   A. Correct.
14   Q. Somebody has parked their vehicle in such a
15 manner as to put their headlights to light up the scene;
16 correct?
17   A. Correct.
18   Q. Do you know who did that?
19   A. No.
20   Q. Do you know whose vehicle is providing light
21 for the scene?
22   A. No.
23   Q. And you can see, as you're walking up to the
24 scene, there are various people that are standing there
25 around the bus stop area; correct?

Page 68

1   A. Correct.
2   Q. Do you know who those are?
3   A. I believe security guards and Sergeant Mansell,
4 I think. It's very blurry, but from what --
5   Q. Okay.
6   A. -- I can remember.
7   Q. All right. Well, let me -- let me play a
8 little bit more of it.
9     (Video plays.)
10   Q. (By Ms. Hutchison) So now I'm at 19 seconds.
11 I just added a couple of seconds. And you can see that
12 Sergeant Mansell's standing there pointing to the right;
13 correct?
14   A. It appears that he's point -- pointing.
15   Q. And then someone's turning to look at you;
16 right?
17   A. Yes.
18   Q. Who is that?
19   A. I don't know their name. A security guard,
20 though.
21   Q. Okay. And then there's another individual
22 that's standing in the street between Mr. Timpa and
23 the -- and the street itself; correct?
24   A. Correct.
25   Q. Do you know who that is?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

| Page 69 |
|---|
| 1     A. I don't know his name, but it was another |
| 2   security guard. |
| 3     Q. Okay. |
| 4        MS. GOWIN: Can you see that okay? Is it |
| 5   big enough that you can see it? |
| 6        THE WITNESS: Yes. |
| 7        MS. GOWIN: Okay. |
| 8     Q. (By Ms. Hutchison) So the -- the shoulder |
| 9   patch on the officer that's looking at you, you think |
| 10   that's a security guard? |
| 11     A. Yes, I believe so. |
| 12     Q. Okay. |
| 13     A. I -- I can't tell what it says or what it is, |
| 14   but from what I can recall. |
| 15        (Video plays.) |
| 16     Q. (By Ms. Hutchison) Okay. So at about |
| 17   36 seconds approximately, the audio comes on; right? |
| 18     A. Uh-huh. |
| 19     Q. And you and Officer Dillard are communicating |
| 20   with Sergeant Mansell; right? |
| 21     A. Yes. |
| 22     Q. And you can hear Mr. Timpa is saying something; |
| 23   right? |
| 24     A. Yes. |
| 25     Q. What was he saying? |

| Page 70 |
|---|
| 1     A. That he -- what I can remember -- I don't |
| 2   remember exactly what he's saying. But looking -- |
| 3   hearing what I heard on the video when you were playing |
| 4   it, it says, "Check and they will see" or something like |
| 5   that. |
| 6     Q. "Check and they will tell you" or something -- |
| 7     A. Something to that -- |
| 8     Q. It doesn't really make any sense, does it? |
| 9        MS. GOWIN: Objection. Calls for |
| 10   speculation. |
| 11     A. I -- I don't know what he's referring to. I |
| 12   just hear him talking. I'm trying to get information |
| 13   from Sergeant Mansell at this time. |
| 14     Q. (By Ms. Hutchison) Right. But does it seem to |
| 15   you that Mr. Timpa -- that right away you can tell he's |
| 16   in some kind of altered mental state? |
| 17     A. I couldn't assume anything. I haven't spoken |
| 18   to him or attempted to speak to him. I just hear him in |
| 19   the background making noise. |
| 20     Q. I'm -- I'm asking about just from the |
| 21   observations that you made when you initially approached |
| 22   the scene? |
| 23     A. I -- something's going on, yes. |
| 24     Q. Something not normal? |
| 25     A. Correct. |

| Page 71 |
|---|
| 1        (Video plays.) |
| 2     Q. (By Ms. Hutchison) Oops. Sorry. |
| 3        And now I want to -- at 45 seconds, you can see |
| 4   that Officer Dillard has moved over to where he's within |
| 5   your body camera footage; correct? |
| 6     A. Correct. |
| 7     Q. And you and Officer Dillard and Sergeant |
| 8   Mansell and at least one security guard are standing |
| 9   there observing Mr. Timpa; correct? |
| 10     A. Yes. |
| 11     Q. Okay. And you would agree with me that, at |
| 12   that point in time, there doesn't seem to be any |
| 13   immediate need for action; correct? |
| 14        MS. GOWIN: Objection. Misstates the |
| 15   evidence. |
| 16     A. I mean, there's always that sense that we're so |
| 17   close to the street. So, I mean, we -- I didn't want to |
| 18   just stay there for too long. |
| 19     Q. (By Ms. Hutchison) I'm talking about, at the |
| 20   time that the -- that the officers and the security |
| 21   guard are standing there -- are just standing there |
| 22   watching him, that was because there was not an |
| 23   immediate need for action; correct? |
| 24     A. You mean the other -- two security guards and |
| 25   Sergeant Mansell, or are you speaking about me? |

| Page 72 |
|---|
| 1     Q. You, Officer Dillard, Sergeant Mansell, and the |
| 2   two security guards are all -- and a bystander are all |
| 3   just standing there watching Mr. Timpa; correct? |
| 4     A. Yes. |
| 5     Q. And the reason is because there was not an |
| 6   immediate need for action at that moment; correct? |
| 7        MS. GOWIN: Objection. Calls for |
| 8   speculation, particularly outside of -- for -- of why |
| 9   other people are doing things. |
| 10     A. When it comes -- for me, I'm looking at him, |
| 11   trying to assess the situation. That's what I'm doing. |
| 12   So that's why I'm not taking any other action -- |
| 13     Q. Sure. |
| 14     A. -- aside from trying to talk to him. |
| 15     Q. (By Ms. Hutchison) Because if he had been |
| 16   doing something -- I don't know -- choking someone, |
| 17   racing into the street, doing something that needed an |
| 18   immediate need for action, you would have acted |
| 19   immediately; correct? |
| 20     A. In a case like that, yes. |
| 21     Q. Okay. And you didn't have to act |
| 22   immediately -- |
| 23     A. It's locking -- |
| 24     Q. -- because you had the -- |
| 25     A. I don't mean to cut you off. It's locking out. |

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 81

1    MS. HUTCHISON: 58.
2    MS. GOWIN: Thanks.
3    A. I see one with -- I can't -- the other one,
4 it's very -- at the outskirts of the screen. It's kind
5 of hard to tell. I can't tell who that is or if it's
6 even a uniform.
7       The other one, it looks -- it looks like a
8 uniform. It doesn't match the Dallas Police patch,
9 though, on the shoulder.
10   Q. (By Ms. Hutchison) Okay. That's all I was
11 going to ask you is if you knew --
12   A. Oh, okay.
13   Q. -- if you knew who those were?
14   A. No, I don't.
15   Q. Okay. At some point, you begin interacting
16 with Mr. Timpa, along with the other officers; correct?
17   A. I remember -- from what I can recall, I
18 remember Dillard saying something and I saying
19 something. I don't recall someone else saying anything.
20   Q. Right. Do you remember that you, Officer
21 Dillard, and Sergeant Mansell were all saying, "Hey,
22 relax, buddy. Chill out. Relax," that kind of thing?
23   A. Yeah. Something to that extent, yes.
24   Q. Okay. And that you said something like, "Hey,
25 Tony, chill out, bro. Look at me." And you wave your

Page 82

1 fingers.
2       Do you remember that?
3    A. Yes.
4    Q. And during this entire time -- this process,
5 where you're all saying things to him, like "Relax,
6 buddy. Chill out." And you say, "Hey, Tony, look at
7 me," and you wave your fingers, nobody's making any move
8 towards Mr. Timpa at all; right?
9    A. That is correct.
10   Q. Mr. Timpa continues to be sort of incoherent
11 and rolling on the ground; correct?
12   A. Correct.
13   Q. And, again, Mr. Timpa is saying things like,
14 "Don't hurt me." And the officers are like, "We're not
15 going to hurt you, man." And, you know, "Chill out,
16 dude," that kind of thing.
17      Do you recall that?
18   A. Yes.
19   Q. And does that also inform you about his --
20 whether he's in a normal state of mind, that he's
21 rolling around, yelling, "Don't hurt me" to police
22 officers?
23      MS. GOWIN: Objection. Calls for
24 speculation.
25   A. I couldn't assume what mental state he was in

Page 83

1 at that point, no.
2    Q. (By Ms. Hutchison) And I -- and I'm trying to
3 distinguish between you assessing a situation --
4    A. Uh-huh.
5    Q. -- and you assuming anything. Okay. Because
6 I'm not asking you to assume anything; fair?
7    A. Yes.
8    Q. All right. I'm asking you the information that
9 you're taking in to assess the situation.
10      Fair enough?
11   A. Okay.
12   Q. Isn't that what you do as an officer?
13   A. Yes, ma'am.
14   Q. Okay. And you would agree with me that the
15 information that you're taking in at the time is that a
16 person is not in their normal state of mind; correct?
17      MS. GOWIN: Objection. Calls for an
18 assumption. Calls for speculation.
19   A. Like I said, at this point, I don't know what's
20 going on. I've had others that are perfectly fine tell
21 me "Don't kill me" because they're about to be arrested.
22 So -- or "Don't kill me. Don't hurt me" type deals.
23   Q. (By Ms. Hutchison) Why did you want him to
24 look at you?
25   A. I felt that, if I could get his attention,

Page 84

1 maybe I could get a response from him.
2    Q. What kind of a response?
3    A. Get information that I needed. If he was okay.
4 If it was a medical situation.
5    Q. Well, up to that point, you'd been there over a
6 minute at that point; right?
7    A. Perhaps.
8    Q. Had --
9    A. Close to.
10   Q. Had Mr. Timpa responded rationally to anybody
11 at that point?
12   A. No.
13   Q. That was part of the information you had;
14 right?
15   A. Correct.
16   Q. And then did you hear the security guard say,
17 "Hey, we're going to get you some help, Tony"?
18   A. I don't recall hearing that.
19   Q. Okay. Let me show you at -- so I'm going to
20 start it at 58. And at about 1:22 or so, you can hear
21 the security guard say, "Hey, relax, man. We're going
22 to get you some help, Tony."
23      See if you can hear that.
24      (Video plays.)
25   Q. (By Ms. Hutchison) Did you hear that?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 85

1    A. Yes, ma'am.
2    Q. Was that the security guard that was saying
3  that?
4    A. Yes. Based on the video, yes.
5    Q. And did you see that there was a guy in, like,
6  a orange or yellow shirt standing there next to the
7  sign?
8    A. When we arrived at the scene, yes, I remember
9  him.
10   Q. Who was he?
11   A. From what I remember, I think he witnessed
12 Mr. Timpa in the street, if I'm able to remember.
13   Q. Did anybody tell him, "Get back. Stay away.
14 This guy's dangerous," anything like that?
15   A. I don't recall. I know I did not. I don't
16 know if anybody else did.
17   Q. He remained standing there, leaning up against
18 the sign within feet of Mr. Timpa pretty much the entire
19 time, didn't he?
20   A. I don't recall how long he was there or when he
21 left or when he moved.
22   Q. So at about this time, 1:25 or so, is when you
23 and Officer Dillard move in to restrain Mr. Timpa;
24 correct?
25   A. I don't know the exact time on the video, but,

Page 86

1  yes, we eventually do move in for a
2    Q. Okay. And what is it that you do specifically
3  in that process?
4    A. The portion where we start to restrain
5  Mr. Timpa?
6    Q. Yes, sir.
7    A. I remember he rolls towards me. I kind of step
8  back because his feet got close to me. He kind of rolls
9  towards Officer Dillard. And then I just kind of like
10 assist to roll him on his stomach and --
11   Q. How?
12   A. With my hands. Just --
13   Q. Where did you -- where did you put your hands?
14   A. On his midsection. So lower back, buttocks
15 area.
16   Q. Okay. And so you put your hands on his lower
17 back, upper buttocks to roll him onto his stomach;
18 correct?
19   A. Correct.
20   Q. And then what do you do?
21   A. Then I kind of squat at that same area -- in
22 that same area. So his -- around his upper buttocks,
23 lower, lower back.
24   Q. And do you put any part of your body on any
25 part of his body?

Page 87

1    A. My knees. My knees are on, like, his buttocks
2  and his lower back.
3    Q. Both knees?
4    A. Yes. One is at his lower back, and one is on,
5  like, his lower -- I mean, his buttocks. Sorry.
6    Q. And Officer Dillard, what does he do with his
7  hands and knees?
8    A. From what I remember, he places a knee on his
9  back and holds down his shoulders with his -- with his
10 hands. Holds down Mr. Timpa's shoulders with his hands.
11   Q. Okay. So do you recall at that point
12 Mr. Timpa, of course, when you -- even when you walked
13 up, was already handcuffed; right?
14   A. Correct.
15   Q. So at about 1:30 or so, you've got Mr. Timpa on
16 his stomach, with your -- both of your knees on him and
17 Officer Dillard's knee on him and Officer Dillard's hand
18 or hands on him; correct?
19        MS. GOWIN: Objection as to lack of
20 foundation as to what point in the video, the timing of
21 the video.
22   A. Say -- say that again, just so I get it right.
23   Q. (By Ms. Hutchison)  Yes, sir. At about 1:30 or
24 so -- and I'll -- I'm happy to -- let me just show it to
25 you.

Page 88

1        You tell me -- I'm going to start it at 1:27.
2  You tell me at what point in the -- in the timing of the
3  video that you've got both of your knees on Mr. Timpa's
4  lower back, upper rear, and Officer Dillard has his knee
5  and one or both hands on him. Okay?
6    A. Okay.
7    Q. Sorry. It's hard for me to -- can you just
8  reach over there and hit the little arrow button and
9  make it play?
10   A. Starting at 1:27; right?
11   Q. Yes, sir.
12   A. Okay.
13        (Video plays.)
14   A. Sorry. I was -- it was at 1:30.
15   Q. (By Ms. Hutchison)  Okay. So -- so it was
16 about at 1:30?
17   A. Right.
18   Q. That's fair; right?
19        Okay. And then that's you saying, "Hey, Tony,
20 what's your last name, Tony?"  Right?  Or was that you?
21   A. I believe so. I don't -- don't recall. I --
22   Q. Okay.
23   A. I'd have to see the video again.
24   Q. That's fine.
25        But you can see at about that time -- and I'll

OFFICER DANNY VASQUEZ

---

Page 89

1 back it up a minute. You can see some hand with blue
2 gloves -- hands with blue gloves coming into the body
3 cam footage. So I'm just going to ask you to look at
4 that --
5     A. Okay.
6     Q. -- and tell me whether you know if that was one
7 of the paramedics.
8     A. Okay.
9     Q. Okay. You didn't wear blue gloves, did you?
10    A. No, ma'am.
11    Q. Do you know if any of the -- did you see the
12 other officers wearing blue gloves?
13    A. No.
14    Q. You --
15    A. Not that I can recall, no.
16    Q. Because you can see at -- I've got it at 1:30.
17 And you see somebody else that's -- that looks like it
18 might be another officer on the footage.
19        Do you know if that's another officer?
20    A. It appears that, in the video in the frame,
21 he's carrying the laptop that paramedics carry.
22    Q. Okay. So that might be one of the paramedics
23 at 1:30?
24    A. It might be.
25    Q. Okay. I think Mr. Burnley, who testified

---

Page 90

1 yesterday, said that he was the one carrying the laptop.
2 He's a paramedic.
3     A. Okay.
4     Q. That would make sense; right?
5     A. If he's a paramedic, yes.
6     Q. Yeah, he is.
7    , A. All right.
8     Q. There was -- the paramedics were Mr. Burnley
9 and Mr. --
10        MS. GOWIN: Flores.
11        MS. HUTCHISON: Flores. Thank you.
12    Q. (By Ms. Hutchison) So at about -- yeah, at
13 about 1:36 or so, you'll see the hands with the gloves
14 come in.
15    A. Okay.
16    Q. Can you hit the play button?
17    A. Yes, ma'am.
18        (Video plays.)
19    Q. (By Ms. Hutchison) Did you see the --
20    A. The hands haven't came in yet.
21    Q. Oh, they didn't?
22    A. No.
23    Q. You didn't see those?
24        Oh, let me -- oh, actually, that's -- sorry.
25 That's at 2:25. So I'll move it up to there for a

---

Page 91

1 second.
2     A. Okay.
3     Q. But what -- the part we were listening to, you
4 can hear Officer Dillard ask him what he took today;
5 right?
6     A. Yes.
7     Q. Did you ask him what he had taken today?
8     A. I can't recall up to that point asking him
9 that, no.
10    Q. Okay. Were you curious?
11    A. Yes.
12    Q. Did you believe that it was likely that he had
13 taken something?
14    A. Later on, yes.
15    Q. Okay. Were you the one that searched his
16 pockets?
17    A. Yes.
18    Q. So, at this point in time where we're looking
19 at the video, which is at about 2 minutes or so, are you
20 still with your knees on his upper -- lower back and
21 upper buttocks?
22        MS. GOWIN: I'm sorry. Can I have that
23 question back? I apologize.
24        MS. HUTCHISON: Yes.
25    Q. (By Ms. Hutchison) At 2 minutes in the video,

---

Page 92

1 Officer Vasquez, did you still have your knees on
2 Mr. Timpa's lower back and upper buttocks?
3        MS. GOWIN: Objection. Have you shown him
4 that portion of the video? I thought we were at 1:36
5 before.
6        MS. HUTCHISON: We're at 2:02.
7        MS. GOWIN: Okay.
8     A. I can't recall. I think I was -- I still have
9 my knees on him.
10    Q. (By Ms. Hutchison) Okay. And, again, your
11 body cam actually shows Officer Dillard --
12    A. Correct.
13    Q. -- more than it shows your own position; right?
14    A. Correct.
15    Q. So we can maybe switch at some point to
16 Officer Dillard's body cam. But, again, if he's facing
17 Mr. Timpa's head, it's not going to show you behind him;
18 right?
19    A. Correct.
20    Q. So do you remember at what point you removed
21 your knees from Mr. Timpa's lower back and upper
22 buttocks?
23    A. I remember removing my left knee to give me
24 more access to his hands when I was changing out his
25 handcuffs.

---

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 93

1  Q. And do you remember at what point in the
2  footage that is?
3  A. No, I do not.
4  Q. So let me show you -- I'm going to move it to
5  at about 2 minutes, and I want you to look at 2 -- 2:21
6  to verify that you're the one that's checking his
7  pockets because I think that's about the time that it
8  shows that.
9  Actually, I'll probably just play it from 2:02
10  because it's so hard to try to pinpoint the exact time.
11  So let me just do that.  And I'll ask you to look for a
12  couple of things.
13  At about 2:10, someone is holding on to
14  Mr. Timpa's foot just using one of their hands, and I
15  wanted you to identify that person, if you can.
16  And then someone is putting cards, like from
17  his wallet, on the bus bench, and if you can identify
18  who that is.  And then at 2:21, who's checking his
19  pockets.  Okay?
20  A. Okay.
21  Q. So those things.  Who's -- who's holding on to
22  his foot at 2:10.  Who's putting things on the bench,
23  and who's checking his pockets at 2:21?
24  A. Okay.
25  Q. Okay.  Let me turn that towards you.  If you'll

Page 94

1  just hit the arrow.
2  A. (Complies.)
3  (Video plays.)
4  Q. (By Ms. Hutchison)  All right.  Did you -- did
5  you see those things that I was talking about?
6  A. Yes, ma'am.
7  Q. Okay.  So who was it that was holding his foot
8  at about 2:10?
9  A. I do not know, ma'am.
10  Q. Was it you?
11  A. I was not holding his feet, no.
12  Q. Okay.  So they weren't -- they weren't holding
13  his feet.  It was just one hand holding one foot; right?
14  A. From what it looked on the video, whoever it
15  was kind of had, like, their knee in the -- in the
16  crease of their knee and then holding the feet.
17  Q. So -- so the officer had his knee in
18  Mr. Timpa's --
19  A. I don't --
20  Q. -- the back of his --
21  A. I don't know who that was.  I don't know if it
22  was an officer or not.
23  Q. Well, it wouldn't have just been a bystander,
24  would it?
25  A. I -- I don't know.  I don't know if it was a

Page 95

1  security guard or one of the officers.
2  Q. So it was either one of the security guards or
3  one of the police officers?
4  MS. GOWIN:  Objection.  Calls for
5  speculation.
6  A. Perhaps.
7  Q. (By Ms. Hutchison)  Well, was there someone
8  else involved in the process of restraint, other than
9  the -- the police officers and the security guards?
10  A. No.  Again, it -- it was either the -- a
11  police officer or a security guard.
12  Q. Okay.  And they had -- so at that point in
13  time, where this other third individual's involved in
14  the restraint process, you still have both of your knees
15  on Mr. Timpa?
16  A. I can't recall for exact.  I mean, I can't
17  recall exactly because I know I made space for the
18  paramedic to do what he was trying to do.
19  Q. Okay.  But at 2:10, the paramedic hadn't
20  entered the picture yet; right?
21  A. Correct.
22  Q. So whoever the third person is involved in the
23  restraint process, you've got Officer Dillard with his
24  knee on Mr. Timpa's back and his hand or hands on him as
25  well; correct?

