OFFICER DANNY VASQUEZ

Page 261

1 force; right?
2    A.  Correct.
3    Q.  Including restraint; right?
4    A.  Yes.
5    Q.  So if you had acted in a manner that
6 unreasonably restrained Mr. Timpa under the
7 circumstances, then you understood that that could
8 violate his constitutional rights; correct?
9        MS. GOWIN:  Objection.  Vague.  Incomplete
10 hypothetical.  Calls for a legal conclusion.  Lack of
11 foundation.
12    A.  Just so I understand you correctly, you're
13 saying that, if I would have done something wrong, I
14 would have, like, been in trouble?  Like, if I violated
15 his rights, I'd be in trouble.
16    Q.  (By Ms. Hutchison)  Well, but if you
17 unreasonably restrained him, in other words, if you
18 restrained him in a manner that was excessive, you
19 understand that that would violate the constitution?
20        MS. GOWIN:  Objection.  Incomplete
21 hypothetical.  Calls for speculation.  Lack of
22 foundation.  And calling for a legal conclusion he's
23 not qualified to give.
24    A.  Yes.
25    Q.  (By Ms. Hutchison)  That would violate his

Page 262

1 Fourth Amendment right to be free from excessive force;
2 correct --
3        MS. GOWIN:  Objection.
4    Q.  -- if you --
5        MS. GOWIN:  Go ahead.
6    Q.  -- if you had done it in a manner that was
7 excessive?
8        MS. GOWIN:  Objection.  Calls for
9 speculation.  Incomplete hypothetical.  Lack of
10 foundation.
11    A.  If I would have, yes.
12        MS. HUTCHISON:  I'll pass the witness.
13        FURTHER EXAMINATION
14 BY MR. ADDISON:
15    Q.  If somebody is in a near -- if somebody has
16 their hands cuffed behind their back and their legs
17 are -- are restrained with zip ties or -- I'm sorry --
18 flex cuffs, is them squirming, is that considered
19 resisting apprehension or arrest?
20    A.  Yes.
21    Q.  Now, what -- was your weight different on --
22    A.  Yes.
23    Q.  -- in August of last -- of 2016?
24        What was your weight then?
25    A.  Maybe about 180, 190.

Page 263

1    Q.  How much does the gear weigh you typically
2 wore?
3        MS. GOWIN:  Objection.  This is beyond the
4 scope of what was just asked.
5        MR. ADDISON:  What?
6        MS. GOWIN:  Yeah.  It has to be a follow-up
7 to what Susan asks.
8        MS. HUTCHISON:  I don't think so.  Not --
9        MS. HUTCHISON:  This is not --
10        MS. HUTCHISON:  Not in a deposition.  Not
11 in a deposition.
12        MS. GOWIN:  Really?
13        MS. HUTCHISON:  Yeah.
14        MR. HENLEY:  No.
15        MS. GOWIN:  Okay.  Geoff, calm down.  Okay.
16 Duly noted.  We're cool.  Okay.
17    A.  Can you restate your question, please.
18    Q.  (By Mr. Addison)  Yeah.  How much did the gear
19 you had on weigh?
20    A.  Oh, man, I don't know the exact weight, sir.
21    Q.  So you had, like, a bulletproof vest on;
22 correct?
23    A.  That is correct.
24    Q.  How much does that thing weigh roughly?  Do you
25 know?

Page 264

1    A.  Roughly, maybe somewhere between maybe 5, 15
2 pounds.
3    Q.  And then, I guess, you had all the stuff from
4 the duty belt we talked about earlier?
5    A.  Yes.
6    Q.  You had the radio on; correct?
7    A.  Yes.
8    Q.  And then you had the body cam?
9    A.  Yes.
10    Q.  Was there anything else on the uniform?
11    A.  No, sir.
12    Q.  Do you wear, like, combat boots when you
13 patrol?
14    A.  I wear, yes, patrol boots or boots.
15    Q.  What was Chief Anderson, on the disciplinary
16 hearing, what was his first name?
17    A.  I do not know his first name, sir.
18    Q.  I know we talked about your -- your -- your
19 comments to Mr. Timpa -- Timpa as belittling and
20 demeaning.  Did you consider them insults as well?
21    A.  No, sir, I didn't mean them like that.
22    Q.  I know you didn't mean to, and I'm just curious
23 if you consider that insulting as well?
24    A.  No, sir.
25        MR. ADDISON:  I'll pass the witness.

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VICKI TIMPA, Individually, and as           )
Representative of the Estate of ANTHONY)
TIMPA, and CHERYLL TIMPA Individually  )
as Next Friend of K.T., a minor child  )
                                       )
     Plaintiffs,                       )
                                       )Civil Action No.
vs.                                    )3:16-CV-03089-N
                                       )
DUSTIN DILLARD, DANNY VASQUEZ,         )
RAYMOND DOMINGUEZ, DOMINGO             )
RIVERA, KEVIN MANSELL, GLENN           )
JOHNSON, CRIMINAL INVESTIGATIVE        )
UNIT, LLC                              )
                                       )
     Defendants.                       )

*************************************************
VIDEOTAPED
ORAL DEPOSITION OF
DF-R OFFICER JAMES FLORES
SEPTEMBER 18, 2019
*************************************************

          ORAL DEPOSITION OF DF-R OFFICER JAMES FLORES,

produced as a witness at the instance of the Intervenor,

and duly sworn, was taken in the above-styled and

numbered cause on the 18th day of September, 2019, from

8:57 a.m. to 12:18 p.m., before Dana Taylor, CSR in and

for the State of Texas, reported by machine shorthand,

at the offices of Dallas City Attorney's Office,

7DN Dallas City Hall, 1500 Marilla Street, Dallas,

Texas 75201, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

DFR OFFICER JAMES FLORES

Page 25

1  from doing whatever it is he -- he was going to do or
2  what they thought he was going to do. Whether that be
3  get up, roll in the street, or whatever -- whatever he
4  was trying to do.
5       MS. HUTCHISON: I object as nonresponsive.
6  Q. (By Ms. Hutchison) All I'm trying to hone in
7  on is is you're observing something.
8  A. Yes, ma'am.
9  Q. I mean, you could say he was trying to jump up
10 on the bench or drive away in a car or, you know, fly
11 off in a helicopter.
12 A. Sure.
13 Q. But you've got to be able to describe
14 physically what you observed that leads you to the
15 opinion that he was trying to get up, is -- is my
16 question.
17 A. Got you.
18      He was shaking back and forth, trying to get
19 onto his back, I assume. Only assume. And the police
20 officers were holding him down.
21 Q. And when you say "shaking back and forth,"
22 you're talking about his arms? His legs? His head?
23 What?
24 A. I can't recall specifics of that. His head was
25 moving. Like I said, he was screaming. And his torso

Page 26

1  was moving enough that those police officers had to hold
2  him there.
3  Q. Okay. So you saw his head moving?
4  A. Yes, ma'am.
5  Q. And his torso moving?
6  A. Yes, ma'am.
7  Q. What about his arms and legs?
8  A. That, I can't specifically recall legs. If I
9  remember correctly, he was handcuffed.
10 Q. So the things that you recall -- that you do
11 recall moving, upon your initial approach when the
12 officers were holding him down, were his head and his
13 torso?
14 A. Yes, ma'am.
15 Q. Anything else that you specifically recall
16 moving at that time?
17 A. No, ma'am.
18 Q. And his head and his torso were moving back and
19 forth?
20 A. Yes, ma'am.
21 Q. Like, right to left? Left to right?
22 A. I can't recall the specifics of that, but yes.
23 Q. So what did you and Mr. Brumley [sic] do when
24 you approached the scene?
25 A. Okay. So we got out of the ambulance, and we

Page 27

1  noticed Mr. Timpa was being held down. There was a
2  sergeant on scene. I went up and talked to him.
3       If I remember correctly, he said something
4  along the lines of "Once he calms down, y'all assess
5  him, and we're going to be taking him to jail."
6       I talked to him about that. And then we held
7  off. We kind of just were in a stand-by position.
8  Q. I'm sorry. Let me -- let me just go back to --
9  A. Sure.
10 Q. So the sergeant said, We're going to -- "When
11 he calms down, we want you to assess him"?
12 A. Yes, ma'am.
13 Q. "And then we're going to take him to jail"?
14 A. Yes, ma'am, something along those lines. I
15 can't remember specifically.
16 Q. And so at -- when you approach a scene like
17 that, you -- I mean, obviously, somebody's got to be in
18 charge of it; right?
19 A. Yes, ma'am.
20 Q. And was that the sergeant, in your opinion?
21 A. Yes, ma'am.
22 Q. And so was it your training that it is the
23 sergeant who determines when it's reasonable or safe for
24 you to do an assessment of the individual?
25 A. No, ma'am.

Page 28

1  Q. What is your training about when it's
2  reasonable or safe for you to do an assessment of the
3  person on the ground?
4  A. Yes, ma'am. Whenever I deem it's safe enough
5  to do it and I can actually perform a -- a blood
6  pressure or whatever kind of vitals I'm needing to take.
7  Q. So is one of your options, at that point when
8  you initially approach and the police were holding him
9  down, to give him a shot?
10 A. Yes, ma'am, I guess so. Yes.
11 Q. What kinds of medication did you have on hand
12 that you could give to someone who is agitated or
13 anxious to calm them down?
14 A. The medication is called Versed.
15 Q. Did you have anything besides the Versed?
16 A. No, ma'am.
17 Q. You did actually give him a shot of Versed at
18 some point later; correct?
19 A. Yes, ma'am, I did.
20 Q. And do you have any understanding of whether or
21 not that shot actually went into his system?
22 A. I don't know what you mean by "system." I
23 mean, I gave it to him in his arm.
24 Q. Right. Have you checked out the autopsy to
25 determine if whether or not his -- he had any

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 57

1    MS. GOWIN: Objection. Calls for
2 speculation.
3        You can answer.
4    A. Yeah, I'm trying to form the answer.
5        Well, they can obviously state to me that they
6 have schizophrenia or they do feel that they're the cat
7 or the Martian or whatever. But as far as like -- I'm
8 sorry. Were you talking about actions again there?
9    Q. (By Mr. Hutchison) No. I'm just talking about
10 the -- the -- for example, Mr. Timpa was continuing to
11 yell incoherently --
12    A. Sure.
13    Q. -- during part of this process; right?
14    A. Yes, ma'am.
15    Q. Things like "No" or "Yeah" or (descriptive
16 sound). I mean, just -- sometimes just incoherent
17 gibberish?
18    A. Yes, ma'am.
19    Q. And does that inform you, as a -- as a
20 paramedic, that he might be in an altered state of mind?
21    A. No, not necessarily; no, ma'am.
22    Q. Okay. Not necessarily. But is that one of the
23 options?
24    A. Sure. Yes, it's an option; yes, ma'am.
25    Q. Okay. And did you ever come to a conclusion

Page 58

1 about whether he was in an altered state of mind during
2 the restraint process?
3    A. So I believe --
4        MS. GOWIN: Objection as to vague, "altered
5 state of mind."
6        You can answer, if you understand.
7    A. So I think the -- the scene changed after --
8 like I said, after we talked to Sergeant, we basically
9 were on stand-by for a moment, and I made the decision
10 that we were just going to go ahead and sedate him.
11        It was obvious that, in order to mitigate the
12 scene as efficiently as possible, we kind of had to act
13 in sedating him and taking him to the hospital.
14    Q. Okay.
15    A. Did that -- I don't know if I answered that
16 right. I'm sorry.
17    Q. (By Ms. Hutchison) Well, no, I'm trying to
18 figure out did you ever conclude, one way or the other,
19 "Yes, he's in an altered state of mind"?
20    A. I have --
21    Q. -- or "he's on something"?
22    A. Yes, ma'am. I have no idea. I can't -- I
23 can't judge someone's state of mind or if he's on
24 something, or anything like that, just from their
25 actions.

Page 59

1    Q. That's not part of what you're trained to do?
2    A. No, ma'am. I mean, it's -- people fight and
3 resist police officers and yell and gibberish and all
4 that whenever they're being arrested quite -- quite
5 often.
6    Q. So what do you do? Just assume that
7 everybody's in a rational state of mind?
8        MS. GOWIN: Objection. Misstates
9 testimony.
10    A. I assess each scene as they come.
11    Q. (By Ms. Hutchison) And you -- that's what I'm
12 asking you about is your assessment of Anthony Timpa.
13 Are you saying that you never formed the opinion that he
14 was on some sort of narcotic or on --
15    A. It was -- I mean, yes, ma'am. I'm sorry. It
16 was a -- it could have -- it was a possibility. It was
17 a possibility from the beginning. It was a possibility
18 at the end.
19        I mean, we don't know exactly for sure what he
20 has taken, whether it be street drugs or his own
21 medications. Or he's not on any medications; he's just
22 angry. I -- I mean, really I have no way of knowing,
23 beyond a shadow of a doubt, what has happened just
24 because of his actions.
25    Q. Right. And I'm -- I'm not actually asking you

Page 60

1 beyond a shadow of a doubt. I'm just asking you, as a
2 paramedic assessing the scene, is it part of what you
3 assessed to make a determination "This person is
4 probably on a narcotic or is probably" --
5    A. Correct.
6    Q. -- "having a mental health episode," something
7 like that. Do you -- is that part of what you do?
8    A. Yes, ma'am.
9    Q. And did you do that with Mr. Timpa?
10    A. Yes, it was...
11    Q. And did you make an assessment that he was
12 probably either on a narcotic or having a mental health
13 episode?
14    A. Yes, ma'am. It was a possibility, yes, ma'am.
15    Q. A probability?
16        MS. GOWIN: Objection. Misstates
17 testimony.
18    Q. (By Ms. Hutchison) That's -- I'm asking you.
19 Was it -- did you --
20    A. Well, I'm -- I don't know the difference
21 between probability and possibility.
22    Q. Okay. Okay. That's fair enough.
23    A. It was in the ballpark of what was going on,
24 sure.
25    Q. You can hear, on the -- on the body cams,

DFR OFFICER JAMES FLORES

Page 61

1  various people asking him over and over and over again,
2  "What did you take?" "Tell us what you took." "Did you
3  take something?"
4      Do you recall that?
5  A. Not specifically, no, ma'am.
6  Q. Did you ask him that question?
7  A. I'm sure I did at some point. To be honest
8  with you, I can't really remember, though.
9  Q. You know what excited delirium is; correct?
10  A. Yes, ma'am.
11  Q. Is that part of your training?
12  A. Yes, ma'am.
13  Q. When did you get training on excited delirium?
14  A. In my paramedic class, and I'm sure I've had a
15  CE, a continuing education, about it at some point.
16  Q. What's your understanding of what it is?
17  A. Excited delirium is where a patient's taken
18  drugs of some kind, whether they're prescribed or street
19  drugs, and are in such a worked-up state that they --
20  they die.
21  Q. What -- what is it that kills them?
22  A. I don't know exactly what -- I don't know
23  exactly what is the determining factor of death, but
24  that's how I understand it.
25  Q. And didn't you form the opinion that Mr. Timpa

Page 62

1  was in a state of excited delirium.
2  A. I don't recall doing that. Again, it was a
3  possibility. It was a possibility that that could have
4  happened, yes.
5  Q. But didn't you state that as a -- as what had
6  occurred is that he had died from excited delirium?
7  A. I can't remember stating that specifically.
8  Are you talking about in a report or something?
9  Q. No. I'm talking about that on the body cam
10  footage.
11  A. Did I say that out loud?
12  Q. Yes. I'm asking you --
13  A. I have no idea if I said that out loud.
14  Q. Okay. But did you have that opinion?
15  A. That he was in a state of excited delirium?
16  Q. Yes, because of drugs?
17  A. It could have -- yes, it was a possibility.
18  Q. But I'm saying did you state that, not as a
19  possibility, but that is your opinion --
20  A. No, ma'am.
21  Q. -- that that's what had occurred?
22  A. Oh, okay. I'm with you.
23      No, ma'am, I did not. That's not -- I don't --
24  it's not necessarily something I can -- I don't think
25  anyone can state, beyond a shadow of a doubt, on the

Page 63

1  scene. I think that's a medical -- I don't know what
2  the word is -- exam.
3  Q. Okay. And so you would not have said that
4  yourself as a --
5  A. No, ma'am.
6  Q. Okay. You knew that Mr. Timpa was dead at the
7  time he was put into the back of the ambulance?
8  A. I knew he was -- I believe I said that out
9  loud, right; he was not breathing.
10  Q. Didn't you point to him and say, "He's dead"?
11  A. I believe it was something like that, yes,
12  ma'am.
13  Q. Give me just one second.
14      MS. GOWIN: We've been going for an hour.
15  Do you need a break?
16      THE WITNESS: As of right now, I'm fine.
17      MS. GOWIN: Okay.
18      THE WITNESS: Unless y'all...
19      MS. HUTCHISON: So I'm going to show you
20  some body cam footage from Officer Dillard's body cam.
21      THE WITNESS: All right.
22      MS. HUTCHISON: It'll take me a second
23  to -- I had to switch body cam footage.
24      This is the reason to never get a Mac.
25      MS. GOWIN: Why is that?

Page 64

1      MS. HUTCHISON: They're so much harder to
2  play a video on Macs than it is on other computers. I
3  don't know why. Maybe it's me. Could be operator
4  error.
5      MR. ADDISON: Which one are you trying to
6  play?
7      MS. HUTCHISON: Okay. Let me see. I might
8  have it. Officer Dillard. I think I've got it
9  hopefully. Wait for a second for the volume to kick on.
10  Q. (By Ms. Hutchison) Okay. I'm going to go to
11  22:21 and see if you -- if this is your -- if you're
12  speaking?
13      MS. GOWIN: 22:21, you said?
14      MS. HUTCHISON: Yes.
15      MS. GOWIN: Okay.
16      MS. HUTCHISON: Actually, we'll -- we'll do
17  it at 22:17 or 18.
18  Q. (By Ms. Hutchison) So this is Officer
19  Dillard's body cam footage, and it's after Mr. Timpa
20  has been put in the back of the ambulance.
21  A. All right.
22  Q. So I'm just going to play it and ask if you can
23  identify this.
24  A. I can probably see it from right there.
25  Q. Okay.

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 65

1    A. Yeah, I can.
2    Q. Okay.
3        (Video plays.)
4    Q. (By Ms. Hutchison) Did you hear that?
5    A. I did say that, yes, ma'am.
6    Q. Okay.
7    A. That was me.
8    Q. All right. So when you say "kind of an excited
9  delirium deal" --
10   A. Yes, ma'am.
11   Q. -- you're talking about someone who dies as a
12  result of drugs?
13   A. I'm -- that -- that's a possibility, yes. But
14  also, in that scene right there, I believe the other
15  engine crew's already there. So we work on kind of a
16  set of protocols, whether it be an allergic reaction, a
17  heart attack, a chest pain.
18       There's an excited delirium protocol, and that
19  kind of gets everybody on the page of what's going on.
20  So that was my best guess of what was going on. It kind
21  of gets everyone, like I said, on the same page.
22   Q. Sure. So your best guess was that Mr. Timpa
23  had died in conjunction with drug use?
24   A. Yes, ma'am.
25       MS. GOWIN: Objection.

Page 66

1        THE WITNESS: I'm sorry.
2        MS. GOWIN: Objection. Misstates
3  testimony.
4        Go ahead.
5    A. That it was a possibility, yes, ma'am.
6    Q. (By Ms. Hutchison) Okay. But I'm saying that
7  was your best guess at the time?
8    A. Right.
9    Q. Because that's -- you were alerting everyone to
10  use the excited delirium protocol?
11   A. Correct. Which, at that time, I mean,
12  that's -- we were doing CPR.
13   Q. Right. But that -- what that was based on was
14  your observations of what had happened during the
15  restraint process?
16   A. Yes, ma'am. Everything leading up to that
17  point, yes, ma'am.
18   Q. Which included the concept that Mr. Timpa had
19  been under the influence of drugs?
20   A. Correct.
21   Q. Okay. So I want to go through some parts of
22  the -- of the video.
23   A. All right.
24   Q. And I'm going to switch it again. So bear with
25  me and be patient.