Page 96

1  A. Correct.
2  Q. And you've got you, at this point in time,
3  that's probably still got two knees on him; right?
4  MS. GOWIN:  Objection.  Calls for
5  speculation.
6  A. I can't remember if I had moved the -- a knee
7  or both knees or -- or how my positioning was at this
8  time, at that point.  I can't remember.
9  Q. (By Ms. Hutchison)  Okay.  But you said you
10  moved one knee in order to do what, again?
11  A. To give me ease of access to -- when I was
12  handcuffing him.
13  Q. The handcuffs.  But that hadn't happened at
14  this point; right?
15  A. No, it had not.
16  Q. So is it likely then you still had both of your
17  knees on him?
18  MS. GOWIN:  Objection.  Calls for
19  speculation.
20  A. Perhaps.
21  Q. (By Ms. Hutchison)  Okay.  And whoever's
22  holding his one foot with their one hand is able to
23  restrain his feet or feet just using one hand at that
24  point; correct?
25  A. Based on where we stopped on the video, it

OFFICER DANNY VASQUEZ

**Page 97**

1  looks as to.  I did not see what he was doing.  I was
2  focused in my little area.
3  Q.  Right.  But I'm talking about at 2:10, when you
4  were looking at the person holding onto his -- holding
5  onto his foot.  They were just doing it with one hand;
6  right?
7  MS. GOWIN:  Objection.  Calls for
8  speculation.
9  A.  Again, I'm not -- I'm looking at Mr. Timpa's
10  midsection, at his hands.  I'm not looking at what the
11  person next to me is doing.
12  Q.  (By Ms. Hutchison)  I'm asking you if you can
13  look on the video --
14  A.  Oh.
15  Q.  -- and see that.  So I'm backing it up to 2:05
16  and asking you to look at 2:10.
17  A.  Okay.
18  Q.  And tell me if you think they needed more than
19  just one hand to restrain his feet?
20  MS. GOWIN:  Objection.  Calls for
21  speculation.  Object to form.
22  (Video plays.)
23  A.  Yes, he's holding at -- he has the -- his knee
24  in the crook of Mr. Timpa's knee and holding it with one
25  hand in the video.

**Page 98**

1  Q.  (By Ms. Hutchison)  Okay.  And his feet at that
2  point aren't moving, are they?
3  A.  A little but not significantly, no.
4  Q.  Okay.  And are you the one that's talking at
5  that point in time where you're talking about his ID?
6  A.  Yes, that is me.
7  Q.  Who are you talking to?
8  A.  I can't recall.  I perhaps was speaking to,
9  like, Sergeant Mansell or somebody else.
10  Q.  Wasn't Sergeant Mansell over there looking
11  through the cards that are on the bench as well?
12  A.  I can't recall what Sergeant Mansell was doing.
13  I know at one point I do talk to him to tell him, you
14  know, what I found in his pockets.
15  Q.  What did you find in his pockets?
16  A.  From what I can remember, it was -- there were
17  cards.  I think it was a credit card in there of some
18  sort and then another card.  I think it was, like, a
19  membership card.
20  Q.  A health club membership card, wasn't it?
21  A.  I believe so.  I can't remember what exactly it
22  was.  I can't remember what else there was in his
23  pockets.
24  Q.  Okay.  But no weapons or anything dangerous or
25  sharp or anything like that?

**Page 99**

1  A.  No, ma'am.
2  Q.  And you took the cards out, and you put them on
3  the bench; right?
4  A.  Yes, that is my hand.
5  Q.  And then the paramedic's hands come in at
6  about -- well, you -- you hear it -- you hear Mr. Timpa
7  saying, "I'm down.  I'm down.  I'm down.  Please don't
8  do it," that kind of stuff; right?
9  A.  I don't recall that.
10  Q.  You don't remember that?
11  Well, the paramedic's hands come in at 2:25,
12  and Mr. Timpa's yelling things at about that time.  So
13  I'm going to start it at 2:13 and ask if you see the
14  paramedic's hands come into the picture.
15  A.  Okay.
16  (Video plays.)
17  A.  That is the paramedic's at 2:27, -28.
18  Q.  (By Ms. Hutchison)  Okay.  That's the
19  paramedic's hands coming in?
20  A.  Yes.
21  Q.  And did you have any idea what he was doing?
22  A.  He had -- from what I can remember, he had a --
23  it's like a monitor, putting it on -- on Mr. Timpa's
24  finger.
25  Q.  It's like --

**Page 100**

1  A.  Trying to get vitals, I assume.
2  Q.  Okay.  Do you know what a pulse oximeter is?
3  A.  No.
4  Q.  Was it a little clippy thing?
5  A.  Yes, clipping something.  It's, like,
6  grayish-bluish with a digital screen on it.
7  Q.  Yeah, and he clipped it to his finger?
8  A.  Yes.
9  Q.  And then he unclipped it; right?
10  A.  Yes.
11  Q.  And when you hear on there, "Right behind you.
12  Don't jump," that's the paramedic; right?
13  A.  That is correct.
14  Q.  And then you -- you also say, "Don't jump back.
15  You've got a paramedic right behind you"?
16  A.  Correct.
17  Q.  And you're talking to Officer Dillard?
18  A.  That is correct.
19  Q.  And then so it -- at about -- so -- so at this
20  point, when the paramedic removes the device, you are
21  still not changing the handcuffs; correct?
22  A.  That is correct.  Yes, I believe so.
23  Q.  So it's likely that you still got both your
24  knees on Mr. Timpa and Officer Dillard has one knee on
25  him; correct?

OFFICER DANNY VASQUEZ

Page 101

1          MS. GOWIN: Objection. Misstates his
2  testimony. Calls for speculation.
3          A. As far as Dillard, I don't remember what he's
4  doing at this point. Me, I possibly still do have my
5  two knees on him.
6          Q. (By Ms. Hutchison) Because you testified
7  earlier that the reason you moved your left knee was in
8  order to start the process of switching out the
9  handcuffs; correct?
10         MS. GOWIN: Objection. Misstates his
11  testimony. Calls for speculation.
12         A. I said I remember moving my knee on his lower
13  back to kind of get more access to -- to change out the
14  handcuffs.
15         Q. (By Ms. Hutchison) All right. And you --
16  your -- both your knees were on Mr. Timpa until the time
17  you moved your left knee to change out the handcuffs?
18         MS. GOWIN: Objection. Misstates
19  testimony. Calls for speculation.
20         A. I can't recall if I moved them -- moved any of
21  my knees earlier than that, but I do remember doing it
22  at that point.
23         Q. (By Ms. Hutchison) And in terms of switching
24  out the handcuffs, whose handcuffs were you putting on
25  him?

Page 102

1          A. Mine.
2          Q. And whose handcuffs were you taking off of him?
3          A. From what I later found out, well, it belonged
4  to one of the security guards.
5          Q. And would -- did the security guard ask you to
6  get his handcuffs back?
7          A. No.
8          Q. Was there any immediate need to put your
9  handcuffs on and take the security guard handcuffs off?
10         MS. GOWIN: Objection to the term -- vague
11  as to "immediate need."
12         A. I would -- what would you consider like
13  "immediate need"?
14         Q. (By Ms. Hutchison) Was the need -- other than
15  the fact that you want to give the dude his handcuffs
16  back, was there any other need for you to switch out the
17  handcuffs?
18         MS. GOWIN: Objection. Calls for
19  speculation. Vague.
20         A. I change out the handcuffs because I know we're
21  going to transport him. So my handcuffs are going to be
22  on him.
23         Q. (By Ms. Hutchison) So how were your handcuffs
24  different than the security guard's handcuffs?
25         A. In the fact that they were mine.

Page 103

1          Q. I'm sorry, sir. How were your handcuffs
2  physically different than the security guard's
3  handcuffs?
4          A. Physically, none.
5          Q. So they were the same handcuffs in terms of the
6  way they --
7          A. Appeared.
8          Q. -- locked, the way they appeared, the way they
9  restrained him?
10         A. Yes.
11         Q. And you're not saying that there's any kind of,
12  like, written policy or order or anything like that that
13  would require you to switch out the handcuffs before you
14  transported him?
15         A. As I remember training, that's -- we're always
16  told we need to switch out handcuffs. You leave the
17  ones on there, replace yours, and then remove the ones
18  that were already there.
19         Q. Okay. And you're saying that that was in,
20  what, your academy training?
21         A. From what I remember in lecture and in actual
22  FTO training, yes.
23         Q. So in the academy training and in the field
24  training, they told you that it was important for you to
25  have your own handcuffs on him, as opposed to someone

Page 104

1  else's handcuffs on him, when you transported him?
2          MS. GOWIN: Objection. Misstates
3  testimony.
4          A. I remember them saying, "Switch it out since
5  you are the transporting officer."
6          Q. (By Ms. Hutchison) Okay. And was there any
7  time requirement?
8          A. Not that I can recount, no.
9          Q. In other words, there's nothing that says, you
10  know, "Within 15 minutes prior to transport, you've got
11  to have those handcuffs switched," or anything like
12  that?
13         A. I don't recall them giving a specific timeline,
14  no.
15         Q. So that could have waited, for example, until
16  he was in the ambulance?
17         MS. GOWIN: Objection. Calls for
18  speculation. Incomplete hypothetical.
19         A. Me, personally, I don't see why I would wait
20  until the ambulance.
21         Q. I didn't ask you that, sir.
22         MS. HUTCHISON: I object as nonresponsive.
23         Q. (By Ms. Hutchison) You could have waited until
24  he was in the ambulance to switch out the cuffs;
25  correct?

LAURIE PURDY REPORTING SERVICE, INC.

## OFFICER DANNY VASQUEZ

Page 105

1    MS. GOWIN: Objection. Calls for
2 speculation. Incomplete hypothetical.
3    A. Again, you're asking me about my actions;
4 correct?
5    Q. (By Ms. Hutchison) I'm asking you whether it
6 could have waited until he was in the ambulance for you
7 to switch out the handcuffs?
8    MS. GOWIN: Objection. Calls for
9 speculation. Incomplete hypothetical.
10    A. Again, in my -- because of my -- what I did
11 was we were there, switch them out now, instead of
12 later.
13    MS. HUTCHISON: I object as nonresponsive.
14    Q. (By Ms. Hutchison) You actually took the
15 handcuffs off of him that you had put on him in the
16 ambulance; correct?
17    A. Yes.
18    Q. By rolling him on his side; right?
19    A. That is correct.
20    Q. Could you have waited until Mr. Timpa was
21 placed in a recovery position to switch out the
22 handcuffs?
23    MS. GOWIN: Objection. Incomplete
24 hypothetical. Calls for speculation.
25    A. Not given that Mr. Timpa was moving. It was

Page 106

1 more safe and more tactical to do it in the prone
2 position.
3    Q. (By Ms. Hutchison) It was more safe to switch
4 them out while he was moving, as opposed to waiting
5 until he was no longer moving? Is that what you're
6 saying?
7    MS. GOWIN: Objection. Misstates
8 testimony.
9    A. That is not what I'm saying.
10    Q. (By Ms. Hutchison) Wouldn't it be more safe to
11 switch them out when he's no longer resisting or moving?
12    MS. GOWIN: Objection. Incomplete
13 hypothetical. Calls for speculation.
14    A. Could you say that again?
15    Q. (By Ms. Hutchison) Yes, sir. So in --
16 according to your training that you received at the
17 academy and in your field training, you are supposed to
18 put someone in the recovery position as soon as
19 feasible; correct?
20    A. Correct.
21    Q. And the recovery position is either on their
22 side or sitting up; right?
23    A. Correct.
24    Q. And when it's feasible is when you can do it
25 without the situation presenting the possibility of harm

Page 107

1 to someone; correct?
2    MS. GOWIN: Objection. Calls for
3 speculation. Incomplete hypothetical.
4    A. Say that again. Sorry.
5    Q. (By Ms. Hutchison) Sure. We're talking about
6 what you were trained as to what it means to put someone
7 in the recovery position when it's feasible, when it's
8 reasonable. Okay?
9    A. Right.
10    Q. So that what they say is "Restrain somebody on
11 their stomach, but because that's a dangerous position
12 to have them in, sit them up or roll them on their side
13 as soon as you reasonably can." Correct?
14    A. Correct.
15    MS. GOWIN: Objection. Calls for
16 speculation. Incomplete hypothetical. And compound
17 question.
18    Q. (By Ms. Hutchison) And so the point at which
19 it's reasonable to do that is the point at which you
20 decide, "We can do this without the -- the
21 probability of harm to anyone." Right?
22    MS. GOWIN: Objection. Incomplete
23 hypothetical. Calls for speculation.
24    A. Perhaps.
25    Q. (By Ms. Hutchison) And so, when you can put

Page 108

1 him on his side or sit him up, at that point in time,
2 you've made the decision, "Okay. It's reasonable to do
3 this without, you know, posing harm to someone." Right?
4    MS. GOWIN: Objection. Incomplete
5 hypothetical. Calls for speculation.
6    A. I mean, in other cases perhaps.
7    Q. (By Ms. Hutchison) No. I'm saying in
8 accordance -- the way you were trained, that's the point
9 at which you sit somebody up or roll them on their side;
10 right?
11    MS. GOWIN: Objection.
12    A. For the recovery?
13    MS. GOWIN: Incomplete hypothetical. Calls
14 for speculation.
15    Q. (By Ms. Hutchison) Yes, for the recovery.
16    A. Yes, that -- those are the two positions.
17    Q. And -- and the time at which you do that is the
18 time at which it can be done safely; right?
19    A. In certain -- certain -- in certain
20 circumstances, yes.
21    Q. What other circumstances would you put somebody
22 on their side or sitting up?
23    A. Just recovery.
24    Q. Correct.
25    A. Sit them up, we're getting ready to take them,

Page 28 (Pages 109-112)

## OFFICER DANNY VASQUEZ

Page 109

1  to transport them.
2      Q.  Well, you're supposed to do it as soon as it's
3  safe to do so; right?
4      A.  Correct.
5      Q.  Okay.  So my question to you is, doesn't it
6  make sense that you would -- because when you roll them
7  onto their side or sit them up, you've determined that
8  it's safe to do so; right?
9      A.  Yes.
10         MS. GOWIN:  Objection.  Incomplete
11  hypothetical.  Calls for speculation.
12      Q.  (By Ms. Hutchison)  And doesn't it make sense
13  that that would be a very reasonable time at which to
14  switch out the handcuffs?
15         MS. GOWIN:  Objection.  Incomplete
16  hypothetical.  Calls for speculation.
17      A.  In a situation where we can do that and it's
18  feasible to do so, yes.
19      Q.  (By Ms. Hutchison)  And so, in accordance with
20  the way you were trained, when you encounter Mr. Timpa,
21  you know that you're going to be assessing when it's
22  safe to roll him on his side or sit him up; right?
23      A.  Yes.
24      Q.  So it would also be a consideration of, "I'm
25  going to be assessing when it's safe to roll him on his

Page 110

1  side or sit him up, so I'll switch out his handcuffs at
2  that point in time"?
3         MS. GOWIN:  Objection.  Incomplete
4  hypothetical.  Calls for speculation.
5      A.  Again, if it's -- if it would have been
6  practical or feasible, perhaps.
7      Q.  (By Ms. Hutchison)  Okay.  But there wasn't any
8  physical need to switch them out when you switched them
9  out, was there?
10         MS. GOWIN:  Objection.  Vague.  Incomplete
11  hypothetical.  Calls for speculation.
12      A.  I would say the need was always there because
13  I had to -- I was going to switch out the handcuffs
14  anyways.
15      Q.  (By Ms. Hutchison)  I understand you felt the
16  need to switch out the handcuffs, Officer.  I'm talking
17  about the timing of it.
18         There wasn't any physical need to do it when
19  you did it, was there?
20         MS. GOWIN:  Objection.  Incomplete
21  hypothetical.  Calls for speculation.
22      A.  Again, we had him in somewhat of a control.  It
23  seemed like the -- a good timing.
24      Q.  (By Ms. Hutchison)  Well, your training was to
25  put him in the recovery position as soon as you could

Page 111

1  safely do so; right?
2      A.  That is the training, yes.
3      Q.  And so, with that consideration in mind, there
4  wasn't any need to keep him on his stomach in order to
5  transfer the cuffs?
6         MS. GOWIN:  Objection.  Objection.
7  Incomplete hypothetical.  Calls for speculation.  And
8  vague.
9      A.  Mr. Timpa wasn't rolled to his side or sat up
10  because he continued to move, continued to resist.
11         MS. HUTCHISON:  I object as nonresponsive.
12      Q.  (By Ms. Hutchison)  Officer, are -- are you
13  saying that there was an immediate need that you
14  absolutely had to switch those cuffs off while he was
15  still on his stomach?
16         MS. GOWIN:  Objection.  Calls for
17  speculation.  Also, vague as to "immediate need."
18      A.  No, that's not what I said.  What I said is
19  that the time I -- it -- it was a good time for me to do
20  so, so I did so.
21      Q.  (By Ms. Hutchison)  You're saying it was
22  convenient?
23      A.  Yes.
24         MS. GOWIN:  Objection.  Misstates
25  testimony.

Page 112

1      Q.  (By Ms. Hutchison)  But it wasn't necessary --
2         MS. GOWIN:  Objection.  Misstates
3  testimony.
4      A.  I'm not --
5      Q.  -- for any physical reason?
6      A.  I'm not saying it wasn't necessary.  It needed
7  to happen.  So it seemed like a good time to do it.
8      Q.  (By Ms. Hutchison)  Did it need to happen for
9  any physical reason?
10         MS. GOWIN:  Objection.  Vague as to
11  "physical reason."  Calls for speculation.  Incomplete
12  hypothetical.
13      A.  What do you mean "physical"?
14      Q.  (By Ms. Hutchison)  Was it necessary based upon
15  any of Mr. Timpa's conduct?
16         MS. GOWIN:  Objection.  Vague as to --
17  vague.  Object to form.  Calls for speculation.
18      A.  As I said before, I replaced the -- I changed
19  out the handcuffs because I know I needed to do so, and
20  the time -- it seemed like a good time to do so.
21      Q.  (By Ms. Hutchison)  Yes, sir, and -- and that's
22  my point.  You did it because it was convenient for you;
23  right?
24         MS. GOWIN:  Objection.  Misstates
25  testimony.

LAURIE PURDY REPORTING SERVICE, INC.

000216

OFFICER DANNY VASQUEZ

---

Page 113

1    A. It was tactically feasible to do so at the
2  time.
3    Q. (By Ms. Hutchison) But it wasn't necessary as
4  a result of any of Mr. Timpa's conduct or to restrain
5  him further or to restrain him better or --
6       MS. GOWIN: Objection.
7    Q. -- anything like that?
8       MS. GOWIN: Objection. Vague. Compound.
9    A. I changed the handcuffs because I needed to
10  change out the handcuffs.
11      MS. HUTCHISON: I object as nonresponsive.
12   Q. (By Ms. Hutchison) Officer, will you please
13  answer my question?
14   A. Okay.
15   Q. It wasn't necessary to change those handcuffs
16  in order to secure him in a different fashion, was it?
17   A. To secure him --
18      MS. GOWIN: Objection as to vague.
19   A. To secure him in any other fashion?
20   Q. (By Ms. Hutchison) In a different fashion than
21  he was already secured?
22      MS. GOWIN: Objection. Vague.
23   A. No.
24   Q. (By Ms. Hutchison) Switching the handcuffs
25  didn't make anybody more safe or less safe, did it?