Page 67

1    A. No problem.
2    Q. Because I'm going to switch to the Vasquez
3  video body cam. And I'm going to start at about 1:30.
4  Let's see where I can get it to on the computer.
5        (Video plays.)
6    Q. (By Ms. Hutchison) Actually, did you hear that
7  at about 1:15 where Mr. Timpa's saying -- saying to the
8  officers, "Please don't hurt me," that kind of thing?
9    A. I don't re-- I don't recall that, no, ma'am.
10   Q. Okay. So I'm going to start it at 1:20, and
11  then I believe, at approximately 1:36, one of you, you
12  or Mr. Burnley, enters the scene. I was going to ask
13  you to kind of identify --
14   A. Sure; yes, ma'am.
15   Q. -- that.
16       (Video plays.)
17   Q. (By Ms. Hutchison) Did you see?
18   A. Yes, ma'am. I believe that's me.
19   Q. Okay. So --
20   A. There at the top left.
21   Q. Okay. So there at the -- in the --
22   A. Yes, ma'am.
23   Q. -- screen at the top left, that's you, and you
24  have blue gloves on?
25   A. Yes, ma'am.

Page 68

1    Q. Okay. And what was your, I guess, intent at
2  that point in time?
3    A. We try to assess patients as soon as we can.
4    Q. Okay.
5    A. And I -- I was attempting to do that.
6    Q. What -- what specifically did -- were you going
7  to do? Do you recall?
8    A. Take a blood pressure, take his pulse, things
9  like that.
10   Q. Okay. I want to go to a place in the video
11  at -- it's about 1:54-ish, where you can hear something
12  in the background about transporting him, and I can't
13  really -- I can't really make it out. I was going to
14  see if you could identify --
15   A. Sure.
16   Q. -- who was talking and what was --
17   A. Yes, ma'am.
18   Q. -- being said, if you can recall.
19       I'm just going to play it from here instead of
20  trying to --
21   A. That's fine.
22   Q. -- mess around with the computer and find it.
23  It's at 1:14.
24       (Video plays.)
25   Q. (By Ms. Hutchison) Did you hear something

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 69

1  about transporting him in the background?
2      A.  No, ma'am, I didn't.
3      Q.  Okay.  But do you recall having a conversation
4  with anyone about transporting him at that point?
5      A.  I don't know -- at that point, I don't know.
6  Obviously, I -- like I said before, I talked to Sergeant
7  about taking him to the hospital.
8      Q.  Uh-huh.
9      A.  I don't know where that conversation is in
10  relation to that video right there, I mean.
11      Q.  All right.  I'm going to go to about 2- --
12  about 2:25.
13          MS. GOWIN:  2:25?
14          MS. HUTCHISON:  Yeah.  I'll probably start
15  it before then.
16      Q.  (By Ms. Hutchison)  And because you can see one
17  of you, one of the paramedics with blue gloves on,
18  reaching in to --
19      A.  All right.
20      Q.  -- the scene of the body cam --
21      A.  Yes, ma'am.
22      Q.  -- and doing something.  And I was wondering if
23  that was the D-stick or something else --
24      A.  Sure.
25      Q.  -- that was happening.

Page 70

1          So -- so we'll start it at about 2:23 and see
2  if you can tell me -- I'm going to start it at 2:23 and
3  play it all the way through about 2:50 because I think
4  that's the time frame that one of you guys is doing
5  something.
6      A.  Okay.
7      Q.  You can see your arms --
8      A.  Yes, ma'am.
9      Q.  -- and the gloves, but you can't see your face.
10      A.  Yes, ma'am.
11      Q.  So you --
12          MS. GOWIN:  You said 2:23, you're going to
13  start?
14          MS. HUTCHISON:  Yeah.
15          MS. GOWIN:  Okay.
16          (Video plays.)
17      Q.  (By Ms. Hutchison)  So I'm going to pause it
18  for just a second.
19      A.  Yes, ma'am.
20      Q.  You can hear it sounds like you --
21      A.  Yes, ma'am.
22      Q.  -- say "I'm right behind you."
23      A.  Yes, ma'am.
24      Q.  "Don't jump."  That's you?
25      A.  Yes, ma'am.

Page 71

1      Q.  Okay.  And what are you -- what are you doing?
2  You -- you see there's some --
3      A.  Yes, ma'am.
4      Q.  -- device or something?
5      A.  That's called an SpO2 monitor, and it measures
6  your heart rate and how much oxygen's in your blood.
7      Q.  And where were you placing it at that time?
8      A.  It's on his finger.
9          MS. GOWIN:  I'm sorry.  What did you say
10  that was called?
11          THE WITNESS:  SpO2 monitor.  There's a
12  complicated name for it.
13          MS. GOWIN:  Okay.  That's all I need.
14  Thanks.
15          THE WITNESS:  SpO2 monitor.
16          MS. HUTCHISON:  That -- that's fine for our
17  purposes.
18          THE WITNESS:  Yeah, I don't -- I don't know
19  what it is.
20      Q.  (By Ms. Hutchison)  So it's -- it's like kind
21  of a pulse oximeter-ish?
22      A.  It's a pulse oximeter, yeah.
23      Q.  Okay.
24      A.  That's the -- that's the word.
25      Q.  Okay.  And do you remember -- does it matter

Page 72

1  which finger you put it on?
2      A.  No, ma'am.
3      Q.  Do you usually put it on your -- the pointy one
4  maybe?
5      A.  No, ma'am, it doesn't matter.
6      Q.  Okay.
7      A.  I mean, if you have crazy nail polish or crazy
8  nails, it matters, but not for him.
9      Q.  Okay.  And so his hands are cuffed behind his
10  back.
11      A.  Uh-huh.
12      Q.  So, obviously, his fingers are accessible --
13      A.  Yes, ma'am.
14      Q.  -- at that point?
15          Do you remember which finger you placed it on?
16      A.  I have no idea.
17      Q.  Okay.  And were you able to take a reading from
18  it?
19      A.  I can't remember if I did or didn't.  I don't
20  think so.  Again, you've kind of got to be --
21      Q.  Still?
22      A.  -- somewhat calm for it to work.
23      Q.  So this is at about -- let me see if I can see
24  where it is.  On the screen right now, it shows 2:42.
25  So I think there's at least another -- so it's about a

DFR OFFICER JAMES FLORES

Page 73

1 10-second period of time, but --
2     A.  Okay.
3     Q.  But I'll let you watch it, and you can --
4     A.  Sure.
5     Q.  -- tell us when you remove it.
6          (Video plays.)
7     Q.  (By Ms. Hutchison)  At that point, did -- did
8 you say "I don't know if this is going to work"?
9     A.  If I believe -- yes, I believe so.
10    Q.  Okay.  Something to that --
11    A.  That's what I heard, something like that,
12 yes, ma'am.
13    Q.  Okay.
14          (Video plays.)
15    Q.  (By Ms. Hutchison)  And then at that -- you see
16 where at that point --
17    A.  Yeah, it just -- it just reads nothing.
18    Q.  Okay.  So you took it off and moved back?
19    A.  Right.
20    Q.  Now, at that point, were you concerned for your
21 safety at all?
22    A.  At that point, I can't -- I can't assess him
23 very well, obviously.  It's obvious that he's not
24 compliant with the police officers and what they're
25 doing.  And I'm not going to be able to do anything for

Page 74

1 him, as far as assessing him or anything like that.
2          MS. HUTCHISON:  Object as nonresponsive.
3     Q.  (By Ms. Hutchison)  Were you concerned, during
4 that period of time that we just watched in the video,
5 for your own safety?
6     A.  For my own safety?  No, ma'am; no.
7     Q.  I'm going to look at 3 -- about 3:53 on the
8 video, just to identify who's in the frame.  So we'll
9 start it at like 3:43.
10         Wait a minute.  It's telling me I have an
11 ejected disk, which I have not.  Let me try to get it
12 back.
13         Okay.  So it's at about 3:52.  Do you see
14 someone's foot up in the top left?
15    A.  Yes, ma'am.
16    Q.  Is that you?
17    A.  No, ma'am.
18    Q.  Okay.  Is that -- you don't know who that is?
19    A.  I have no idea who that is.
20    Q.  Okay.  All right.
21    A.  We were -- I -- I guess that guy has shorts on.
22    Q.  Oh, you had long pants on?
23    A.  Yes, I did.
24    Q.  Okay.  Let me play it -- I'm sorry.  My
25 computer does not like me turning it around.

Page 75

1     A.  Having issues.
2     Q.  Maybe I'll use this one.
3          MR. ADDISON:  Which one?
4          MS. HUTCHISON:  Vasquez at like 3:52.
5          MR. ADDISON:  3 minutes and what?
6          MS. HUTCHISON:  52 seconds-ish.
7          MR. ADDISON:  It's like at 3:47.
8          MS. HUTCHISON:  Okay.
9     Q.  (By Ms. Hutchison)  Starting at 3:47.  Can you
10 see that far away?
11    A.  I can see it if you tow it up a little.
12    Q.  That way?
13    A.  Yeah, that's good.
14    Q.  Okay.
15    A.  It's just the glare.  Yeah, that's perfect.
16          (Video plays.)
17    Q.  (By Ms. Hutchison)  Did you hear Mr. Timpa
18 those last few seconds?
19    A.  I heard him.
20    Q.  Could you make out what he was saying?
21    A.  No, ma'am.
22    Q.  Okay.
23          (Video plays.)
24    Q.  (By Ms. Hutchison)  All right.  Do you see
25 that -- do you see someone sitting on the bench --

Page 76

1     A.  Yes, ma'am.
2     Q.  -- doing paperwork?
3     A.  Yes, ma'am.
4     Q.  Is that one of you or Mr. Burnley?
5     A.  That would be my assumption.
6     Q.  Okay.
7     A.  It looked like he had a Dallas Fire shirt on.
8     Q.  Okay.
9     A.  We were the only ones there.
10    Q.  Maybe I can back it up again and...
11    A.  I didn't...
12    Q.  And see if I...
13          (Video plays.)
14    Q.  (By Ms. Hutchison)  Do you --
15    A.  I saw him right there, yes, ma'am.
16    Q.  Yeah, you saw him holding the laptop?
17    A.  That's -- that's Curtis.
18    Q.  Okay.
19    A.  Yes, ma'am.
20    Q.  And then it looks like he's the one that comes
21 over and sits on the bench?
22    A.  I'll -- I'll agree with that, yes, ma'am.
23    Q.  All right.
24          MS. GOWIN:  We're about an hour and a half
25 in.  If you get to a good stopping point, it wouldn't be

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 77

1  a bad idea to take a break.
2        MS. HUTCHISON:  Okay.  Can I just play like
3  one more -- because I've got to switch videos.  So how
4  about if I just play like one more thing off of this
5  one, and then we can take a break, and I'll switch the
6  video.
7        MS. GOWIN:  Is that okay with you?
8        THE WITNESS:  I'm --
9        MS. GOWIN:  Sure.
10       THE WITNESS:  I'm fine.
11       MS. HUTCHISON:  Okay.
12     Q.  (By Ms. Hutchison)  So I just wanted to go
13  to -- actually to 8:19 and 8:32 where --
14       MS. GOWIN:  Still on Vasquez; right?
15       MS. HUTCHISON:  Yes, on Vasquez.
16     Q.  (By Ms. Hutchison)  Where you hear -- at 8:19,
17  you hear a voice saying, "You want to roll him -- do you
18  want to roll him out?"  And then, at 8:32, "Roll him
19  over."
20     A.  Okay.
21     Q.  And I just wanted to see if -- the questions I
22  have for you are, A, do you know who said that?
23     A.  Okay.
24     Q.  And, B, do you remember hearing it?
25     A.  Okay.

Page 78

1     Q.  So all right.  Let me start it at 8:15, and I'm
2  just going to play it all the way through 8:32.
3        (Video plays.)
4     Q.  (By Ms. Hutchison)  Did you hear those two --
5  did you hear those comments?
6     A.  Yes, ma'am.
7     Q.  Do you know who said either of those things?
8     A.  I have no idea.
9     Q.  Were you -- did you hear those things being
10  said?
11     A.  I -- at the time, no, I don't remember hearing
12  those.  I mean, I hear it on the video.
13     Q.  But I -- at the time, do you remember?
14     A.  No, ma'am, I -- no.
15       MS. HUTCHISON:  Okay.  We can take a break,
16  and I'll --
17       MS. GOWIN:  Okay.
18       MS. HUTCHISON:  We'll switch.
19       THE VIDEOGRAPHER:  End of media.  Off the
20  record at 10:24.
21       (Break from 10:24 to 10:35.)
22       THE VIDEOGRAPHER:  Back on the record at
23  10:35.
24     Q.  (By Ms. Hutchison)  So, sir, I want to play
25  for you a portion from -- hopefully I've got Officer

Page 79

1  Dillard's body cam queued up here, and I want to play it
2  for a portion where I believe it's you that comes in to
3  take the blood pressure.  So I'm going to --
4     A.  All right.
5     Q.  -- start it at 7- -- let me see what -- where
6  this is -- 7:57, and play it all the way through 9:16.
7  Actually, I'm going to play it through 9:55.  Nope.  I'm
8  going to keep going.  Sorry.  I'm looking at my notes.
9  I'm going to play it through 10:15.
10       So that's several minutes, but there's some
11  conversation going on after you take the blood pressure,
12  and then -- oh, I'm wrong.  I'm going to have to switch
13  them again.  I'm just going to play this one throughout
14  the process of taking the blood pressure.
15     A.  Okay.
16     Q.  And just ask you kind of if that's you, and
17  once it's -- you know, we finish playing it, if you'll
18  just kind of describe what you did and what happened.
19  Okay?
20     A.  Yes, ma'am.
21       (Video plays.)
22     Q.  (By Ms. Hutchison)  Okay.  So was that you
23  taking the blood pressure?
24     A.  Yes, ma'am, it was.
25     Q.  And -- I stopped it at 9:32.

Page 80

1        Were you able to get a blood pressure reading?
2     A.  I believe so, yes, ma'am.
3     Q.  And did you believe that he was resisting
4  physically your attempts to take his blood pressure?
5     A.  I was able to do it.  It wasn't the most ideal
6  way to do it, but I was able to do it.
7     Q.  Right.
8     A.  He wasn't resisting me personally.
9     Q.  Okay.  So you'd agree with me that Mr. Timpa
10  was not resisting you or your attempts to take his blood
11  pressure?
12     A.  No, ma'am.  Yeah, or -- yes, I'm agreeing with
13  you.  Sorry.
14     Q.  Okay.
15       MS. GOWIN:  I'm going to object to that.
16  Calls for speculation.
17     Q.  (By Ms. Hutchison)  And you could hear him
18  making noises; right?
19     A.  Correct.
20     Q.  Some of it was gibberish?
21     A.  Correct.
22     Q.  And you could hear him say, "Kill me, my
23  friend"?
24     A.  Something like that, yeah.
25     Q.  Did that make any sense to you?

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 81

1    A. No.
2    Q. Did it seem like he was trying to engage in any
3  kind of a rational communication?
4    A. I don't know about rational, but he was
5  talking.
6    Q. Right. But --
7    A. It didn't seem rational.
8    Q. Okay.
9    A. Yeah.
10   Q. He was moving his head during that period of
11 time --
12   A. Yes, ma'am.
13   Q. -- back and -- back and forth, obviously?
14       Did you see his arms moving at all during that
15 time?
16   A. No, ma'am.
17   Q. Okay. I'm going to go to 1:21 and see if you
18 can identify who it says -- who it is that says he took
19 something. Wait a minute. 11:21, not 1:21. Sorry.
20       MS. GOWIN: Can you say that one more time
21 when you find your place?
22       MS. HUTCHISON: I think it's -- I think
23 it's 11:21. My notes say 1:21, but that doesn't make
24 any sense to me. So I'm going to look -- I'm going to
25 put it at 11:21 maybe.

Page 82

1    Q. (By Ms. Hutchison) I'm going to -- all right.
2  I'm going to start it at 11:10.
3        (Video plays.)
4    A. I heard it right there.
5    Q. (By Ms. Hutchison) Okay. That -- that was at
6  like 11:10.
7        Do you -- do you know who said that?
8    A. I have no idea who said that.
9    Q. Okay. That wasn't you?
10   A. No, ma'am.
11   Q. Okay. And I think it should say it again.
12       (Video plays.)
13   Q. (By Ms. Hutchison) Did you hear it again?
14   A. Yes, ma'am.
15   Q. And that's still not you?
16   A. No, ma'am.
17   Q. You see feet and pants in the picture frame.
18 Is that you?
19   A. I don't -- I don't think so. In fact, I know
20 it's not. Those aren't my boots.
21   Q. Okay. And then you hear somebody say, "So
22 what's the plan." Right?
23   A. Yes, ma'am.
24   Q. Do you know who that was?
25   A. No, ma'am.

Page 83

1    Q. And then let me play it a little bit further.
2  It -- I know you can hear on a -- on a different one
3  about putting him on a gurney, but I want to see if you
4  can hear it on this one.
5        (Video plays.)
6    Q. (By Ms. Hutchison) And did you hear someone
7  say "You got HMFIC out here, sir"?
8    A. Yes.
9    Q. Was that one of -- either you or Mr. Burnley?
10   A. No, ma'am.
11   Q. Okay.
12   A. I don't know what that -- I don't know what
13 that means.
14   Q. Okay. And then there's a discussion after that
15 about putting him in a gurney and driving the ambulance,
16 and I want to see if you, again, know who -- recognize
17 any of the voices or --
18   A. Sure.
19   Q. -- yourself in the conversation.
20   A. Yes, ma'am.
21   Q. Let me back it up a second. Okay. I'm
22 starting it at like 11:10.
23       (Video plays.)
24   Q. (By Ms. Hutchison) Okay. Did you hear
25 somebody kind of in the background saying, "If you'll

Page 84

1  strap him to a gurney," one of y'all, did you hear that
2  part?
3    A. No, I didn't specifically, but I -- no. The
4  strapping to gurney part, no.
5    Q. Okay. Did you say, "If you guys will strap him
6  to a gurney, we'll transport him"? Do you recall saying
7  something like that?
8    A. No, ma'am, I don't.
9    Q. Okay. And then you hear somebody's joking
10 about, "I'll drive the ambulance, and they can both ride
11 in the back"?
12   A. Yeah; yes, ma'am.
13   Q. Do you remember that part where the -- they
14 were kidding around about that?
15   A. No, ma'am. If I recall correctly, I was --
16 like I said, I was on the other side of the ambulance
17 during all this. But I -- so I wasn't in earshot of
18 what they were talking about.
19   Q. Okay. So we'll go to -- we're going to go to
20 12:41. And someone says something to the effect of,
21 "His nose is buried." And I wanted to see if that
22 was --
23   A. Okay.
24   Q. -- you or Mr. Burnley.
25       Let me ask you first. Do you recall noting

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 85

1  that Mr. Timpa's nose was buried?
2      A.  No, ma'am.
3      Q.  Okay.  I'll start it at 12:37.
4          (Video plays.)
5      Q.  (By Ms. Hutchison)  Okay.  So someone is bent
6  down at the top of the screen, right --
7      A.  Yes, ma'am.
8      Q.  -- on one knee?
9          That's not you?
10      A.  No, ma'am.
11      Q.  Again, not your shoes, I guess?
12      A.  I don't -- no, I don't -- that's not me.
13      Q.  Okay.  All right.  And then there's a
14  conversation about, "Hey, Tony, back to school.  Wake
15  up.  Waffles," that kind of thing.
16          You were not present during that --
17      A.  No, ma'am.
18      Q.  -- communication?
19      A.  No, ma'am.
20      Q.  Is that when you were on the other side of the
21  ambulance --
22      A.  I believe so, yes, ma'am.
23      Q.  -- preparing the shot?
24      A.  Yes, ma'am.
25      Q.  Okay.  Because if you then go to 13:49 -- I'm

Page 86

1  going to do a little bit before that.  It appears to
2  be -- that appears to be the time when you came to give
3  him a shot.
4      A.  Okay.
5      Q.  And it was immediately before that the
6  conversation about waffles --
7      A.  Yes, ma'am.
8      Q.  -- was going on.  So I'm assuming that's when
9  you were --
10      A.  Yes, ma'am.
11      Q.  -- getting the shot ready.
12      A.  I'm with you.
13      Q.  I'll start it at 13:40.
14          By the way, let me ask you this.  What -- what
15  was Mr. Burnley doing while you were doing all of these
16  other things, taking his blood pressure --
17      A.  Uh-huh.
18      Q.  -- doing the pulse ox, getting the shot ready?
19      A.  I -- I don't know specifically.  But,
20  typically, one person handles that Toughbook.  So
21  they're putting in information about what we're doing.
22  And the other person does all of the -- things.
23  Now, I can't remember exactly where he was or what he
24  was doing.
25      Q.  Well, he appears to be on the computer a lot.