---

Page 114

1       MS. GOWIN: Objection. Vague. Also, calls
2  for speculation.
3    A. The changing of the handcuffs is to change out
4  handcuffs.
5    Q. (By Ms. Hutchison) And it didn't make anybody
6  more secure or less secure, did it?
7       MS. GOWIN: Objection. Vague.
8  Incomplete -- or sorry. Vague and incomplete
9  hypothetical. Calls for speculation.
10   A. Again, I -- I believe I'm answering your
11  question. It --
12   Q. (By Ms. Hutchison) No, sir, you're not. I'm
13  asking you to just state on the record whether it's true
14  or not that switching those handcuffs out didn't make
15  anybody more secure or less secure under the
16  circumstances?
17      MS. GOWIN: Objection. Calls for
18  speculation. Vague. Lack of foundation.
19   A. Perhaps not to either.
20   Q. (By Ms. Hutchison) How long did it take you to
21  switch the handcuffs out?
22   A. Oh, I don't know exact timing.
23   Q. Do you know approximately?
24   A. I couldn't even remember.
25      MS. GOWIN: Objection. Calls for

---

Page 115

1  speculation.
2    Q. (By Ms. Hutchison) I'm sorry, Officer?
3    A. I couldn't remember how long it took me.
4    Q. Okay. So at some point you tell him, "You
5  don't need to be squirming."
6       Do you remember that?
7    A. I believe so.
8    Q. That might be when you're trying to change out
9  the handcuffs. I don't -- do you remember?
10   A. Perhaps it's when it is. I can't remember
11  exactly. I remember him moving a lot when I was trying
12  to do so.
13   Q. When he's -- at the point in time where you're
14  telling him, "You don't need to be squirming," and
15  you're saying that he's squirming too much, you still
16  have both knees on him; correct?
17      MS. GOWIN: Objection. Calls for
18  speculation.
19      You can answer, if you know.
20      MS. HUTCHISON: Can we just stipulate that
21  he can answer if he knows and doesn't have to answer if
22  he doesn't know, instead of you keep saying that on the
23  record?
24      MS. GOWIN: Go ahead and ask your question.
25      MS. HUTCHISON: Well, I'm just saying it's

---

Page 116

1  really inappropriate for you to --
2       MS. GOWIN: Go ahead and ask your question.
3       MS. HUTCHISON: -- continue to do that.
4  So I'm just offering -- I'm just offering you a
5  stipulation.
6       MR. ADDISON: I'll join the stipulation
7  that he's only testifying to stuff he has personal
8  knowledge of.
9       MS. GOWIN: Go ahead and ask your
10  questions, and I'll object as I see fit. Thanks.
11   Q. (By Ms. Hutchison) Officer, just for the
12  record, I only want you to answer what you know. Okay?
13   A. Okay.
14   Q. Is that fair?
15   A. Yes.
16   Q. So I'm going to move this to 3:02. Actually,
17  start at 2:58. And you can hear you saying, you know,
18  "You don't need to be squirming," that kind of stuff.
19  And tell me, if you know, at this point in time, which
20  officers are doing what with respect to Mr. Timpa.
21  Okay?
22   A. I will try.
23   Q. All right. And you can just reach up there and
24  hit that arrow.
25   A. (Complies.)

---

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 117

1        (Video plays.)
2     A.  When did you say I need to look?
3     Q.  (By Ms. Hutchison)  Oh, wait.  See, you just
4  hit where -- where you hear you say, "Tony."  You say
5  something like, "Stop squirming" or "You don't need to
6  be squirming."  That's the point at which I wanted to
7  know if you knew who all was involved.
8     A.  Okay.
9        (Video plays.)
10     Q.  (By Ms. Hutchison)  Okay.  Now, you can -- can
11  you -- do you know, from your -- your memory and/or the
12  body cam footage, what officers are doing what at that
13  point in time?
14        MS. GOWIN:  Objection.  Compound.
15     A.  I -- I know Dillard was at Mr. Timpa's upper
16  half of the body.  I'm still at his midsection.  And
17  somebody's at his feet, but I do not recall who that
18  was.
19     Q.  (By Ms. Hutchison)  Okay.  Can you see any
20  other officers that are in the vicinity?
21     A.  In the video, there's somebody standing near
22  the squad car, but I don't know who that is.
23     Q.  What's Sergeant Mansell doing at this point in
24  time?
25     A.  I am not tracking what Mr. -- what Sergeant

Page 118

1  Mansell is doing.
2     Q.  So -- but you know you've got at least three
3  people involved in the actual restraint; correct?
4     A.  Correct.
5     Q.  Somebody's standing by the squad car; correct?
6     A.  Correct.
7     Q.  You know that Sergeant Mansell is not one of
8  the ones involved in the actual restraint; correct?
9        MS. GOWIN:  Objection.  Vague as to does he
10  know it from looking at the video, or does he know it --
11  did he know it at the time?
12        MS. HUTCHISON:  Either way.
13        MS. GOWIN:  Well, those are two different
14  questions.
15     Q.  (By Ms. Hutchison)  I don't care how you know.
16  Do you know that Sergeant Mansell was not one of the
17  ones involved in the restraint?
18        MS. GOWIN:  Objection.  Compound.  Vague.
19     A.  As Sergeant Mansell having any -- physically
20  touching Mr. Timpa, no, he's not.
21     Q.  (By Ms. Hutchison)  He didn't the entire time,
22  did he?
23     A.  Not that I can recall, no.
24     Q.  But you had enough manpower available at that
25  point in time to engage in the five-man restraint

Page 119

1  process; correct?  Or three-man restraint process;
2  correct?
3        MS. GOWIN:  Objection.  Calls for
4  speculation.
5     A.  Just so I understand correctly, you're asking
6  me if I had enough people, at least three, to do the
7  five-man takedown?
8     Q.  (By Ms. Hutchison)  Three to five -- according
9  to your training, it was three to five officers; right?
10     A.  Correct.
11     Q.  And if you were going to initiate that process,
12  that was part of the training in the takedown process,
13  you'd have an officer at each -- on each leg; right?
14     A.  Uh-huh.
15     Q.  "Yes"?
16     A.  If I have five, yes, or at least -- yes.
17     Q.  Okay.  Well, you had three, didn't you?
18     A.  Yes.
19     Q.  So you could have used that process that you
20  learned in your defensive tactics class; correct?
21        MS. GOWIN:  Objection.  Misstates evidence.
22  Calls for speculation.  Incomplete hypothetical.
23     A.  As you can see in the video, we're using the
24  three and just dividing the body.  There's one at the
25  top, the middle, and somebody's at the feet.

Page 120

1     Q.  (By Ms. Hutchison)  Okay.  Well, in -- as far
2  as I can tell from the slides that were provided with
3  respect to your defensive training class, it -- the way
4  it explains it is a little different; right?
5        MS. GOWIN:  Objection.  Vague.
6     A.  Saying about the takedown?  What portion of
7  that?
8     Q.  (By Ms. Hutchison)  Well, we can look at it.
9  The "Control and Stabilize."
10     A.  Okay.
11     Q.  Do you recall that?
12     A.  Yes.
13     Q.  And it says you can use the control team
14  takedown to control the subject; correct?
15     A.  Yes.
16     Q.  And that would mean that you would have a
17  different officer on each limb; right?
18     A.  As -- as feasible.
19     Q.  Right.  And then, once they're handcuffed, you
20  don't have to have an officer on each arm; right?
21        MS. GOWIN:  Objection.  Misstates the
22  evidence.  Incomplete hypothetical.  And calls for
23  speculation.
24     A.  It doesn't say anything in the slide about it.
25     Q.  (By Ms. Hutchison)  If you'll look at 381?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 121

1    A. (Complies.)
2    Q. The procedure, the "Takedown Procedure."
3    A. Okay.
4    Q. That -- it says that, after they get to
5 prone -- do you see the part where, after they get to
6 prone, where it says "Arm officers"?
7    A. Yes.
8    Q. Okay. So after a person gets to prone, which
9 is laying on the ground on their stomach; right?
10    A. Uh-huh.
11    Q. "Yes"?
12    A. Yes, ma'am.
13    Q. The "Arm officers handcuff." Correct?
14    A. That's what it says, yes.
15    Q. You didn't need to do that because he was
16 already handcuffed; right?
17    A. That is correct.
18    Q. The "leg officers control the kicking," which
19 means you'd have an officer on each leg to control the
20 kicking; correct?
21    A. Correct.
22    Q. Now, you didn't have an officer on each leg.
23 You had an officer for both legs; right?
24    A. I -- that's how it --
25        MS. GOWIN: Objection. Vague.

Page 122

1    A. That's how it appears on the video, yes.
2    Q. (By Ms. Hutchison) Okay. And -- but that
3 person was controlling his legs sufficiently; correct?
4        MS. GOWIN: Objection. Calls for
5 speculation. Vague.
6    A. I can only assume.
7    Q. (By Ms. Hutchison) Well, you were right there,
8 right next to it; right?
9    A. Right. But, like I said, I was paying
10 attention to his midsection and his hands. I don't know
11 what the person at the legs was doing.
12    Q. Okay. But you're not offering any testimony
13 that whoever was on his legs wasn't sufficiently
14 controlling them, are you?
15    A. Wait. Say that again.
16    Q. You're not offering an opinion or going to
17 offer an opinion that whoever it was that was
18 controlling his legs wasn't doing it sufficiently?
19        MS. GOWIN: Objection. Compound.
20    A. Yeah, I'm not going to give an opinion about it
21 because I don't know.
22    Q. (By Ms. Hutchison) Okay. That's fair.
23        You're just saying you don't know what was
24 going on with his legs?
25    A. Right.

Page 123

1    Q. What you did know was that Officer Dillard had
2 control of his upper section?
3    A. Yes.
4    Q. And that you had control of his midsection and
5 were working on switching out the handcuffs?
6        MS. GOWIN: Objection. Vague as to
7 "control."
8    Q. (By Ms. Hutchison) Correct?
9    A. I was at his midsection, yes.
10    Q. Did you have control of his midsection?
11        MS. GOWIN: Object. Vague as to "control."
12    A. As best as possible. When he'd move, it's kind
13 of hard to control somebody when they keep -- continue
14 to try moving.
15    Q. (By Ms. Hutchison) What did you not have
16 control of?
17    A. His movement.
18    Q. What movement did you not have control of?
19    A. He --
20        MS. GOWIN: Objection. Vague as to
21 "control."
22    A. He continued to -- buck, to move, to squirm.
23    Q. (By Ms. Hutchison) Describe "squirm."
24    A. Best way I can describe squirm is to
25 continuously move in a -- I don't know how to explain

Page 124

1 it. Like, a shrimping movement. Continue to -- to
2 squeeze in, squeeze out, move left, move right.
3    Q. How far left? How far right?
4        MS. GOWIN: Objection. Calls for
5 speculation.
6    A. I wouldn't know the exact.
7    Q. (By Ms. Hutchison) Well, but I -- I'm looking
8 for a description. You're the one saying he was
9 squirming. I'm asking you to describe it in a manner
10 that we can visualize.
11    A. Enough to move me and the other officers.
12    Q. So he was moving you physically?
13    A. Yes.
14    Q. And in order for him to do that, you'd have to
15 be on top of him; correct?
16        MS. GOWIN: Objection. Misstates his
17 testimony. Misstates the evidence.
18    A. Was I on him when he was moving? Perhaps, yes.
19    Q. (By Ms. Hutchison) Okay. So going back to the
20 procedure, it says the "Arm officers handcuff." We
21 talked about that. The "leg officer controls the
22 kicking." We talked about that.
23        And then it says, while you're doing that,
24 while they're prone, you are to "avoid any restrictions
25 to breathing." Correct?

OFFICER DANNY VASQUEZ

---

Page 125

1    A. That's what it says, yes.
2    Q. Okay. Y'all didn't do anything to avoid
3  breathing restrictions, did you?
4         MS. GOWIN: Objection. Misstates the
5  evidence.
6    A. What do you mean we didn't do anything to avoid
7  his breathing?
8    Q. (By Ms. Hutchison) What actions did you take,
9  in the first 10 minutes of your restraint of Mr. Timpa,
10  to avoid restrictions to breathing?
11    A. I was on his buttocks area. I don't believe I
12  restricted his breathing.
13    Q. Well, you had one officer that was on his back
14  that was where his chest cavity was; correct?
15         MS. GOWIN: Objection. Vague as to "on his
16  back."
17    Q. (By Ms. Hutchison) Didn't you?
18         MS. GOWIN: Objection. Vague as to "on his
19  back."
20    A. Officer Dillard was on his upper section.
21    Q. (By Ms. Hutchison) Okay. I want you to look
22  at Exhibit 21 in the notebook in front of you.
23         MS. GOWIN: Can I flip this? There's
24  some --
25         THE WITNESS: Oh, okay.

---

Page 126

1         MS. GOWIN: Oh, you got it. Good.
2    Q. (By Ms. Hutchison) That's -- that's Officer
3  Dillard; correct?
4    A. Yes.
5    Q. From your body camera; correct?
6    A. It appears to be so, yes.
7    Q. And you've got both hands leaning onto
8  Mr. Timpa; correct?
9    A. He has his both hands on Mr. Timpa, yes.
10    Q. On his upper back; right?
11    A. It looks like his left shoulder, and it's hard
12  to see his right hand.
13    Q. Okay. And his knee as well; correct?
14    A. It appears so, yes.
15    Q. And that would be about where Mr. Timpa's chest
16  cavity is, wouldn't it?
17    A. Yes, perhaps.
18    Q. Okay. So what actions did you take
19  proactively, during the 10 minutes of -- the first
20  10 minutes of the restraint, to avoid restrictions to
21  Mr. Timpa's breathing?
22         MS. GOWIN: Objection to the -- vague as to
23  "proactively."
24    A. Again, I am at his midsection. Mr. Timpa is
25  still yelling and screaming. So breathing wasn't a

---

Page 127

1  concern, or at that point.
2    Q. (By Ms. Hutchison) So it's fair to say that
3  you didn't take any action, in the first 10 minutes of
4  the restraint, to avoid restrictions to his breathing?
5         MS. GOWIN: Objection. Misstates
6  testimony. Misstates the evidence.
7    A. Me being at his midsection and hearing him
8  talk, yell, and scream, and still moving gave me the
9  indication that he was breathing.
10         MS. HUTCHISON: Object to the
11  responsiveness.
12    Q. (By Ms. Hutchison) It's fair to say, Officer,
13  that you did not take any -- for whatever reason, you
14  did not take any action to avoid restriction to
15  Mr. Timpa's breathing in the first 10 minutes of
16  restraint; correct?
17         MS. GOWIN: Objection. Vague. Also,
18  misstates his testimony. Misstates the evidence.
19    A. It is not fair to say that.
20    Q. Okay.
21    A. As I said, I am at his midsection. He is
22  yelling and screaming. So his breathing -- I assume he
23  is breathing at this -- he's still breathing, breathing
24  fine.
25    Q. (By Ms. Hutchison) Yes, sir, and I'm not

---

Page 128

1  asking you that question. Okay.
2    A. Uh-huh.
3    Q. What I'm asking you is -- and I'll make a list.
4  Why don't you tell me every action that you took to
5  avoid restriction to Mr. Timpa's breathing --
6         MS. GOWIN: Objection. Vague as to
7  "action."
8    Q. (By Ms. Hutchison) -- in the first 10 minutes
9  of the restraint?
10         What's Number 1?
11    A. What do you define as an "action"?
12    Q. Doing something.
13    A. I am at his midsection. I am not impeding his
14  breathing. He's breathing at this point.
15         MS. HUTCHISON: I object as nonresponsive.
16    Q. (By Ms. Hutchison) I understand you want to
17  say that he was breathing. And it's fine if you say,
18  "Because he was breathing, I did not take any action to
19  avoid restricting his breathing." That's fine.
20         I just want to clarify for the record that, for
21  whatever reason, you did not take any action to avoid
22  restriction to his breathing while he was prone;
23  correct?
24         MS. GOWIN: Objection. Misstates his
25  testimony. He said he was at -- holding -- restraining

---

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 129

1  him at his midsection.
2         This question's been asked and answered
3  twice.
4     A.  I -- I feel like I've answered your question.
5  I -- I don't know what else you want me to say.
6     Q.  (By Ms. Hutchison)  I just want you to tell me
7  any action you took to avoid restricting his breathing.
8     A.  Again, I am at his midsection.
9     Q.  Okay.  So the only --
10    A.  Mr. Timpa's breathing.
11    Q.  So let me -- let me rephrase it.
12        The only action that you took to avoid
13  restricting Mr. Timpa's breathing, while he was prone
14  restraint with two to three officers putting weight on
15  top of him, is for you to be at his midsection?
16        MS. GOWIN:  Objection.  Misstates the
17  evidence.  Object to form.  Vague.
18    Q.  (By Ms. Hutchison)  Is that correct?
19    A.  I -- I feel you continue to ask me the same
20  thing, and I've already answered it.  Not impeding his
21  breathing.  He's breathing fine.  And I'm at his
22  midsection dealing with his midsection and his hands and
23  with his handcuffs.
24        MS. HUTCHISON:  I object as nonresponsive.
25    Q.  (By Ms. Hutchison)  Is it your testimony,

Page 130

1  Officer, that the action that you took to avoid
2  restricting Mr. Timpa's breathing was to be at his
3  midsection while Officer Dillard was on the top of his
4  back and the other -- other officer was at his feet?
5        MS. GOWIN:  Objection.  Asked and answered.
6  He's been over this several times.  I understand he's
7  not giving you the answer that you want, but he has
8  answered the question.
9        MS. HUTCHISON:  You know what?  Don't --
10  don't lecture me.
11        MS. GOWIN:  So we're not going to -- he's
12  not answering this any further.  He's answered it three
13  or four times now.
14        MS. HUTCHISON:  Are you instructing him not
15  to answer the --
16        MS. GOWIN:  I am.
17        MS. HUTCHISON:  -- the question?
18    Q.  (By Ms. Hutchison)  So was Officer Dillard
19  putting weight on his arms at the time that he was on
20  the back of Mr. Timpa?
21        MS. GOWIN:  Objection.  Vague as to whose
22  arms.
23    Q.  (By Ms. Hutchison)  On his own arms.  Was he
24  putting weight on his, Officer Dillard's, arms?
25    A.  I don't know.  You would have to ask Officer

Page 131

1  Dillard.
2     Q.  I'm asking you what you observed, sir.
3     A.  I observed Officer Dillard's hands on his
4  shoulder, on the left shoulder, possibly on his back.  I
5  couldn't tell you if he put weight or not.
6     Q.  Wouldn't he be having to put his own weight on
7  top of Mr. Timpa, if Mr. Timpa was squirming, in order
8  to stop him?
9        MS. GOWIN:  Objection.  Asked and answered.
10  And calls for speculation.
11    A.  Again, you could only assume.
12    Q.  (By Ms. Hutchison)  Sir, again, I'm asking you
13  what you observed.  Okay?
14    A.  I observed his hands on his back.
15    Q.  And did you observe Officer Dillard, in order
16  to try to stop Mr. Timpa from moving, place his weight
17  on top of him?
18        MS. GOWIN:  Objection.  Calls for
19  speculation.
20    A.  I don't know if he put any weight or how much
21  weight he put in there.  I don't know.
22    Q.  (By Ms. Hutchison)  So is it your testimony
23  that, if Officer Dillard had put no weight on top of
24  Mr. Timpa, he would still be under the amount of control
25  that he was?

Page 132

1        MS. GOWIN:  Objection.  Misstates his
2  testimony.  Calls for speculation.
3     A.  My testimony is I don't know.
4     Q.  (By Ms. Hutchison)  I'm asking you, sir, from
5  what you observed at the scene of Mr. Timpa, are you
6  saying that it was not necessary to put any weight on
7  his upper and mid back to control him?
8        MS. GOWIN:  Misstates test- -- objection.
9  Misstates testimony.  Calls for speculation.
10    A.  I'm not saying that at all.
11    Q.  (By Ms. Hutchison)  Okay.  What are you saying?
12  Was it --
13    A.  I'm saying that I --
14    Q.  Was it --
15    A.  -- observed Dillard have his hands and his knee
16  on Mr. Timpa's back.
17    Q.  Was it necessary to put weight on Mr. Timpa's
18  back and upper back in order to stop him from moving
19  around?
20        MS. GOWIN:  Objection.  Calls for
21  speculation.
22    A.  I couldn't tell you what Dillard felt he needed
23  to do.
24        MS. HUTCHISON:  I object as nonresponsive.
25    Q.  (By Ms. Hutchison)  Officer, I'm not asking you

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 133

1 what Dillard felt he needed to do. Okay. I'm asking
2 you, from you being at the scene on top of Tony Timpa,
3 to try to prevent him from moving around, was it
4 necessary for someone to put weight on his upper back to
5 stop him from moving around?
6    A. Like I said, perhaps Dillard felt that way,
7 that he needed to put pressure. I don't know.
8    Q. No, sir, I'm not asking you how Officer Dillard
9 felt. Okay. Can we please set that aside?
10    A. I'm -- I'm answering your question. You're
11 asking me if he had pressure on him.
12    Q. No, sir, I'm not asking you that either.
13    A. So what is your question?
14    Q. Is it your testimony that, in order to prevent
15 Mr. Timpa from moving around too much, somebody had to
16 put weight on the top -- on his back and upper back?
17    A. Just so I understand and I can answer your
18 question, you're asking me if -- if it was anybody else,
19 we would have to put pressure on his back to control
20 him?
21    Q. I don't -- I'm not sure I even know what you
22 just said.
23       I'm asking you, under the circumstances you
24 encountered with Tony Timpa at the scene on the date in
25 question, that you were, yourself, involved in, was it

Page 134

1 necessary to put weight on top of Tony Timpa's back in
2 order to stop him from moving unnecessarily?
3    A. Perhaps.
4    Q. What do you mean by "perhaps"?
5    A. We were trying to keep him from -- stop moving,
6 so applied the amount of -- amount of restraint
7 possible, as needed.
8    Q. And that's what I'm asking you, sir. Was it
9 necessary to put weight on him to restrain him?
10    A. Perhaps, yes.
11    Q. And did you observe Officer Dillard doing that?
12    A. I observed Dillard putting his hands and his
13 knees on Mr. Timpa's back, yes.
14    Q. In order to stop him from unnecessarily moving?
15    A. Yes.
16    Q. And that was during the entire restraint
17 process; correct?
18       MS. GOWIN: Objection. Calls for
19 speculation.
20    A. As -- I -- I think so, throughout the -- I
21 can't remember exactly if -- if he moved or when he
22 moved.
23    Q. (By Ms. Hutchison) But is your contention
24 that he needed to be restrained on his stomach during
25 the entire restraint process; correct?