Page 87

1      A.  Yeah; yes, ma'am.
2      Q.  So do you think he's just inputting
3  information?
4      A.  That's typically what he's doing, yes, ma'am.
5      Q.  Okay.  Were you and Mr. Burnley communicating
6  during this time?
7      A.  I can't recall exactly when or what we talked
8  about.
9      Q.  You knew that -- at the time you gave him the
10  shot, you knew that Mr. Timpa was out or out of it?
11          MS. GOWIN:  Objection.  Vague as to "out of
12  it."
13          You can answer, if you understand.
14      A.  He was -- I don't know what you mean by "out of
15  it."  I'm sorry.
16      Q.  (By Ms. Hutchison)  Unconscious?
17      A.  Did I know he was unconscious?  No, ma'am.
18      Q.  Did you think he was asleep?
19      A.  No, ma'am, that never crossed my mind.
20      Q.  Did you think he was conscious?
21      A.  Yes.
22      Q.  Are you the one that said "This might wake him
23  up"?
24      A.  No, ma'am, I don't believe I did.
25      Q.  Okay.  Did you hear that -- the officers

Page 88

1  talking about that, you know, he suddenly just -- they
2  say "bloop."  That he suddenly just "bloop."
3          Do you remember that?
4      A.  No, ma'am.
5      Q.  Okay.  Here; I'll play it.
6      A.  Yes, ma'am.
7          (Video plays.)
8      Q.  (By Ms. Hutchison)  So you see, as you're
9  giving the shot --
10      A.  Yes, ma'am.
11      Q.  -- you can hear them saying --
12      A.  Yes, ma'am.
13      Q.  -- that "He's out cold."
14      A.  Uh-huh.
15      Q.  And then you hear someone say, "This might wake
16  him up."
17          That's not you?
18      A.  No, ma'am.
19      Q.  And that "He just got quiet, and all of a
20  sudden, bloop," that kind of thing.
21      A.  Okay.
22      Q.  Did -- did you have any opinion as to what
23  Mr. Timpa's condition was when you were giving him the
24  shot?
25      A.  Obviously, he had calmed down a whole lot.

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 97

1  CPR chest compressions?
2      A.  We do it -- no, it's not in place, no, ma'am.
3      Q.  So it's simultaneous?
4      A.  As simultaneous as possible, yes, ma'am.
5      Q.  Because just, you know, when you get the
6  training on the AED device, it tells you, once you place
7  it, "Stand back"?
8      A.  Sure.
9      Q.  You know, "Stop the chest compressions."
10     A.  Sure.
11     Q.  "Stand back."
12         But this is different?
13     A.  Well, it's -- it says that if there's a --
14  shockable rhythm.
15     Q.  I see.  So it -- it checks to see if there's a
16  shockable rhythm, and if there is --
17     A.  Correct.
18     Q.  -- it'll tell you "Stand back."
19     A.  Correct.
20     Q.  "Get away"?
21     A.  And -- and -- and -- I'm sorry.  In that
22  LIFEPAK -- in that LIFEPAK 15, that -- that can do a
23  number of things.  But it can also just monitor your
24  heart rate, show me your -- your ECG.
25     Q.  But if -- if there had been any kind of a

Page 98

1  shockable rhythm, it would have said, "Stand back," and
2  they would have stopped doing the chest compressions?
3      A.  No, because -- so whenever it comes down to
4  CPR, you have asystole, which is basically your heart's
5  not beating, which is what he was in the whole time.
6  And then there's really kind of anything else.
7          Anything else can be shocked.  Asystole cannot
8  be shocked.  It doesn't -- it doesn't -- it doesn't do
9  anything for the patient.
10     Q.  Okay.  And so it was your opinion that his
11  heart -- that he was in asystole, or his heart had
12  stopped beating, before he was rolled over and put onto
13  the stretcher?
14     A.  I can't say exactly when his heart stopped
15  beating.  As soon as I put that LIFEPAK on him, those
16  pads on him, I can tell because, again, it's -- it's a
17  monitor.
18     Q.  If the shot that you gave him of Versed was not
19  absorbed into his system, does that inform you as to
20  whether or not he had -- his heart had stopped beating
21  before that?
22         MS. GOWIN:  Objection.  Calls for
23  speculation.
24         You can answer, if you know.
25     A.  Ask that one more time.

Page 99

1      Q.  (By Ms. Hutchison)  Yes.  In accordance with
2  your medical training, if the Versed shot that you gave
3  him was not absorbed into his system, does that inform
4  you as to whether or not he was -- that his heart had
5  stopped beating --
6      A.  Not --
7      Q.  -- before that time?
8      A.  Not necessarily.
9      Q.  What are all of the things that would explain
10  the Versed not being absorbed into his system?
11     A.  Well, I'm sorry.  Absorbed.  Okay.  So I don't
12  know exactly when that happens.  If your heart's not
13  beating, it's not going to absorb.  It's not going to go
14  through your circulatory system, but -- yes.
15     Q.  So is that an indicator if there's no -- if
16  there was no Versed that was absorbed into his system,
17  as reflected on the autopsy --
18     A.  Right.
19     Q.  -- is that an indicator that his heart had
20  stopped beating at the time he got the shot?
21     A.  I would -- yes, I would guess so.  I...
22     Q.  Did you notice any indicia of him being alive
23  at the time you gave him the shot?
24     A.  I -- I believed he was.  Again, I walked over
25  there and just kind of gave it to him.  I didn't -- I

Page 100

1  definitely didn't...
2      Q.  But did you -- did you assess him for whether
3  or not he was still alive, or not alive, at the time
4  you --
5      A.  No, ma'am.
6      Q.  Okay.  Did you have the ability to tell the
7  officers to roll Mr. Timpa over, sit him up, put him in
8  the recovery position, anything like that?
9      A.  Yes.
10     Q.  Did you -- I guess you had the ability to
11  because you could talk, but --
12     A.  Yes, ma'am.
13     Q.  Let me rephrase that question.
14     A.  I'm sorry.
15     Q.  That was a bad question.
16         Did you have the authority to instruct the
17  officers on how they should be restraining him?
18     A.  Yes, ma'am.  I mean, we -- we talk.  It's a
19  collaborative deal.
20     Q.  Did you, at any time, tell them to roll him
21  over or put him in the recovery position?
22     A.  No, ma'am, that would -- no.
23     Q.  Do you receive any training on the restraint
24  process and the recovery position?
25     A.  Yes, ma'am.

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

|  | Page 101 |
|---|---|
| 1 | Q. Do you receive any -- |
| 2 | A. What -- |
| 3 | Q. -- training on mechanical or positional |
| 4 | asphyxia? |
| 5 | A. What do you mean by -- what are you calling it, |
| 6 | the "recovery position"? |
| 7 | Q. I'm just -- I'm using that phrase from the -- |
| 8 | from the training -- officer training records that -- |
| 9 | A. Oh. |
| 10 | Q. -- talk about restraint.  They call it the |
| 11 | recovery position, either on their side or sitting up. |
| 12 | A. Okay.  Yes. |
| 13 | Q. And do you have any training with respect to |
| 14 | positional or mechanical asphyxia? |
| 15 | A. Yes. |
| 16 | Q. And does that include the dangers of an |
| 17 | individual asphyxiating when they're restrained on their |
| 18 | stomach, with weight on their back, with their hands and |
| 19 | legs restrained? |
| 20 | MS. GOWIN:  Objection.  Compound. |
| 21 | You can understand, if you understand. |
| 22 | A. Yes.  I mean, that's a way to -- yes. |
| 23 | Q. (By Ms. Hutchison)  Because that interferes |
| 24 | with their breathing process? |
| 25 | A. Sure. |

|  | Page 103 |
|---|---|
| 1 | ability to, you know, use their diaphragm and expand |
| 2 | their lungs is impeded or interfered with, then that |
| 3 | could be a problem with their ability to breathe? |
| 4 | A. I agree with you, yes, ma'am. |
| 5 | Q. And that one of the things that is taught, with |
| 6 | respect to mechanical or positional asphyxia, is, as |
| 7 | soon as it's reasonably feasible or reasonable, to put |
| 8 | someone on their side or on their -- or sitting up so |
| 9 | that their ability to breathe is no longer impeded? |
| 10 | A. Yes, ma'am. |
| 11 | Q. Did you have any discussion with any of the |
| 12 | officers about that particular aspect of it? |
| 13 | A. No, ma'am. |
| 14 | Q. I know -- I think I already asked you if you |
| 15 | heard anybody say, "Roll him over," but I don't remember |
| 16 | if -- if you -- |
| 17 | A. I heard it on the video just now, yes, ma'am. |
| 18 | Q. Okay.  But while you were there? |
| 19 | A. No, ma'am, it doesn't -- I don't recall that, |
| 20 | no, ma'am. |
| 21 | Q. And you never -- you never said that, "Sit him |
| 22 | up; roll him over," anything like that? |
| 23 | A. I don't believe so, no, ma'am. |
| 24 | Q. Did Mr. Burnley, to your recollection, ever |
| 25 | say anything like, "Sit him up" or "Roll him over" or |

|  | Page 102 |
|---|---|
| 1 | Q. Did you form any opinion as to whether or not |
| 2 | Mr. Timpa was obese? |
| 3 | A. I don't know about obese.  He was overweight. |
| 4 | Q. Okay.  Did you note whether or not he had a |
| 5 | large stomach? |
| 6 | A. I'm -- yes. |
| 7 | Q. Is that the kind of thing that could |
| 8 | potentially interfere with someone's ability to breathe? |
| 9 | MS. GOWIN:  Objection.  Calls for |
| 10 | speculation. |
| 11 | Q. (By Ms. Hutchison)  If they have a large -- if |
| 12 | they're restrained on their stomach and they have a |
| 13 | large stomach? |
| 14 | A. I -- probably.  Possibly.  I don't... |
| 15 | Q. The -- the mechanism of breathing includes |
| 16 | being able to expand your lungs? |
| 17 | A. Yes, ma'am. |
| 18 | Q. I know that sounds like -- like that's so |
| 19 | basic. |
| 20 | A. No, I'm -- yeah, I'm trying -- yeah. |
| 21 | Q. But -- and that includes the -- the diaphragm |
| 22 | being involved in that process? |
| 23 | A. Yes, ma'am. |
| 24 | Q. And so if there's a -- if there's a manner in |
| 25 | which someone's on their stomach and the -- their |

|  | Page 104 |
|---|---|
| 1 | "Put him on his side"? |
| 2 | A. No, ma'am. |
| 3 | Q. Did you form any opinion as to whether or not |
| 4 | the manner of restraint contributed to Mr. Timpa's |
| 5 | death? |
| 6 | A. I can't -- I can't say that.  I mean, I'm not a |
| 7 | medical doctor.  I can't -- I can't say that for sure. |
| 8 | Q. Okay.  And I -- you know, I'm not trying to |
| 9 | exceed your area of expertise. |
| 10 | A. Yes, ma'am. |
| 11 | Q. I don't know if that -- if your area of |
| 12 | expertise includes having -- forming an opinion -- |
| 13 | A. Yes, ma'am. |
| 14 | Q. -- about someone's death.  So let me -- let me |
| 15 | start -- that's actually a good point. |
| 16 | So does your training and expertise to become a |
| 17 | paramedic, would that encompass you being able to form |
| 18 | an opinion as to the cause or manner of someone's death |
| 19 | during restraint? |
| 20 | A. No, ma'am. |
| 21 | Q. It just encompasses the dangers associated with |
| 22 | various types of restraint? |
| 23 | A. Yes, ma'am, I'll agree with that. |
| 24 | Q. Okay.  And one of the dangers associated with |
| 25 | restraining someone on their stomach, with their hands |

DFR OFFICER JAMES FLORES

Page 105

1 and legs restrained and weight on their back, is the
2 danger of interfering with the breathing process?
3        MS. GOWIN: Objection. Calls for
4 speculation. And lack of foundation.
5    A. Yes, I'll agree with you.
6    Q. (By Ms. Hutchison) And are you trained or
7 taught about the mechanism of asphyxia?
8    A. Yes.
9    Q. Okay. And asphyxia, meaning someone dying as a
10 result of a lack of oxygen circulating in their system?
11    A. Correct.
12    Q. And being unable to breathe can lead to,
13 obviously, asphyxia?
14    A. Correct.
15    Q. And that's not always an immediate process, is
16 it?
17    A. No, ma'am.
18    Q. So sometimes it's a gradual process. For
19 instance, if somebody goes into a mine shaft where
20 there's not enough oxygen, they can slowly asphyxiate?
21    A. Correct.
22    Q. And by the same token, if someone is restrained
23 on their stomach, with weight on their back, for a long
24 period of time, it can be a gradual process of -- of the
25 lack of oxygen circulating through their body?

Page 106

1    A. Yes, ma'am.
2    Q. And that can lead to death in that manner?
3    A. Yes, ma'am.
4    Q. And that is a potential regardless of the
5 amount of narcotics in their system?
6    A. It's -- say that --
7        MS. GOWIN: Objection. Calls for
8 speculation.
9    Q. (By Ms. Hutchison) Well, so in -- in keeping
10 with your training and -- and education, someone being
11 in an agitated state can increase their need for oxygen?
12    A. Yes, ma'am.
13    Q. Which would also increase their -- the body's
14 lack of processing of oxygen if their breathing is
15 restricted?
16    A. Yes.
17    Q. And so, if someone's under the influence of
18 narcotics, that can also increase their agitation and
19 their need for oxygen?
20    A. I --
21        MS. GOWIN: Objection. Calls for
22 speculation.
23    A. I don't know about ingesting drugs, if that
24 requires you to breathe more. I don't -- I don't know.
25    Q. (By Ms. Hutchison) Okay. Fair enough.

Page 107

1        But from what you were trained and your
2 education, the dangers associated with the -- the
3 mechanical asphyxia, being restrained on your stomach
4 with weight on your back, those dangers exist separate
5 and apart from whether or not you're under the influence
6 of drugs?
7    A. Yes, ma'am.
8        MS. HUTCHISON: I'll pass the witness.
9        (Discussion off the record.)
10        THE VIDEOGRAPHER: Off the record at 11:14.
11        (Break from 11:14 to 11:20.)
12        THE VIDEOGRAPHER: Back on the record at
13 11:20.
14        EXAMINATION
15 BY MR. ADDISON:
16    Q. Mr. Flores, do you have a specific rank at
17 Dallas Fire and Rescue?
18    A. Fire-rescue officer.
19    Q. And when you were out on the scene that day,
20 did you think that Mr. Timpa was a danger to himself or
21 others?
22    A. Yes, ma'am. Oh, I'm sorry. Yes, sir. I
23 apologize.
24    Q. And why did you believe he was a danger to
25 himself or others?

Page 108

1    A. Because he wasn't complying with what the cops
2 were doing. He was -- at the beginning of the video, he
3 was rolling all around. He could have rolled in the
4 street. A number of things.
5    Q. Was there anything else besides what you just
6 mentioned?
7    A. Not that I can recall specifically.
8    Q. Now, and when, during the interaction, was
9 it -- the decision made to transport him to the
10 hospital?
11    A. So, like I said, once we got there, went up to
12 that sergeant, he told me kind of what his thoughts were
13 about "We'll assess him once he calms down; take him to
14 jail."
15        We observed what was going on for a while, and
16 it kind of became apparent to me that he probably --
17 jail wasn't the best place for him. There was something
18 going on, and he needed to go to the hospital, out of an
19 abundance of caution, I guess.
20    Q. So when -- when was that decision made?
21    A. I can't give you an exact minute on the video,
22 but it was sometime -- some time had passed after I
23 talked to that sergeant that I kind of decided that.
24    Q. Okay. So this wasn't when y'all -- when you
25 initially arrived on the scene, there wasn't already a

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 121

1  what, my opinion, was going on.
2      Q.   And -- and, I guess, are there specific
3  protocol procedures once you've -- or you've made a
4  determination or -- or guesstimate or whatever you --
5  term you want to use, that this is excited delirium?
6      A.   No, sir.  And really at that point in -- at
7  that point in time, it was -- it was a CPR to us, which
8  is -- I mean, not to be crude, but a CPR's a CPR.  It's
9  pretty clear, cut and dry what we need to do.
10      Q.   And -- and -- and I might be getting just
11  tripped up on the term "protocol."  Because, I mean,
12  protocol, I think, is a -- is a deliberate process based
13  on a diagnosis or something to that effect.
14      A.   Correct.  I think --
15      Q.   And that's -- that was my question is, is there
16  a specific step-by-step protocol for excited delirium
17  cases?
18      A.   There are -- there are -- protocol might be the
19  wrong word.  It's -- it's kind of more of a guideline.
20      Q.   Okay.
21      A.   I just -- yes, it's a guideline.
22      Q.   And, generally, I guess, if you -- if you
23  remember, what is --
24      A.   Sure.
25      Q.   -- the general guideline for excited delirium

Page 122

1  cases?
2      A.   They all kind of start the same where they talk
3  about scene safety and body substance isolation and not
4  harming yourself or anything like that.  They all start
5  like that.  And then it talks about trying to calm the
6  patient down.
7          And then it goes all the way through to giving
8  the medication I gave, the Versed.  And it keeps in
9  mind -- tries to remind you to do all the things you're
10  supposed to do, as far as monitoring air -- his airway
11  and breathing, such like that.
12      Q.   And why did it take, I guess -- at least on the
13  video, it looks like about 14 minutes into the -- into
14  the video is when you administered the Versed?
15      A.   Yes.
16      Q.   And I --
17      A.   Yes, sir.
18      Q.   What took so long from when you first responded
19  to the scene to get that injection of Versed into him?
20      A.   Because people -- people fight the cops pretty
21  regularly.  That's not a -- that scene wasn't an
22  abnormality.  We get called whenever patients fight
23  cops, resist arrest, or anything like that.  That's a
24  pretty -- what's the word -- pretty automatic thing for
25  the police to do.

Page 123

1      Q.   And I know that the -- the shot was
2  administered after the -- the vitals or the blood
3  pressure was taken; correct?
4      A.   Yes, sir.
5      Q.   And was it taken like -- it looked like about
6  maybe six or seven minutes after that?
7      A.   Okay.
8          MS. GOWIN:  Objection.  Misstates the
9  evidence.
10      Q.   (By Mr. Addison)  Do you recall how long it was
11  after you took the vitals --
12      A.   I have --
13      Q.   -- that you gave the Versed?
14      A.   -- no idea, no, sir.
15      Q.   And why did you not administer the Versed when
16  you -- right after you got done taking the blood
17  pressure?
18      A.   Well, like I said, the -- so I took the -- my
19  vitals, my set of vitals, and then went -- went -- went
20  around to the other side of the ambulance.  Versed's
21  a -- at controlled substance.  It's a Schedule I drug.
22  So we have to keep it under two forms of security, I
23  guess.
24          And there's a -- in our medic bag, there's a
25  pouch.  It has a combination lock on it.  And inside,

Page 124

1  there's a zip tie.  It -- it takes some time just to
2  draw it up.  You've got to find a needle for the
3  syringe.  You've got to get a syringe and draw it up.
4      Q.   And by the time you took his blood pressure --
5  had you made the decision or determination by the time
6  you were taking his blood pressure, that you were going
7  to administer a shot of Versed?
8      A.   I did because he was still -- in my opinion, he
9  wasn't going to be very compliant to what we needed to
10  do in the back of the ambulance.
11      Q.   And were you monitoring his breathing at -- at
12  all throughout this process?
13      A.   I was listening to him breathe.  I was
14  listening to him talk.  He was making noises.  He was
15  moving around.  All those are indications that he's --
16  he's breathing, his heart's beating, all those things.
17      Q.   Now, you term -- are you aware of the term
18  "hypoventilate" or "hyperventilate"?
19      A.   Hypoventilate?  Yes, sir.
20      Q.   In which case a person's breathing, but they're
21  not -- I guess, what does hypoventilate mean to you?
22      A.   Someone's not breathing enough.
23      Q.   Are you --
24      A.   Slower.  I'm sorry.  Hypo means slow.  So
25  breathing slowly.