Page 135

1    A. To be honest with you, I don't know what
2 "contention" means.
3    Q. Oh, it's your -- I'm sorry. I don't mean to
4 use legalese.
5       It's your opinion that -- no. I'm sorry. I
6 don't remember now what my question was. I don't even
7 know what my question was.
8       MS. GOWIN: Do you want it back?
9       MR. ADDISON: Yeah, he -- yeah, read it
10 back.
11       MS. HUTCHISON: Yeah. Sorry. Can you read
12 it back.
13       (Discussion off the record.)
14       (Reporter read the requested testimony.)
15       MS. HUTCHISON: Okay. I'll re-ask that.
16    Q. (By Ms. Hutchison) It's your opinion that
17 Mr. Timpa needed to be restrained face down, on his
18 stomach, during the entire restraint process?
19    A. Yes.
20    Q. And you -- you didn't see any point in time
21 that he could be put into a recovery position in
22 accordance with your training concerning takedown
23 procedures?
24    A. No.
25       MS. GOWIN: We've been going a very long

Page 136

1 time now. Let's take a break. It's noon.
2       (Discussion off the record.)
3       THE VIDEOGRAPHER: Off the record at 12:05.
4       (Break from 12:05 to 1:12.)
5       THE VIDEOGRAPHER: We're on the record at
6 1:12.
7    Q. (By Ms. Hutchison) So according to the way you
8 were trained and -- and the knowledge that you had at
9 the time you encountered Mr. Timpa, you understood that,
10 when it was safe to put somebody in a recovery position,
11 that's when you -- when you're supposed to do it; right?
12    A. Yes.
13    Q. And so how long is the period of time that
14 someone is not struggling until you consider it safe?
15       MS. GOWIN: Objection. Incomplete
16 hypothetical. Calls for speculation.
17    A. I couldn't say any determined amount of time.
18    Q. (By Ms. Hutchison) So how do you decide?
19    A. When we find it safe to do so.
20    Q. How do you know when it's safe?
21    A. When we feel safe at the point or feel
22 confident enough that we can accomplish what we've got
23 to do.
24    Q. Right. And what do you -- what is your
25 training about how to make that determination?

OFFICER DANNY VASQUEZ

**Page 137**

1 A. That everything is in play, that we have
2 control, and that raising -- sitting up -- someone up or
3 turning onto their side won't result in either further
4 injury or restarting the incident.
5 Q. Right. Considering the amount of manpower you
6 have on -- on hand; correct?
7 A. Yes.
8 Q. And whether or not someone's struggling or not;
9 correct?
10 A. Yes.
11 Q. Because they teach you that what you have to
12 consider is the totality of the circumstances; correct?
13 A. Correct.
14 Q. At the moment that you make the decision;
15 right?
16 A. Yes.
17 Q. So, in other words, whether or not somebody
18 struggled, you know, 20 minutes earlier isn't
19 necessarily relevant to what they're doing at the time
20 you make the decision; correct?
21 MS. GOWIN: Objection. Calls for
22 speculation.
23 A. Yes. In certain circumstances, yes.
24 Q. (By Ms. Hutchison) Okay. So my question is
25 what did they teach you, what were you trained to do in

**Page 138**

1 order to assess the situation you're in, in terms of
2 when it's safe to put someone in recovery?
3 MS. GOWIN: Objection. Vague. Incomplete
4 hypothetical.
5 A. Again, in order for us to sit him up -- sit the
6 subject up or sit him on his side is determined whether
7 it's -- it's safe for both officers -- the officers and
8 the person, if it's feasible at the time, and -- and it
9 won't recreate the incident to begin -- where they begin
10 fighting or resisting again.
11 Q. (By Ms. Hutchison) Right. I got that part.
12 Now, let's go to the part where what did they teach you
13 to know when it's safe, when it's feasible?
14 MS. GOWIN: Objection. Asked and answered.
15 A. Is that not what I answered?
16 Q. (By Ms. Hutchison) No, sir. You said that
17 they taught you to sit him up or put him in recovery
18 when it's safe and feasible.
19 A. Yes.
20 Q. My --
21 MS. GOWIN: Objection. Misstates
22 testimony. That's not what he said.
23 Q. (By Ms. Hutchison) My question is what did
24 they teach you as to how to decide when it's safe and
25 feasible?

**Page 139**

1 MS. GOWIN: Objection. Asked and answered.
2 A. I -- I answered. When -- when we as officers
3 feel that it's safe to do so.
4 Q. (By Ms. Hutchison) How do you know when it's
5 safe to do so, Officer? I'm not -- I'm not asking you
6 when it's safe. I'm asking you how do you decide when
7 it's safe --
8 MS. GOWIN: Objection. Asked and answered.
9 Q. -- which is a different question.
10 MS. GOWIN: Objection. Asked and answered.
11 A. I've answered it. When we feel that it's
12 safe --
13 Q. (By Ms. Hutchison) How do you --
14 A. -- to do so.
15 Q. How do you know when you feel that?
16 A. Because I feel it.
17 Q. You feel it what? Just like it bubbles up in
18 your subconscious? How do you -- how do you come to the
19 conclusion, "Okay, now it's safe to do this"?
20 MS. GOWIN: Objection. Asked and answered.
21 Argumentative.
22 A. I -- I try to get past what you're saying, but
23 it -- it's -- I've -- we have come to a conclusion it's
24 safe. We no longer have a resisting subject. It's safe
25 to do so for both parties.

**Page 140**

1 Q. (By Ms. Hutchison) Anything else besides
2 they're no longer resisting?
3 A. It's safe to do so, and it's feasible.
4 Q. And -- and I get that part.
5 What I'm asking you is what are the factors
6 that make you decide it's now safe and feasible? You
7 said "no longer resisting." Are there any others?
8 A. I'm pretty sure there is.
9 Q. And what would those be?
10 A. Those are so variant. It's -- every case is
11 different.
12 Q. What are the -- what are the possibilities?
13 MS. GOWIN: Objection. Calls for
14 speculation. Incomplete hypothetical.
15 A. The possibilities are numerous honestly.
16 Q. (By Ms. Hutchison) Give me four.
17 A. Not resisting.
18 Q. Got that one.
19 A. Not -- let me see. It -- it's safe to do so.
20 We're able to move him in a -- move him or her into a
21 safe position, safe spot.
22 Q. What do you mean by "able to move them into a
23 safe position"?
24 A. They are allowing themselves to be moved or --
25 Q. Is that --

LAURIE PURDY REPORTING SERVICE, INC.

000223

OFFICER DANNY VASQUEZ

---

Page 141

1    A. -- or the fact that me rolling them, I'm not
2 going to roll them into the street, or I'm not going to
3 roll them onto a bush of thorns or something like that.
4    Q. Okay.
5    A. My surroundings.
6    Q. So they're no longer resisting and that you can
7 roll them without rolling them into a hazard?
8    A. Yes.
9    Q. Anything else?
10    A. There'd be multiple. Those are just some.
11    Q. Okay. And what would those be?
12    A. Let's see. I guess it would also be dependent
13 on either we're transporting in an ambulance or you're
14 transporting in a squad car. Because if you're
15 transporting in an ambulance, you've got to wait for the
16 gurney.
17    Q. Okay. The availability of gurney.
18       Anything else?
19    A. Make sure everybody's done what they need to
20 do, as in, if the EMTs are out there, have the EMTs
21 gotten what they need to do so we can transport.
22    Q. Well, EMTs can take vitals, et cetera, on
23 somebody who's on their side or sitting up; right?
24       MS. GOWIN: Objection.
25    A. That's --

---

Page 142

1       MS. GOWIN: Calls for speculation.
2    A. That's up to the EMT.
3    Q. (By Ms. Hutchison) Are you aware of anything
4 that would prevent an EMT from taking vitals on someone
5 who's sitting up?
6       MS. GOWIN: Objection. Calls for
7 speculation.
8    A. I don't know. I'm not an EMT.
9    Q. (By Ms. Hutchison) Okay. Since you don't know
10 whether or not that's a factor, can we just not include
11 that as a factor, or do you -- or are you still
12 insisting that that's a factor to determine -- in
13 deciding whether or not you can sit someone up?
14       MS. GOWIN: Objection.
15    A. It could be.
16       MS. GOWIN: Com- -- compound.
17    Q. (By Ms. Hutchison) Under what circumstances
18 could it be?
19    A. Somebody sitting down who's either still moving
20 or sitting down and attempting to perhaps bite the EMT,
21 he can't do what he has to do.
22    Q. Doesn't that fall under "no longer resisting"?
23    A. It could.
24    Q. Okay. But -- so we've already got "no longer
25 resisting." Okay?

---

Page 143

1    A. Yes.
2    Q. You with me on that one?
3    A. Yes.
4    Q. All right. Then how would the EMT being able
5 to do their vitals factor in if the person's no longer
6 resisting?
7       MS. GOWIN: Objection. Calls for
8 speculation. Incomplete hypothetical.
9    A. Again, if -- if we're transporting with via
10 medical, they have to do what they have -- whatever
11 they've got to do. Then we can move them or move them
12 however they see fit.
13    Q. (By Ms. Hutchison) Yes, sir. My question to
14 you is, when you, as an officer, are assessing when it's
15 safe to sit someone up --
16    A. Uh-huh.
17    Q. -- and the gurney is available, how is the EMT
18 participation a factor?
19    A. Are you --
20       MS. GOWIN: Objection. Calls for
21 speculation. Incomplete hypothetical.
22    A. So you said if the gurney was available; right?
23    Q. (By Ms. Hutchison) Yes.
24    A. If the gurney's available, we would lay him on
25 the gurney.

---

Page 144

1    Q. I'm talking about putting someone in a recovery
2 position. Okay?
3    A. But if the gurney was there, we would put them
4 on the gurney.
5    Q. Yes, sir, I -- I'm just talking about putting
6 someone in a recovery position. Okay?
7    A. I understand, but I went based -- that you said
8 a gurney was available.
9    Q. Yes, sir. I'm just talking -- can you -- I'm
10 talking -- I'm asking you about putting someone in a
11 recovery position, and you said you do it when it's safe
12 to do so; right?
13    A. Yes.
14    Q. And I'm asking you how do you decide if it's
15 safe to do so? You said, "if someone's no longer
16 resisting; if you can do it without placing them in a
17 hazard." Correct?
18    A. Uh-huh.
19    Q. "Yes"?
20    A. Yes.
21    Q. Is there anything else that factors into your
22 assessment of when it is safe to do so?
23    A. Yes, I'm -- again, there's multiple, as I
24 stated before.
25    Q. And what -- what else is there, besides them no

---

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 145

1  longer resisting and you can do it without putting them
2  into a hazard?
3         MS. GOWIN: Objection. Calls for
4  speculation. Incomplete hypothetical.
5      A. I can't have any come to mind at this point.
6      Q. (By Ms. Hutchison) So you would agree with me
7  that, when they're teaching you in the academy, "Put
8  somebody in recovery as soon as it's feasible," that
9  they also teach you, "Here are the things for you to
10 decide whether it's feasible." Right?
11        MS. GOWIN: Objection. Misstates
12 testimony.
13     A. I can't recall them giving any specifics,
14 saying, "Hey, this is what you have to have for it to be
15 safe and feasible."
16     Q. (By Ms. Hutchison) They didn't provide you any
17 guidance in that regard?
18        MS. GOWIN: Objection. Misstates
19 testimony.
20     A. Again, from what I can recall, at the academy
21 was -- you know, they gave specifics, that it's safe for
22 you and safe for the subject.
23     Q. They didn't teach you what was safe?
24        MS. GOWIN: Objection. Misstates
25 testimony.

Page 146

1      A. I can't recall them saying, "Hey, this is what
2  you must have in order for it to equal safe."
3      Q. (By Ms. Hutchison) They didn't teach you that
4  part of what you are to assess is that someone's no
5  longer resisting, or is that something -- something you
6  just knew?
7      A. Yes, I -- I mean, it was taught that, if they
8  are no longer resisting, it's time to go --
9      Q. Okay.
10     A. -- take care of whatever we're going to do.
11     Q. So you would agree with me that, if you've got
12 somebody that you're restraining on their stomach, that
13 you're taught that, if they're -- if they stop resisting
14 and there's not a hazard that you're going to, you know,
15 put them in, that you should put them in the recovery
16 position?
17        MS. GOWIN: Objection. Misstates his
18 testimony. Misstates the evidence we've seen here.
19     A. What I remember from training, that the
20 recovery position is prior to transport, if somebody is
21 not -- no longer resisting under arrest or being
22 transported to a medical facility, the point is to get
23 them up, get in the gurney or in the squad car, and time
24 to go.
25     Q. (By Ms. Hutchison) Yes, sir. I'm not talking

Page 147

1  about the gurney or the squad car. I'm talking about
2  the recovery position.
3         You understand that?
4      A. Yes.
5      Q. And your training specifically says to put them
6  in the recovery position as soon as you can; correct?
7      A. Correct.
8         MS. GOWIN: Objection. Misstates the
9  evidence and the testimony.
10     Q. (By Ms. Hutchison) And what they taught you
11 was, as soon as someone is no longer resisting and
12 you're not going to put them into a hazard, put them in
13 a recovery position --
14        MS. GOWIN: Object --
15     Q. -- correct?
16        MS. GOWIN: Objection. Misstates the
17 evidence. Misstates the testimony.
18     A. From what I remember of the slides we looked at
19 earlier, it did say to put them in a recovery position
20 when it's feasible, yes.
21     Q. (By Ms. Hutchison) And that's part of what you
22 were taught in the academy; right?
23     A. Yes.
24     Q. So if someone's no longer resisting and it's
25 feasible, you're supposed to put them in recovery;

Page 148

1  right?
2         MS. GOWIN: Objection. Misstates
3  testimony. Misstates evidence. Incomplete
4  hypothetical. And calls for speculation.
5      A. I mean, and -- and, again, it's a case by case.
6  Could I do it with somebody that we still had to take
7  care of something at the scene, then, yes. If it's
8  somebody ready to be transported, we transport.
9      Q. (By Ms. Hutchison) Can you think of anything
10 that would prevent you from following the training that
11 tells you to put somebody into a recovery position when
12 they're no longer resisting?
13        MS. GOWIN: Objection. Calls for
14 speculation. Incomplete hypothetical.
15     A. Can you say that again?
16     Q. (By Ms. Hutchison) Yes, sir. Can you think of
17 anything that would prevent you, that would stop you, in
18 a given situation, from putting someone who was no
19 longer resisting into a recovery position?
20        MS. GOWIN: Objection. Misstates --
21 Objection. Calls for speculation. Incomplete
22 hypothetical.
23     A. If it falls within being safe and no hazards, I
24 don't see why not.
25     Q. (By Ms. Hutchison) So I want to show you --

OFFICER DANNY VASQUEZ

Page 149

1  I'm going to start this at about 4:24, if I can get it
2  there.
3       MS. GOWIN:  Are we still on Officer
4  Vasquez's body cam?
5       MS. HUTCHISON:  Yes.
6       MS. GOWIN:  Okay.
7    Q.  (By Ms. Hutchison)  I got it at 4:25.  I think
8  this is about the time where you say, "I'm going to try
9  to change cuffs."
10   A.  Okay.
11   Q.  So kind of listen for that; verify that that's
12  you.  And I'm going to play it through 4:53.  And I want
13  you to make note -- and I don't know if you want a pen
14  and a piece of paper or whatever.  But I want you to
15  note -- or you can even just say, "Hey, stop right
16  there" -- any place where you contend that Mr. Timpa is
17  struggling.  Okay?
18   A.  All right.  You mean "contend," you mean, like,
19  when I see him moving?
20   Q.  Where you -- yes.  I'm sorry.
21   A.  Okay.
22   Q.  I need to quit using legalese just in general.
23       But any place where you say that he's
24  struggling right there, that shows he's struggling.
25  Okay?

Page 150

1    A.  Okay.
2    Q.  So, like I said, 4:25 and stop it at 4:53.
3       MS. GOWIN:  I'm going to have a standing
4  objection on this part where for -- this calls for
5  speculation and is limited to what can be seen in the
6  video from this aspect.
7    Q.  (By Ms. Hutchison)  Well, let -- so let me ask
8  you this.  Any -- any place that you believe it shows on
9  the video or you -- you are going to testify, "Well, you
10  can't see it on the video, but he was struggling."  So
11  just any place in there where you say either it's shown
12  on the video or it was happening.  Okay?
13       MS. GOWIN:  Objection.  Overbroad.  Vague.
14  Calls for speculation.
15       Just answer what you see in the video.
16       MS. HUTCHISON:  That's not my question.
17   Q.  (By Ms. Hutchison)  Answer my question, please.
18  It's at 4:25.  And, again, I'm going to stop it at 4:53.
19       (Video plays.)
20   A.  I'm going to pause it.  The glare is --
21   Q.  (By Ms. Hutchison)  Oh, yeah, you can --
22   A.  If you don't mind --
23   Q.  -- maybe --
24   A.  No, it -- it was just the way it was leaning,
25  the glare was real bad.

Page 151

1    Q.  Okay.
2    A.  It's starting at 4:24.
3    Q.  Okay.
4       (Video plays.)
5    A.  He's moving.  He's moving.  Okay.
6       MS. GOWIN:  Okay.
7    Q.  (By Ms. Hutchison)  Is it --
8    A.  Yeah, it's at 4:57 now.
9    Q.  Oh, okay.  So where in there, in that period of
10  time from when you started handcuffing at 4:24 to 4:53,
11  did you see Mr. Timpa struggling?
12   A.  The whole time.
13       MS. GOWIN:  He indicated as we went.
14   Q.  (By Ms. Hutchison)  I'm sorry.  I didn't hear
15  you.
16   A.  The whole time.  That he was moving?
17   Q.  Oh, no, struggling.  So you believe that, from
18  4:24 to 4:53, Mr. Timpa was struggling that entire time?
19   A.  Yes.
20   Q.  And what was it -- let me back it up to 4:20 --
21  4:27.  So here I'm going to -- I'm going to come around
22  so I can see what you're seeing.
23   A.  Your microphone.
24   Q.  Okay.  Here we go.
25       Okay.  I'm going to start at 4:27.  And tell me

Page 152

1  which part of his body that you see you can -- that
2  you're saying was a struggle -- was struggling.
3       (Video plays.)
4    Q.  (By Ms. Hutchison)  Okay.  So at -- up to 4:36,
5  what part of his body was resisting you?
6    A.  His hands that are not in screen.  His hands
7  and his, like, wrist area, you know, pulling away from
8  me.
9    Q.  With just his hands, or are you saying his arms
10  were pulling away from you?
11   A.  Yeah.  So he's trying to move his hands, best
12  way I can describe it.
13   Q.  Okay.  What I'm trying to figure out is are you
14  saying that his arms are pulling away from you or just
15  his hands?
16   A.  His hands.
17   Q.  Okay.
18   A.  His -- his -- at this point, his arms are
19  moving because I am trying to hold his hand or arm to
20  put the handcuff on.
21   Q.  Right.  You're pulling on his hands, which is
22  making his arms move?
23   A.  Yes.
24   Q.  But he's not moving his arms himself at this
25  point?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 153

1   A. Yes, he is.
2   Q. Oh, he is?
3   A. Yes.
4   Q. Okay. So you think that this shows him moving
5   his arms to resist you?
6   A. Yes. You cannot see it on camera when he's
7   flailing his hands and pulling his hands away from me.
8   Q. I know, but I'm talking about his arms. You're
9   saying that this video shows him resisting you?
10  A. I'm telling you his arms are moving because I
11  am trying to get a hold of his arms, but not on video is
12  his hands pulling away from me.
13  Q. Yes, sir, I understand what you're saying about
14  his hands.
15  A. Uh-huh.
16  Q. I'm asking you if it's -- if you're taking the
17  position that this is showing him struggling against
18  you?
19  A. Yes, for what is not seen on video, yes.
20  Q. Okay. I get that. Now, I'm asking you for
21  what is seen on the video. Are you saying that what we
22  are seeing on the video is showing him struggling
23  against you?
24  A. Again, the video may not show it that way, but
25  I know he's moving because of what's not seen.