000261

DFR OFFICER JAMES FLORES

**Page 125**

1    Q. And hyperventilate is?
2    A. Hyper is fast.
3    Q. Fast.
4      And, I guess, during -- do you recall, at any
5 point during -- when you were, I guess, right next to
6 Mr. Timpa, that he was having difficulty breathing?
7    A. Difficulty? No, sir, I wouldn't say that.
8    Q. Do you recall if you ever heard him hypo or
9 hyperventilate?
10    A. Not specifically, no, sir.
11      Let me re-- can I rephrase that?
12    Q. Sure.
13    A. So, in the beginning, he was -- and I think I
14 put it on my PCR. He was -- he was breathing fast. I
15 mean, obviously, he was fighting. He was in a position
16 that he was using a lot of energy.
17    Q. Going back to your -- to your affidavit. And
18 in this affidavit, the second paragraph -- or the -- the
19 third paragraph, it says, "At no time, did I observe the
20 officers at the location use excessive force."
21      Do you see that?
22    A. Yes, sir, I do.
23    Q. Do you have any police training?
24    A. No, sir, I do not.
25    Q. Do you have any military training?

**Page 126**

1    A. No, sir, I do not.
2    Q. Are you qualified to give an opinion on
3 excessive force?
4    A. Am I qualified to give an opinion?
5    Q. Yes, on excessive force?
6    A. I think I can give an -- my opinion.
7    Q. Well, let me ask you, are -- are you -- what
8 would make you qualified to give an opinion on excessive
9 force?
10    A. I think any -- I'm not trying to be smart, but
11 can't anyone give an opinion of that?
12    Q. Sure. I guess, it -- what would your opinion
13 be informed by then?
14    A. What I observed at the scene.
15    Q. Just as excessive force, but, yeah, you're
16 saying if -- you don't think you observed excessive
17 force, and I'm curious --
18    A. Correct.
19    Q. -- is that a layman's, an unqualified opinion
20 of excessive force?
21    A. That's how I'm speaking -- I guess that's how
22 I'm speaking of it, yes, sir, because of all the things
23 you just said. I'm not -- I'm not a cop.
24    Q. So and -- and that was my initial question.
25 Maybe it was poorly worded.

**Page 127**

1      Are you qualified to give a -- opinion on
2 excessive force?
3      MS. GOWIN: Objection. Asked and answered.
4      You can answer.
5    A. I think I can give an opinion, but I don't have
6 any -- I'm just a layman. I'm just a guy.
7    Q. Okay.
8    A. I've seen it happen before.
9    Q. (By Mr. Addison) Okay. And then the second
10 sentence, it says, "The patient was a danger to himself
11 and others."
12      I think we went through that?
13    A. Yes, sir.
14    Q. And then it says, "The officers used the
15 minimal amount of force necessary to control him."
16      Do you see that?
17    A. Yes, sir.
18    Q. And do you have any training on -- on use of
19 force, use of force --
20    A. No, sir.
21    Q. -- continuum?
22    A. No, sir, I do not.
23    Q. And was it Dallas Fire and Rescue's, was it
24 y'all's decision to transport Mr. Timpa to a hospital,
25 if you recall?

**Page 128**

1    A. Yes.
2    Q. Could the police have made that determination
3 as well?
4    A. I believe so, yes, sir. I mean, police take
5 people to hospitals before, but not in that case.
6      MR. ADDISON: I'll pass the witness.
7      EXAMINATION
8 BY MS. GOWIN:
9    Q. You mentioned that Versed is a controlled
10 substance; correct?
11    A. Yes, ma'am.
12    Q. Do you have to perform any procedures to a
13 patient before you're able to administer Versed?
14    A. Yes. I mean, you'd have to make sure you're
15 giving the right medication. Inside that little pouch,
16 there's actually two medications. You don't want to
17 give fentanyl, which is a pain killer. So you've got to
18 do -- make sure it's in date, right dose, right time,
19 all those things.
20    Q. Okay. Do you have to do anything to evaluate
21 the patient before you do that?
22    A. Before I do what? I'm sorry.
23    Q. Before you administer an injection of a
24 medication.
25    A. Yes, you should -- I mean, you should be aware

LAURIE PURDY REPORTING SERVICE, INC.

Page 33  (Pages 129-132)

DFR OFFICER JAMES FLORES

Page 129

1  that their airway's intact, their breathing, and all
2  those things, yes.
3      Q.  Do you need to take their vital signs before
4  you do that?
5      A.  You do, yes, ma'am.  So there are certain
6  things -- you don't want to give Versed to someone whose
7  blood pressure's incredibly low or if their heart rate's
8  incredibly low or some contraindications like that.
9      Q.  You testified before that you received
10  training about the relationship between prone restraint
11  and breathing.  Were you trained that placing a person
12  in a prone restraint position always interferes with
13  breathing?
14          MS. HUTCHISON:  Objection.  Leading.
15      A.  What's my point here?  Can I --
16      Q.  (By Ms. Gowin)  You can answer it.
17      A.  Oh, I can answer it.
18          No, you can -- I mean, all of us can lay on the
19  ground and -- and breathe.
20      Q.  Okay.  Were you trained that putting a person
21  in a prone restraint position when they're in handcuffs
22  always interferes with their breathing?
23          MS. HUTCHISON:  Objection.  Leading.
24      A.  No, ma'am, it doesn't always.
25      Q.  (By Ms. Gowin)  And were you trained that

Page 130

1  placing a person in a prone restraint position, while
2  handcuffed and with weight on their back, always
3  interferes with breathing?
4          MS. HUTCHISON:  Objection.  Leading.
5      A.  I guess it depends on how much weight, but...
6      Q.  Okay.
7      A.  No.
8      Q.  (By Ms. Gowin)  You also answered a series of
9  questions about a gradual process of asphyxia.  Did that
10  occur in this incident with Mr. Timpa?
11          MR. ADDISON:  Objection.  Form.
12          MS. HUTCHISON:  Objection.  Form.
13      Q.  Go ahead?
14          MS. HUTCHISON:  Calls for speculation;
15  unqualified.
16      A.  Yes.
17      Q.  (By Ms. Gowin)  Pardon me?
18      A.  Yes.  I'm sorry.  What -- what was the
19  question?  Say it one more time.
20      Q.  You answered questions about whether gradual
21  asphyxia can occur.  Did that -- did you see any sign
22  that that occurred during the incident with Mr. Timpa?
23          MS. HUTCHISON:  Objection.  Form.
24          MR. ADDISON:  Same.
25      A.  He slowed his breathing down to nothing, so,

Page 131

1  yes, in video.
2      Q.  (By Ms. Gowin)  That his breathing slowed down
3  or that he asphyxiated?
4      A.  Well, as- -- asphyxia, as I understand it, is
5  not breathing.
6      Q.  Okay.  But if not breathing is the same as
7  asphyxia, then wouldn't every human being who dies
8  asphyxiate?
9      A.  Yes, ma'am, I guess at some point.
10      Q.  Okay.  So is there a difference between
11  stopping breathing and asphyxia?
12      A.  Yes.  I'm sorry.  Yes.
13      Q.  Okay.
14      A.  There is, I believe, yes.
15      Q.  And so would you say that asphyxia is not
16  breathing or being unable to breathe because of some
17  outside factor?
18      A.  Not breathing?  I believe the definition of
19  asphyxia is not breathing.
20      Q.  Okay.
21      A.  Now, whether it's mechanical or medical, I
22  think there's some other --
23      Q.  Okay.  Did you see any indications, at the
24  time of the incident, that Mr. Timpa was having great
25  difficulty breathing?

Page 132

1      A.  Breathing, no.
2      Q.  Did you see any indication that he was
3  struggling to breathe?
4      A.  No.  His airway was open, and he was breathing.
5      Q.  Did you see any indication that the officers
6  were -- were suffocating him?
7          MS. HUTCHISON:  Objection.  Form.
8      A.  No, I don't think they were holding him down so
9  hard that he stopped breathing, no, ma'am.
10      Q.  (By Ms. Gowin)  Okay.  When we looked at the
11  video where you mentioned the term excited delirium in
12  the ambulance --
13      A.  Yes, ma'am.
14      Q.  -- at that time, you knew that Mr. Timpa had
15  suddenly died; correct?
16      A.  Yes, ma'am.  We were doing CPR on him right
17  then.
18          MS. HUTCHISON:  I object to the form of the
19  last question.  Leading.
20      Q.  (By Ms. Gowin)  Did your knowledge that
21  Mr. Timpa had suddenly died affect your assessment of
22  what had happened here?
23          MS. HUTCHISON:  Objection.  Form.
24      A.  Did it -- say that one more time.
25      Q.  (By Ms. Gowin)  Did your knowledge that

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 133

1 Mr. Timpa had suddenly died affect your assessment that
2 excited delirium was at play?
3          MS. HUTCHISON: Objection. Form.
4    A. It -- I guess a little bit, but it's more of --
5 I don't know why I'm having a hard time answering that.
6 I don't think I'm understanding your question.
7    Q. Do you want me to rephrase?
8    A. Yeah; yeah, if you don't mind. I'm not trying
9 to be...
10   Q. Did the fact that Mr. Timpa had suddenly died
11 play into your assessment that excited delirium may have
12 been at play?
13   A. Yes.
14          MS. HUTCHISON: Objection. Form.
15   A. Yes.
16   Q. (By Ms. Gowin) Okay. Did you believe that he
17 was experiencing excited delirium while he was alive and
18 the officers were restraining him?
19   A. I can't really say for sure at the time.
20 Again, that's a -- the way I understand it, that's a
21 medical diagnosis.
22   Q. Okay. At any point did you hear Mr. Timpa
23 gasping?
24   A. Gasping? No, not necessarily.
25   Q. Okay. And were you paying attention to his

Page 134

1 breathing throughout the time the officers restrained
2 him?
3    A. Yes, ma'am.
4    Q. Okay.
5          MS. GOWIN: That's all I have.
6          MS. HUTCHISON: I've got some follow-up.
7          FURTHER EXAMINATION
8 BY MS. HUTCHISON:
9    Q. So had you heard Anthony Timpa make any threats
10 to harm anyone?
11   A. No, ma'am.
12   Q. Had you seen him taking a swing at anybody?
13   A. A swing? No, ma'am.
14   Q. Had you seen him kicking anybody?
15   A. No, ma'am.
16   Q. So in what manner was he threatening to harm
17 another person?
18          MS. GOWIN: Objection. Misstates his
19 testimony.
20   A. He can headbutt you. He can bite you. He can
21 scratch you. He can -- not having -- there's a number
22 of things.
23   Q. (By Ms. Hutchison) Well, anybody can do that;
24 right?
25   A. Anybody in the world can do that, yes, ma'am.

Page 135

1    Q. So is everybody a danger to others?
2          MS. GOWIN: Objection. Misstates
3 testimony.
4    A. Is everybody a danger to everybody?
5    Q. (By Ms. Hutchison) Sure.
6    A. I guess, at some point in life, yeah. I mean,
7 I don't -- I'm trying not to be philosophical, but...
8    Q. Well, I'm saying -- you're saying that he --
9 there's a lot of things he could do. He could headbutt.
10 He could bite. He could scratch; right?
11   A. Right. And he was in the -- he was in a
12 position where that was a possibility.
13   Q. Had he headbutted anybody?
14   A. No.
15   Q. Okay.
16   A. Possibility.
17   Q. Had he bitten anyone?
18   A. Not that I know of.
19   Q. Had he scratched anyone?
20   A. No, ma'am.
21   Q. Was he threatening to headbutt anyone?
22   A. I would say yes.
23   Q. So he -- you heard Mr. --
24   A. It's poss- -- no, not that I -- go ahead.
25          MS. GOWIN: Let him finish his answer and

Page 136

1 then -- yeah, go ahead and answer.
2    Q. Did he verbalize "I'm going to headbutt you,"
3 no. It's a possibility, with him thrashing around on
4 the ground, that he could injure somebody.
5    Q. (By Ms. Hutchison) My question is what
6 information did you have, other than that he was
7 thrashing around?
8    A. He was --
9    Q. Set aside the "thrashing around." What
10 information did you have that he intended to harm anyone
11 else?
12   A. If that's what I'm setting aside, then nothing.
13   Q. Okay. So the sole basis for you offering an
14 opinion that he posed a threat to other people was that
15 he was thrashing around on the ground?
16   A. Thrashing around on the ground; the police were
17 holding him down, yes, ma'am.
18   Q. Well, the police holding him down doesn't
19 indicate he's a threat to anyone, does it?
20          MS. GOWIN: Objection. Calls for
21 speculation.
22   A. I will speculate that, if you're being held
23 down by the ground -- by cops, there's a reason for
24 that.
25   Q. (By Ms. Hutchison) Okay. But I -- I want to

DFR OFFICER JAMES FLORES

| Page 137 |
|---|

1 set aside speculation. Okay. Because there's a -- you
2 know, a jillion different reasons a cop might be holding
3 you down on the ground; right?
4 MS. GOWIN: Objection. Calls for
5 speculation. Incomplete hypothetical.
6 Q. (By Ms. Hutchison) Couldn't they be holding
7 you down because you might run?
8 A. Sure.
9 Q. Couldn't they be holding you down because -- I
10 don't know -- whatever other reasons police might hold
11 you down that don't have anything to do with you posing
12 a threat to other people. I mean, aren't there other
13 reasons for police holding someone down?
14 MS. GOWIN: Objection. Calls for
15 speculation.
16 A. I have no idea. I'm not a police officer.
17 Q. (By Ms. Hutchison) Well, then how can you draw
18 a conclusion of your own from solely the fact that the
19 police were holding him down?
20 A. That's not -- I'm not drawing it solely from
21 that. I'm drawing it from the entire scene.
22 Q. Okay. So what you're drawing a conclusion
23 based on is that Mr. Timpa was thrashing around?
24 A. Yes.
25 Q. Why was he thrashing around?

| Page 138 |
|---|

1 MS. GOWIN: Objection. Calls for
2 speculation. He has no way to know that.
3 MS. HUTCHISON: That's a great point. I'll
4 stipulate to that, and then we can get rid of this whole
5 concept that he posed a danger to other people, which is
6 based on speculation and nothing.
7 Q. (By Ms. Hutchison) I'm sorry. What was your
8 answer?
9 A. What was the question? I apologize.
10 MS. HUTCHISON: Can you read the question
11 back, please.
12 (Reporter read the requested testimony.)
13 MS. GOWIN: Objection. Calls for
14 speculation.
15 A. I don't know why he was thrashing around.
16 Q. (By Ms. Hutchison) And, see, that's kind of my
17 point. If you don't know why he was thrashing around,
18 then what about your observing that occurrence means to
19 you that that -- that that fact made him a danger to
20 other people?
21 A. Because we're trained to have scene safety
22 first and protect ourselves before we act in any way.
23 Q. I get the concept that you guys are all trained
24 to protect yourselves above and beyond everything else.
25 My question is --

| Page 139 |
|---|

1 MS. GOWIN: Objection. Misstates his
2 testimony.
3 Q. (By Ms. Hutchison) My question is, what about
4 the simple fact that Mr. Timpa was thrashing meant that
5 he was going to hurt somebody besides himself?
6 A. Sure.
7 MS. GOWIN: Objection. Misstates his
8 testimony.
9 Go ahead.
10 A. I feel like, if I need to -- my job, I have to
11 get very close to somebody. I have to put my hands on
12 you, and I have to assess you and do all the things that
13 we've been talking about.
14 If you are thrashing around enough to where
15 police are having to hold you down and put you in
16 handcuffs, yes, you are a danger to me because I don't
17 know if you're going to -- and you're thrashing around
18 for whatever reason -- hit me, headbutt me, bite me,
19 which are all things that have happened to me.
20 Q. (By Ms. Hutchison) And it's not anything that
21 happened to you from Mr. Timpa, is it?
22 A. No. He -- he did not harm me in any way,
23 no, ma'am.
24 Q. And he did not attempt to harm you in any way,
25 did he?

| Page 140 |
|---|

1 MS. GOWIN: Objection. Calls for
2 speculation.
3 A. No, ma'am.
4 Q. (By Ms. Hutchison) And you put your hands on
5 him on several occasions; correct?
6 A. Yes, ma'am.
7 Q. At least three that we can see in the video;
8 right?
9 A. Yes, ma'am.
10 Q. And on any of the three occasions -- or were
11 there more than that, actually?
12 A. Not that I know of, no, ma'am.
13 Q. So on any of the three occasions, taking the --
14 using the pulse oximeter, taking his blood pressure --
15 A. Yes, ma'am.
16 Q. -- giving him a shot, on any of those
17 occasions, did he do anything whatsoever that appeared
18 as if he was trying to harm you?
19 A. No, ma'am.
20 Q. Did you see him do anything whatsoever that
21 appeared as if he -- he was trying to harm anyone?
22 A. No, ma'am. Besides being held down by the
23 police, I'm just deducing what was happening on the
24 scene.
25 Q. How does being held down indicate that he's

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 141

1  trying to harm someone?
2     A. Because that's one of the reasons why the
3  police would hold someone down.
4     Q. But there's also other reasons?
5     A. There -- yes.
6     Q. So how are you deducing that the simple fact
7  that the police are holding him down means he's trying
8  to harm someone besides himself?
9     A. It was just how I observed the situation.
10    Q. Did you ask anybody, "Hey, who did he try to
11 hurt?"
12    A. No, ma'am.
13    Q. Did you ask anybody, "What's he done to to try
14 harm some other person?"
15    A. No, ma'am.
16    Q. Maybe he was thrashing around because he
17 couldn't breathe. Is that possible?
18       MS. GOWIN: Objection. Calls for
19 speculation.
20    A. As he was thrashing around, he was breathing.
21    Q. (By Ms. Hutchison) Maybe he was thrashing
22 around trying to get some air. Is that possible?
23       MS. GOWIN: Objection. Calls for
24 speculation.
25    A. Possible, yes, ma'am.

Page 142

1     Q. (By Ms. Hutchison) Because if someone is
2  having their inter- -- their breathing interfered with,
3  you would expect them to try to get in a position where
4  they can breathe better?
5     A. Yes, ma'am.
6        MS. GOWIN: Objection. Calls for
7  speculation.
8     Q. (By Ms. Hutchison) What was his blood pressure
9  and pulse when you took them?
10    A. Oh, I have no idea what it is standing --
11 sitting here. I know I wrote it down on my patient care
12 report.
13    Q. Is a blood pressure of 150/90, is that normal?
14    A. It's on the high side of normal, yes, ma'am.
15    Q. And what are the problems in the potential
16 indicator of a high blood pressure?
17       MS. GOWIN: Objection.
18       Can I have that question back? I'm sorry.
19       MS. HUTCHISON: I can -- I can ask it
20 better maybe.
21       MS. GOWIN: Okay. Whatever -- whichever
22 you prefer.
23    Q. (By Ms. Hutchison) I'm trying to -- so if
24 150/90 is high or on the high side, what are the
25 problems that could be associated with that level of

Page 143

1  blood pressure?
2     A. It's on the high side of normal. The problems
3  associated with a -- on scene and for what we were doing
4  there, I wasn't alarmed or alerted by that.
5        MS. HUTCHISON: I object as nonresponsive.
6     A. Now, if I took his blood pressure and it
7  read 280/220, that's a completely different deal, or
8  vice versa, whatever, 60/40, incredibly low.
9        MS. HUTCHISON: I object as nonresponsive.
10    Q. (By Ms. Hutchison) Are there any problems
11 associated with a blood pressure at that level, 150/90?
12 Is that an indicator of any problems?
13    A. It's an indicator of high blood pressure. Now,
14 why that is, there's a bunch of reasons.
15    Q. You said all of us can lay on the ground and
16 breathe; right?
17    A. Yes, ma'am.
18    Q. Is that also true if we get excited, run
19 around, get anxious, have our hands and legs bound, lay
20 on our stomach, and have weight put on our back?
21       MS. GOWIN: Objection. Calls for
22 speculation.
23    Q. (By Ms. Hutchison) Or does that change our
24 ability to breathe?
25       MS. GOWIN: Objection. Calls for

Page 144

1  speculation. Lack of foundation.
2        You can answer, if you know.
3     A. I mean, yes, you can still breathe while that
4  happens.
5     Q. (By Ms. Hutchison) Does it change your ability
6  to breathe?
7        MS. GOWIN: Same objections.
8     A. I don't know about ability, but probably the --
9  the act, it changes. I don't know.
10    Q. (By Ms. Hutchison) I'm not following you.
11    A. Are you asking is it different if I just lay
12 down on the floor, as opposed to three cops come in here
13 and put me in handcuffs and...
14    Q. Put you on the ground on your stomach and put
15 weight on your back?
16    A. Yes, those are two different things.
17    Q. And I think you said -- well, let me ask you
18 this.
19       Do you know how much Officer Dillard weighed?
20    A. No, ma'am.
21    Q. Or Officer Vasquez?
22    A. No, ma'am.
23    Q. If Officer Dillard weighs about 150 pounds,
24 does that make a difference, in terms of whether weight
25 on someone's back impedes their ability to breathe?