Page 154

1   Q. Okay. I -- I will give you that you are --
2   that it's your position that what we cannot see shows
3   him struggling against you?
4   A. Yes.
5   Q. I'm asking you, what we can see, are you saying
6   that that shows him struggling against you?
7   A. Again, you see him moving because he's moving
8   his hands, and I'm trying to grab a hold of his arm. So
9   he is moving, yes.
10  Q. Okay. And so you say that what we see on that
11  shows him struggling against you?
12  A. Again, because you cannot see the totality of
13  what the video shows, the video doesn't show his hands
14  moving. So according -- in the video, it just seems
15  like his arm is moving, but he is fighting against my
16  hands trying to put the handcuff on.
17  Q. So if you just look at the video without your
18  testimony about his hands, it doesn't look like he's
19  struggling against you, does it?
20      MS. GOWIN: Objection. Misstates
21  testimony. Misstates the evidence.
22  A. I couldn't say that based on what I -- because
23  of what I know and what I'm seeing is what I'm
24  answering.
25  Q. (By Ms. Hutchison) Okay. We'll keep going

Page 155

1   from 4:37.
2       (Video plays.)
3       Q. (By Ms. Hutchison) Now, you can see -- at that
4   point, you can actually see you putting the cuffs on
5   him, can't you?
6       A. Yes. I am attempting to do it at that time,
7   yes.
8       Q. And your -- and it's your testimony to the jury
9   in this case, under oath, that that shows him struggling
10  against you?
11      A. Again, the video does not show what his hands
12  are doing, but his hands are pulling away as I'm
13  attempting to put on the handcuffs.
14      Q. Officer, my question to you is, is it your
15  testimony that this video, that we are looking at --
16      A. Uh-huh.
17      Q. -- with our own eyes right now from your body
18  camera at 4:40, shows Mr. Timpa struggling against you?
19      MS. GOWIN: Asked and answered. We're
20  done. We -- he's already answered it twice.
21      MS. HUTCHISON: No.
22      MS. GOWIN: You don't get to ask it
23  he says what you want him to say.
24      MS. HUTCHISON: He -- he --
25      MS. GOWIN: We're done. Asked and

Page 156

1   answered. We'll move on.
2       MS. HUTCHISON: He has not answered the
3   question. I'm not asking him about what he's contending
4   is happening off the camera. I'm asking only solely
5   based on what's reflected in the video. Just that
6   basis.
7       Q. (By Ms. Hutchison) Are you saying that it
8   shows him struggling against you?
9       MS. GOWIN: Objection. Asked and answered.
10  I'm instructing him not to answer. He's already
11  answered you several times. You don't get to ask it
12  until he says what you want.
13      Q. (By Ms. Hutchison) Where is he struggling
14  against you in the video? Not off camera, in the video.
15      MS. GOWIN: Objection. Asked and answered
16  multiple times. I'm instructing him not to answer.
17      MS. HUTCHISON: I just -- I'm asking him
18  where in the video. Like, point --
19      MS. GOWIN: I understand. You have asked
20  that as well.
21      Q. (By Ms. Hutchison) Like, point to it?
22      MS. GOWIN: Asked and answered.
23      Q. (By Ms. Hutchison) Will you please point to
24  it?
25      MS. GOWIN: Asked and answered. I'm

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 165

1  required him to be physically restrained at -- during
2  this process?
3         MS. GOWIN: Objection. Misstates the
4  testimony. Misstates the evidence.
5     A. Mr. Timpa is still moving, still resisting, so
6  we're acting accordingly.
7         MS. HUTCHISON: I object as nonresponsive.
8         Will you read the question back, please.
9     (Reporter read the requested testimony.)
10        MS. GOWIN: Objection. Compound.
11 Objection. Misstates the evidence. Misstates the
12 testimony. Badgering the witness.
13        You can answer.
14    A. So you're asking me if Mr. Timpa was still
15 resisting and that we needed to continue to restrain
16 him? Am I correct?
17    Q. (By Ms. Hutchison) Sure.
18    A. Yes, Mr. Timpa is still resisting and --
19    Q. At what level is he resisting?
20        MS. GOWIN: Objection. Vague.
21    A. He is resisting where we need to contain him.
22    Q. (By Ms. Hutchison) Both of you? Both you and
23 Officer Dillard?
24        MS. GOWIN: Objection. Calls for
25 speculation.

Page 166

1         MS. HUTCHISON: How on earth does that call
2  for speculation?
3         MS. GOWIN: How about you ask your
4  questions, and --
5         MS. HUTCHISON: No. I want to know.
6         MS. GOWIN: -- I'll do my thing.
7         MS. HUTCHISON: No. I get to ask you the
8  basis for your objection. What is it?
9         MS. GOWIN: Sure. Absolutely. I don't
10 think that one witness can -- can opine on what another
11 witness is doing and why they are doing it and whether
12 or not that person felt that it was necessary. So
13 that's why.
14        MS. HUTCHISON: Really?
15    Q. (By Ms. Hutchison) All right, Officer. Is it
16 your testimony that you don't have any idea whether or
17 not Officer Dillard's restraint was necessary?
18        MS. GOWIN: Objection. Misstates
19 testimony. Misstates the evidence.
20    A. My testimony is that Mr. Timpa was still
21 resisting, and we acted accordingly.
22        MS. HUTCHISON: I object as nonresponsive.
23    Q. (By Ms. Hutchison) Are you going to testify
24 to the jury that you had no idea whether or not
25 Officer Dillard needed to continue to restrain

Page 167

1  Mr. Timpa?
2     A. What I am saying is that Mr. Timpa was still
3  resisting; so we acted accordingly.
4         MS. HUTCHISON: I object as nonresponsive.
5     Q. (By Ms. Hutchison) Did you hear my question?
6     A. Yes, I did.
7     Q. Please answer it.
8     A. I believe I did. I'm telling -- I am answering
9  that we did and acted accordingly based on Mr. Timpa's
10 resistance.
11    Q. And when you say "we," you mean both you and
12 Officer Dillard; correct?
13    A. If that's who you're asking about, yes.
14    Q. Well, who else -- and whoever else was involved
15 in his restraint; right?
16    A. Yes.
17    Q. Because there was another officer, as you said,
18 kneeling on his -- I think you said the crease in his
19 knee?
20    A. That's what it appeared to be.
21    Q. Okay. So you're saying that, because of the
22 way Mr. Timpa was acting, it was necessary for you and
23 Officer Dillard and the officer on his knee to do what
24 you were doing to restrain him; correct?
25    A. That is correct.

Page 168

1     Q. And, therefore, you're offering an opinion
2  about the necessity of what Officer Dillard was doing;
3  correct?
4     A. I am not offering an opinion on what he did.
5     Q. You just did, Officer. You just said, because
6  of the way he was acting, it was necessary for "us --
7  we, the officers -- to restrain him." Right?
8     A. Yes.
9     Q. So, therefore, you're including Officer Dillard
10 and the officer at his legs; correct?
11    A. Correct.
12    Q. And so my question to you is, encompassed
13 within that, you're saying it was necessary for
14 Officer Dillard to use the type and amount of force
15 that he used; correct?
16    A. Yes.
17    Q. And it was necessary for you to use the type
18 and amount of force that you used; correct?
19    A. Yes.
20    Q. And it was necessary for the officer at his
21 legs to use the type and amount of force that he used;
22 correct?
23    A. Yes.
24    Q. So encompassed within that, you're saying that,
25 in order for Mr. Timpa to be properly restrained,

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 169

1 Officer Dillard needed to use his weight on top of
2 Mr. Timpa to restrain him; correct?
3      A. I can say he needed weight. How much weight
4 Officer Dillard put, I do not know. And how much he
5 needed to use, I wasn't at that portion of his body, so
6 I wouldn't know.
7      Q. I understand. But in keeping with the -- the
8 way that you -- your expectations of Officer Dillard to
9 restrain Mr. Timpa's upper half, you believed that he
10 was putting his body weight on top of Mr. Timpa to
11 restrain him; correct?
12          MS. GOWIN: Objection. Vague as to
13 "body weight."
14      A. I can only assume the amount of weight he was
15 placing on him.
16      Q. (By Ms. Hutchison) Well, if Mr. Timpa was
17 struggling to the point that you needed to continue to
18 restrain him, how did you expect Officer Dillard to
19 restrain him?
20      A. With whatever he needed to do; however he
21 needed to do it.
22      Q. Okay. So if Mr. Timpa wasn't struggling at
23 all, then Officer Dillard could have just used no
24 weight; right?
25      A. In theory.

Page 170

1      Q. Well, I'm talking about in practice. If
2 somebody's not struggling, you don't need to put weight
3 on them, do you?
4      A. Well, but Mr. Timpa was resisting.
5      Q. So what I'm saying, if Mr. Timpa hadn't been
6 struggling, you wouldn't have needed to put weight on
7 him; right?
8          MS. GOWIN: Objection. Incomplete
9 hypothetical. Calls for speculation.
10      A. That's totally if -- an "if" situation.
11      Q. (By Ms. Hutchison) Yes, it is.
12      A. So if things would have went that way, then, in
13 theory, yes, he could have not been on him.
14      Q. Okay. And so, in order to justify an officer
15 placing weight on top of somebody who's prone, that
16 person has to be struggling; right?
17          MS. GOWIN: Objection. Incomplete
18 hypothetical.
19      A. To some extent, yes.
20      Q. (By Ms. Hutchison) If someone's not
21 struggling, why else would you put weight on top of
22 them, body weight?
23          MS. GOWIN: Objection. Incomplete
24 hypothetical. Calls for speculation.
25      A. So in a dynamic takedown, as we discussed

Page 171

1 before, you know, if we need to control them while we're
2 handcuffing. If they're no longer resisting, nobody's
3 no longer on top of them, and we're standing them up or
4 getting them ready to transport.
5      Q. I'm not sure you understood my question.
6          MS. HUTCHISON: I'm going to object as
7 nonresponsive.
8      Q. (By Ms. Hutchison) If someone is not
9 struggling, then there isn't any need to put weight on
10 them; correct?
11          MS. GOWIN: Objection. Incomplete
12 hypothetical. Calls for speculation.
13      A. If they're no longer struggling and resisting,
14 at that point, we wouldn't have weight on them because
15 we would be getting them ready to -- to leave.
16      Q. (By Ms. Hutchison) Or putting them in the
17 recovery position?
18      A. Yes.
19          MS. GOWIN: Objection --
20      A. If need -- if that need is -- if -- if that is
21 needed.
22      Q. (By Ms. Hutchison) Well, that's always needed
23 when someone's being restrained on their stomach, isn't
24 it? As soon as -- as soon as it's safe to do, that's
25 always needed?

Page 172

1      A. When it's --
2          MS. GOWIN: Objection. Misstates evidence.
3 Incomplete hypothetical. Calls for speculation.
4      A. If the person is no longer resisting and we're
5 ready to transport, there's no need for a recovery. You
6 just pick them up and put them in whichever vehicle you
7 are transporting them in.
8      Q. (By Ms. Hutchison) I'm -- I'm not talking
9 about transport, Officer.
10      A. You're asking me about recovery. Correct?
11      Q. I'm saying that weren't you taught -- it's
12 right there in your slides -- that, as soon as it's safe
13 to do so, you put someone in the recovery position?
14          It doesn't say anything about transport, does
15 it?
16      A. It -- everything leads to transport.
17      Q. Okay.
18      A. So if I don't need to put them in recovery
19 because it's time to transport, I'll just transport
20 them. They'll be seated or laying down on the gurney.
21 It's either laying on the gurney or sitting in the back
22 seat of a squad car.
23      Q. I see what you're saying. So, as soon as it's
24 safe to do so, you get them up, whether it's to seat
25 them in the recovery position, put them in a gurney,

OFFICER DANNY VASQUEZ

| Page 173 |
| --- |

1 transport them, whatever reason, as soon as --
2      A. Yes.
3      Q. -- it's safe to do so, you get them out of the
4 prone position; is that fair?
5      A. Yes.
6      Q. Okay. So it stands to reason that, if they
7 remain in the prone position with weight on them, it's
8 because they're resisting?
9          MS. GOWIN: Objection. Incomplete
10 hypothetical. Calls for speculation.
11      A. Yes. If they are resisting, yes.
12      Q. (By Ms. Hutchison) Okay. And if they're not
13 resisting, that's when you -- or if they stop resisting,
14 that's when you get them out of the prone position for
15 whatever you're going to do?
16          MS. GOWIN: Objection. Incomplete
17 hypothetical. Calls for speculation.
18      A. Yes. If feasible and safe, yes.
19      Q. (By Ms. Hutchison) Okay. So in terms of
20 how -- how much he was struggling, was there any point
21 where you were interacting with Mr. Timpa where you were
22 out of breath?
23      A. I can't recall if I was out of breath.
24      Q. I mean, from the parts that I recall listening
25 to, you seem pretty calm.

| Page 174 |
| --- |

1          Do you remember that?
2      A. Yes.
3      Q. Okay. And that you were talking in a normal
4 tone of voice?
5      A. Yes.
6      Q. So what was -- what were Tony's hands doing
7 that you're saying was resisting you -- was it removing
8 the cuffs or putting the cuffs on?
9      A. Both.
10      Q. What were his hands doing?
11      A. His hands were pulling away from me, and he --
12 do I demonstrate --
13      Q. Sure.
14      A. -- with my hands?
15      Q. Sure.
16      A. So he's handcuffed, and he's doing something
17 like this and keeps pulling, trying to grab my hand,
18 attempting to grab my fingers and my hand as I'm trying
19 to take off handcuffs.
20          When I'm trying to put them on, he's constantly
21 pulling away, but I can't do it because my hand's not
22 behind me. But he's pulling away or he's kind of, like,
23 lifting his hands so I can't get in between and
24 constantly trying to grab my hand.
25      Q. So he's moving his finger -- so one -- on the

| Page 175 |
| --- |

1 ones you're taking off, he's moving his fingers to try
2 to grab your hand.
3          Is that what you're saying?
4      A. Yes, he's flexing his hand, trying to grab my
5 hand, as I'm trying to remove the cuffs.
6      Q. And does he ever -- does -- does he ever grab
7 your hand?
8      A. I can't recall if he did. I think -- not
9 necessarily grabbing hold, a grip, but I was able to
10 pull my hand away.
11      Q. Okay. So the answer to my question as to
12 whether or not he ever grabbed your hand is, "No, he did
13 not"?
14          MS. GOWIN: Objection. Misstates
15 testimony.
16      A. I'm saying he attempted, and it felt like he
17 was about to grab my hand but didn't get a grip, and so
18 I pulled my hand away.
19          MS. HUTCHISON: I object as nonresponsive.
20      Q. (By Ms. Hutchison) I didn't ask you about
21 attempting. I didn't ask you about trying. I didn't
22 ask you about maybe. My question is, it's true that he
23 never grabbed your hand; correct?
24          MS. GOWIN: Objection. Misstates
25 testimony.

| Page 176 |
| --- |

1      A. I'm saying he attempted, and I pulled my hand
2 away when I felt his hand --
3          MS. HUTCHISON: I --
4      A. -- about to get my hand.
5          MS. HUTCHISON: I object as nonresponsive.
6      Q. (By Ms. Hutchison) Sir, you understand I'm not
7 asking you about attempts.
8          Do you understand that?
9      A. Yes, you're asking me if he grabbed my hand.
10      Q. Yes, sir, not whether he attempted to or tried
11 to or you moved your hand.
12      A. I guess what I'm trying to say is that he
13 attempted, and he almost did, but I managed to pull my
14 hand away.
15      Q. So the answer to my question is, no, he did not
16 grab your hand --
17          MS. GOWIN: Objection.
18      Q. -- correct?
19          MS. GOWIN: Objection. Asked and answered.
20      A. To fully hold a grip of my hand, no.
21      Q. (By Ms. Hutchison) Now, when the paramedic
22 walked over, leaned down, and put the clippy on his
23 finger, how long did the clip remain there?
24      A. Oh, I do not know. And I believe that was
25 prior to me changing out the handcuffs.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 177

1    Q. Okay. I wasn't relating that to you changing
2  out the handcuffs.
3    A. Okay.
4    Q. I just said, when the paramedic walked over and
5  put the pulse oximeter on his finger, do you know how
6  long it remained there?
7    A. No, I do not.
8    Q. Did he ever grab the paramedic's hand at that
9  point?
10    A. I don't believe so.
11    Q. Did the paramedic express any concern or worry
12  about being near Mr. Timpa?
13    A. No, not to me at least.
14    Q. Do you remember who it was that said, in the
15  video, "Roll him over"?
16      MS. GOWIN: Objection. Vague. When?
17    A. Where in the video?
18    Q. (By Ms. Hutchison) Well, do you remember
19  anyone at any point saying, "Hey, roll him over"?
20      MS. GOWIN: Objection. Vague.
21    A. Not off the top of my head.
22    Q. (By Ms. Hutchison) Or "Roll him out," either
23  of those two things?
24    A. Not off the top of my head, no.
25    Q. What were you doing when the paramedic took his

Page 178

1  blood pressure?
2    A. That's not the thing on his finger, is it?
3    Q. No, it's the --
4    A. The actual cuff thing --
5    Q. Yeah, the cuff with the --
6    A. -- that they listen to --
7    Q. Yes. There was a -- Mr. -- I can't -- I
8  don't --
9      MS. GOWIN: Flores.
10      MS. HUTCHISON: Flores. I don't know why
11  that --
12      MS. GOWIN: The paramedic.
13      MS. HUTCHISON: -- will not stick in my
14  head.
15    Q. (By Ms. Hutchison) Mr. Flores had the
16  stethoscope and the cuff and the thing you pump up
17  and -- you know what I'm talking about?
18    A. Yes; yes, I know.
19    Q. Were you there when he did that?
20    A. Yes.
21    Q. What were you doing when he did that?
22    A. I was -- if I don't mistaken, I was at
23  Mr. Timpa's side. And I think, at this time, I had my
24  hand kind of postured over Mr. Timpa's lower back.
25    Q. Did you ask anybody, including the paramedic,

Page 179

1  "Hey, can we just sit him up, and you can do it while
2  he's sitting up"?
3    A. Not that I recall, no.
4    Q. But you no longer felt it necessary to have
5  your knees on top of Mr. Timpa?
6    A. No, not at this point.
7    Q. So, apparently, he wasn't struggling or
8  resisting enough for you to use your knees to restrain
9  him; correct?
10    A. Yes, correct.
11    Q. And you didn't use both hands to try to
12  restrain him?
13    A. No.
14    Q. And you didn't use your feet to step on him or
15  do anything like that to try to restrain him?
16    A. No, ma'am.
17    Q. So at this point, he was struggling so little
18  or resisting so little that you just used one hand and
19  placed it on him; correct?
20    A. Yes.
21    Q. I mean, you weren't like leaning all your
22  weight on it or anything, were you?
23    A. No, ma'am.
24    Q. So you were using one hand without putting your
25  body weight on it?