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 145

1          MS. GOWIN: Objection. Calls for
2 speculation. Lack of foundation.
3     A. I have no idea.
4     Q. (By Ms. Hutchison) Well, I think you
5 testified, in response to your lawyer's questions, that
6 someone's ability to breathe might depend on how much
7 weight is put on them; correct?
8     A. Sure. But I don't know if how much weight is
9 being put on them is indicative of how much somebody
10 weighs. I mean, they're -- they're not laying on them.
11 The way that I --
12     Q. So --
13     A. Go ahead.
14     Q. No; no. I want you to go ahead and finish.
15     A. The way that I saw it on the video, they were
16 holding him down with his hands for the vast majority of
17 it.
18     Q. Really? You didn't see officer -- any of the
19 officers kneeling on top of him?
20     A. Again, for the vast majority of it, they were
21 holding him down with his hands. Yes, I did see that he
22 did place his knee in his back in the video.
23     Q. But that was just temporary?
24     A. I guess so, yes, ma'am.
25     Q. So you -- it's your testimony that, for the

Page 146

1 vast majority of the restraint, there was no knee on the
2 back of Anthony Timpa?
3     A. The way that I remember the scene, yes.
4     Q. Yes, there was no knee?
5          MS. GOWIN: Objection. Misstates his
6 testimony.
7     Q. (By Ms. Hutchison) I'm just -- I'm just trying
8 to -- the -- the way I asked it maybe was double
9 negative. I don't know. And the way you answered it
10 was --
11     A. Yeah.
12     Q. -- confusing the answer.
13     A. I'm with you.
14     Q. So I'm just trying to clarify. Are you saying,
15 correct, for the vast majority of it, there was no knee
16 on his back?
17          MS. GOWIN: Object --
18     A. Right. That's what I'm saying.
19          MS. GOWIN: Objection. Calls for
20 speculation.
21     Q. (By Ms. Hutchison) You said you didn't hear
22 anything that sounded like gasping to you; correct?
23     A. No, ma'am.
24     Q. That -- is that correct?
25     A. Yes, ma'am. Sorry. I apologize.

Page 147

1     Q. No, I -- I have a tendency to ask a double
2 negative. So I -- I apologize for that.
3     A. Okay.
4     Q. Sometimes it's hard to --
5     A. Right.
6     Q. -- ask it that way.
7          But what -- to you, what does gasping sound
8 like?
9     A. Gasping, I guess, sounds like you can't
10 breathe.
11     Q. And what --
12     A. So --
13     Q. Can you -- can you give us an -- can you show
14 us?
15     A. (Descriptive sound.) I mean, that's a gasp.
16     Q. Okay. And -- and to you, that would be an
17 indicator of a lack of breath?
18          MS. GOWIN: Objection. Calls for
19 speculation.
20     A. I don't know. I don't know how to -- I don't
21 know how to answer that question. Whenever I was
22 looking -- whenever I was watching him, I'm -- I'm
23 really concerned about "is he breathing, is he not" and
24 "can he breathe, can he not." I didn't -- I didn't
25 study his breathing at the time.

Page 148

1     Q. (By Ms. Hutchison) Okay. You -- you would
2 agree with me, though, that, if someone is gasping,
3 that's a pretty clear indicator that they're not getting
4 normal breaths?
5          MS. GOWIN: Objection. Calls for
6 speculation.
7     A. I guess it depends on what you're doing.
8 I -- if you work out really hard, you could be
9 considered gasping for breath.
10     Q. (By Ms. Hutchison) Right. And -- and that --
11 that -- those are not normal breaths, are they? That's
12 someone who's trying to get air into them?
13     A. It's normal in the process of what's going on.
14     Q. Okay. Now, Mr. Timpa was just laying on the
15 ground; right?
16          MS. GOWIN: Objection. Calls for
17 speculation. Lack of foundation.
18     A. No, I wouldn't say he was just laying down.
19     Q. (By Ms. Hutchison) Did you see him doing any
20 exercise before you arrived?
21     A. No, I didn't see him doing any exercise before
22 I arrived.
23     Q. And did you see him doing anything, other than
24 laying on the ground with -- being held down by the
25 police officers?

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 149

1    A. No, ma'am.
2    Q. So my question to you is, if he was gasping,
3 would that be an indicator to you that he was trying to
4 get breath?
5        MS. GOWIN: Objection. Calls for
6 speculation.
7    A. At the time, it sounded and looked completely
8 normal because he wasn't just laying on the ground. He
9 was thrashing around, and the officers were holding him
10 down.
11       MS. HUTCHISON: I object as nonresponsive.
12    Q. (By Ms. Hutchison) If Mr. Timpa was gasping
13 during the restraint process, would that be an indicator
14 to you that he was trying to get breath?
15    A. Get breath? No, ma'am. Breathing harder, yes.
16    Q. (By Ms. Hutchison) Isn't that what breathing
17 harder is doing is trying to get breath?
18    A. I don't know. I -- I...
19       MS. GOWIN: Objection. Calls for
20 speculation.
21    Q. (By Ms. Hutchison) Well, you testified that
22 you didn't hear him gasping; right?
23    A. Correct.
24    Q. So what I'm trying to figure out is what you
25 meant by that?

Page 150

1    A. He was working to breathe because he was in an
2 excited state, and he was in the scene that he was in.
3 Would I qualify that as gasping? As I understand it,
4 no, that was not gasping.
5    Q. Okay. But you would agree with me that he was
6 clearly working to breathe?
7    A. Sure. He was -- had a higher respiratory rate.
8    Q. And that he was not breathing normally?
9       MS. GOWIN: Objection. Calls for
10 speculation. Lack of foundation.
11    A. Yeah, I don't know what he normally breathes
12 like, no, ma'am.
13    Q. (By Ms. Hutchison) Well, you didn't hear him
14 unable to clearly articulate words because he was trying
15 to breathe?
16    A. Correct.
17       MS. GOWIN: Objection. Calls for
18 speculation. He doesn't know any of that.
19    Q. (By Ms. Hutchison) I'm sorry. What was the
20 answer? You agreed with that?
21    A. What was the question? I'm sorry.
22       MS. HUTCHISON: Can you read it back,
23 please.
24    (Reporter read the requested testimony.)
25       MS. GOWIN: Objection. Calls for

Page 151

1 speculation. Lack of foundation.
2       MS. HUTCHISON: And he answered "correct"?
3       THE REPORTER: I -- I got "correct."
4       MS. HUTCHISON: Okay. But I still
5 didn't -- was the question "You didn't hear him" or
6 "Did you"? Sorry.
7       THE REPORTER: That's okay.
8       "Well, you didn't hear him unable to
9 clearly articulate words because he was trying to
10 breathe?"
11       MS. HUTCHISON: Okay.
12    Q. (By Ms. Hutchison) So you're saying he -- he
13 was -- he was not unable to articulate?
14       MS. GOWIN: Objection. Calls for
15 speculation. Incomprehensible and compound.
16    A. I think the -- the reason -- and this is just
17 me thinking about it. The reason why he was having
18 trouble communicating was not because he was gasping for
19 air. It was more because of just the excited state that
20 he was in.
21       I don't feel like he was gasping for air -- let
22 me see how I can say that. I believe he was breathing
23 as normal as somebody would under those conditions.
24    Q. (By Ms. Hutchison) Well, under the conditions
25 of being agitated and anxious, restrained on their

Page 152

1 stomach, their hands cuffed behind their back, their
2 legs cuffed, with a police officer putting weight on
3 their back, is that the conditions you're talking about?
4       MS. GOWIN: Objection.
5    A. Those are going to make you breathe -- those
6 are going to make you breathe faster, yes -- yes, ma'am,
7 I'll agree with that.
8    Q. (By Ms. Hutchison) Okay. And are those going
9 to interfere with your breathing?
10       MS. GOWIN: Objection. Calls for
11 speculation. Lack of foundation.
12    A. Not necessarily.
13    Q. (By Ms. Hutchison) I didn't ask "necessarily."
14 I'm asking if, under the circumstances I described,
15 those things could interfere with your breathing?
16       MS. GOWIN: Objection. Calls for
17 speculation. Lack of foundation. Also, asked and
18 answered.
19       You can answer, if you know.
20    A. I -- I mean, no, I don't know.
21    Q. (By Ms. Hutchison) And there was no indication
22 to you at all, during the entire time, that anything was
23 interfering with Mr. Timpa's breathing?
24    A. From what I saw the police doing, no.
25    Q. No. From the way he sounded?

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

Page 153

1  A. From the way he sounded, no. He was breathing
2  rapidly, which makes sense -- which makes -- again, it
3  makes sense in the scene. It would not make sense if he
4  was breathing as calm and coolly as anyone in this room.
5  That -- that doesn't make sense to me.
6  Q. Right. But I'm not talking about rapid
7  breathing. Rapid breathing is (descriptive sounds);
8  right?
9  A. Correct.
10  Q. I'm talking about interfering with his ability
11  to breathe, like (descriptive sounds).
12  MS. GOWIN: Objection. Calls for
13  speculation.
14  You don't know that that -- you're
15  mischaracterizing evidence by saying that that's what it
16  was, and that's -- and there's no way you can do that.
17  Q. (By Ms. Hutchison) Do you see the difference
18  between those two things?
19  A. What I heard you giving the example right then
20  is what I heard Mr. Timpa saying or presenting, I guess,
21  is the word.
22  Q. So you did hear him doing the second thing of
23  (descriptive sounds)?
24  A. No.
25  Q. No?

Page 154

1  A. I mean, yes, he was talking during all of that.
2  So as you -- as anyone knows, if you're working out or
3  something like that, you're -- you have a hard time
4  breathing -- I mean, you have a hard time talking just
5  because you have an elevated -- you're breathing more.
6  Q. So what I'm trying to distinguish between is
7  rapid breathing, which is (descriptive sounds) --
8  A. Correct.
9  Q. -- and not being able to get words out.
10  You -- you don't call that gasping if somebody
11  goes (descriptive sounds)? You don't call that --
12  MS. GOWIN: Objection. I'm sorry.
13  Q. (By Ms. Hutchison) You don't call that
14  gasping?
15  MS. GOWIN: Objection. Compound. Calls
16  for speculation. Lack of foundation. Incomplete
17  hypothetical.
18  A. No, I don't -- I personally do not call that
19  gasping.
20  Q. (By Ms. Hutchison) Okay. So what is gasping
21  to you?
22  A. Gasping --
23  MS. GOWIN: Objection. Asked and answered.
24  You can answer again.
25  Q. (By Ms. Hutchison) I'm sorry. What is gasping

Page 155

1  to you?
2  A. Gasping is not what I saw him doing on the
3  scene.
4  Q. What is gasping to you?
5  A. Gasping is if I -- I mean, I don't know the
6  actual definition of it, but I would say --
7  Q. Well, I'm just asking you to show us what
8  gasping is.
9  A. I would say, if I put a bag over your head and
10  restricted your breathing for a period of time and then
11  took that bag off, I think that's more of a gasp.
12  Q. Which would be what? (Descriptive sounds)?
13  A. Something more along the -- the lines of that.
14  Q. But if I can't really get air in, how would I
15  be going (descriptive sounds)?
16  MS. GOWIN: Objection. Incomplete
17  hypothetical. Calls for speculation. Lack of
18  foundation.
19  A. I feel like he was breathing for the -- during
20  the scene.
21  Q. (By Ms. Hutchison) But I -- I'm just asking
22  you -- I don't really -- I think we're -- we're not --
23  I'm not understanding. When you say "gasping," I don't
24  know what that means.
25  A. I don't -- yeah.

Page 156

1  Q. Like, would you -- if someone has a bag over
2  their head and they can't get air in, what are you --
3  what would that sound like to you?
4  MS. GOWIN: Objection. That's not --
5  misstates testimony. That's not what he --
6  A. It would sound a lot more violent than what I
7  saw in the video.
8  Q. (By Ms. Hutchison) But like what?
9  MS. GOWIN: Objection. Calls for
10  speculation. Lack of foundation.
11  A. I don't know what that would sound like.
12  Q. (By Ms. Hutchison) Okay. Have you ever heard
13  anybody that had their breathing interfered with, what
14  they sounded like?
15  A. Yes.
16  Q. What did it sound like?
17  A. Sounded like they were struggling to breathe.
18  Q. What does that sound like?
19  MS. GOWIN: Objection. Speculation. Lack
20  of foundation.
21  I don't think you can ask him to try to
22  recreate sounds that other people made. That seems very
23  misleading and unfair.
24  Q. (By Ms. Hutchison) What did that sound like?
25  MS. GOWIN: Same objections.

LAURIE PURDY REPORTING SERVICE, INC.

DFR OFFICER JAMES FLORES

**Page 157**

1    A. It sounded like someone struggling to breathe.
2    Q. (By Ms. Hutchison) And what does that sound
3  like? I'm asking you to -- to show us. Demonstrate
4  what that sounds like.
5    A. I don't...
6      MS. GOWIN: Same objections.
7    Q. (By Ms. Hutchison) You cannot demonstrate what
8  it sounds like when someone is struggling to breathe?
9      MS. GOWIN: Objection. Misstates his
10 testimony.
11   Q. (By Ms. Hutchison) Is that true that you
12 cannot demonstrate what it sounds like when someone is
13 struggling to breathe?
14     MS. GOWIN: Objection. Misstates his
15 testimony.
16   A. I'm curious to what point I answer or don't
17 answer.
18   Q. (By Ms. Hutchison) You can answer.
19     Basically the rule is that you can answer
20 unless she tells you "Don't answer that."
21   A. I understand.
22   Q. If she tells you "Don't answer that,"
23 obviously, don't answer that. But if she doesn't tell
24 you "Don't answer that," generally speaking, you can
25 answer.

**Page 158**

1    A. I understand.
2      Ask it one more time, and we'll do it.
3    Q. Yes, sir. Can you demonstrate for us, on the
4  record, what it sounds like when someone is struggling
5  to breathe?
6      MS. GOWIN: Objection. Calls for
7  speculation. Lack of foundation.
8    A. No.
9      MS. HUTCHISON: I'll pass the witness.
10     MR. ADDISON: I just have one quick
11 follow-up.
12     FURTHER EXAMINATION
13 BY MR. ADDISON:
14   Q. You said that you monitored his breathing
15 throughout the entire time you were out there; correct?
16   A. Yes, sir, I did.
17   Q. If you look at Exhibit 28, is that you in the
18 background?
19   A. Yes, sir, it is.
20   Q. Okay. And at this point, are you monitoring
21 Mr. Timpa?
22   A. No, sir, I'm not.
23   Q. Okay.
24     MR. ADDISON: That's all I've got.
25     THE WITNESS: Yes, sir.

**Page 159**

1      MR. ADDISON: Pass the witness.
2      FURTHER EXAMINATION
3  BY MS. GOWIN:
4    Q. Do you have any way of knowing what Mr. Timpa
5  would have done if the police officers were not
6  restraining him?
7    A. No, ma'am, I do not.
8      MS. GOWIN: That's all I have.
9      MS. HUTCHISON: I do have a follow-up.
10     FURTHER EXAMINATION
11 BY MS. HUTCHISON:
12   Q. When you were monitoring his breathing, were
13 you watching his chest rise and fall?
14   A. I was watching him, yes, that's one of the
15 things that we look at.
16   Q. So you were watching Mr. Timpa's chest rise and
17 fall?
18   A. That was -- yes. And if you're -- if you're
19 screaming and making noise and I hear you breathing,
20 that -- that satisfies to me that you're breathing and
21 your airway's open, is the big one for us.
22   Q. But my question was limited to the chest rise
23 and fall. Is that something that you monitored the
24 entire time?
25   A. That is something that I watched whenever I was

**Page 160**

1  watching him, yes, ma'am.
2    Q. Was there anything else that you were visually
3  observing, other than his chest rising and falling, to
4  monitor his breathing?
5    A. Visually?
6    Q. Yes.
7    A. No. I guess that's a -- it's an audible thing
8  to listen to someone breathe, to hear them talk, and all
9  those things.
10   Q. Right. But if you're counting the
11 respirations -- which is what you do?
12   A. Yes, ma'am.
13   Q. If you're counting the respirations, then
14 that's something you do by watching a chest --
15   A. Yes, ma'am.
16   Q. -- rise and fall?
17   A. I'm sorry. Yes, ma'am.
18   Q. You don't count respirations by listening to
19 somebody talk?
20   A. Well, I mean, you can. I mean, not -- not by
21 someone talking, no, ma'am. No, ma'am, not at all.
22 But if I hear you breathing too, obviously, I can hear
23 an inhale, an exhale, an inhale, an exhale, if it's --
24   Q. Did you count Mr. Timpa's respirations by
25 audibly listening to him?

LAURIE PURDY REPORTING SERVICE, INC.

EMILY OGDEN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VICKI TIMPA, Individually, and as    )
Representative of the Estate of ANTHONY)
TIMPA, and CHERYLL TIMPA Individually  )
as Next Friend of K.T., a minor child  )
                                       )
     Plaintiffs,                       )
                                       )Civil Action No.
vs.                                    )3:16-CV-03089-N
                                       )
DUSTIN DILLARD, DANNY VASQUEZ,         )
RAYMOND DOMINGUEZ, DOMINGO             )
RIVERA, KEVIN MANSELL, GLENN           )
JOHNSON, CRIMINAL INVESTIGATIVE        )
UNIT, LLC                              )
                                       )
     Defendants.                       )

*************************************************
VIDEOTAPED
ORAL DEPOSITION OF
EMILY OGDEN, M.D.
SEPTEMBER 16, 2019
*************************************************

        ORAL DEPOSITION OF EMILY OGDEN, M.D., produced

as a witness at the instance of the Intervenor, and duly

sworn, was taken in the above-styled and numbered cause

on the 16th day of September, 2019, from 1:27 p.m. to

7:05 p.m., before Dana Taylor, CSR in and for the

State of Texas, reported by machine shorthand, at the

offices of Dallas County Southwestern Institute of

Forensic Sciences, 2355 North Stemmons Freeway, Dallas,

Texas 75207, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

LAURIE PURDY REPORTING SERVICE, INC.

EMILY OGDEN

Page 69

1  you dissected?
2      A.  I mean, I know it was decomposition, just based
3  on the appearance.  I -- I suppose I could have taken
4  skin and -- and looked at it under a microscope and seen
5  that it's dead tissue.
6      Q.  And, I guess, is it fair to say you did not do
7  that in this case?
8      A.  Not on the skin.  I will say he had signs of
9  decomposition in other organs that I looked at.
10      Q.  Do you recall which organs you looked at that
11  he had signs of decomposition?
12      A.  Lungs and heart.
13      Q.  Do you recall how long it was after, I guess,
14  he was pronounced dead at the hospital before you
15  started your autopsy?
16      A.  Yes.  He was pronounced at 11:30 p.m. on
17  August 10th, and I did the autopsy on August 13th at
18  7:30 a.m.
19      Q.  7:30 a.m., you said?
20      A.  Yes.
21      Q.  So I guess it was roughly 50-some-odd hours --
22  50-something hours maybe after he passed away?
23      A.  Yes, more than two days.
24      Q.  Somewhere --
25      A.  Two-and-a-half days.