Page 180

1    A. Correct.
2    Q. But he was still on his stomach?
3    A. Yes.
4    Q. And Officer Dillard was still on his back?
5      MS. GOWIN: Objection. Vague as to "on his
6  back."
7    A. I -- I believe so, yes.
8    Q. (By Ms. Hutchison) Was Mr. Timpa struggling or
9  resisting at that point?
10    A. I remember Mr. Timpa going, like, in and out.
11  So he'd calm down, and then he'll spark back up, and
12  then he'll calm down, and then he'll spark back up. So
13  he had -- I don't know the best word to describe it.
14  But he had spontaneous moments.
15    Q. I'm talking about when the paramedic was taking
16  his blood pressure.
17    A. I can't recall if -- if he was moving or if --
18  how much he was moving.
19    Q. So I'm going to go to 8:19 and ask you to hear
20  who says, "Y'all want to roll him out."
21      I'll start it at 8:10. So 8:19 and then 8:32,
22  someone says, "Roll him over." I want to see if you can
23  identify either of those.
24    A. It's counting down but not playing.
25    Q. Okay. Sometimes -- it kind of has to sometimes

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

**Page 181**

1  catch up to itself. Well, it's acting up.
2       (Discussion off the record.)
3       MS. HUTCHISON: Okay. Where is that at?
4       MR. ADDISON: 8:14.
5       MS. HUTCHISON: Okay. 8:14.
6       (Video plays.)
7  Q. (By Ms. Hutchison) So I just want to stop it
8  at that point.
9       That's you, isn't it?
10 A. Yes, it is.
11 Q. Okay. So you're saying you want -- you said,
12 "Y'all want to roll him out?"
13 A. Yes.
14 Q. Who are you talking to?
15 A. To the officers that were at his feet, which I
16 think it was Dominguez. It's Dominguez. Because they
17 were having issues with his feet being underneath the
18 bench, so if they wanted to slide him out in order to
19 get his feet.
20 Q. So when you say "Roll him out," you're talking
21 about just getting his feet out from under the bench?
22 A. Yes.
23 Q. That's all?
24 A. Yes.
25 Q. And what did they say?

**Page 182**

1  A. I can't recall what they say word for word.
2  What I can remember, I -- it ends up being that they're
3  like -- they say they're good. They manage to get
4  the -- the zip ties on -- on his feet.
5  Q. Okay. And then, after that, after they say,
6  "We got the -- we couldn't get the zip -- other zip tie
7  over the heel, but we got it" -- by the way, do you know
8  who said that? Was -- if it was Officer Rivera?
9  A. I'm not sure if it was Rivera or Dominguez.
10 Q. But those --
11      MS. GOWIN: Did we play that part there?
12      MS. HUTCHISON: No. I'm getting to that.
13      MS. GOWIN: Okay.
14 Q. (By Ms. Hutchison) But -- but it it -- it was the
15 two from down there at his feet; right? Dominguez
16 and Rivera?
17 A. I believe so.
18 Q. Okay. But that -- that's who you were talking
19 to is those two when you said, "Do you want to roll him
20 out?"
21 A. Yes.
22 Q. And they say, "Oh, we -- we got the zip tie
23 over his feet." And then, after that, at 8:32, someone
24 says, "Roll him over."
25      Did we get this?

**Page 183**

1       (Video plays.)
2  Q. (By Ms. Hutchison) Okay. So that's at 8:15.
3  When does that happen?
4       All right. Yeah, 8:19 is when you say, "Y'all
5  want to roll him out," and then there's some discussion.
6  And then at 8:32 is when someone says, "Roll him over."
7       So I'm just going to play it from here so I
8  quit messing with the -- if it'll play.
9       (Video plays.)
10 Q. (By Ms. Hutchison) Did you hear the --
11 A. Yes, I heard it.
12 Q. Okay. And who was it that said "Y'all want to
13 roll him over?"
14 A. It sounded like Dillard.
15 Q. Okay. Was there any response to that?
16 A. I didn't hear any.
17 Q. Do you remember somebody saying, "Roll him
18 over"?
19 A. No, I do not.
20 Q. Do you know why someone made that comment or
21 statement or question or whatever it was, however you
22 want to characterize it?
23 A. No, I don't know why they said it.
24 Q. You can see at this point -- so at 8, I guess,
25 43, you can see that Officer Dillard's still -- his --

**Page 184**

1  on Mr. Timpa's back with his knee in the back; correct?
2       MS. GOWIN: Objection. Vague as -- or
3  object to the phrase "on his back."
4  A. It appears that Officer Dillard has a hand and
5  a knee on Mr. Timpa.
6  Q. (By Ms. Hutchison) On his back?
7  A. It appears that way. Yes, it appears that way.
8  Q. Okay. And then who is it that's kind of
9  standing up facing Mr. Timpa's feet?
10 A. I do not know.
11 Q. Who is it that's standing over by the police
12 car?
13 A. I don't know. Perhaps the security guard.
14 Q. But you don't know?
15 A. No, I do not.
16 Q. The gurneys had straps on them; correct?
17 A. I don't know if it comes with the straps on
18 them. I know they -- the EMTs have straps.
19 Q. So once somebody's put into a gurney, they --
20 they can be strapped down?
21 A. I've seen the buckle straps that they have for
22 them not to fall off. I don't know if those are the
23 ones you're referring to.
24 Q. Just whatever the straps were on the gurney
25 that was there for Mr. Timpa?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 185

1    A. I remember them being that orange color,
2 buckle-type straps.
3    Q. So someone can be strapped in using a buckle
4 that -- that straps on the gurney?
5    A. Yes.
6    Q. I'm going to switch this to Officer Dillard's
7 dash cam, and then I'll be done. I just have a couple
8 of --
9        MS. GOWIN: Okay. So we're going to
10 Dillard's dash cam --
11       MS. HUTCHISON: Yes.
12       MS. GOWIN: -- or body cam now?
13       MS. HUTCHISON: Yes.
14       MS. GOWIN: Okay.
15       MS. HUTCHISON: Body cam, not dash.
16       MS. GOWIN: Sure.
17    Q. (By Ms. Hutchison) So I want to -- from 7:55
18 to 9:43, I guess -- no. Wait. From 7:55 -- sorry. I'm
19 trying to figure out how -- when the blood pressure
20 period of time is going.
21       Okay. So about 9:10 is when the paramedic's
22 taking the blood pressure. Okay. So I'm going to start
23 it at 7:55, and I want you to indicate where you believe
24 the video that we're looking at reflects Mr. Timpa
25 struggling and resisting. Okay?

Page 186

1    A. Okay.
2        MS. GOWIN: Do you just want him to say it
3 as it goes? How do you want him to indicate it?
4    Q. (By Ms. Hutchison) What -- what would be
5 easiest for you? To say it as it goes, and we'll stop
6 it and look? Or for you to write down the time?
7    A. I guess probably announce it every time I see
8 it.
9    Q. Okay.
10    A. I don't want to forget anything.
11    Q. Okay. Maybe. All right. I'm going to try to
12 start it at 7:50. See if that works. What did I say,
13 until about 9:10?
14    A. Yes.
15    Q. Okay. So when you think it shows, you know --
16 actually, if you don't mind, I'll -- I can walk and look
17 that way so I can write down the time real quick, unless
18 you don't like me standing over there, which I get.
19    A. That's fine.
20    Q. Okay.
21       (Discussion off the record.)
22    Q. (By Ms. Hutchison) All right. I'll start it
23 there, if it'll work, at 7:50. We'll go to about 9:10,
24 and you just be, like, go, "There." And I'll write it
25 down and reach over and stop it.

Page 187

1        (Video plays.)
2    A. There.
3    Q. (By Ms. Hutchison) Okay. That was about 8:04
4 or so?
5    A. Yes.
6    Q. Okay.
7        (Video plays.)
8    A. There; right there.
9    Q. (By Ms. Hutchison) At 8-- like 8:41-ish --
10    A. Yes.
11    Q. -- or a couple of seconds --
12       What was he doing there?
13    A. He -- he started to tense up, and he started
14 to -- to -- best word I can -- for lack of better words,
15 wiggle.
16    Q. Tense up and wiggle?
17    A. Uh-huh.
18    Q. Okay. Okay. So you're saying there he
19 tense -- was tense up and wiggle?
20    A. Uh-huh.
21    Q. I'm just saying that because you're saying
22 "uh-huh" and I --
23    A. Oh, I'm sorry. Yes.
24    Q. Okay.
25       (Video plays.)

Page 188

1    A. There, he's moving.
2    Q. (By Ms. Hutchison) Okay. Where he was lifting
3 up his head?
4    A. Lifting up his head. He's twisting his body.
5    Q. Okay.
6        (Video plays.)
7    Q. (By Ms. Hutchison) Okay. So that goes to
8 about 9:12. Did you hear him saying, "Kill me, my
9 friend. Kill me"?
10    A. It sounds something like that. "Kill me" or I
11 believe he says "I want to die" or "I need to die,"
12 something of that nature.
13    Q. Okay. And did that indicate to you that he was
14 in mental distress?
15    A. It being -- him -- I don't remember hearing him
16 say that then. From where I was sitting, I don't recall
17 if I could hear him or not.
18    Q. Where were you sitting?
19    A. Behind Dillard. I was --
20    Q. On --
21    A. I was behind Dillard. So that's Dillard's body
22 camera. So that --
23    Q. Yes.
24    A. I can't recall if I heard that when he said it.
25    Q. Okay. But when you say you were sitting behind

LAURIE PURDY REPORTING SERVICE, INC.

## OFFICER DANNY VASQUEZ

Page 189

1  Dillard, at this point in time, you were still on
2  Mr. Timpa? Your knees were on him?
3      A. No. This is the blood pressure moment. So I
4  am off to his side with my hand on his lower back.
5      Q. Oh, okay. I got you. That's the point where
6  you're saying you reached in --
7      A. Yes.
8      Q. -- with one hand?
9      Okay. So you've got one hand on Mr. Timpa on
10 his back, but you're saying you don't know whether you
11 heard him saying, "Kill me. Kill me, my friend"?
12     A. Yes. I -- I hear it in the video. In the
13 video you just showed me, you could hear it. But from
14 where I was, I don't recall hearing it.
15     Q. And it's your belief or your position in this
16 lawsuit that, even with all of the officers on hand and
17 what we just saw in the video, that that blood pressure
18 could not have been taken with Mr. Timpa sitting up or
19 in a stretcher?
20         MS. GOWIN: Objection. Calls for
21 speculation. Lack of foundation.
22     A. I mean, I couldn't assume what the EMTs prefer.
23 They didn't say -- they didn't ask us to have him in a
24 certain position for it.
25     Q. (By Ms. Hutchison) Yes, sir. I'm asking you,

Page 190

1  as -- as one of the officers restraining Mr. Timpa,
2  do -- are you taking the position, one way or the other,
3  as to whether or not that could have been done with him
4  sitting up or in a -- in a stretcher?
5         MS. GOWIN: Objection. Calls for
6  speculation. Lack of foundation.
7      A. I don't know if it could or if it couldn't.
8      Q. (By Ms. Hutchison) Do you remember hearing
9  Officer Dillard say that he took something? That it's
10 not -- "This is not schizophrenia. He took something."
11     Do you remember that?
12     A. Yes, I remember -- I -- I don't remember if
13 those were the exact words. But, yes, I remember him
14 saying he took something.
15     Q. Okay.
16     A. Or he ought -- took something or something to
17 that nature.
18     Q. Do you remember somebody saying, "This ain't
19 just normal crazy, man. He's on something. There's no
20 way this is normal crazy"?
21     A. That was myself.
22     Q. So you were of the opinion, at the time, that
23 Mr. Timpa was on something?
24         MS. GOWIN: Objection. Vague as to at --
25 on -- "at the time."

Page 191

1      A. So at that instant and time when I say that, I
2  was assuming that this was, aside from a mental health
3  issue, that -- that it's very possible that he took some
4  kind of drug.
5      Q. (By Ms. Hutchison) I mean, that's pretty
6  obviously why you said that; right?
7      A. Right.
8      Q. So you had the opinion that he was acting
9  crazy; right?
10         MS. GOWIN: Objection. Vague as to
11 "crazy."
12     A. I -- I knew he was acting out of -- out of
13 normality or -- or, yes, acting differently.
14     Q. (By Ms. Hutchison) What's normal -- or let me
15 ask you it this way.
16     "This ain't just normal crazy. There's no way
17 this is normal crazy." What does that mean?
18     A. Somebody just suffering from a mental health
19 issue where they're suicidal or wanting to hurt others
20 or something like that. That this was perhaps in
21 combination thereof of some kind of substance and his
22 mental illness.
23     Q. And then, at some point, somebody kind of bends
24 down on one knee and says, "I want to make sure" --
25 something about his breathing. I can't remember exactly

Page 192

1  the words. And then saying his nose is buried.
2      Do you remember that?
3      A. Yes.
4      Q. Do you know who that was?
5      A. I believe that was Officer Dominguez.
6      Q. Okay. You want me to show it to you? Would
7  that help?
8      A. Yes, that would help.
9      Q. Okay. It's at 12:41. I'll do it at 12:38.
10         (Video plays.)
11     A. That was Officer Dominguez.
12     Q. (By Ms. Hutchison) Okay. At that point in
13 time, Officer Dominguez was just kneeling down nearby;
14 correct?
15     A. Correct.
16     Q. Was there anybody that was on Mr. Timpa's feet
17 or legs?
18     A. Oh, I can't recall.
19     Q. Do you know what Mr. Timpa was doing with his
20 feet or legs at that time?
21     A. At that specific time, I cannot remember.
22     Q. And it's about at that point where Mr. Timpa
23 completely stops moving; correct?
24     A. I don't know the exact timing of it.
25     Q. Okay. Let me show you. We'll go to 12:22.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 193

1      MS. GOWIN: 12:22, you said?
2      MS. HUTCHISON: We're going to go to 12:15
3 because --
4      MS. GOWIN: Okay.
5      MS. HUTCHISON: -- that's as close as I can
6 get.
7      MS. GOWIN: Sure. No, that's all right.
8      (Video plays.)
9    Q. (By Ms. Hutchison) Did you hear somebody say,
10 has he -- "Did he acknowledge you" or something like
11 that?
12    A. Yes.
13    Q. Was that you?
14    A. No. That was Officer Dominguez.
15    Q. Okay. Okay. From the -- from that time, from
16 the time of someone saying, "Tony, you still with us" --
17 by the way, do you -- do you know who that was?
18    A. That was Officer Dominguez.
19    Q. Okay. From that time on, do you recall
20 Mr. Timpa moving at all?
21    A. I remember him moving his head.
22    Q. After the point that he said, "Tony, you still
23 with us?"
24    A. Yes.
25    Q. Okay.

Page 194

1    A. I believe I saw him move his head.
2    Q. All right. Let's -- we'll play it, and you
3 tell -- tell me where.
4      (Video plays.)
5    A. There.
6    Q. (By Ms. Hutchison) Okay. So at like
7 12:30-something, you're saying?
8    A. Yes. Right after you hit play, he moved.
9      (Video plays.)
10    A. Right there. So it's about 12:47, -8.
11    Q. (By Ms. Hutchison) Okay. 12:47.
12      And see about after that.
13      (Video plays.)
14    Q. (By Ms. Hutchison) I'm going to pause there
15 for a second.
16    A. Okay.
17    Q. The -- the person that whistled, that went
18 (descriptive sound) "Back to school," was that you or
19 Officer Dominguez?
20    A. I don't know who that was. I don't remember
21 whistling.
22    Q. Okay. And then some other person says, "I
23 don't want to go to school, Mom."
24      That's you; right?
25    A. Yes, ma'am.

Page 195

1    Q. And then there's some comments like "First day.
2 Can't be late. Big breakfast. Scrambled eggs."
3      That was Officer Dominguez; right?
4    A. I believe so, yes.
5    Q. And then "Waffles," was that you?
6    A. That was me, ma'am.
7    Q. The "Rooty, tooty, fruity waffles," was that
8 you?
9    A. Yes, that was.
10    Q. Okay. And so, during this period of time where
11 those comments were being made, the paramedic comes in
12 to give him a shot of Versed; right?
13    A. I don't know what he was giving him. I know he
14 gave him a shot.
15    Q. Okay. A shot.
16      During any of this period of time, where y'all
17 are making these comments or the paramedic gives him a
18 shot or at any time after, did Mr. Timpa ever move
19 again?
20    A. Yes, I remember him moving when he got the
21 shot. His head moves when he gets the shot. And then I
22 can't recall. I remember him moving when he gets the
23 shot though.
24    Q. Were you aware that the medical examiner
25 testified that he was already dead when he got the shot?

Page 196

1      MS. GOWIN: Objection. Calls for
2 attorney-client communication.
3      I'm going to instruct you not to answer.
4    Q. (By Ms. Hutchison) Okay. Other than anything
5 your lawyer told you, were you aware that the medical
6 examiner testified that Mr. Timpa was already dead when
7 he got the shot?
8      MS. GOWIN: Same objection. Same
9 instruction.
10      MS. HUTCHISON: Well, I just asked -- I
11 just said "other than what your lawyer told you."
12      MS. GOWIN: And you can answer, other than
13 anything that you have discussed with your lawyers.
14    A. No.
15    Q. (By Ms. Hutchison) But it's your contention
16 that he wasn't dead at that time?
17      MS. GOWIN: Objection.
18    A. That's --
19      MS. GOWIN: I'm sorry.
20      Objection. Calls for speculation. Lack of
21 foundation.
22    A. At the time, I didn't believe Mr. Timpa to be
23 dead, no.
24    Q. (By Ms. Hutchison) When did you believe him to
25 be dead?

LAURIE PURDY REPORTING SERVICE, INC.

Page 50 (Pages 197-200)

OFFICER DANNY VASQUEZ

Page 197

1    A. When I was told by Sergeant Mansell that he was
2 no longer breathing.
3    Q. So when you say you saw him move when he got
4 the shot -- let me rephrase my question.
5       At any time after the point in time where
6 someone said "Tony, you still with us," was Mr. Timpa
7 resisting or struggling?
8    A. No.
9    Q. And is it your con- -- your, I guess, position
10 that the comments that you made to Mr. Timpa, about
11 being late for school and having waffles and all of
12 that, was made for a particular purpose?
13    A. Yes.
14    Q. And is that the "Well, we hoped to engage him"
15 purpose?
16    A. Yes.
17    Q. So you and Mr. Dominguez had this idea that you
18 would use comments that were basically making fun of him
19 to see if you could get a reaction from him?
20       MS. GOWIN: Objection. Misstates the
21 evidence and the testimony and, frankly, just harassing.
22       You can answer.
23    A. Okay. The comments that I made were to elicit
24 a response from Mr. Timpa. At no time was I trying to
25 make fun of him or ridicule him. It was to elicit a

Page 198

1 response.
2    Q. (By Ms. Hutchison) Well, lest I be accused of
3 harassing you, I mean, you got disciplined for making
4 fun of him, didn't you?
5    A. I got disciplined for my comments, yes.
6    Q. Because it was determined that you were making
7 fun of him; right?
8       MS. GOWIN: Objection. I think that
9 misstates the evidence.
10    A. Yes, I got in trouble for my comments. Yes.
11    Q. (By Ms. Hutchison) And the reason you got in
12 trouble for your comments is it was determined that you
13 were saying them to make fun of him; correct?
14       MS. GOWIN: Objection. Misstates evidence.
15    A. I received my reprimand for violating code of
16 conduct in our general orders.
17    Q. (By Ms. Hutchison) And how was it determined
18 you violated the code of conduct?
19    A. Because of my statements.
20    Q. What about your statements violated the code of
21 conduct?
22    A. They stated -- or the GO states that I
23 belittled or ridiculed, along with a list of other
24 things.
25    Q. Okay. I'll use those -- their words then.