Page 70

1      Q.  Okay.  And how much does a body decompose in
2  two-and-a-half days?
3      A.  It's going to depend on a lot of factors.  It's
4  going to depend on temperature.  It's going to depend on
5  how big the person is.  It's going to depend on if they
6  had any sort of infection going on that would raise
7  their body temperature when they -- before they died.
8      Q.  And based on, like I said, everything here,
9  from the time it took him to get to the hospital and
10  then, I guess, ultimately get over here, do y'all -- did
11  y'all put him in a refrigerator when he got here, or a
12  cold room?
13      A.  Yes.
14      Q.  And, based on your experience, how much
15  decomposition would you expect to see in somebody like
16  Mr. Timpa who would -- I guess, immediately went to the
17  hospital and came here?
18      A.  I'd say it was -- it was about what I would
19  expect for two-and-a-half days.
20      Q.  Did you discuss your testimony today with
21  your -- any of your colleagues before coming here?
22      A.  No.
23      Q.  How many death certificates do you think you've
24  signed off on that have had excited delirium as a cause
25  of death?

Page 71

1      A.  It might just be this one.
2      Q.  At least the only other one you can recall
3  being involved with was when you were doing your
4  fellowship; is that correct?
5      A.  Yes.
6      Q.  And other than that, do you remember being
7  involved or even tangently or consulted with on a
8  excited delirium death?
9      A.  Yeah.  Any time anyone in this office gets one,
10  it's going to go through our -- our pending conference.
11      Q.  Have you seen -- or have you seen other death
12  certificates that list excited delirium as the cause
13  that you did not sign off on?
14      A.  I don't think anyone in this office is ever
15  going to put excited delirium as a cause.
16      Q.  And why not?
17      A.  It's -- I mean, it's kind of a vague term that
18  doesn't really get to what happened.
19      Q.  And, I guess, your report in this at least
20  lists -- lists that potential -- or I'm sorry.  I don't
21  want to -- to misstate what you say.
22          So, I guess, was excited delirium syndrome a
23  cause of death in this case?
24      A.  No.
25      Q.  No.  And so what were the causes of death in

Page 72

1  this case?
2      A.  Toxic effects of cocaine and physiologic stress
3  associated with physical restraint, and then
4  contributing factors are cardiac hypertrophy and
5  bipolar disorder.
6      Q.  Do you think that Mr. Timpa -- the death in
7  this case was caused by asphyxia?
8      A.  No.
9      Q.  And why not?
10      A.  Because of the fact that I can see him yelling
11  and moving for the majority of the restraint.  He
12  doesn't say he can't breathe.  He doesn't complain of
13  not being able to breathe.
14      Q.  And in your report, you had something I wanted
15  to ask you about.  Well, multiple things, but
16  specifically this.  And I believe it's on Page 6.
17      A.  Uh-huh.
18      Q.  You said -- and it's under 2, and it looks like
19  VII, Roman Numeral VII, "The decedent begins to calm
20  down and is heard snoring."
21          Is that something that you heard on the body
22  cam footage, or is that something that you -- that you
23  relied on the police to form that opinion?
24      A.  Correct.  So, yeah, I put it in quotes because
25  that was what I was told to me.

LAURIE PURDY REPORTING SERVICE, INC.

EMILY OGDEN

Page 105

1  by yourself. And accident is just an accident and...
2      Q. Okay.
3      A. Yeah.
4      Q. Would the manner of death be like the -- the
5  non-medical circumstances?
6          MS. HUTCHISON: Objection.
7      Q. That -- would that be accurate?
8          MS. HUTCHISON: Objection. Leading.
9      A. Not really.
10     Q. (By Ms. Gowin) Okay. Sorry.
11     A. Yeah.
12     Q. That's the best I got.
13     A. Yeah. I guess it's kind of the situation --
14 situational aspect of it; so...
15     Q. Okay.
16     A. Yeah.
17     Q. When you determined that this event was a
18 homicide, are you suggesting that the officers murdered
19 Mr. Timpa?
20     A. No.
21     Q. Could you give a definition of homicide as --
22 as you use it in your work?
23     A. Right. So -- so homicide means that the death
24 was brought about by another person. So if you shoot
25 somebody else, that's a homicide because you were shot

Page 106

1  by another person. Another person caused your death.
2          Homicide is a medical term and murder is a
3  legal term. So we do not ever speculate as to if it was
4  a murder or not. Someone could shoot somebody else in
5  self-defense, and it's a homicide, but the court doesn't
6  see that as a murder necessarily.
7      Q. Did you -- when you reviewed the body cam
8  footage, did you see anything that suggested that the
9  officers were trying to hurt Mr. Timpa?
10     A. No.
11     Q. Did you see any indication that the officers
12 had hurt Mr. Timpa?
13     A. No.
14         MS. HUTCHISON: Object to the question --
15 form of the question.
16     Q. (By Ms. Gowin) Did you see anything on the
17 body cam -- excuse me.
18         Did you see anything on the body cam video that
19 suggested that Mr. Timpa couldn't sufficiently breathe
20 at any point?
21     A. No.
22         MS. HUTCHISON: Object to form.
23     Q. (By Ms. Gowin) Did you find anything during
24 your exam that indicated that Mr. Timpa died of
25 positional asphyxia?

Page 107

1      A. No.
2      Q. Did you find anything during your exam that
3  indicates that Mr. Timpa died of mechanical asphyxia?
4      A. No.
5      Q. Did you see anything on the video that
6  suggested that Mr. Timpa died of positional asphyxia?
7      A. No.
8      Q. Did you see anything on the video that
9  suggested that Mr. Timpa died of mechanical asphyxia?
10     A. No.
11     Q. So why did you include it on the report that
12 you can't rule it out?
13     A. So just the fact that he is face down and there
14 is somebody on his back, by convention in this office,
15 we say that it cannot be ruled out. It's kind of a -- I
16 don't know -- "cover our butt" kind of statement that we
17 throw in these cases.
18         Had there been nobody on him and he was face
19 down, I don't think I would have included it.
20     Q. Okay. Would you have included it -- this is
21 just speculation. But would you have included it if an
22 officer had put pressure on his back but then was no
23 longer on his back at the time that he passed away?
24     A. No; no. So yeah. So if I can still see him
25 breathing and there's nobody on him?

Page 108

1      Q. Uh-huh.
2      A. No.
3      Q. Okay. What is "sudden cardiac death"?
4      A. So, in general, when you say sudden cardiac
5  death, we're referring to some sort of -- usually an
6  electrical disturbance, like an arrhythmia.
7          You can also have that if you get either a
8  blood clot or cholesterol that breaks off into one of
9  your arteries and -- and you get complete occlusion of
10 that and...
11     Q. Occlusion of the art--- -- arteries?
12     A. Yes.
13     Q. Okay. Is sudden cardiac death painful?
14     A. You know, I don't -- I don't know from
15 experience. But, in general, I think, if it's an
16 electrical disturbance, people don't even realize it's
17 happening. And if it's a heart attack, then, yes, it
18 can be.
19     Q. Which -- which circumstance did you find was
20 the cause of Mr. Timpa's death? An electrical --
21     A. From -- from those two?
22     Q. -- disturbance?
23     A. Yes, I -- I think he had some sort of
24 arrhythmia.
25     Q. So, in your opinion, do you think he

LAURIE PURDY REPORTING SERVICE, INC.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VICKI TIMPA, individually,          )
and as representative of            )
The Estate of ANTHONY               )
TIMPA, et al.,                      )
                                    )
            Plaintiffs,             )
                                    )
        vs.                         ) Case No. 3:16-CV-3089-N
                                    )
DUSTIN DILLARD, et al.,             )
                                    ) November 15, 2019
            Defendants.             ) Columbia, Missouri

DEPOSITION OF MICHAEL D. LYMAN, Ph.D.,

an expert witness, produced, sworn, and examined on
November 15, 2019 between the hours of 8:00 a.m. and
6:00 p.m. of that day, at the Candlewood Suites Hotel,
1400 Creekwood Parkway, Board Room, in the City of
Columbia, County of Boone, State of Missouri, before

SHELLY L. STEWART, CCR (No. 619)
CAPITAL CITY COURT REPORTING
Jefferson City ** The Lake ** Columbia
573-761-4350 * 573-365-5226

within and for the State of Missouri, in the above-entitled
cause, on the part of the Defendants, taken pursuant to
notice.

Page 122

1  enforcement and public safety interface with emergency
2  medical.
3      It's two very different skill sets, two very
4  different training orientations.
5      The police, though, have a responsibility to
6  bring the situation under control before anything can
7  happen. It would be irresponsible, unprofessional and just
8  derelict duty for an officer in the hypothetical to respond
9  to a scene, similar to this one like Mr. Timpa was involved
10 in, and simply direct the paramedics to go and see if they
11 are able to take vital signs or something without the
12 individual first being under control. So they have a
13 responsibility to do that first.
14      So the extent that bringing someone under control
15 is part of serving the medical needs of that same person I
16 think can't be ignored. That's a part of it. But for that
17 little part of this situation, the police are not being
18 medical professionals. They are being police officers to
19 control it so the medical people, the paramedics, can do
20 their job. So I don't know if that was responsive to what
21 you were asking or not.
22      Q. Sort of. So is it your understanding that the
23 paramedics were called immediately when -- upon Sergeant
24 Mansell's arrival?
25      A. Yes.

Page 123

1      Q. And that they arrived shortly thereafter, is that
2  your understanding?
3      A. Yes.
4      Q. Okay. So the paramedics from the Dallas Fire and
5  Rescue were present for virtually the entire time that
6  Mr. Timpa was restrained, correct?
7      A. Yes. The lion's share of the time.
8      Q. At any point did you see either of the paramedics
9  indicate that they believed Mr. Timpa was in medical
10 distress?
11     A. Well, they were certainly right there at the
12 ready. So to that extent -- I mean, they were -- they were
13 visible on the body cameras. You could see them. But are
14 you asking if they -- if anything was said by either one of
15 them or --
16     Q. Good question. Let me rephrase.
17     Did you hear either of the paramedics express any
18 concern about the manner in which Mr. Timpa was being
19 restrained?
20     A. No, but sitting here right now I don't know that
21 I recall much of anything said by the paramedics, because I
22 just don't know if it came out over the audio of the body
23 cam videos.
24     So, no, I don't recall anything said, but that
25 doesn't mean that something wasn't said, because it could

Page 124

1  have been and I was unable to hear it.
2      Q. You reviewed the deposition transcripts of the
3  paramedics, correct?
4      A. Yes.
5      Q. Do you recall what they had to say about whether
6  or not they expressed any concerns about that?
7      A. I don't recall anything.
8      Q. Okay. If they had seen something that concerned
9  them in what the officers were doing, would it be
10 reasonable for the officers to expect them to communicate
11 those concerns?
12     A. Assuming that the paramedics were trained in the
13 same fashion as the officers were, and assuming that the
14 paramedics had written directives similar to what the
15 officers had in this case, I would assume that they would
16 have said something. But my role in this case is not to
17 review the actions of the paramedics, so I don't know. I
18 mean, I just don't know.
19     Q. This is kind of an unusual case for a situation,
20 because usually when you're dealing with police litigation
21 you have it where the officers are making decisions before
22 the paramedics arrive. That's usually the fact pattern.
23     They generally have it where the paramedics were
24 here the whole time.
25     I'm wondering, what are your thoughts on whether

Page 125

1  it was reasonable for the officers to rely on the
2  paramedics to make medical decisions for Mr. Timpa?
3      A. At what point?
4      Q. At any point.
5      A. I don't think it was reasonable for the
6  paramedics to make decisions for the police officers upon
7  the police officers arrival, because that was a police
8  situation in the early stages.
9      And the police have their job. They are trained
10 for their job. They go to the police academy for a long
11 time to get their certification to do their job.
12     And this is not -- I mean, on one hand it is an
13 unusual situation. On the other hand it's not an unusual
14 situation.
15     First Responders show up to scenes from all
16 different areas of public safety, whether it's a
17 firefighter or an ambulance or law enforcement or whomever.
18 And it's not usual that those folks will all show up, but
19 the law enforcement component must bring the situation
20 under control. Because if it's not, then there is a
21 potential risk of harm that has not been addressed.
22     Q. Okay. Let me take you step-by-step through the
23 different things that the officers did. So let's see.
24     Would you agree that Mr. Timpa was running into
25 oncoming traffic on Mockingbird Lane prior to the officers'

JEFFERSON CITY          CAPITAL CITY COURT REPORTING          THE LAKE AREA
(573) 761-4350          www.capitalcitycourtreporting.com          (573) 365-5226

000275
ceb542c7-b886-4d10-a1a3-6815c8586acc

Page 126

1  arrival?
2      A.  According to the caller, the 911 call he was.
3      Q.  Is there any reason to doubt that?
4      A.  No.
5      Q.  Would you agree that Mr. Timpa was a danger to
6  himself?
7      A.  At that time I think he was.  If he's out in
8  traffic running around and if he's experiencing some kind
9  of a crisis, personal crisis at the time he's out in
10  traffic — and that's what the evidence supports — I think
11  at that time he was probably a threat to himself, yeah.
12      Q.  Okay.  Was it reasonable -- I'm sorry.  On
13  Page 11 you note that Mr. Timpa was clearly disturbed by
14  being restrained.
15      Is it your opinion that he should not have been
16  restrained that night?
17      A.  No.
18      Q.  Okay.  At what point do you think he should have
19  been restrained?
20      A.  I think he should have been restrained when he
21  was restrained --
22      Q.  So you think the --
23      A.  -- with the security handcuffs.
24      Q.  Okay.  I don't understand quite what you mean by
25  that?

Page 127

1      A.  Well, we know that when the police officers
2  arrived, when Sergeant Mansell, who was the first officer
3  on the scene arrived, he was already in handcuffs.
4      Q.  Right.
5      A.  Now Mr. Timpa had Mr. Washington's handcuffs on
6  him.  That's my understanding.  And they put handcuffs on
7  him because they felt that he was a threat to himself
8  because he was out in traffic, and he jumped on a bus, and
9  so they pulled him to the side and they put him in cuffs.
10      The 911 call was placed by Johnson to the police
11  so they could come and address the situation themselves.
12  That's my understanding.  I think all that was appropriate
13  at the time.
14      When the police arrived, the police are issued
15  equipment, and it's common for the police to want to swap
16  out the handcuffs.  I take no issue with that.
17      So, yeah, I think — I think restraint of
18  Mr. Timpa was important, sure, considering his behavior.
19  Absolutely.
20      Q.  Do you believe that he should not have been --
21  I'm just talking about restraints, not the manner in which.
22  We'll get to that.
23      A.  I understand.
24      Q.  But do you believe that it was appropriate to
25  restrain him for the period of time that he was restrained?

Page 128

1      A.  Well, I don't think it was necessary to restrain
2  him for that period of time if he had been properly
3  restrained initially.
4      And I think this is a direct response to your
5  question, because the reason he was restrained in the
6  manner that he was restrained is because there was no
7  proper field supervision to direct the officers to get
8  things done quicker.  I think it's as straightforward as
9  that.
10      So I think had -- going back to my earlier
11  statement.  Had Sergeant Mansell directed the other four
12  officers on the scene to quickly switch out the handcuffs
13  by controlling Mr. Timpa's arms and legs and head, and to
14  quickly secure his ankles, I don't think he would have been
15  restrained as long as he was restrained.
16      Meaning I think he would have been up on the
17  gurney quicker and transported to the hospital quicker had
18  those other pieces fallen into place as I just described.
19      Q.  Okay.  Let me just take some notes on that and
20  then I'll be ready.
21      A.  Sure.
22      Q.  You mentioned that the officers should have
23  restrained him by holding onto his arms and legs, correct?
24      A.  Yes.
25      Q.  And how else would you have them position him?

Page 129

1  Would you have them immediately have him on his side, or
2  would you have him on his back or his stomach or -- explain
3  to me what -- explain the body position that you have in
4  mind?
5      A.  Well, going back we know that Mr. Timpa was
6  assuming a number of different positions before Dillard got
7  on his back.
8      Okay.  He was — he was rolling around.  He was
9  on his side.  He was on his back.  He was on his stomach,
10  so he was just kind of moving around vigorously.
11      I think, and I alluded to this earlier today,
12  there are circumstances where a subject, who is being taken
13  into custody, can be placed on their stomach, but only
14  momentarily.  But not every circumstance has to be that
15  way.
16      So I think it would be prudent, should the
17  officers take control of arms, legs and head, they should
18  attempt to place him on his side to switch those cuffs out.
19  His hands are already back there.  They're not going
20  anywhere.  So it's a matter of switching the cuffs out.  If
21  he's on his side, they have more time.
22      It kind of comes down to how Mr. Timpa would have
23  acted under that circumstance, and we don't know how he
24  would have acted.
25      But if the ankles were secure and there were

40 (Pages 154 to 157)

Page 154

1    Q.  What do you mean?
2    A.  Well, the policies have to be reasonable, and
3  they have to be consistent with the national recognized
4  standards of care and professional guidelines.
5    Q.  They can't fall below a certain level, correct?
6    A.  Correct.
7    Q.  But they can exceed that minimum level as much as
8  they want?
9    A.  I misunderstood.
10   Q.  Correct?
11   A.  Yes.
12   Q.  Okay.  Good.  Is it your understanding that a
13  police department's procedures are the equivalent of
14  constitutional requirements?
15   A.  Not per se, but it's my understanding that a
16  properly written directive will have embedded in it
17  constitutional protections and constitutional requirements
18  that are identified in case law and statutory law.
19   Q.  For example, a police department can put into
20  place procedures that are more restrictive of the officers
21  than the constitution requires, correct?
22   A.  I think so, yes.
23   Q.  For example, it's not unconstitutional to engage
24  in a car pursuit, correct?
25   A.  Correct.  Well, in and of itself.

Page 155

1    Q.  Sure.  But lots of police departments across the
2  country have said we're not going to do that anymore,
3  correct?
4    A.  That's right.
5    Q.  So that would be an example of one place where
6  the procedures are tighter than the constitutional
7  requirements?
8    A.  I agree.
9    Q.  And there's lots of reasons that might be,
10  correct?
11   A.  Sure.
12   Q.  Could be safety, could be liability, could be a
13  variety of different things?
14   A.  Agreed.
15   Q.  And different departments might adopt them for
16  different reasons as well, correct?
17   A.  Yes.
18   Q.  Have you yourself ever exercised strenuously and
19  then laid facedown flat on the floor in a prone position?
20   A.  I don't think so.
21   Q.  So you've never tried yourself to see whether it
22  affects your breathing or the extent to which it does?
23   A.  No.
24   Q.  With the law enforcement agencies that you have
25  been affiliated with, has it always been the case that

Page 156

1  officers are trained to never put their knees or their body
2  weight on a person's back while they're in a prone
3  position?
4    A.  Yes.
5    Q.  Under any circumstances?
6    A.  The policies dictate that.  I mean, there is --
7  in the extreme there is the circumstance where an officer
8  is battling an individual for their lives, and one of the
9  two is going to survive the encounter.  You know, again, an
10  extreme circumstance.
11       In that circumstance academies teach police
12  officers to survive, doing whatever you need to do to
13  survive.  So barring something that extreme, that would be
14  the only exception that I can think of.
15   Q.  And all general orders and policies and
16  procedures are issued with that general understanding, that
17  the policies and procedures need to be applied in a
18  reasonable manner under the circumstances that are
19  presented to the officer, correct?
20   A.  Well, I think that's correct most of the time.
21  There are some policies that specifically mandate that a
22  certain procedure will take place and there's no room for
23  discretion.
24   Q.  But they usually indicate that pretty clearly,
25  correct?

Page 157

1    A.  Yes.
2    Q.  For example, I know that it came up with the Eric
3  Garner case in New York where choke-holds are not
4  permitted.  Those are just -- under no circumstance, no
5  choke-holds.
6    A.  Right.
7    Q.  That would be an example I'm thinking of.  Is it
8  fair to say that there is rarely an always or a never in
9  police work?
10   A.  Rarely being the operative word, yes, but I think
11  a lot of departments will word their protocols that an
12  officer shall do this as opposed to may.
13   Q.  Uh-huh.
14   A.  Or at all times an officer will do this.
15   Q.  Okay.
16   A.  That is pretty straightforward.
17   Q.  Uh-huh.
18   A.  And that's the case of the Dallas Police
19  Department policy, by the way.
20   Q.  Which policy?
21   A.  The policy that states that they will not place a
22  person in a prone position.  I think the words at all times
23  are used.
24   Q.  Did Danny Vasquez use unreasonable force against
25  Mr. Timpa?