Page 199

1       It was determined that you ridiculed and
2 belittled Mr. Timpa; correct?
3    A. By the police department?
4    Q. Yes.
5    A. Yes.
6    Q. And it's your position that you were not
7 belittling or ridiculing him because the reason that you
8 said those things was to try to get him to respond;
9 correct?
10    A. That is correct.
11    Q. Despite the fact that, in the entire time up
12 until that point in time, you had not been able to
13 engage him in conversation; correct?
14    A. That is correct.
15    Q. And then do you remember someone saying, "He
16 just got quiet," and then someone says, "All of a
17 sudden, he just" (descriptive sound)?
18       Do you recall that?
19    A. No, I do not recall.
20    Q. I'm trying to figure out if that was you. It's
21 at like -- we're going to go to 14:34-ish when he gives
22 him a shot. I'm going to go to 14:32.
23       So 14:32. Mr. Timpa has -- is not resisting,
24 he's not struggling; correct?
25    A. I would assume. I can't remember from the

Page 200

1 video.
2    Q. Well --
3       MS. GOWIN: Can you back it up a couple of
4 seconds just so he can see where he is?
5       MS. HUTCHISON: Sure. I'll back -- I'm
6 going to back it up to 12:22. Actually, I'll back it up
7 to 12:09.
8       MS. GOWIN: Dillard still; correct?
9       MS. HUTCHISON: Correct.
10       MS. GOWIN: Okay.
11       MS. HUTCHISON: Or 12:06. That's as close
12 as I can get.
13       MS. GOWIN: That's fine.
14    Q. (By Ms. Hutchison) And tell me if, at any
15 point from 12:06 to 15:13, if Mr. Timpa's struggling or
16 resisting.
17       (Video plays.)
18    Q. (By Ms. Hutchison) All right. Did you -- did
19 you see any place in -- up through 15 -- minute 15 or so
20 where he was resisting or struggling?
21    A. No, not in the video, ma'am, no.
22    Q. Are you saying that there was evidence outside
23 of the video that -- in those three minutes, that
24 Mr. Timpa was resisting or struggling?
25    A. I cannot recall that -- him resisting outside

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

| Page 201 | Page 203 |
|---|---|
| 1  the video.<br>2  Q. Okay. And did Officer Dillard, as far as you<br>3  can tell in the -- in the video, remain on -- with a<br>4  knee and hand on Mr. Timpa's back during those three<br>5  minutes?<br>6  A. It appears from the video that way.<br>7  Q. Okay. Did you hear the comment about "All of a<br>8  sudden, he went" (descriptive sound)? Did you hear<br>9  that?<br>10  A. Yes.<br>11  Q. Was that you?<br>12  A. I don't recall saying it, but it sounds like<br>13  me.<br>14  Q. Okay. But you don't remember saying that?<br>15  A. No, I don't.<br>16  Q. Do you -- did you hear the conversation with<br>17  the paramedic about putting the narcotic into guns and<br>18  shooting them from the car or something like that?<br>19  A. Oh, yes, I heard it.<br>20  Q. And where you were -- you said something like,<br>21  "Wait for it" or -- was that you?<br>22  A. That was Dominguez.<br>23  Q. Oh, okay. But did you participate in that<br>24  conversation?<br>25  A. I can't recall me participating in it. I -- I | 1  Q. -- somebody was talking in a funny voice?<br>2  That -- part of that wasn't you?<br>3  A. I don't recall doing that, no. I don't recall<br>4  me con-- in -- in that conversation.<br>5  Q. Okay. Because the voice talking in a funny<br>6  voice sounds similar to the one about being late for<br>7  school and going "Oh, Mom." And --<br>8  MS. GOWIN: Objection. Asked and answered.<br>9  He said he doesn't recall.<br>10  Q. (By Ms. Hutchison) I just want you to -- let<br>11  me...<br>12  So at what point are you saying you realized he<br>13  was dead?<br>14  A. When Sergeant Mansell walked up to me and told<br>15  me that he was no longer breathing.<br>16  Q. Okay. So getting him on the stretcher, you<br>17  didn't realize he was dead?<br>18  A. No. I thought I saw him move his head.<br>19  Q. You thought you saw him move -- move his head<br>20  where? On the stretcher or --<br>21  A. Uh-huh.<br>22  Q. -- getting him on the stretcher?<br>23  A. On the stretcher.<br>24  Q. Okay. Let's see. I'll start it at 15:09.<br>25  (Video plays.) |

| Page 202 | Page 204 |
|---|---|
| 1  don't recall participating in it.<br>2  Q. Okay. So you didn't -- you don't think any of<br>3  that sounded like you?<br>4  A. I don't think so. I can't recall, to be -- to<br>5  be exact.<br>6  Q. All right. And then at some point somebody<br>7  said, "Let's get him on the stretcher." Right?<br>8  A. Yes.<br>9  Q. Do you know who that was?<br>10  A. No, if -- if you want to put it on the video, I<br>11  can probably distinguish the voice.<br>12  Q. I think it was probably Mr. Flores, but let me<br>13  see if you...<br>14  MS. GOWIN: Do you have an approximate time<br>15  mark?<br>16  MS. HUTCHISON: Yeah.<br>17  MS. GOWIN: When you get it.<br>18  MS. HUTCHISON: 14:48. No. 14:40.<br>19  (Video plays.)<br>20  Q. (By Ms. Hutchison) Did you hear that?<br>21  A. Yeah. I don't know who that is.<br>22  Q. Okay. And did you hear some more of the<br>23  discussion about having the narcotic in guns and stuff<br>24  and --<br>25  A. Yeah, I heard it. | 1  Q. (By Ms. Hutchison) Did you see the point where<br>2  you thought his head moved?<br>3  A. Yes.<br>4  Q. Oh, where was it?<br>5  A. Oh, I'm sorry.<br>6  Q. I'm sorry.<br>7  A. I didn't know I was supposed to --<br>8  Q. I -- I wasn't clear about that.<br>9  Do you recall where that was?<br>10  A. No. I know I said it, I saw it, or I -- it<br>11  appeared to me that he moved his head. I'm not sure if<br>12  it's in the camera or in the screen.<br>13  Q. Okay.<br>14  MS. HUTCHISON: I'll pass the witness.<br>15  MR. ADDISON: You want to take a quick<br>16  break?<br>17  MS. GOWIN: Sure. Yeah, that's fine.<br>18  THE VIDEOGRAPHER: Off the record at 2:38.<br>19  (Break from 2:38 to 2:49.)<br>20  THE VIDEOGRAPHER: On the record at 2:49.<br>21  EXAMINATION<br>22  BY MR. ADDISON:<br>23  Q. Officer Vasquez, I want to ask you a couple of<br>24  quick questions on the video real quick. The first I<br>25  want to go to is the -- this is Dillard's -- sorry. |

LAURIE PURDY REPORTING SERVICE, INC.

Page 52 (Pages 205-208)

OFFICER DANNY VASQUEZ

Page 205

1  This is your body cam, and I'm going to start it on
2  1:23.
3        There's a statement that's made around 1:28
4  that says, "Just keep him down." I want you to listen
5  and tell me if you recognize who is saying that
6  statement.
7        Does that make sense?
8     A. Yes.
9     Q. Okay. So I don't even know if you need to see
10 the video necessarily, but...
11        (Video plays.)
12    Q. (By Mr. Addison) Did you hear that, just --
13 did you hear that, "Just keep him down"?
14    A. Yes.
15    Q. Do you know who said that?
16    A. It sounds like me.
17    Q. Do you recall saying that out there at the
18 scene?
19    A. I don't recall it, but it sounds like me.
20    Q. Then I also want to go to -- I'm going to go to
21 your body cam again, and I'm going to start at 8:30.
22 And I'm just going to play a couple of seconds, and...
23        Can you see that?
24    A. Yes.
25        (Video plays.)

Page 206

1     Q. (By Mr. Addison) And if I pause it right here,
2  like 8:32, can you see that, at this point, Mr. Timpa's
3  legs now have those legs cuffs on them, the zip ties?
4     A. It --
5     Q. Zip cuffs?
6     A. -- appears like it, yes.
7     Q. Okay. And at that point, did you know that
8  Mr. Timpa -- Timpa, I guess, at that point, had
9  handcuffs and leg cuffs on?
10    A. Yes.
11    Q. And after those leg cuffs were attached,
12 Mr. Timpa was not moved to a recovery position until he
13 was put on the gurney; correct?
14    A. That is correct.
15    Q. If you'll go to Exhibit 18 in that book?
16    A. (Complies.)
17    Q. This is an affidavit. It purports to be by
18 you. Let me ask you to look it over real quick and see
19 if you recognize it.
20    A. Yes, it's my IAD --
21    Q. I -- I'm sorry?
22    A. It's my IAD statement.
23    Q. Did you type out this statement yourself?
24    A. Yes, alongside my -- my attorney.
25    Q. And, I guess, is that your signature on the

Page 207

1  second page?
2     A. That is correct.
3     Q. And, I guess, this is a recitation of -- of
4  your memory of what happened the night of the incident;
5  correct?
6     A. That is correct.
7     Q. If you'll go to the third paragraph with me, it
8  says, "Around approximately 10:30 p.m."
9        Do you see that?
10    A. Yes, I do.
11    Q. And I want to -- I you want you to read along
12 or at least follow along with me.
13        It says, "Around approximately 10:30 p.m.,
14 Officer Dillard and I were added to a call as a cover
15 element at 1720 West Mockingbird Lane for a signal 46
16 CIT."
17        Do you see that?
18    A. Yes.
19    Q. What is a signal 46 CIT?
20    A. It is the code that you are given for a
21 possible, like, mental health patient or subject that is
22 suffering from mental illness.
23    Q. And so it -- when you receive that call, you
24 know that you're walking into a situation where somebody
25 is suffering some sort of mental problem; is that

Page 208

1  correct?
2     A. Correct, it could be.
3     Q. And then, if we read the next sentence, it
4  says, "Call notes indicated that the complainant
5  called 911 for assistance and stated that he was a
6  schizophrenic with depression, off his medication,
7  and was scared about the person he was with at the
8  location."
9        Do you see that?
10    A. Yes.
11    Q. And then it says, "A second call came in to 911
12 about a white male, later identified as the complainant,
13 Anthony Timpa, running in traffic on Mockingbird Lane,
14 yelling that somebody was after him, and attempting to
15 climb onto a DART bus."
16        Do you see that?
17    A. Yes.
18    Q. And it says, "Call notes additionally indicated
19 that a second caller, a security guard, felt Mr. Timpa
20 may be on drugs and was concerned for Mr. Timpa's
21 safety."
22        Do you see that?
23    A. Yes, I do.
24    Q. At least when I read this, I read this as this
25 is the call notes that came in to you when y'all respond

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 209

1 to the scene; is that correct?
2     A.  Not entirely.
3     Q.  Okay.  And what -- what is not -- which part of
4 this is not part of the call notes that y'all receive
5 when you respond to the scene?
6     A.  The second phone call.
7     Q.  Okay.  But you -- so you've -- so when we're
8 talking the notes that when you got the call on the
9 scene, signal 46 CIT call, and that the complainant was
10 a schizophrenic with depression, off his medication, and
11 scared of somebody; is that correct?
12    A.  That is correct.
13    Q.  And at that point, you're not there for -- to
14 effect an arrest, are you?
15    A.  No.
16    Q.  And I think you're talking about an APOWW;
17 right?
18    A.  Yes.
19    Q.  Which is an apprehension by peace officer
20 without warrant; correct?
21    A.  Correct.
22    Q.  So that's not an arrest.  It's an apprehension
23 to get somebody into the hospital, I guess, for
24 treatment or something to that effect; correct?
25    A.  Correct.

Page 210

1     Q.  And in that situation, are you immediately in
2 tune that this could be an excited delirium case?
3     A.  No.
4     Q.  And why not?
5     A.  No prior knowledge of Mr. Timpa.  Don't know
6 what's going on.  I haven't arrived at the scene.  I
7 haven't seen him personally.
8     Q.  And if we can go to -- I think it's the slides
9 that we have, Exhibit 36.
10    A.  (Complies.)
11    Q.  Now, this is from the excited delirium class
12 you took.  And if you go to the first page, second
13 slide, it says, "Delirium is a sudden severe confusion
14 and rapid change in brain function that occurs with
15 physical or mental illness.  It is a state in which
16 there is an altered level of consciousness with
17 impairment of cognition and perception.  Currently not a
18 diagnosis on its own, but rather a symptom of underlying
19 disorders.  Ranges from quiet to agitated, excited, with
20 no reliable indicators of impending death.  In an
21 excited state, is a medical emergency, which physician
22 (sic) control is -- in which physician (sic) control is
23 needed prior to treatment procedures."
24        Do you see that?
25        MS. GOWIN:  Objection.

Page 211

1     A.  Yes.
2        MS. GOWIN:  I think you misread the word --
3 one of the words in the last sentence.  You said
4 "physician."  It says "physical."
5        MR. ADDISON:  I'm sorry.  Physical.
6     Q.  (By Mr. Addison)  Sorry.  You see that?
7     A.  Yes.
8     Q.  And I guess the -- so it looks like the -- what
9 you've learned is that delirium is a -- some sort of
10 mental state that somebody is on or -- or some sort of
11 mental condition that somebody might be under; is that
12 correct?
13    A.  Correct.
14    Q.  And so, when you get a call of somebody, it's a
15 schizophrenic, signal 46 CIT call, why are you not
16 thinking delirium?
17    A.  I am unaware of his current state.  I -- all I
18 know is that he was schizophrenic and depressed, off his
19 medication.
20    Q.  And it's a CIT call; correct?
21    A.  All in one, yes.
22    Q.  And so isn't that his current state?  Isn't
23 that what you're responding to, his current state?
24    A.  His current state at this time and moment, from
25 the information I've gathered, which is whatever showed

Page 212

1 up on the MDC, is that he's schizophrenic, depression,
2 off his medication.
3     Q.  And so -- and so you're saying that that would
4 not, I guess, qualify as delirium under this definition
5 up here?  Or what it says, delirium is a sudden severe
6 confusion and rapid change in brain function that
7 occurs -- well, you know what?  Let's move on.
8        The -- the fourth slide on here, "What it means
9 to us."
10       Do you see this?
11    A.  Yes.
12    Q.  And it says, "Officers need a way to describe
13 subjects."  And it says, "We do not make a diagnosis.
14 Excited delirium is a state with many potential
15 diagnoses."  Is that correct?
16       MS. GOWIN:  Objection.  Vague.
17       Is that what it says, or is --
18       MR. ADDISON:  Yeah, is that what it says.
19       MS. GOWIN:  -- he agreeing with what it
20 says?
21    A.  Excited delirium is a state with many potential
22 di -- yes, I see it.
23    Q.  (By Mr. Addison)  Okay.  It says, "The
24 underlying diagnosis is initially irrelevant."
25       Do you see that?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 213

1   A. Yes.
2   Q. And then it says, "May result from psychiatric
3   illness, drug intoxication, or both."
4       And it says, at the very bottom, "Subject's
5   behavior determines officer response."
6       Do you see that?
7   A. Yes.
8   Q. And, again, this is your training and this is
9   your material that you're supposed to learn or you --
10  that you did learn saying that this is something that
11  you can easily diagnose. So there's -- or you do not
12  make a diagnosis of. But you're responding to, I guess,
13  is a -- some sort of psychiatric illness, drug
14  intoxication, or both; correct?
15      MS. GOWIN: Objection. Misstates the
16  evidence.
17  A. Again, I -- I know I'm responding to a --
18  something with -- a subject with a mental illness
19  because he's schizophrenic and depression -- and he's
20  depressed -- he suffers from depression, off his
21  medications. That's what I know at the time.
22  Q. (By Mr. Addison) A psychiatric illness;
23  correct?
24  A. Yes.
25  Q. Okay. And that is what is the underlying

Page 214

1   diagnosis is initially irrelevant, and it may result
2   from a psychiatric -- psychiatric illness. This is the
3   delirium slide.
4       Do you see that?
5   A. Where it says it on here, I see it.
6   Q. So why does that still not raise the specter of
7   excited delirium when you're responding to a signal 46
8   CIT call with schizophrenia -- schizophrenic, off his
9   meds?
10  A. Initially, it's -- it's -- I don't diagnose. I
11  can't say he's -- he is in excited delirium.
12  Q. And then so and would it --
13  A. All I have was what I have in front of me,
14  which is schizophrenic, depression, off his medication.
15  Q. And, I guess, if -- if -- and let's go to the
16  second page.
17  A. (Complies.)
18  Q. It says control -- or "Contain and Protect,"
19  the fifth slide. And it's talking about officer safety.
20      Actually, let's go to the sixth slide, which is
21  "Control and Stabilize."
22  A. Okay.
23  Q. And this might not be the sixth slide. I don't
24  know. It's kind of -- it's the slide -- the second
25  slide up top, top right.

Page 215

1   A. Okay.
2   Q. It says, "When practical, use a control team
3   takedown, five-man takedown, required (sic) to control
4   the sub- -- subject."
5       Was a five-team takedown used in this case?
6   A. No.
7   Q. Have you ever used a five-team takedown in the
8   field?
9   A. Not that I can recall.
10  Q. Have you -- so do you know of any other
11  officers that have?
12  A. I'm pretty sure there's multiple officers that
13  have.
14  Q. And have you -- do you know any that have ever
15  said, "I've done a five-team takedown"?
16      MS. GOWIN: Objection. Vague. Any officer
17  ever or...
18      MR. ADDISON: Any officer that he -- that
19  he knows of --
20      MS. GOWIN: Okay.
21      MR. ADDISON: -- that's done a five-team
22  takedown.
23  A. Yeah, possibly.
24  Q. (By Mr. Addison) When you say "possibly," I
25  guess that -- that indicates to me that you don't

Page 216

1   necessarily know or that you don't know of --
2   A. I can't recall --
3   Q. -- any other officers?
4   A. -- somebody specifically saying, "Hey, I did a
5   five-man take -- you know, a five-man takedown."
6   Q. Okay. So with the five-man takedown, is that a
7   restraint position, or is that just a movement to get
8   somebody to a restraint position?
9   A. It is a movement to get them to the prone
10  position.
11  Q. Okay. And what's the purpose of getting them
12  to the prone position?
13  A. It's the more tactical and safe position to
14  handcuff someone.
15  Q. Okay. And then, once you get them handcuffed,
16  what's the next procedure?
17  A. As I stated before, that it's either to
18  transport to a medical facility or transport them to
19  jail.
20  Q. Okay. And on this "Control and Stabilize," it
21  says, "While the actual takedown might -- may -- may be
22  dynamic, as soon as possible, move subject to a recovery
23  position."
24      Do you see that?
25  A. Yes.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 217

1    Q. "On side or seated upright."
2       So what -- so the recovery position is -- is
3  the person on their side or -- or seated; is that
4  correct?
5    A. Yes. According to the slide, yes.
6    Q. Okay. And, at least in this case, Mr. Timpa
7  was not in a recovery position prior to y'all moving him
8  to the gurney; correct?
9    A. That is correct.
10   Q. I know that you've given, in addition to this
11 August 16th statement and -- wait a minute. Let me get
12 that -- August 15th, at least the date of the affidavit.
13      Do you recall if that was the date you did this
14 affidavit, August 15th of 2016?
15   A. If it's dated that date, yes.
16   Q. You also did at least two additional
17 statements. If you'll turn to Exhibit 19?
18   A. Yes.
19   Q. This is a -- it's called a "Supplemental
20 Statement." Do you recall giving this supplemental
21 statement?
22   A. Yes, I do.
23   Q. And in this supplemental statement -- I guess,
24 is that your signature at the bottom?
25   A. That is correct.

Page 218

1    Q. In the supplemental statement, you said, "Upon
2  arrival to the scene, Mr. Timpa was somewhat coherent
3  and appeared to be having a psychotic episode."
4       Do you see that?
5    A. Yes, I see it.
6    Q. Okay. And a psychotic episode, is that an
7  excited delirium? Or would that be a part of an excited
8  delirium di-- or determination when you get on the
9  scene, a psychotic episode?
10   A. I couldn't say. I -- since I can't diagnose
11 it.
12   Q. Okay. And I'm not asking you to diagnose it.
13 I'm saying that you're trained on -- on what to do with
14 a suspect when you suspect excited delirium; correct?
15   A. Right. And at this moment, I have not -- I did
16 not suspect Mr. Timpa to be in excited delirium.
17   Q. Okay. So you said that he was somewhat
18 coherent and appeared to have a -- be in a psychotic --
19 or having a psychotic episode.
20      And then the next sentence says, "During the
21 incident, I did not believe Mr. Timpa was in excited
22 delirium."
23      Do you see that?
24   A. Yes.
25   Q. And that looks like you're -- you are

Page 219

1  diagnosing excited delirium. Or am I misreading that
2  sentence?
3    A. I -- I wrote that because if I don't -- if I
4  remember, I was questioned about excited delirium at the
5  IAD interview.
6    Q. And this statement is -- dated August -- I'm
7  sorry -- April 7th of 2017; correct?
8    A. Yes, I put --
9       MS. GOWIN: April 17th, I think.
10   A. Yes, April 17th. Sorry.
11   Q. (By Mr. Addison) And so this would have been,
12 I guess, nine months, roughly, after your first
13 statement of -- of August of 2016?
14   A. Yes.
15   Q. And this was the first statement that you gave
16 where you mentioned excited delirium; is that correct?
17   A. That is correct.
18   Q. And you -- you mentioned excited delirium in
19 this -- in this statement, you said, in response to an
20 IA complaint?
21   A. An IA investigation.
22   Q. And what -- I guess, what did you get from the
23 IA investigation that prompted you to cite -- to write a
24 supplemental statement concerning excited delirium?
25   A. I'm trying to see if it states it in here.

Page 220

1  They questioned me about excited delirium.
2    Q. And at that point, did they -- did you go back
3  and review the slides from your excited delirium class
4  from the academy?
5    A. I think they did. I can't remember if they
6  did -- if that's when they -- yes. Yes.
7    Q. And did you review them?
8    A. Yes.
9    Q. Okay. And then did you write this statement
10 after you reviewed the slides?
11   A. Yes.
12   Q. Okay. And it says, "Mr. Timpa was not
13 unusually aggressive or unusually strong as seen in
14 other excited delirium situations."
15      Do you see that?
16   A. Yes.
17   Q. And how many excited delirium situations have
18 you seen in the field?
19   A. Maybe -- that I was directly involved in,
20 Mr. Timpa was the first one.
21   Q. Have you seen any subsequent to Mr. Timpa?
22   A. No.
23   Q. So when you say that "unusually aggressive or
24 unusually strong," I guess is that based on your
25 training or -- as opposed to experience?