Page 166

1  or what -- just tell me what you mean by that.
2      A.  Well, it was your question, so I don't know what
3  you meant.
4      Q.  No, what you wrote.
5      A.  Something that would cause anybody apprehension
6  of injury or death.
7      Q.  Is running out into traffic in front of a car
8  could be death?
9      A.  It would depend on the traffic.  It would depend
10  on how close the cars are to him, so it may or it may not.
11      Q.  Okay.  Tell me what you know about the APOWW.
12  What do you know about the APOWW procedure in Texas?
13      A.  I don't, other than the fact it's Apprehension By
14  a Police Officer Without a Warrant.
15      Q.  Yes.
16      A.  But as far as the breakdown of any procedure, I
17  have not seen any protocol addressing that.
18      Q.  Okay.  Do you think that it was appropriate for
19  an APOWW procedure to be used for Mr. Timpa that night?
20      A.  I believe so given his bizarre behavior.
21      Q.  Do you believe that he should have been taken to
22  a hospital as opposed to taken to jail and/or prosecuted?
23      A.  Yes.
24      Q.  Making sure I've got everything that I wanted to
25  ask you about.

Page 167

1      A.  Sure.
2      Q.  So now I would like to look at an exhibit.
3          (DEFENDANTS' DEPOSITION EXHIBIT NO. 68 WAS MARKED
4  FOR IDENTIFICATION.)
5  BY MS. GOWIN:
6      Q.  Exhibit 68 is an article called New Expert Report
7  On Excited Delirium Stresses 4-Point Protocol.  And this is
8  by Chuck Remsberg.  And you took a look at it while we were
9  taking a break, correct?
10      A.  I did.
11      Q.  Okay.  Had you seen this before?
12      A.  No.
13      Q.  Had you seen -- now this article -- just to
14  summarize, the article is talking about a 34-member panel
15  that was assembled by the Weapons and Protective System
16  Technologies Center at Pennsylvania State University under
17  a National Institute of Justice directive.  Had you heard
18  of the panel before you read this article?
19      A.  No.
20      Q.  Okay.  So you haven't seen these protocols or
21  this article or anything to do with this, correct?
22      A.  That's right.
23      Q.  Okay.  What was your reaction -- I'm sorry.  Can
24  you just tell me what are the -- what is the four-step
25  protocol that they are recommending here?

Page 168

1      A.  It appears to be these four steps on the front
2  page.
3      Q.  Okay.
4      A.  One, two, three and four.
5      Q.  Okay.  Do you agree with those?  I'm sorry, let
6  me rephrase that.
7          Do you have any reason to disagree that this is
8  an appropriate protocol?
9      A.  For excited delirium, and that's the context of
10  this article, from what I know about excited delirium, I
11  think this is consistent with the protocols that exist to
12  address excited delirium, assuming obviously that you're
13  dealing with a known excited delirium case or situation.
14      Q.  Is it your opinion that Mr. Timpa was suffering
15  from excited delirium?
16      A.  Well, I don't have a medical determination on
17  that.  All I can do is acknowledge that the medical
18  examiner used the term excited delirium, but she also
19  referred to a contributing factor being the fact that he
20  was in a prone position.
21      Q.  Did she -- are you sure about that?
22      A.  Well, that's my understanding.  I don't have it
23  in front of me here.  Actually, I do.  If I could take a
24  look?
25      Q.  Please do.

Page 169

1      A.  And I'm reasonably sure about that.
2      Q.  I think the part you're probably looking for is
3  in the last two pages, but I could be wrong.
4      A.  Yeah.  Page 7 of 8.  Can I read it?
5      Q.  Please do.
6      A.  Due to his prone position, which I was referring
7  to, and physical restraint, which I was also referring to,
8  by an officer, an element of mechanical or positional
9  asphyxia, which I was also referring to, cannot be ruled
10  out.
11      Q.  What does that mean to you cannot be ruled out?
12      A.  That it's possible that it was a contributing
13  factor in his death.
14      Q.  Have you reviewed the medical examiner's
15  deposition?
16      A.  No.
17      Q.  Would it change your opinion if you knew that the
18  medical examiner testified that while she couldn't rule it
19  out, she had seen no evidence of mechanical or positional
20  asphyxia?
21      A.  No.  Again, this ventures into medical
22  determinations, which I'm not prepared to make.  And all
23  I'm doing is acknowledging what the report says, as I've
24  read into the record.  And it says what it says, and I have
25  not been provided the deposition transcript.

Page 1

IN THE UNITED STATES DISTRICT COURT ☐11:08:32

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


DEPOSITION OF KIMBERLY COLLINS, MD

NOVEMBER 21, 2019


VICKI TIMPA, INDIVIDUALLY, AND AS REPRESENTATIVE
OF THE ESTATE OF ANTHONY TIMPA, et al.,


            Plaintiffs,


      vs.      Civil Action No. 3:16-CV-3089-N


DUSTIN DILLARD, et al.,


            Defendants.

_____


TIME:              11:00 AM


LOCATION:          QUALITY INN
                   CHARLESTON, SC




REPORTED BY:     MACKENZIE ALLEN
                 CLARK & ASSOCIATES, INC.
                 CHARLESTON, SC 29415
                 843-762-6294
                 WWW.CLARK-ASSOCIATES.COM

## Page 89

1    trying to get up?

2         Q. Do I think it's reasonable?

3         A. Uh-huh.

4         A. I guess I don't because I don't see how

5    they think he can get up when his hands are

6    behind him, his feet are together.  How is he

7    going to get up?  And there's -- he's got five

8    officers.  Everyone is around him.  I just don't

9    think that he's resisting.

10        Q. So are you saying that if he were not

11   restrained, that he couldn't get up when he's

12   handcuffed behind his back and his --

13        A. Yes, if he was not restrained.

14        Q. Okay.  I understand.  In your review of

15   the evidence, have you seen anything that

16   indicates that the officers knew that Mr. Timpa

17   had ingested cocaine?

18        A. At one point -- and I could be

19   mistaken -- I thought he said coke.  And they

20   kept asking him, what did you take, what did you

21   take, what did you take?  And at one point I

22   thought he said coke.  But maybe if a digital

23   forensic person could make the sound clearer, I

24   could tell better exactly what he said.

25        Q. Did it seem to you that the officers

## Page 90

1    knew that he had taken cocaine?

2         MR. HENLEY:  Object to the form.

3         Q. At any point?

4         A. I think they knew he -- they thought he

5    had taken something, because when one of them

6    said this is -- I know I'm going to misquote this

7    part too -- this is not your usual crazy.

8         Q. I know the part you're talking about.

9         A. Yeah.  So there's something going on

10   here.  Either it's the schizophrenia or crystal

11   meth or cocaine or PCP.  You know, there's

12   something that possibly has put him in this

13   agitated state.  And so they knew it wasn't just

14   your usual mentally handicapped, delusional

15   individual.

16        Q. Okay.  Is there anything else in

17   subsection two that you disagree with?

18        A. I did not see him moving up to

19   13 minutes.  I saw him being still before that.

20        MR. HENLEY:  Is that Roman numeral

21   eight?

22        THE WITNESS:  Eight.

23        Q. Do you mean that -- by still, do you

24   mean like completely motionless, or do you

25   mean --

## Page 91

1         A. I don't mean that he's deceased.  I just

2    think that -- because at around 11 minutes, I

3    know he grunts.  And then he seems to be moving

4    his head.  And then at one point, I saw his cheek

5    blow out like breathing.

6         Q. And what about the cheek blowing out

7    leads you to conclude he was dead?

8         A. No.  That did not -- no.  I'm saying

9    that I did not see him moving.  He was just down

10   there, but I didn't see him -- it says the

11   decedent can be seen moving until 13 minutes

12   after the force is applied to his back.  I guess

13   I'm interpreting the moving as squirming around.

14   But I did see a sign of life when I thought that

15   he blew -- he exhaled in his cheek.  I saw his

16   cheek.

17        Q. Thank you.  That's exactly what I was

18   trying to ascertain.  Thank you.

19        A. Okay.  But then -- so I have it earlier,

20   and that's the last thing.  I had 11:51.  That's

21   the last thing I see of any movement of him.

22        Q. By movement, do you mean sign of life or

23   resistance?

24        A. Immediate sign of life.

25        Q. Okay.  What's your end point?

## Page 92

1         A. 11:51.

2         Q. And that's on Officer Dillard's body

3    camera, right?

4         A. Uh-huh.

5         Q. The officer who was restraining?

6         A. Uh-huh.  And he is not turned over until

7    15:08.

8         Q. Do you believe that he dies within

9    seconds of the last sign of life?  Perhaps this

10   would be better posed to you while looking at the

11   video?  Would that be more helpful?

12        A. Posed what?

13        Q. Would this question be better posed to

14   you while you're looking at the video?

15        A. Oh, yeah.  It's just I'm thinking -- you

16   know, with hypoxia you're going to -- you're not

17   able to supply the blood to your brain and

18   oxygen.  So what happens is you go unconscious,

19   go into a coma.  And to actually pinpoint when

20   someone dies, you know, might be a little bit

21   difficult.  You can pinpoint when they kind of

22   show no signs of life.  But we can definitely do

23   the video.

24        Q. That makes sense.  No, that's great.  If

25   someone goes unconscious due to hypoxia, can they

Page 101

1  going to school.
2       I think if someone's in this position,
3  they suddenly don't move, you think they're
4  asleep or unconscious, and you know that this is
5  what they've learned in training is this may not
6  be good, I would turn them over.
7       Q.  Okay.  Actually, that wasn't my
8  question.  I just meant that if you can't arouse
9  them, would that suggest to you they were
10  unconscious or unresponsive?
11       A.  Yes.
12       Q.  Okay.  Now, would you agree that someone
13  could also pretend to be asleep?
14       A.  Yes.  People can pretend to be asleep.
15       Q.  Is there any way that you could tell if
16  a person were really asleep or pretending to be
17  asleep?
18       A.  Well, you could do -- you would have to
19  turn him over.  You would do sternal rubs.  You
20  can do -- you know, which is painful, sternal
21  rub.  If you had a needle or proper equipment,
22  you could do the nasal septum.  I mean, I'm
23  trying to picture in the hospital what we do.  I
24  guess there you could yell.  You could put
25  something in their nose to make them sneeze.  You

Page 102

1  could sprinkle water on them.
2       Q.  But you're trying to get them to
3  involuntarily react to you, correct?  Or
4  voluntarily?  Sorry.  You're trying to get them
5  to react to you, right?
6       A.  Yeah.  Right, to prove that they are not
7  unconscious.
8       Q.  Okay.  A person could also be feigning
9  unconsciousness too, correct?
10       A.  Yes, but it wouldn't matter.  They're no
11  longer resisting.  Why not turn them over and put
12  him in the gurney?
13       Q.  Oh, no.  That's not my question at all.
14  I was asking if they could feign unconsciousness
15  because that would be an alternate explanation
16  for his behavior other than a medical emergency,
17  wouldn't it?
18       A.  That he's faking unconsciousness?
19       Q.  That could be -- that could happen?
20       A.  Well, nothing is impossible.  But you've
21  got three or five men on top of you, and you
22  suddenly become unresponsive.  I wouldn't think
23  he's feigning unconsciousness.  I would be a
24  little worried.
25       Q.  How many officers do you think were

Page 103

1  putting pressure on Mr. Timpa's back when he went
2  unconscious?
3       A.  I believe there were three.  Maybe two.
4  I know there are five around.
5       Q.  So how many do you believe were putting
6  pressure on Mr. Timpa's back at the time he went
7  unconscious?
8       A.  Just back?
9       Q.  Yes.
10       A.  One.
11       Q.  Would pressure on other areas of his
12  body contribute to mechanical asphyxia?
13       A.  Back, shoulders, neck.
14       Q.  Anywhere else?
15       A.  Well, head.
16       Q.  Anywhere else?
17       A.  If you want to talk about upper back,
18  chest, and lower back, abdomen.  Nothing on his
19  legs.  Nothing to his arms.
20       Q.  Do you believe Officer -- I'm sorry.  Do
21  you know which roles the different officers
22  played in the restraint?
23       A.  Not right offhand.
24       Q.  Okay.  Do you believe any of the
25  officers other than the one who was putting

Page 104

1  pressure on Mr. Timpa's back and shoulders used
2  unreasonable force?
3       MR. HENLEY:  Objection to form.
4       A.  I know on one I couldn't see because he
5  was on the legs.  And so that one doesn't concern
6  me.  The one on the -- if it's one or two on the
7  back and the shoulders or lower back, upper back,
8  shoulders that -- was it excessive force?  Is
9  that what you asked me?
10       Q.  Yes.
11       A.  I think it was unnecessary force.
12  Excessive?  You know, it's hard to tell how much
13  pressure they're putting on there.  But the
14  problem is you're putting a force on a small,
15  limited area, square inches or whatever on the
16  body.  You're putting X amount of pressure.
17       Q.  So putting pressure on a smaller area is
18  more likely to cause mechanical asphyxia than
19  putting pressure on a broader area?
20       A.  No.  I guess what I'm getting at is that
21  you can have people putting pressure on your
22  legs, on your hips, on your -- just like I read
23  in one of your expert reports.  You know, on your
24  butt, on your back.  And it can be X pounds of
25  pressure.  But that's different when you take

## Page 105

13:36:50  1   that X pounds of pressure and you focus it on
13:37:02  2   back, shoulders, those areas.
13:37:07  3       Q.  Okay.  So your point is about location
13:37:19  4   of the pressure rather than the surface area; is
13:37:22  5   that correct?
13:37:22  6       A.  Well, it all comes into play.  Pressure
13:37:28  7   is the amount of force per surface area.  So, you
13:37:32  8   know, we're not talking about pressure on his
13:37:35  9   arms.  It's more where the pressure was was a
13:37:40  10  crucial location for him to be able to breathe.
13:37:44  11  The different areas.  The shoulders.  I mean, you
13:37:47  12  can't use your accessory muscles.  And he was --
13:37:52  13  to me, he had a belly.
13:37:54  14       And so you've got that belly pressure.
13:37:57  15  And then you've got force on the back where the
13:37:59  16  diaphragm and the lungs are.  And after a while
13:38:01  17  you just wear out, and you can't breathe with the
13:38:04  18  force against the ground, the force above you.
13:38:08  19       Q.  What I'm trying to get at here is that
13:38:12  20  do you think that it would be more likely to
13:38:15  21  cause mechanical asphyxia if the force were
13:38:20  22  isolated on the upper back in a small area or if
13:38:25  23  the entire -- if force were applied to the entire
13:38:28  24  back area?
13:38:29  25       A.  If it was a small area where he could

## Page 106

13:39:35  1   still inhale and exhale using his diaphragm and
13:38:38  2   his intercostal muscles and the -- but the only
13:38:41  3   pressure was just between his shoulder blades, I
13:38:46  4   think that he would have been able to breathe
13:38:48  5   fine.
13:38:56  6       Q.  At the time that the police --
13:39:04  7       A.  Are we on a number?
13:39:06  8       Q.  No.  Sorry.  At the time the police
13:39:09  9   arrived, do you believe that Mr. Timpa was a
13:39:11  10  danger to himself?
13:39:12  11       A.  Okay.  At the time -- okay.  This is
13:39:19  12  when he's got handcuffs on his back and he's
13:39:21  13  running across the road.  Yes.
13:39:24  14       Q.  He's a danger to himself then?
13:39:26  15       A.  Yes.  He's running into traffic, yes.
13:39:26  16  And I know that the security guard was worried
13:39:36  17  about him.
13:39:38  18       Q.  Do you think it was necessary for
13:39:37  19  someone to pull him out of the road?
13:39:40  20       A.  I think that if someone had not there
13:39:45  21  could have been an automobile-pedestrian
13:39:53  22  accident.  So yes.  I mean, I think someone
13:39:56  23  should have gotten him out of the way of danger.
13:39:59  24       Q.  Do you think it was unreasonable for the
13:40:02  25  security guards to put handcuffs on him?

## Page 107

13:40:05  1       A.  No.
13:40:05  2       Q.  Do you believe that it was unreasonable
13:40:06  3   for the police to have had handcuffs on him?
13:40:12  4       A.  No.
13:40:12  5       Q.  Do you believe that it was unreasonable
13:40:13  6   for the police to have ankle restraints on him?
13:40:18  7       A.  No.
13:40:18  8       Q.  Do you take issue with the fact that he
13:40:37  9   was restrained?
13:40:38  10       A.  No.
13:40:38  11       Q.  Do you take issue with the length of
13:40:42  12  time that he was restrained?
13:40:42  13       A.  Yes.
13:40:43  14       Q.  Do you take issue with the position in
13:40:46  15  which he was restrained?
13:40:47  16       A.  Yes.
13:40:46  17       Q.  Or the manner in which he was
13:40:48  18  restrained?
13:40:48  19       A.  The manner?  Well, the position --
13:40:52  20       Q.  Prone restraint with weight on the back?
13:40:54  21       A.  Yes.  Yes.  The position and combining
13:40:57  22  that with the time.
13:40:58  23       Q.  Okay.
13:40:58  24       A.  Now, I don't think time would have been
13:41:00  25  such an issue if he was lateral.

## Page 108

13:41:03  1       Q.  What does lateral mean?
13:41:05  2       A.  On his side.
13:41:06  3       Q.  Okay.
13:41:06  4       A.  A recovery position some of them call
13:41:09  5   it.
13:41:09  6       Q.  So you're not taking issue with the fact
13:41:13  7   that he was restrained.  Just the manner in which
13:41:16  8   he was restrained and the duration, correct?
13:41:17  9       A.  Yes.
13:41:17  10       Q.  Okay.
13:41:18  11       A.  Being prone with the pressure on his
13:41:20  12  back.
13:41:20  13       Q.  Okay.  Did the security guards restrain
13:41:24  14  him in any way that was harmful to him?
13:41:27  15       A.  I don't recall any information except
13:41:30  16  for the handcuffs.  And they called 911.
13:41:32  17       Q.  Is that -- what you know of that, would
13:41:35  18  that have been harmful to Mr. Timpa?
13:41:41  19       A.  No.  This is the initial security guard?
13:41:43  20       Q.  Correct.
13:41:46  21       A.  No.
13:41:47  22       Q.  Okay.  Now, it's your opinion that the
13:42:14  23  pressure applied by Officer Dillard to
13:42:15  24  Mr. Timpa's back was restricting circulation of
13:42:21  25  his blood into and out of his upper torso and

## Transcript of Exhibit 1 Audio

During their encounter with Mr. Timpa, Officers Dillard, Vasquez and Rivera each wore their Dallas Police Department body cameras, which recorded the incident from the officers' respective vantage points.  Neither Sgt. Mansell nor Sr. Cpl. Dominguez had been issued body cameras at that time. Appx. at 2-7.

Forensic audio/video analyst Barry Dickey merged and synchronized all three body-camera videos into one split-screen video with a single running clock.  This merged video (App. Ex. 1-A) allows the viewer to watch the incident from all available vantage points simultaneously.  Officer Vasquez was the first officer to activate his body camera, followed by Officers Dillard and Rivera in the following sequence:

Duration of Video (Appx. Ex. 1-A):  27 minutes, three seconds (27:03)

Full Screen:      Officer Vasquez        (00:00-00:37)

Top Left:          Officer Dillard         (00:38-17:15)

Bottom Left:   Officer Vasquez        (00:38-17:15)

Bottom Right: Officer Rivera          (03:20-10:02)

Full Screen:      Officer Dillard         (17:16-27:03)

The initial thirty seconds of each officer's video will be silent.  When activated, the cameras record the video images (without audio) from the thirty seconds prior to activation, and begin recording audio immediately upon activation.  App. at 207 (66:5-20).