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

**Page 221**

1    A. Yes.
2    Q. Okay. And then the next sentence says,
3  "Mr. Timpa was asked on multiple occasions if any drugs
4  had been used. Mr. Timpa never answered my questions."
5      Do you see that?
6    A. Yes.
7    Q. Does excited delirium require drug use?
8    A. I am not aware if it is or does not.
9    Q. And if you'll go to Exhibit 20?
10   A. (Complies.)
11   Q. This is a subsequent -- I guess it looks like
12 another supplemental statement you wrote on June 23rd of
13 2017.
14     Do you see that?
15   A. Yes.
16   Q. And this supplemental statement -- I guess,
17 what prompted you to write this supplemental statement?
18   A. I was questioned about my comments during the
19 incident with Mr. Timpa.
20   Q. And so at this point, you were going -- or --
21 or responding to the questions that were on the -- I
22 guess the stuff you were saying on the video about --
23   A. Yes.
24   Q. -- making breakfast, eating waffles, and things
25 of that nature?

**Page 222**

1    A. That is correct.
2    Q. And I guess that was -- you were ultimately
3  reprimanded for that conduct?
4    A. Yes, I was.
5    Q. And I want to play the bureau command hearing.
6  Do you recall going to a bureau command hearing
7  regarding your conduct?
8    A. Yes.
9    Q. And I want to play this, and I guess I'm
10 probably going to play it for a second, let you identify
11 who's speaking first, and then fast forward to where you
12 start speaking. I believe you start speaking. I want
13 to verify that. Okay?
14   A. Okay.
15     (Discussion off the record.)
16   Q. (By Mr. Addison) All right. So I'm going to
17 start playing this.
18   A. Okay.
19     (Audio plays.)
20   Q. (By Mr. Addison) And this sounds like the --
21 I guess the chief or whoever's --
22   A. Yes.
23   Q. -- running the meeting?
24   A. Chief.
25   Q. Do you know who that is?

**Page 223**

1    A. Chief Anderson.
2    Q. Chief Anderson. Okay.
3      And then I want to go to -- I believe at 3:16
4  is when you start talking, and I just want to confirm
5    A. Okay.
6      (Discussion off the record.)
7    Q. (By Mr. Addison) I'm going to start it at
8  3:11, and I believe you start talking at 3:16. I want
9  to confirm that.
10   A. Okay.
11     (Audio plays.)
12   Q. (By Mr. Addison) Do you hear that?
13   A. Yes.
14   Q. Is that -- is that your voice?
15   A. It sounds like me.
16   Q. Okay.
17   A. The audio's kind of bad, but --
18   Q. It's kind of low. Let me see if I can turn it
19 up a little bit. That's as loud as it gets.
20     Anyway, let's listen real quick and see if --
21   A. Okay.
22     (Audio plays.)
23   Q. (By Mr. Addison) Was that you?
24   A. Yes.
25   Q. Okay. And when you say "a bad agenda on the

**Page 224**

1  news," what do you -- what are you referring to?
2    A. Just the bad stuff that's on the news about
3  police.
4      (Audio plays.)
5    Q. (By Mr. Addison) And so I guess -- I think
6  that's pretty much it, but we -- so you said that you
7  didn't want to mock him and you didn't intend to
8  belittle him; correct?
9    A. That is correct.
10   Q. But your -- your comments still did mock and
11 belittle him, didn't they?
12   A. In retrospect.
13   Q. Is that a "yes" then?
14   A. Yes.
15   Q. Okay. And I guess that's why you would -- if
16 you were available -- I guess, if it was an available
17 option to you, you would apologize; is that correct?
18   A. Yes, I would.
19   Q. And I guess that is what -- I guess they give
20 you a letter of reprimand in your file; is that correct?
21   A. That is correct.
22   Q. I want to hand you --
23     MR. ADDISON: Hand me an exhibit sticker,
24 Susan.
25     (Exhibit 37 marked.)

LAURIE PURDY REPORTING SERVICE, INC.

Page 57 (Pages 225-228)

OFFICER DANNY VASQUEZ

Page 225

1    Q. (By Mr. Addison)  I'm going to mark this as 37
2  and have you take a look at this.  It's titled "Sworn
3  Training Record."
4    A. Yes.
5    Q. And have you ever seen this before?
6    A. Yes.
7    Q. And do you know -- and what is -- what are we
8  looking at here?
9    A. My training record.
10    Q. So -- and I guess this has a list of classes
11  and hours, completion dates.  What exactly are classes,
12  hours, completion dates?  What are these referencing?
13    A. How many hours the course -- the duration of
14  the course, so how many days.  And a completion date of
15  when it was actually completed.
16    Q. So, like, if you go to the second page at the
17  very bottom, it says, "Recruit Basic Peace Officer
18  Course."
19    A. Yes.
20    Q. Looks like Course Number 1000, completion date
21  of 10/2/2013, and then 864?
22    A. Yes.
23    Q. Is that the date you done with police
24  academy, roughly?
25    A. No.  No.  It was in December.  Yes, December, I

Page 226

1  believe.  Yes, December.  I don't know, 10/2, if that's
2  when we took our TCOLE certification test.
3    Q. So the 864 hours -- when did you start basic
4  training -- or police -- I'm sorry -- police academy?
5    A. April.  April.
6    Q. April?
7    A. Yes, in April of 2013.
8    Q. And then you said, I guess, you became a -- a
9  police officer in December of 2013?
10    A. That's when I graduated the basic academy.
11    Q. And, I guess, is this -- so is this a list of
12  all of the -- a list, as of whatever date this was
13  printed, of all of the classes, all the TCOLE classes,
14  use of force classes, police academy classes, you had
15  taken up until the date of this printing out?
16    A. Yes.
17    Q. Okay.  And I know the last completion date on
18  here for a TCOLE use of force was 9/15 of 2016.
19    Do you see that?
20    A. That is correct.
21    Q. So prior to the interaction with Mr. Timpa, you
22  would have had all the classes on here that are dated
23  prior to August 10th of 2016; correct?
24    A. That would be correct.
25    Q. Okay.  And are you familiar with the

Page 227

1  Dallas Police Department General Orders?
2    A. Yes.
3    Q. And I know you talked briefly about the use of
4  force continuum earlier.  Is restraint a use of force?
5    A. Yes.
6    Q. And where on the use of force continuum is
7  restraint?
8    A. It's --
9    MS. GOWIN:  Objection.  Vague.
10    A. Restraint is -- it's an outcome of -- because
11  of your use of force continuum.  I mean, I can restrain
12  somebody willingly, as I can restrain somebody who is
13  not willing.
14    Q. (By Mr. Addison)  So the restraint, I guess,
15  could be anywhere on the use of force continuum.  It's
16  just a result of maybe a verbal command or something
17  like that?
18    A. It could be a by-product of the use of force
19  continuum.
20    Q. How tall are you?
21    A. Five, seven.
22    Q. How much do you weigh?
23    A. Now I weigh 215.
24    Q. Do you have any martial arts training?
25    A. Say it again.

Page 228

1    Q. Do you have any martial arts training?
2    A. Just the military.
3    Q. Where -- how -- when were you in the military?
4  What branch?
5    A. Army.
6    Q. How long were you in the military?
7    A. I've been in the Army since 2008.
8    Q. Are you still in the Army?
9    A. I'm in the Army Reserve.
10    Q. And what do you do in the Army Reserve?
11    A. Now, I am an observer coach/trainer.  So I
12  prepare and train units that are getting ready to deploy
13  to overseas operations.
14    Q. Do you train them in any combat, or is it
15  something else?
16    A. I train them in multiple aspects.  So we are,
17  like, certifiers for the Department of the Army.  So
18  any Reserve or National Guard unit will train in
19  North Fort Hood, and we will certify that they are
20  ready to go for their overseas operations.  That's an
21  extent of, you know, Counter-IED.  You can do multiple
22  reactive contacts and an -- an array of training.
23    Q. Would -- I guess would that also include, I
24  guess, any sort of military police, MP?
25    A. No, we do not train any combat-oriented units.

LAURIE PURDY REPORTING SERVICE, INC.

Page 63  (Pages 249-252)

OFFICER DANNY VASQUEZ

Page 249

1  And the recovery position -- and I guess the recovery
2  position is either on their side or sitting up; correct?
3      A. Yes.
4      Q. Is prone position, face down on the ground, is
5  that a recovery position?
6      A. No, it's not.
7      Q. Okay.  And why not?
8          MS. GOWIN: Objection.  Calls for
9  speculation.  Lack of foundation.  Lack of personal
10  knowledge.
11     A. I would assume because of -- to help them get
12  on their side and easier access to air, according to the
13  slides.
14     Q. (By Mr. Addison) Okay.  And, I guess, that --
15  that's what I was asking is what -- what were you
16  trained?  What do they teach you in training about that?
17         MS. GOWIN: Objection.  Vague.
18     A. It's that -- what's in the slides.  That -- you
19  know, that if it's feasible and -- and if you can do it,
20  to do it.
21     Q. (By Mr. Addison) So, I guess, is it your
22  understanding that your training taught you that it is
23  potentially dangerous to have somebody handcuffed,
24  prone, face down?
25     A. I think --

Page 250

1          MS. GOWIN: Is that the question?  Are you
2  done?
3          MR. ADDISON: Yes.
4          MS. GOWIN: Okay.  Vague and incomplete
5  hypothetical.
6      A. It could possibly be.
7      Q. (By Mr. Addison) Do you know what the term
8  "hypoxic" means or "hypoxia"?
9      A. No, sir.
10     Q. I know that, in the video, your camera shuts
11  off when I -- I think it's -- somebody comes around
12  and says, "What the fuck."  And then your camera turns
13  off.
14     Do you recall that?
15     A. Yes.
16     Q. Who was talking to you at that point?
17     A. Sergeant Mansell.
18     Q. And what did you and Sergeant Mansell discuss
19  after you turned the body cam off?
20     A. He told me that Mr. Timpa was no longer
21  breathing.
22     Q. And, I guess, what was your response when he
23  told you that?
24     A. I was shocked, and I told him, "What?  We just
25  put him in the ambulance."  I couldn't say that's

Page 251

1  verbatim word for word what I said, but somewhere along
2  those lines.
3      Q. And why was, I guess, Sergeant Mansell --
4  I guess, do you know why he said, "What the fuck"?
5      A. I guess he was shocked as well.  I can only
6  assume -- that's what I assume.
7      Q. And why were you shocked, I guess, that he
8  wasn't breathing when he was put in the ambulance?
9      A. Because at no point I believe Mr. Timpa to be
10  deceased or not breathing.
11     Q. And, I guess, once Mr. Timpa was -- was no
12  longer making noises on the video, did you do anything
13  else to monitor his breathing after he stopped making
14  noise?
15     A. I went based on what I heard Officer Dillard
16  say.  He said, "Yeah, he's breathing."
17     Q. So I -- I guess, were you working on the
18  assumption that -- that Officer Dillard was monitoring
19  his breathing?
20     A. I would suppose so.
21     Q. Were you monitoring any -- any vitals for
22  Mr. Timpa, other than his breathing?
23     A. No.
24     Q. And at any point, did you call for the gurney
25  to be brought over by Dallas Fire and Rescue to put him

Page 252

1  on a gurney?
2      A. Not by myself -- by my personally, no.
3      Q. Do you know who called the -- I guess, told
4  them to bring the gurney over?
5      A. I don't know.  I just overheard that they
6  were bringing the gurney.  I think it was between
7  Officer Dominguez and Sergeant Mansell, but I'm not
8  sure.
9      Q. And during your restraint of Mr. Timpa, did
10  Officer Mans-- or I'm sorry -- did Sergeant Mansell,
11  I guess, tell you and -- and Officer Dillard to do
12  anything or not do anything?
13     A. I can't recall him telling us anything.
14     Q. Do you recall him saying anything from the
15  moment you -- you and Mr. -- you and Officer Dillard get
16  on top or -- or start to control Mr. Timpa, do you
17  recall Sergeant Mansell saying anything to you?
18     A. I believe he told me his name, or I -- I think
19  it was him telling me his full name.  But I can't recall
20  if he told us anything.
21     Q. Everybody on the scene was using "Tony Timpa."
22     Do you recall that?
23     A. Yes.
24     Q. And, I guess, his name is Anthony Timpa, which
25  Tony is a -- the shortened version of that.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 253

1     Do you know why everybody on the scene was
2  calling him Tony Timpa, as opposed to what his ID said,
3  which was Anthony Timpa?
4     A. No.  I -- I went with it because that's what I
5  got from Sergeant Mansell.
6     Q. Another -- the comment -- and I don't recall if
7  you said who said it -- was somebody said, "No way
8  normal crazy."
9     Do you recall that, somebody --
10    A. I know, at one point, I said something along
11  those lines.
12    Q. Okay.  And that's what I want to double-check.
13  So that's -- that was you saying, "No way this is normal
14  crazy.  This is" --
15    A. Yes.
16    Q. And who made the decision to change the cuffs
17  on the -- while he was on the ground?
18    A. That was mine.
19    Q. And did you consult anybody about that
20  decision, or was that your decision alone?
21    A. That was my decision alone.
22    Q. And, I guess, that -- also in the video,
23  I guess there's somebody in the background saying,
24  "Zip cuffs back of vic."
25    Do you recall if you were saying that?

Page 254

1     A. That's me.
2     Q. And when you're saying, "the back of the vic,"
3  are you referring to a Crown Victoria?
4     A. No, to the vehicle.
5     Q. Okay.  I didn't know if that was a shortened --
6  so "the vic" is a shortened term for vehicle?
7     A. Yes.
8     Q. And, I guess, the zip cuffs that were put on
9  Mr. Timpa's legs, do you know if those came out of the
10  back of your vehicle?
11    A. I believe they did.  I told them they were
12  there.  Whether or not they got them from there, I don't
13  know.
14    Q. Okay.  Did you do any of the chest compressions
15  in the back of the ambulance?
16    A. No, sir.
17    Q. Did you escort the ambulance to the hospital?
18    A. No, sir.
19    Q. What did you and -- and Officer Dillard do
20  after the ambulance left?
21    A. We stayed separated per -- I believe
22  Sergeant Mansell told us to be separated to -- because
23  Mr. Timpa, at that point, was -- you know, we were told
24  that Mr. Timpa was not breathing, so to stay separated,
25  not to leave the area.

Page 255

1     Q. What does the general orders say about excited
2  delirium?
3         MS. GOWIN:  Objection.  Vague -- vague.
4  Overbroad.
5     A. They say quite a bit.  Some symptoms to look
6  out for and a lot of verbiage that I can't recall right
7  now.
8     Q. (By Mr. Addison)  Give me a second.  I'm going
9  to -- oh, here it is.
10        And then General Orders 905.00, are you
11  familiar with that general order?
12    A. If I look at it, perhaps.
13    Q. And if you do, it's on Exhibit 2.
14        MS. GOWIN:  Are you sure?  Exhibit 2?
15        MR. ADDISON:  Yeah.
16    Q. (By Mr. Addison)  And go to Page 17.
17    A. Page 17.  17, yes.
18    Q. And it says -- it's the second paragraph.  Do
19  you see that, "General Orders 905.00"?
20    A. Yes.
21    Q. It says, "Drug-Induced Psychosis/Excited
22  Delirium, Handling suspects exhibiting symptoms of
23  Drug-Induced Psychosis/Excited Delirium or a Psychotic
24  Episode states, Subjects suffering from disorder -- this
25  disorder may collapse and die without warning, and are

Page 256

1  subject to medical distress within an hour after being
2  restrained.  Subjects will be placed in an upright
3  position, if possible, or on their side as soon as
4  they're brought under control."
5     Do you see that?
6     A. Yes.
7     Q. And, I guess, were you subject to or were
8  you -- are general orders something that you, as an
9  officer, have to follow?
10    A. Yes.
11    Q. When you took the excited delirium course in
12  the academy, do you recall who taught it?
13    A. No, sir.  No, I do not.
14    Q. Do you know if you've had any subsequent
15  continuing education on excited delirium?
16    A. I can't recall taking any other class regarding
17  that.
18    Q. Did you have any involvement in drafting or
19  preparing the custodial death report?
20    A. Sir, to be honest, I don't even know what that
21  is.
22    Q. Do y'all train on those general orders?  I
23  mean, like --
24    A. What do you mean by that, sir?
25    Q. I mean, that's probably a bad question.

LAURIE PURDY REPORTING SERVICE, INC.

OFFICER DANNY VASQUEZ

Page 257

1    Do y'all like -- are you required to memorize
2  or get a test on those general orders?
3    A. Yes, during the academy.
4    Q. And do those general orders ever change or get
5  added to?
6    A. Yes.
7    Q. And in which case, how do they inform the
8  officers of the additions?
9    A. A -- what is it?  A -- a log comes to the -- to
10 each division saying, "This is the new update" or "This
11 is new information."  And we all have to sign off saying
12 we have read it and are aware of it.
13   Q. Do you recall if the General Order 905, on
14 the drug-induced psychosis, was in effect prior to
15 you joining or -- or starting of the academy, or was
16 that --
17   A. I don't know the exact date of when that came
18 out.
19   Q. Do you recall learning about the general order
20 while you were at the academy?
21   A. Perhaps.  I can't recall exactly if they went
22 over the general order or not, but...
23       MR. ADDISON:  I'll pass the witness.
24       MS. GOWIN:  I don't have any.
25       MS. HUTCHISON:  I have some follow-up.

Page 258

1       FURTHER EXAMINATION
2  BY MS. HUTCHISON:
3    Q. So you have never been informed that, as a
4  result of Mr. Timpa's death, you needed any new or
5  different training; correct?
6    A. No, sir -- no, ma'am.  Sorry.
7    Q. And, as far as you're aware, neither you nor
8  any of the other officers involved have received new or
9  different training as a result of Mr. Timpa's death;
10 correct?
11   A. Yeah, I'm not aware of any other training.
12   Q. You understand that people can suffocate
13 slowly; correct?
14       MS. GOWIN:  Objection.  Calls for
15 speculation.  Lack of personal knowledge.  Lack of
16 foundation.
17   A. I don't know personally.
18   Q. (By Ms. Hutchison)  Oh, you haven't seen
19 anything like where a miner goes down in a mine shaft,
20 and there's no oxygen, and it's a slow process of death?
21   A. I haven't seen it.  I've heard of it.
22   Q. Okay.  And you'd heard of that kind of thing in
23 2016; right?
24   A. Possibly.
25   Q. So you were aware that death by asphyxiation

Page 259

1  wasn't necessarily immediate; right?
2       MS. GOWIN:  Objection.  Calls for
3  speculation.  Incomplete hypothetical.  Lack of
4  foundation.
5    A. I guess it could be.
6    Q. (By Ms. Hutchison)  Okay.  Could be a -- could
7  be a process; right?
8    A. Perhaps.
9    Q. And during that process, somebody might be able
10 to make sounds or speak on some level, even though they
11 still need additional oxygen; correct?
12       MS. GOWIN:  Object -- objection.  Calls for
13 speculation.  Lack of foundation.  Lack of personal
14 knowledge.  Incomplete hypothetical.
15   A. Perhaps.
16   Q. (By Ms. Hutchison)  And, again, you had that
17 understanding in 2016; correct?
18       MS. GOWIN:  Objection.  Incomplete
19 hypothetical.  Calls for speculation.  Lack of
20 foundation.  Lack of personal knowledge.
21   A. Yes.
22   Q. (By Ms. Hutchison)  Did you ever ask Mr. Timpa
23 if he could breathe?
24   A. I don't recall doing so, no.
25   Q. Did you ever hear anyone else ask Mr. Timpa if

Page 260

1  he could breathe?
2    A. I do not recall hearing anyone.
3    Q. Part of your responsibility, as a sworn peace
4  officer, is, if you see another officer doing something
5  wrong, to inter- -- is to intervene; correct?
6    A. Correct.
7    Q. You have that responsibility; right?
8    A. Yes.
9    Q. And if you don't -- if you see somebody else
10 doing something that's wrong and you don't intervene,
11 then you are not acting in accordance with your sworn
12 duty as a peace officer; correct?
13   A. Correct.
14   Q. You would agree with me you -- you learned
15 about the constitutionality of your conduct in the
16 academy; correct?
17       MS. GOWIN:  Objection.  Vague.  Confusing.
18   Q. (By Ms. Hutchison)  That it has to -- that
19 you have to act in accordance with the constitution;
20 right?
21   A. Yes.
22   Q. And that you cannot violate people's
23 constitutional rights; correct?
24   A. That is correct.
25   Q. And that includes with respect to the use of