000283

[Vasquez Audio begins at 00:30]

| | | |
|---|---|---|
| 00:30 | MANSELL: | These cuffs are these guys'-- |
| | VASQUEZ: | Alright. |
| | TIMPA: | They're not real, they're not real!  Check 'em, they won't tell you!  Check 'em --- |
| | MANSELL: | -- and obviously we've been rolling around in the street and everything. |
| | TIMPA: | --- they won't show you! They won't show you! |
| | VASQUEZ: | I see.  Got you.  Yeah, definitely...definitely taking a ride. |
| | MANSELL: | (inaudible) ...he sits here. |
| | DILLARD: | Got any ID on him? |
| | VASQUEZ: | Got any name out of him or anything? |
| | MANSELL: | Just "Tony" is the only thing we can get out of him. |
| 00:48 | TIMPA: | Help me! |
| | VASQUEZ: | Tony! |
| | DILLARD: | Hey, get on the ground. |
| | TIMPA: | No!  You're gonna kill me! |
| | DILLARD: | No, I'm not gonna kill you. |
| | TIMPA: | You're gonna kill me!  You're gonna kill me! |
| | MANSELL: | Alright. |
| | VASQUEZ: | Tony.  Relax, buddy. |
| | MANSELL: | Chill out. |
| | DILLARD: | Relax. |
| | TIMPA: | What are you gonna do?!  Help me! |
| 01:05 | DILLARD: | We're gonna help you out, but you need to relax. |

000284

| | | |
|---|---|---|
| | TIMPA: | Help me! |
| 01:06 | VASQUEZ: | Hey, Tony.  Chill out, bro.  Hey Tony, look at me. |
| 01:06 | DILLARD: | Hey, Tony, look at me. |
| 01:09 | SEC. GUARD: | Relax, man.  Just relax. |
| | TIMPA: | Help me! |
| | VASQUEZ: | Hey, what's up? Hey look, Tony.  Look at me, bro. |
| | DILLARD: | Tony, chill out man. |
| 01:15 | TIMPA: | Give me a gun. Give me…please, give me…just take me down, and…(unintelligible) |
| 01:17 | DILLARD: | No, you're fine. |
| | TIMPA: | Don't hurt me! |
| 1:19 | DILLARD: | We're not gonna hurt you, bro.  We're not gonna hurt you. |
| | VASQUEZ: | Hey Tony. |
| | DILLARD: | |
| | VASQUEZ: | Tony. |
| | TIMPA: | Don't know where we are. |
| 01:20 | SEC. GUARD: | Relax, man. We're gonna get you some help, man.  Relax, man.  Just stay down. |
| 01:23 | | **[Mr. Timpa rolls toward the street and kicks at Officer Vasquez]** |
| | DILLARD: | Hey Tony. |
| | SEC. GUARD: | Tony ---                                                1:26 |
| | DILLARD: | Tony, Tony, Tony --- |
| | SEC. GUARD: | Tony --- |
| | TIMPA: | Help! |
| | Unknown: | Damn it! |

3

| | | |
|---|---|---|
| TIMPA: | (yells) | |

01:29            **[Mr. Timpa rolls onto his stomach. Officer Dillard, Officer Vasquez, and security guard Glenn Johnson hold him in place.]**

| | | |
|---|---|---|
| VASQUEZ: | Just keep him down. | |
| TIMPA: | No! (grunts) | |
| VASQUEZ: | This is too much. | 01:31 |
| DILLARD: | Stop it. | 01:33 |
| TIMPA: | (grunts) Oh no, please! | |
| DILLARD: | You're gonna be alright. You're gonna be alright. | |
| VASQUEZ: | Hey Tony. What's your last name, Tony? | |
| TIMPA: | Please! | |
| DILLARD: | We're not gonna hurt you, okay?  You need to relax, okay? | 01:43 |
| VASQUEZ: | Ain't got nothing on him. | 01:43 |
| DILLARD: | What did you take today? | |
| TIMPA: | (unintelligible; possibly "coke") | |
| DILLARD: | What did you take, Tony? | |
| TIMPA: | Oh God! I can't…can't feel --- | 01:47 |
| DILLARD: | Hey, hey, hey, what did you take? | |
| TIMPA: | Help me! | |
| DILLARD: | Hey, what did you take today? | |
| TIMPA: | Help me! | |
| DILLARD: | Tony, Tony, what did you take today? | |

000286

| | | | |
|---|---|---|---|
| SEC. GUARD: | He ran --- | |
| DILLARD: | What did you take? | |
| TIMPA: | (unintelligible) | |
| VASQUEZ: | 'Tony Timpa' is the name we got. | 01:59 |
| TIMPA: | Help me! | |
| MANSELL: | I'm sorry? | |
| SEC. GUARD: | Well, he was trying to get on the bus.  I was trying to stop him. | 02:03 |

02:02            **[Mr. Timpa thrashes; Dillard is nearly dislodged]**       02:05

| | | | |
|---|---|---|---|
| DILLARD: | Hey, hey, hey, hey, hey! | |
| MANSELL: | This is (unintelligible) | |
| VASQUEZ: | That's all we got on him. | 02:12 |
| TIMPA: | Help me! | |
| VASQUEZ: | Tony Timpa. | |
| Unknown: | What the hell is this? (unintelligible)… his ID? | |
| TIMPA: | No! No! | |
| VASQUEZ: | Oh—Oh, it's an actual ID? | |
| Unknown: | Yeah, he had --- | |
| VASQUEZ: | Oh damn. | |
| TIMPA: | Help me! Don't do…don't do anything! | |
| Unknown: | I didn't see a Texas ID. | |
| TIMPA: | Okay I'm down! I'm down! I'm down!  Please don't do it! | |

02:24            **[Paramedic Flores reaches in, attempts to take vital signs]**

| | | |
|---|---|---|
| MANSELL: | Diagnosed schizophrenic… |
| TIMPA: | Please! Don't do it! |

000287

| | | | |
|---|---|---|---|
| | DILLARD: | You're alright… Hey, you're okay. | |
| | MANSELL: | …off his meds. | |
| | TIMPA: | Okay. | |
| | DILLARD: | You're okay.  You're okay. | |
| | TIMPA: | (unintelligible)…hurt me. | 02:34 |
| 02:34 | PM FLORES: | I'm right behind you, so don't jump up. | 02:37 |
| 02:37 | VASQUEZ: | Yeah, don't -- don't jump back.  You got a paramedic behind you. | |
| | DILLARD: | Okay. | |
| | VASQUEZ: | If you want, twist your body out to the right. | |
| 02:41 | DILLARD: | No, that's good. I'm just worried about him. | |
| 02:43 | TIMPA: | I can't live.  I can't. | 02:44 |
| 02:46 | PM FLORES: | Damn, that's not gonna work. | 02:47 |
| 02:49 | TIMPA: | No!  Oh God.  This sucks. | 02:55 |

**[02:53 - PM Flores removes equipment and withdraws]**

| | | | |
|---|---|---|---|
| 02:57 | DILLARD | You're gonna be alright. | |
| 02:58 | VASQUEZ: | Tony, just relax.  Tony, relax man.  Tony, relax.  You don't need to be squirming, man. | |
| | DILLARD: | Stop. | |
| | S.G. Johnson: | We're trying to get you help, man, alright? | |
| | TIMPA: | Help me! | |
| | DILLARD: | Stop. | |
| | TIMPA: | Okay, stop!  I stop! I stop!  I stop! Please leave my feet alone!  Please leave…(unintelligible) | 03:12 |
| 03:16 | MANSELL: | Man, there's two call sheets on this one. | |
| | MANSELL: | Hey, what's, uh… This might have come out of his pocket.  What the hell is that? | |

6

| | | | |
|---|---|---|---|
| | Unknown: | (unintelligible) …I told you --- | |
| | Unknown: | Yeah. | |
| | S.G. Johnson: | Is that his real name? Tony? | |
| | VASQUEZ: | Yeah, Tony Timpa is his name. | |
| 03:34 | TIMPA: | (yells) | 03:37 |
| 03:38 | MANSELL: | It's like finally…he finally said… (unintelligible)… yacht club in Rockwall that's (unintelligible) money. | 03:41 |
| 03:20 | | **[Officer Rivera arrives and activates his body camera]** | |
| 03:41 | TIMPA: | (grunts)  Okay. Please let me go, please?! | 03:43 |
| | VASQUEZ: | Hey Tony. | |
| | TIMPA: | Please let me go. | |
| | VASQUEZ: | We're trying to help you out man, just relax. | |
| | TIMPA: | Ohhh, okay.  My bad.  Fuck yeah!  (grunts)  (unintelligible) | |
| 03:54 | DILLARD: | Just another day. | 03:55 |
| | SG Johnson: | Yeah. | |
| | TIMPA: | (unintelligible) | |
| 03:55 | RIVERA: | Yeah, this is his. | |
| | Unknown: | Say what? | |
| | SG Johnson: | Uh, I think that's his. | |
| | RIVERA: | Yeah, that's…that's his, and the car's over there somewhere. | 04:02 |
| 04:02 | TIMPA: | No! No! | |
| | MANSELL: | Oh, I (unintelligible). | |
| | Unknown: | Do we have, uh… | |
| 04:08 | RIVERA: | Anybody got leg restraints? | 04:09 |

7

| | | | |
|---|---|---|---|
| | Unknown: | Zip-- yeah. | |
| | Unknown: | Sir --- | |
| | VASQUEZ: | I got zip cuffs in my…in the trunk…in the trunk of that vic…behind this Dodge, black Dodge. | |
| | TIMPA: | Help me! | |
| | VASQUEZ: | There's zip-- there's zip cuffs in the back trunk. | 04:19 |
| | TIMPA: | Help! Help me! Help me! Help me! | |
| 04:24 | VASQUEZ: | Hey, I'm gonna try to change cuffs --- | |
| | DILLARD: | Okay. | |
| | VASQUEZ: | --- that way we don't have to worry about it once he's up. | |
| | DILLARD: | Yeah. | |
| 04:29 | | **[Officer Vasquez begins to replace the security guard's handcuffs with his own.]** | |
| 04:32 | | **[Rivera kneels by Mr. Timpa's legs.]** | |
| 04:36 | RIVERA: | Relax, man. Relax. | |
| | DILLARD: | You're gonna be alright, Tony. | |
| 04:49 | VASQUEZ: | This is gonna be a pain in the ass. He's swinging his hands. | |
| 04:51 | DILLARD: | That's okay. | 04:52 |
| | TIMPA: | Oh God, please! Oh God! Oh God! | |
| | DILLARD: | You're gonna be alright. | |
| | DILLARD: | You're gonna be alright. | |
| | | [Mr. Timpa's cell phone begins to play music] | |
| | TIMPA: | No, you'll pull my feet off! | 04:58 |
| | DILLARD: | You're -- You're gonna be alright, Tony, okay? | |

8

| | | | |
|---|---|---|---|
| | TIMPA: | (grunts) | |
| | DILLARD: | We're gonna get you some help. | |
| 05:04 | PM FLORES: | Trying to figure out what that was. | |
| 05:06 | RIVERA: | That's his phone, not mine. | |
| | TIMPA: | (grunts) | |
| | DILLARD: | Stop. | |
| | TIMPA: | (yells) | |
| | PM FLORES: | Is that your phone or his phone? | |
| | TIMPA: | (yells) | |
| | RIVERA: | That's his. | |
| 05:14 | TIMPA: | Stop!  Stop, officer!  Okay. | |
| | RIVERA: | I don't know why it started playing all of a sudden, but… | |
| | TIMPA: | Stop, officer! | |
| | DILLARD: | You're gonna be okay, Tony. Tony, chill. Relax. | |
| | TIMPA: | Okay.  Okay. | 05:21 |
| 05:21 | VASQUEZ: | Hey, shine me over here, Sarge, so I can unbuckle these… | |
| | TIMPA: | Okay. | |
| | VASQUEZ: | Trying to switch out cuffs --- | |
| | TIMPA: | No! | |
| | VASQUEZ: | --- while we…while we got him controlled. | 05:27 |
| | TIMPA: | Help me! | |
| | DILLARD: | Tony, you're gonna have to relax. | |
| | TIMPA: | Help me! | |
| | VASQUEZ: | Here we go! | 05:32 |

9

| | | | |
|---|---|---|---|
| | TIMPA: | Okay, I'll stop.  I'll stop! | 05:34 |
| | DILLARD: | You gotta relax.  Relax. | |
| | TIMPA: | I'm stopping! Please! | 05:35 |
| | DILLARD: | Okay. | |
| | Unknown: | Come on, get the little piggies. | 05:36 |
| | TIMPA: | Please! I'm stopping! Please! | |
| | DILLARD: | Okay. | |
| 05:38 | VASQUEZ: | What did I do with the key? | |
| 05:40 | | [Mr. Timpa thrashes hard] | |
| 05:45 | Unknown: | Whoo! | |
| 05:45 | RIVERA: | Ah, shit. | |
| 05:45 | MANSELL: | He's gonna be tired. | |
| | VASQUEZ: | You hooked him? | |
| | Unknown: | Here, man. | |
| | MANSELL: | He's gonna be tired tomorrow! | 05:49 |
| | DOMINGUEZ: | So here, um… Alright, I got one on. | |
| | RIVERA: | You got one what? Leg restraint? | |
| | DOMINGUEZ: | Yeah, I'm just trying to… | |
| | Unknown: | There you go! | |
| | Unknown: | Alright! | |
| | DOMINGUEZ: | I mean, it would be easier if we rotate him around from underneath this bench there. | |
| | MANSELL: | Let's get… get one set of cuffs off of him. | |
| | VASQUEZ: | Yeah, I'm trying. | 06:01 |

000292

| | | |
|---|---|---|
| RIVERA: | Bring it behind…Bring it through…right here. | |
| Unknown: | And then we'll just --- | |
| 06:02  VASQUEZ: | He's squirming way too much. | |
| MANSELL: | Let's do one thing at a time, and then we'll pull his legs out and get the rest of him. | |
| VASQUEZ: | Hold on, hold on, hold on.  We need a smaller key. | 06:08 |
| TIMPA: | No! Please don't do this! | |
| TIMPA: | Please don't! | |
| VASQUEZ: | Hold on, hold on, hold on, hold on! | |
| DILLARD: | Stop. Tony, stop. | |
| TIMPA: | Please! | |
| DILLARD: | You're gonna have to stop squirming. | |
| TIMPA: | No! Help me! | |
| MANSELL: | Tony. Tony. Tony, chill out, man. | 06:16 |
| TIMPA: | Help me! | |
| MANSELL: | Chill out. | |
| TIMPA: | Help me!  Help me! | |
| DOMINGUEZ: | Can you put the foot underneath here?  If you put it underneath here, you can use… See? Like, right now I got one hand controlling that because if you get it under here… | 06:27 |
| TIMPA: | (unintelligible) | |
| DOMINGUEZ: | I can just… | 06:30 |
| TIMPA: | You guys let me go! | |
| VASQUEZ: | Ah, come on. | |
| DOMINGUEZ: | Where's his foot at? | |

000293

|       | RIVERA:     | It's under there somewhere. |       |
|-------|-------------|------------------------------|-------|
|       | VASQUEZ:    | Damn key don't wanna come off! | 06:42 |
|       | Unknown:    | Oh, man. |       |
|       | DILLARD:    | Yeah, he's … |       |
| 06:50 | VASQUEZ:    | He's moving way too much, man. |       |
|       | Unknown:    | Now, if you look…yeah. You gotta get two more little piggies through. |       |
| 06:53 | MANSELL:    | Y'all don't happen to have any "chill out" shots that ya'll can give him? |       |
|       | DILLARD:    | It's gonna be alright, Tony. |       |
|       | PM FLORES:  | Surely he's had enough of those. |       |
|       | Unknown:    | Here we go! |       |
|       | Unknown:    | There you go! |       |
|       | Unknown:    | (unintelligible) |       |
| 07:04 | DOMINGUEZ:  | Get a Green Oaks Cocktail Special?[1] |       |
|       | PM FLORES:  | Yeah. | 07:08 |
|       | DOMINGUEZ:  | That's what she said. |       |
|       | Unknown:    | Why can't I get it in? |       |
|       | VASQUEZ:    | Stop it. |       |
|       | Unknown:    | No, it's on the heel. |       |
| 07:09 | VASQUEZ:    | Stop it! Tony, stop fighting me.  I'm just trying to take this handcuff off. |       |
| 07:16 | TIMPA:      | Yeah, take it off. |       |

---

[1] "Green Oaks" refers to Medical City Green Oaks Hospital, a psychiatric care facility to which DPD officers transport citizens who need mental health care. Green Oaks staff members frequently inject agitated patients with sedatives upon arrival.  These sedatives are colloquially referred to as a "Green Oaks Cocktail." Ex. 17 at 260:12-261:1.

000294

|       |            |                                                                                                                      |       |
|-------|------------|----------------------------------------------------------------------------------------------------------------------|-------|
|       | VASQUEZ:   | Alright.                                                                                                              |       |
|       | TIMPA:     | Oh God.  It hurts ---                                                                                                 |       |
|       | VASQUEZ    | I think it's too…too small man.                                                                                       |       |
| 07:19 |            | [07:19 - Vasquez removes the security guard's handcuffs and hands them to Mansell, who hands them to the security guard] | 07:19 |
|       | TIMPA:     | Please take it off!  Oh my God! Oh my God, it hurts!                                                                  | 07:29 |
|       | Unknown:   | Yeah.                                                                                                                 |       |
|       | Unknown:   | Ahh.                                                                                                                  |       |
|       | MANSELL:   | There you go.                                                                                                         |       |
|       | TIMPA:     | Oh my God!                                                                                                            |       |
|       | MANSELL:   | Good workout.                                                                                                         |       |
| 07:36 | Unknown:   | Do we need a…  All our zip ties are all like that.                                                                   |       |
| 07:42 | VASQUEZ:   | I'm trying to double-lock them so he don't cinch them on himself.                                                    |       |
|       | DILLARD:   | Take your time, bro. Take your time.                                                                                  |       |
|       |            | {radio traffic}                                                                                                      |       |
|       | MANSELL:   | Okay.                                                                                                                 |       |
| 07:58 | Unknown:   | (unintelligible) … have to hog tie him, do we?                                                                       |       |
| 08:07 | Unknown:   | Gotta love it!  We could pull his legs up…(unintelligible)                                                            |       |
|       | RIVERA:    | Yeah, well, I don't. Nobody needs to be kicked.  He already kicked my thumb.                                         | 08:13 |
| 08:16 | TIMPA:     | Ahh, you suck, motherfucker!                                                                                          | 08:17 |
|       | RIVERA:    | Is he partially under there?                                                                                         |       |
| 08:19 | VASQUEZ:   | Ya'll wanna roll him… Y'all wanna roll him out?  We can, kinda like, scoot him out. We can swing him toward the…     |       |
| 08:24 |            | [Leg restraint makes audible zipping noise]                                                                          |       |

000295

| 08:26 | RIVERA: | I got it! |
| | VASQUEZ: | You got it? |
| | RIVERA: | Yep. We couldn't get the other zip over the heel, but we got it. |
| | VASQUEZ: | Alright.                                                      08:30 |
| 08:32 | DILLARD: | Do you want me to roll him over? |
| | DILLARD: | Is that a debit card? |
| | TIMPA: | They won't (unintelligible) they don't have --- |
| | PM FLORES: | Before ya'll move him, if I can just get right here and see if I can just get to his arm. |
| | VASQUEZ: | Go ahead man. |
| | TIMPA: | Ah shit. |
| | DILLARD: | He's trying to help you out, okay?  He's trying to help you out, okay? You're doing good. You need to relax. |
| 08:50 | MANSELL: | Uh-oh.  Baylor fitness center.  He's an employee for Baylor. |
| | Unknown: | What? |
| | Unknown: | That's why he's so athletic. |
| | VASQUEZ: | Employee or frequent --- |
| | MANSELL: | And he's in the, the fitness center. |
| | VASQUEZ: | --- or frequent flyer? |
| | MANSELL: | No, employee.  Looks like employee.  Don't it look like employee? |
| | Unknown: | Yeah, I believe. |
| 09:14 | DILLARD: | You're gonna be alright. |
| 09:15 | MANSELL: | Got a Mercedes somewhere. |
| | DILLARD: | Trying to help you out. |