IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-CV-3089-N |
| | § | |
| DUSTIN DILLARD, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses Defendants Dustin Dillard, Danny Vasquez, Raymond Dominguez, Domingo Rivera, and Kevin Mansell's (collectively, "Defendants") motion for summary judgment on qualified immunity [150].[1]   For the reasons below, the Court determines that the claims Plaintiffs raise are either unsupported by the summary judgment evidence or barred by the doctrine of qualified immunity and grants the motion.

### I. ORIGINS OF THE SECTION 1983 LAWSUIT

### A. *The 911 Calls*

On August 10, 2016, the City of Dallas 911 Center received four calls precipitating the police officer Defendants' interaction with decedent Tony Timpa ("Timpa").  Timpa initiated the first 911 call, telling the operator that he was a thirty-two-year-old male, that

---

[1] The Court is aware that this case touches on issues that are currently of widespread public concern.  Nonetheless, this Court must decide the issues presented in accordance with the pages of binding precedent from the Supreme Court and Fifth Circuit, rather than the pages of today's newspapers.

MEMORANDUM OPINION AND ORDER – PAGE 1

he was afraid of a man he was with, and that he was "having a lot of anxiety." Defs.' Appx. Ex. B-1 [151]. He also disclosed that had schizophrenia, bipolar disorder, depression, and anxiety and that he had not taken his medications that day. *Id.* After Timpa's call ended abruptly, the 911 operator called him back. *Id.* at Ex. 1-C. Multiple car horns are audible at the 4:20 minute mark during this call. *Id.* Timpa became agitated and can be heard arguing with several males. *Id.*

A motorist also placed a 911 call reporting a white male "running up and down the highway on Mockingbird . . . and stopping traffic. I almost hit him." *Id.* at Ex. 1-D. She states that the man stood in front of a Dart bus, stopped it, and began climbing it. *Id.* A private security guard called as well, echoing the female caller's reports that a man was running in the middle of Mockingbird Lane, jumping on a DART bus, and yelling that someone is trying to kill him. *Id.* at Ex. 1-E. He also stated that he believes the man "is on something." *Id.*

### B. The Officers Respond to West Mockingbird Lane

The Dallas Police Department ("DPD") dispatcher informed officers that there was a crisis intervention training ("CIT")[2] situation at 1728 West Mockingbird Lane involving a white male with schizophrenia who was off his medications. Mansell responded and arrived at 10:36 p.m. Intervenor's Resp. Brief 9 [164]. He requested backup, stating that Timpa "is in traffic on Mockingbird, and he's definitely going to be a danger to himself." Defs.' Appx. Ex. 1-G [151]. Mansell called for an ambulance before exiting his patrol car.

---

[2] A CIT call indicates that the 911 operator believes the situation involves a citizen who may be experiencing mental health issues. Defs.' Appx. 164, 194 [151].

MEMORANDUM OPINION AND ORDER – PAGE 2

*Id.* at Ex. 1-L; 165–66. Despite being handcuffed, Timpa repeatedly attempted to roll into the right lane of the road — where vehicles were still driving — and succeeded at one point, requiring Mansell and one or both of the security guards to lift him back to the roadside.[3] *Id.* at 167–68.

Approximately seven minutes after Mansell arrived, paramedics arrived with Dillard and Vasquez pulling up shortly after them. Timpa was handcuffed and sitting on the ground between a bus stop bench and the road. He was unresponsive to the officers' attempts to calm him and repeatedly yelled "you're gonna kill me!" and "help!" before lurching towards the street. *Id.* at Ex. A-1 0:50–1:24. Dillard and Vasquez then rolled him onto his stomach while a security guard restrained his legs. *Id.* at 1:24–2:05. Dominguez arrived roughly three minutes later, followed closely by Rivera.

### C. Timpa's Restraint

Dillard restrained Timpa by placing his left knee on Timpa's upper back and left hand between Timpa's shoulders with his right hand on Timpa's shoulders intermittently. *Id.* at 1:30. This restraint lasted roughly fourteen minutes. *Id.* at 1:30–15:16. Vasquez assisted Dillard by placing his left knee on Timpa's lower back and right knee on his buttock for roughly 160 seconds. *Id.* at 1:44–3:55. When Timpa continued to yell, Dillard

---

[3] The Intervenor asserts that the body cam recordings do not show this. However, only Dillard, Vasquez, and Rivera recorded the situation on their body cameras. The earliest of these officers arrived seven minutes after Mansell was on the scene, and their body cameras could not have captured events that occurred prior to their arrival. Further, as Vasquez walks up, his body cam records Mansell as stating, "We've been rolling around in the street and everything." *Id.* at Ex. A-1 0:36–0:38. Because there is no evidence contradicting Mansell's deposition testimony or his statement captured by the body cam, the Court holds there is no genuine dispute of fact on this point.

MEMORANDUM OPINION AND ORDER – PAGE 3

asked, "What did you take today?"  Timpa replied, "Coke," although Dillard testified that he did not hear this.  *Id.* at 1:43; Appx. 76.  Dillard repeated his question, and Timpa responded with incoherent sounds.  *Id.* at 1:45–2:00.

Roughly two minutes into the restraint, Paramedic James Flores ("Flores"), who was standing behind the bus bench with Paramedic Curtis Burnley ("Burnley"), approached to take Timpa's vitals.  *Id.* at 2:26–2:53; Appx. 253.  The paramedics had been standing nearby since Timpa's initial restraint and can be seen in video background intermittently.  *Id.* at 1:30–1:40, 2:08–2:33, 3:38–4:10.  While walking towards Timpa, Paramedic Flores warned Dillard, "I'm right behind you, don't jump up."  *Id.* at 2:33–2:38. Dillard moved to the right after another officer warned that the paramedic was behind him and suggested "twist your body off to the right."  *Id.* at 2:38–2:40.  Timpa struggled and yelled, "I can't live! I can't live!"  Flores, unable to get a reading, stepped back and said, "Damn, that's not gonna work."  *Id.* at 2:46–2:53; Appx. 213, 254.  Timpa shouted and attempted to thrust his body forward.  *Id.* at 2:50–3:05.  After Dillard and the security guard reassured him, he said "Ok, I stop! I stop, I stop! Now please leave my feet alone!" and then kept still for roughly twenty seconds.  *Id.* at 3:06–3:33.

Timpa continued to shout and struggle, at one point maneuvering his legs out from under the bus bench and kicking, causing Dillard to lurch.  *Id.* at 4:02–4:08.  Dominguez left to retrieve leg restraints from Vasquez's patrol car while Vasquez attempted to swap the security guard's cuffs for an officer's pair so "we don't have to worry about it once

he's up."[4] *Id.* at 4:08–4:24; Appx. 3.  Vasquez had difficulty swapping the handcuffs and complained that Timpa was moving too much, stating "This is gonna be a pain in the ass. He's swinging his hands." and "Stop it. Tony, stop fighting me! I'm just trying to take this handcuff off." *Id.* at 4:50–7:16; *see* Appx. at 175, 219, 226–27, 230.  Mansell retrieved a flashlight to assist Vasquez, and Vasquez succeeded in switching handcuffs and double-locking them to prevent Timpa from cinching them. *Id.* at 7:19–7:46.

While Vasquez and Mansell focused on the handcuffs, Dominguez and Rivera worked to place zip ties around Timpa's ankles, during which process Timpa kicked them both several times. *Id.* at 4:33–7:32; *see id.* at 8:07–8:14, Appx. 5, 12, 127.  Flores approached a second time, and Dillard asked, "Do you want me to roll him over?" *Id.* at 8:30–8:33.  Flores declined stating, "Before y'all move him, if I can just get in right here, and see if I can just get to his arm." *Id.* at 8:32–8:40.  Dillard replied "go ahead, man" and shifted his knee to Timpa's shoulder and right arm. *Id.* at 8:41–8:42.  Paramedic Flores succeeded in attaching a blood pressure cuff and pulse oximeter. *Id.* at 8:40–10:02.  While the paramedic took his vitals, Timpa intermittently moved his head from side to side, made incoherent sounds, and chanted "kill me," "I need to die." *Id.* at 9:02–10:05.  Timpa then began yelling "We're gonna die. Help me!" and started shouting "Help me!" repeatedly. *Id.* at 10:21–11:48.  Paramedic Flores removed the pulse oximeter and left to prepare a sedative. *Id.* at 10:36–10:37; Appx. 249, 57.  At this point, Timpa had a pulse of 100 beats

---

[4] *See also id.* at 170, 214 (explaining DPD officers are taught that when taking custody of a pre-handcuffed person they should replace the handcuffs with their handcuffs before transporting the person).

per minute and blood pressure of 150/90, and Paramedic Flores "wasn't alarmed or alerted by that." *Id.* at 27, 266.

As Timpa continued to yell "Help me!" repeatedly without responding to the officers' questions, the security guard noted, "This ain't just normal crazy, man. He's on something." *Id.* at 11:17–11:21. Vasquez agreed, and Dillard concluded, "Yeah, he took something." *Id.* at 11:17–11:28, 12:00. At this point, Timpa was grunting and eventually became quiet and still. When Paramedic Burnely asked if Timpa could walk to the ambulance, others responded, "I highly doubt it" and "They zip-tied his feet. He's a kicker, man." *Id.* at 12:37–12:43. Dominguez then asked, "Tony, you still with us?" *Id.* at 13:02–13:04. Someone responded, "He's breathing." "I just wanted to make sure he was still breathing. 'Cause his nose is buried in that," Dominguez clarified. *Id.* at 13:20–13:24. "I think he's just asleep," Dillard replied. "Yeah, he's still breathing. He just snorted. He's out cold." *Id.* at 12:30–13:26; Appx. 2, 7, 131, 234–35. An officer remarked "If I were squirming that much I'd be sleeping too." *Id.* at 13:45–13:47. Dominguez and Vasquez then engaged in a series of jesting comments, such as "Hey, time for school! Wake up!" to which Timpa did not respond. *Id.* at 14:06–14:30.

Paramedic Flores returned to administer the sedative, and Timpa's head jerked in response to the injection. Dillard remarked, "Oh, there he comes." *Id.* at 14:39–11:49; Appx. 257. After waiting roughly twenty seconds, Vasquez lifted his hand from Timpa's back, and Dillard moved off him shortly after. *Id.* at 15:09–15:16. At a paramedic's prompting, the Defendants rolled Timpa onto his back and lifted him onto the gurney. *Id.* at 15:34–16:00. When they placed Timpa on the gurney, his head and torso rolled off the

MEMORANDUM OPINION AND ORDER – PAGE 6

side uncontrollably.  *Id.* at 16:00–16:32.  Timpa's head hung to the side as Paramedic Burnley strapped him onto the gurney, leading Dillard to ask, "Is he knocked out, or . . . he ain't dead, is he?"  *Id.* at 16:11.  Vasquez replied in the negative, but Dillard again asked, "He didn't just die down there, did he?"  "Is he breathing?"  *Id.* at 16:19–16:27.  Dominguez performed a sternum rub as the paramedics wheeled Timpa toward the ambulance, and when Timpa did not respond, Dillard exclaimed, "I hope I didn't kill him."  *Id.* at 16:27–16:34.  Some of the other Defendants laugh and respond, "What's this 'we' you are talking about?"  "We ain't friends."  *Id.* at 16:38–16:44.

After Timpa was loaded in the ambulance for treatment, Paramedic Burnley announced, "Yeah, he's not breathing."  *Id.* at 17:14–17:32.  Dominguez began performing chest compressions.   Mansell, who had left to call Timpa's family and ask what medications he was supposed to be taking, returned at this point.  Flores bluntly stated that Timpa was dead, causing Mansell to exclaim "He's what?!" and end the call with Timpa's mother.  *Id.* at 17:35–17:42.

Timpa was taken to Parkland Hospital, where staff confirmed his death.  *Id.* at 3. On November 3, 2016, Plaintiffs Vicki Timpa, individually and as representative of the state of Anthony Timpa, and Cheryll Timpa, individually and as next friend of K.T., a minor ("Plaintiffs") filed this section 1983 lawsuit against the Defendant Officers as well as several other defendants.  Intervenor Joe Timpa ("Intervenor") later joined the lawsuit.[5]

---

[5] Because the Intervenor and Plaintiffs raise most of the same claims and arguments, references to "Plaintiffs" in this Opinion include the Intervenor unless otherwise stated.

MEMORANDUM OPINION AND ORDER – PAGE 7

### D.  Timpa's Cause of Death

The Dallas County medical examiner who conducted Timpa's autopsy determined that Timpa died due to "sudden cardiac death due to the toxic effects of cocaine and physiological stress associated with physical restraint."  She acknowledged that due to "his prone position and physical restraint by an officer, an element of mechanical or positional asphyxia cannot be ruled out (although he was seen to be yelling and fighting for the majority of the restraint.)"  *Id.* at 35.  Plaintiffs' expert opined that Timpa died due to mechanical asphyxia, and while Defendants' experts disagree, the Defendants assume Plaintiffs' expert is correct for purposes of this motion.  *Id.* at 41; *see* Defs.' Summary Judgment Mot. 23 [150].

## II.  LEGAL STANDARDS

### A.  Summary Judgment Motion

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made the required showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable

MEMORANDUM OPINION AND ORDER – PAGE 8

jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### B. Section 1983 Claims and Qualified Immunity

Section 1983 authorizes plaintiffs to bring claims "against persons in their individual or official capacity, or against a governmental entity." *Pratt v. Harris Co., Tex.*, 822 F.3d 174, 180 (5th Cir. 2012) (internal quotation omitted). A party has a colorable claim under section 1983 if the plaintiff can "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

The doctrine of qualified immunity provides a defense against these claims to government officials who "make reasonable but mistaken judgments about open legal questions" and shields "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 733 (2011). This is an exacting standard. To overcome it, plaintiffs bear the heavy burden of showing that the official both violated a constitutional or statutory right and that this right was clearly established in the law prior to the challenged conduct occurring. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). Courts "do not require a case

MEMORANDUM OPINION AND ORDER – PAGE 9

directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741; *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established.") (emphasis in opinion) (internal quotation omitted).

### III. THE COURT DETERMINES THAT QUALIFIED IMMUNITY BARS ALL CLAIMS RAISED AGAINST THE DEFENDANTS

Plaintiffs allege excessive force,[6] denial of medical care, bystander liability, and supervisor liability claims.[7]  For the reasons below, the Court holds that each of these claims are barred by qualified immunity as against these Defendants.

### A. *Excessive Force Claims*

An official's use of excessive force in effecting an arrest violates the Fourth Amendment's protection against unreasonable seizures and, if established, satisfies the first

---

[6] Plaintiffs devote roughly one page of their response brief to arguing that prone restraints constitute "deadly force" and must be assessed under this subset of excessive force.  Pltfs.' Resp. Brief 29–30 [156].  The Court disagrees.  Plaintiffs cite to one Fifth Circuit case which states that while "guns represent the paradigmatic example of 'deadly force,'" courts have held a variety of "police tools and instruments" may meet that definition.  *Gutierrez v. City of San Antonio*,139 F.3d 441, 446 (5th Cir. 1998).  The Court cites to multiple cases, including a Seventh Circuit case acknowledging prone restraints as deadly force.  *Id.*  The Court does not adopt these positions, however, and there is no Fifth Circuit case that directly holds that prone restraints constitute a form of deadly force.  The closest the Court gets is its holding that hog-tying *may* amount to deadly force.  *Id.*  Rather, there are multiple Fifth Circuit opinions holding that prone restraints do not even constitute excessive force.  *See infra* III.A.1.  Consequently, the Court declines to treat the alleged Fourth Amendment violations as deadly force claims.

[7] Defendants' opening summary judgment brief assumed that Plaintiffs' complaint also alleged an unlawful seizure claim.  The complaint does not expressly raise such a claim, however, and neither Plaintiffs nor Intervenor rebut Defendants' arguments on this point. The Court thus determines that to the extent the complaint suggests an unlawful seizure claim, the Defendants are entitled to summary judgment on it.

MEMORANDUM OPINION AND ORDER – PAGE 10

prong of the qualified immunity analysis. *Pratt*, 822 F.3d at 181. The Fifth Circuit has observed that "overcoming qualified immunity is especially difficult in excessive-force cases." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2018). This is true because in excessive force cases, "the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

Here, the Court determines that Plaintiffs' excessive force claims cannot succeed, even assuming the Defendants' conduct constitutes excessive force, because there was no law clearly establishing Defendants' conduct as a constitutional violation prior to August 10, 2016 — the date that the challenged conduct occurred. The Court consequently does not decide whether Defendants' conduct amounts to a Fourth Amendment violation. *See Pearson*, 555 U.S. at 236 (permitting courts to address the prongs of the qualified immunity inquiry in whichever order they chose and not requiring courts to address both prongs if either is dispositive); *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014).

**1. Fifth Circuit caselaw decided prior to August 2016 does not clearly establish Defendants' conduct as a Fourth Amendment violation —** Conduct is clearly established as a constitutional violation only when there is either (a) binding authority or (b) a robust consensus of persuasive authority sufficient to alert every reasonable officer that the challenged conduct did in fact violate the plaintiff's constitutional rights. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc). The "focus is on whether the officer had fair notice that her conduct was unlawful" and "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543

U.S. 194, 198 (2004) (internal quotation omitted); *see also Mullenix*, 136 S. Ct. at 308 ("[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation.") (internal quotation omitted).

Here, there is no binding authority from either the Supreme Court or the Fifth Circuit holding that prone restraint is a *per se* Fourth Amendment violation or that it is a violation when performed in the manner of Defendants' restraint of Timpa.  *See Castillo v. City of Round Rock*, 177 F.3d 977 (5th Cir. 1999) ("Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest.") (internal quotation omitted).  Rather, of the four most analogous Fifth Circuit cases involving prone restraints that were decided prior to August 2016, the Court held in three of those instances that there was no Fourth Amendment violation.  Plaintiffs rely on the fourth and oldest of these cases, *Gutierrez v. City of San Antonio*, to argue that clearly established Fifth Circuit law prohibits Defendants' restraint used on Timpa.[8]   139 F.3d 441 (5th Cir. 1998).

---

[8] Plaintiffs and Intervenor also suggest that expert testimony and policies and training used by DPD and other law enforcement organizations establishes that Defendants' conduct was clearly established as a constitutional violation prior to August 2016.  Pltfs.' Resp. Brief 28, 33–36 [156]; Intervenor's Resp. 36–39 [164].  While department policies have been held sufficient to create a question of fact as to whether the use of force was reasonable, *Gutierrez*, 139 F.3d at 449–51, these sources are not sufficient to show that conduct was legally established as a constitutional violation.  *Morgan*, 659 F.3d at 371 (requiring either binding legal authority or a robust consensus of persuasive authority to satisfy clearly established law prong).

MEMORANDUM OPINION AND ORDER – PAGE 12

*Gutierrez* is inapplicable to this case, however, whether examined in the context of more recent caselaw or considered in isolation.

*Gutierrez* stands for the "very limited" proposition that officers may use excessive force "when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Id.* at 451. Despite Gutierrez's admission that he had "shot some bad coke," officers hog-tied and placed him face down in the back seat of a patrol car while driving to the hospital, during which time they did not monitor him. *Id.* at 443, 449.

The Court focused specifically on the officers' use of a hog-tie restraint on Gutierrez — a type of restraint that was not employed in this case and one that is arguably more aggressive, as it pulls the feet towards the back and places the legs at a ninety-degree angle in an 'L' shape. *Id.* at 443. Further, the Fifth Circuit explicitly cabined *Gutierrez*'s holdings to its narrow facts, both in that case and in subsequent cases involving hog-tie prone restraints where the Court nevertheless determined that qualified immunity applied.

*Pratt v. Harris County, Texas*, is the most notable such case. 822 F.3d 174 (5th Cir. 2016). Officers encountered Pratt at the scene of a minor accident, where he exhibited bizarre behavior and continued to walk away from the scene despite officer requests that he stop. *Id.* at 178. After Pratt ignored multiple requests and warnings to comply and evaded their attempts to restrain him, the officers deployed their tasers six times. *Id.* Even after being handcuffed, Pratt kicked an officer, prompting an officer to tase him again. *Id.* The officers also placed Pratt in a hog-tie prone restraint. *Id.* at 179. While the Fifth Circuit acknowledged that "hog-tying is a controversial restraint," it emphasized that the *Gutierrez*

MEMORANDUM OPINION AND ORDER – PAGE 13

holding was heavily bound to its specific factual context.  *Id.* at 182.  The Court also found it significant that unlike the officers in *Gutierrez*, the officers in *Pratt* did not know the suspect was on cocaine, and the Court ultimately held that the officers' conduct in *Pratt* was not excessive force.  *Id.* at 182–83.

The Fifth Circuit likewise distinguished *Gutierrez* when it applied qualified immunity in *Wagner v. Bay City*.  227 F.3d 316, 318–20 (5th Cir. 2000).  The suspect in *Wagner* had been belligerent in a restaurant and swung at an officer who was trying to apprehend him.  *Id.* at 318.  After pepper spraying and handcuffing the suspect, who was still struggling, two officers knelt on his back while one "kept pushing [suspect's] neck and head to the ground with a stick."  *Id.* at 319.  When additional officers arrived, the officers placed the suspect in the back of a patrol car on his stomach and transported him to a jail; though he appeared unconscious, the officers did not speak to him or check for injuries. *Id.*

The *Wagner* Court discussed *Gutierrez* in detail, ultimately distinguishing it on the basis that "perhaps most importantly, as defendants note, [decedent] was not 'hog-tied,' and, as a result, the 'very limited' holding of *Gutierrez* cannot support a finding that [the officers] violated clearly-established law."  *Id.* at 322–23.  The Court also noted the absence of cocaine and determined that the use of pepper spray and a choke hold were not clearly established as excessive force.  *Id.* at 321, 323–24.

*Castillo v. City of Round Rock*, decided one year after *Gutierrez*, is also illuminating. 177 F.3d 977 (5th Cir. 1999).  There the Fifth Circuit unequivocally held that there was no excessive force when an officer and male bystander together sat on a prone, handcuffed

suspect's back for four to six minutes while three other officers placed flex cuffs on his legs. *Id.* at \*2. The officer also placed weight on the suspect's neck and head for five to ten minutes. *Id.* During this time, Castillo exclaimed he was going to die. *Id.* The Court held the circumstances — which included Castillo raising a beer bottle at an officer and fighting with him prior to being handcuffed, and kicking and yelling even after being handcuffed and placed in a prone position — merited the force used. *Id.* at \*2–\*4.

On balance, the facts of this case align more closely with those in *Pratt*, *Wagner*, and *Castillo* and differ in critical points from those in *Gutierrez*. Here, Timpa presented a danger to himself and others by running across traffic on Mockingbird Lane, a three-lane road. At least one motorist reported nearly colliding with Timpa and said Timpa also halted and climbed a DART bus. Mansell describing Timpa to the dispatcher as "a danger to himself," and called an ambulance before ever leaving his patrol car. While Timpa was handcuffed, Timpa was nonresponsive to the officer's questions, yelled uncontrollably, and repeatedly attempted to roll into the right lane of the road, ultimately succeeding and necessitating efforts by Mansell and the security guards to move him to safety. And prone restraint was not the Defendants' first resort — they did not roll Timpa over until he again lurched towards the road, after Vasquez and Dillard's arrival.

Even after being rolled onto his stomach, Timpa continued to yell, toss his head, and struggle to move his torso and limbs. He repeatedly kicked at officers. *See Pratt*, 822 F.3d at 184 (underscoring Pratt's "'on again, off again' commitment to cease resisting, recurring violence, and the threat he posed while unrestrained"). Further, paramedics were present during the entirety of the Defendants' roughly fourteen-minute prone restraint of

MEMORANDUM OPINION AND ORDER – PAGE 15

Timpa and never indicated that the Defendants were harming Timpa or that they should move him.  Paramedic Flores specifically declined Dillard's offer to roll Timpa over and indicated that he should not be moved until Paramedic Flores had an opportunity to take his vitals.  And Paramedic Flores was not concerned by Timpa's blood pressure and pulse, which he took roughly five minutes before Defendants ceased the prone restraint. These facts distinguish this case from *Gutierrez*, where the paramedics did not observe the officers' restraint of Gutierrez and where officers hog-tied Gutierrez, placed him face down in the back seat of a patrol car for half an hour, and did not monitor him while he was in this position.

The fact that the Defendants knew of Timpa's cocaine consumption is the biggest factual distinction between this case and *Castillo*, *Wagner*, and *Pratt*.  Because there is a fact question regarding whether Defendants knew Timpa had used cocaine, the Court views the facts in Plaintiffs' favor and assumes that Defendants knew of his cocaine usage at the latest when Timpa responded to Dillard's first inquiries.[9]

Plaintiffs insist that the Defendants' awareness of Timpa's drug use means that *Gutierrez* clearly establishes their restraint of Timpa as unconstitutional.  The Plaintiffs correctly note that in distinguishing *Gutierrez*, the Court in *Pratt* emphasized the officers' unawareness of the decedent's drug use at the time that they used prone restraint and hog-

---

[9] Defendants admit that around the 1:45 mark, the body cam footage does suggest that Timpa replied "coke" to Dillard's initial question "what did you take?"  But Dillard also testified that he did not hear this response and continued to ask Timpa what he had taken. The body cam footage shows the Defendants agreeing later, however, that Timpa was "on something."

MEMORANDUM OPINION AND ORDER – PAGE 16

tying.  But Plaintiffs are wrong to assume that Defendants' knowledge of Timpa's cocaine use is dispositive here.

While the officers in *Pratt* employed hog-tying, the restraint method at issue in *Gutierrez*, Timpa was never hog-tied. This fact is critical.  *Gutierrez* involved the fatal combination of officers who used a hog-tie restraint despite knowledge of the suspect's cocaine consumption.  *Pratt* has already demonstrated that the presence of only one of these factors — even if the primary factor, hog-tying — does not present enough similarity to *Gutierrez* for it to constitute clearly established law.  Adherence to the Fifth Circuit's qualified immunity analysis in *Pratt*, as well as the Supreme Court's frequent exhortation "not to define clearly established law at a high level of generality," means that *Gutierrez* does not govern this case.  *Ashcroft*, 563 U.S. at 742.

Plaintiffs note some ways in which this case differs from *Castillo*, *Wagner*, and *Pratt*.  But it is not enough to merely note dissimilarities between the Defendants' conduct towards Timpa and the conduct in cases where the Court did *not* find a constitutional violation.  This does not meet Plaintiffs' burden to identify law that affirmatively establishes that conduct like Defendants' conduct is unconstitutional.  Here, we have several cases holding similar conduct constitutional and one case self-identifying as a narrow holding that hog-tying may be unconstitutional under specific facts.  And as stated above, the Court cannot read *Gutierrez* as governing this case.  *See also Morrow*, 917 F.3d at 879 ("Cases cutting both ways do not clearly establish the law.").

MEMORANDUM OPINION AND ORDER – PAGE 17

Plaintiffs also argue that Timpa did not resist the officers.[10]  Pltfs.' Resp. Brief 41

[156].  In support, they claim that Defendants "urge only that [Timpa] 'squirmed' at

times"[11] and assert that Defendants' expert testified in a different case that "such

movements" are just reflexive attempts to breathe.  *Id.*   The Court is unpersuaded.

Although Timpa was not struggling for the entire duration of Defendants' restraint of him,

the body cam video and audio shows that he continuously moved and yelled in

contravention of the officers' directives, kicked at Officers Dominguez and Rivera, and

was struggling enough that Paramedic Flores's first attempt to take his vitals was

unsuccessful.  The law clearly established prior to August 2016 does not suggest Timpa's

reaction during his restraint falls short of resistance,[12] particularly in view of *Pratt*'s

---

[10] Plaintiffs briefly mention the custodial death report, which indicated that Timpa did not threaten, hit, or fight officers or resist being handcuffed or arrested.  Pltfs.' Appx. 65–67 [157].  This report, however, was drafted by an officer who was not present at the scene and contradicts the events shown on the body cam videos.  The Court thus holds that it does not create an issue of fact.  *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

[11] Even if the Court were to consider only the comments made by Defendants during their restraint of Timpa and disregard their deposition testimony, the body cam video shows this is not entirely accurate.  Defendants are heard describing Timpa as "a kicker" and frequently request that he "be still" or "calm down."  Defs.' Appx. Ex. A-1 [151].

[12] Plaintiffs cite three cases on the constitutionality of officers' use of force for the proposition that Timpa's conduct constituted "passive resistance" that the Fifth Circuit has found insufficient to justify officers' use of force in other instances.  *Trammel v. Fruge*, 868 F.3d 332 (5th Cir. 2017); *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017); *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009).  Two of these cases were decided after August 2016, the date the Defendants restrained Timpa, and consequently may not be considered in the clearly established law analysis.  *See Morgan*, 659 F.3d at 371 (stating that law must be clearly established "*at the time of the challenged conduct*") (emphasis added).  The

determination that use of prone restraint was not unconstitutional even where resistance was "on again, off again." *Pratt*, 822 F.3d at 184; *see also Estate of Aguirre v. City of San Antonio*, 2017 WL 6803374, at *10 (W.D. Tex. 2017) (concluding that a prone suspect actively resisted police when he "continued to strain and bob up and down . . . when he was face-down on the ground, continued to yell and move his head from left to right, as well as his body"). Courts "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the video." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (internal quotation omitted).

Plaintiffs cite no law for their related argument that any "resistance" was merely Timpa's struggle for air rather than noncompliance. In fact, the Fifth Circuit rejected this same approach when it held that the prone restraint used in *Castillo* was constitutional. *Castillo*, 177 F.3d at *3 ("That Castillo's struggle might eventually have become a panic reaction to his positional asphyxia changes neither its perception to reasonable officers as hostility and resistance to arrest nor the fact that it clearly began as hostile resistance to lawful and reasonable demands of the police."). Even assuming Plaintiffs' description is accurate, the Court is unconvinced by Plaintiffs' citation to an expert's testimony in a different case with different factual circumstances.

---

remaining case differs significantly from the facts of this case and is not dispositive to the Court's analysis. *Deville*, 567 F.3d at 167–68 (qualified immunity did not apply where officer broke car window and forcefully grabbed suspect stopped for minor traffic violation where there was a question of fact as to whether she physically resisted order to exit).

MEMORANDUM OPINION AND ORDER – PAGE 19

Lastly, Plaintiffs reference a 2014 opinion by this Court that held that it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued or incapacitated constitutes excessive force." *Pena v. Dallas Co. Hosp. Dist.*, 2014 WL 12648507 (N.D. Tex. 2014). That case is inapplicable for three reasons. First, the opinion was reversed by the Fifth Circuit, although the circuit's rationale for reversal did not address this Court's excessive force determination. *Pena v. Givens*, 637 F. App'x 775, 779–81 (5th Cir. 2015). Second, this Court's *Pena* decision did not address either *Castillo* or *Wagner*, both of which suggest that within the Fifth Circuit it is not excessive force to place weight on a prone suspect if the suspect resists even after being incapacitated by handcuffs. And third, *Pena* relied on out-of-circuit authority but was decided before the circuit split on this issue became apparent with the Eighth Circuit's decision in *Lombardo v. City of St. Louis*. 2020 WL 1915135 (8th Cir. 2020); *Pena*, 2014 WL 2014 WL 12648507, at *6. Thus, the Court remains unpersuaded that caselaw within the Fifth Circuit clearly establishes Defendants' conduct as unconstitutional.

**2. *Because there is a circuit split on this issue, Plaintiffs' persuasive authority does not pass muster as a "robust consensus" clearly establishing the law —*** The law is not clearly established when "no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue" — even if the split did not develop until after the conduct occurred. *Morgan*, 659 F.3d at 372. When plaintiffs rely on "a consensus of persuasive cases from other jurisdictions" rather than binding authority, the consensus must be "robust." *Morrow*, 917 F.3d at 879. The Fifth Circuit

MEMORANDUM OPINION AND ORDER – PAGE 20

recently explained that it has found even "widespread acceptance" of a doctrine among other circuits insufficient to clearly establish law where "the circuits were not unanimous in its contours or its application to a factual context similar to that of the instant case." *Id.* (quoting *McClendon v. City of Col.*, 305 F.3d 314, 330 (5th Cir. 2002), where the Court held that a six-circuit consensus was insufficient to clearly establish a doctrine).

Plaintiffs' argument that there is clearly established law is primarily supported by citations to cases from the First, Sixth, Seventh, Ninth, and Tenth Circuits.  Each of these cases involved prone restraints followed by fatalities or severe injuries, and each court determined that the restraints did or could constitute excessive force under the facts of the case.  *Champion McCue v. City of Bangor, Maine*, 838 F.3d 55, 64 (1st Cir. 2016); *Estate of Booker v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014); *Abdullahi v. City of Madison*, 423 F.3d 763, 765, 769 (7th Cir. 2005); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061–62 (9th Cir. 2003).  Even if the Court were persuaded that these cases involved facts sufficiently analogous to Defendants' conduct, however, they cannot satisfy the Fifth Circuit's requirement for a "robust consensus" of persuasive authority because there is a circuit split. *Morgan*, 659 F.3d at 372; *see Morrow*, at 917 F.3d at 879.  In contrast to Plaintiffs' cases, the Eighth Circuit recently upheld qualified immunity in an excessive force challenge to prone restraint similar to the restraint Defendants' used on Timpa.  *Lombardo v. City of St. Louis*, 2020 WL 1915135 (8th Cir. 2020).

Officers in *Lombardo* detained the suspect, Gilbert, in a holding cell and attempted to handcuff him after they observed erratic behavior.  *Id.* at 1011.  Gilbert had not informed

MEMORANDUM OPINION AND ORDER – PAGE 21

the officers that he had taken methamphetamine.  *Id.* at 1012.  After Gilbert began to struggle, the officers placed him in a prone position, where he continued to kick and thrash.  *Id.* at 1011–12.  Officers secured his limbs, shoulders, and torso with their body weight for roughly fifteen minutes before he stopped resisting; during this time, Gilbert continued to try to raise his chest up and told the officers to "stop because they were hurting him." *Id.* at 1012.  When they rolled him over, he had ceased breathing.  *Id.*  The Eighth Circuit held that "the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directive and efforts to subdue the detainee." *Id.* at 1013.

So, at best there is a circuit split on the constitutionality of prone restraints when employed as Defendants did here.  *See Lombardo v. St. Louis City*, 361 F. Supp. 3d 882, 905–15 (E.D. Mo. 2019) (providing a detailed summary of the circuit split on this issue).  This is fatal to Plaintiffs' reliance on persuasive authority to argue that there is clearly established law relevant to this case.  Because there is no clearly established law holding unconstitutional restraints analogous to the Defendants' restraint of Timpa, the Court holds that qualified immunity bars the excessive force claims against the Defendants.

### B.  Claims for Denial of Medical Care

"A pretrial detainee's constitutional right to medical care, whether in prison or other custody," is derived from the Fourteenth Amendment.  *Wagner*, 227 F.3d at 324.  When the challenge is based on an official's "episodic acts or omissions," the plaintiff must "prove that the official acted or failed to act with subjective deliberate indifference to the detainee's needs." *Campos v. Webb Co., Tex.*, 596 F. App'x 787, 791 (5th Cir. 2015) (internal quotation omitted).  An "action is characterized properly as an 'episodic act or

omission' case" if "the complained-of harm is a particular act or omission of one or more officials." *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009).

"Deliberate indifference is an extremely high standard to meet." *Campos*, 596 F. App'x at 792. The plaintiffs must show that the officer denied or delayed medical treatment and that this denial "resulted in substantial harm." *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019). Plaintiffs must also prove that the official had subjective knowledge of the risk of harm and subjectively intended that harm to occur. *Tamez*, 589 F.3d at 770; *see also Campos*, 596 F. App'x at 793 ("[F]ailure to alleviate a significant risk that [the official] should have perceived but did not is not deliberate indifference.") (internal quotation omitted).

Plaintiffs'[13] primary arguments boil down to two points: the Defendants physically blocked the paramedics' access to Timpa, and the Defendants failed to follow DPD General Orders, which required that they perform a five-man takedown.[14] Neither assertion is substantiated by the evidence.

The body cam video shows that Paramedic Flores was able to approach Timpa at least three separate times. Defs.' Appx. Ex. 1-A at 2:23–2:38; 8:31–12:32 [151]. At none of these points do any of the Defendants physically block his access to Timpa. In fact,

---

[13] Intervenor's brief does not respond to Defendants' summary judgment challenge to the denial of medical aid claims.

[14] A five-man takedown tactic employs five officers, with "each officer controlling one limb of the subject with the officer's body weight, until the suspect can be handcuffed" and thus does not require weight to be placed on the back of a suspect. Pltfs.' Appx. 54 [157.1].

MEMORANDUM OPINION AND ORDER – PAGE 23

when Paramedic Flores first approaches, an officer warns Dillard, "Don't jump back, you've got a paramedic behind you."[15]  *Id.* at 2:23–2:38.  Importantly, Paramedic Flores's initial inability to assess Timpa was due to Timpa's struggles.  *Id.* at 2:38–2:53; Appx. 213, 254.  Upon Flores's second approach, Dillard asked him, "Do you want me to roll him over?"  Flores responded "Before y'all move him, if I can just get in right here, and see if I can just get to his arm."  *Id.* at 8:32–8:40.  Vasquez replied, "Go ahead, man."  *Id.* at 8:35–8:40.  Flores successfully took Timpa's vitals at this attempt and successfully administered a sedative upon a third approach.  *Id.* at 14:29–14:42.  The Defendants actually assisted the paramedics in lifting Timpa onto a gurney after he was sedated.  *Id.* at 15:33–15:46.  These interactions suggest that rather than physically block the paramedics' access to Timpa, the Defendants attempted to facilitate it.

Plaintiffs also contend that had the officers completed a five-man takedown rather than Dillard's "prolonged stay on Tony's back," the paramedics would have been able to timely access, sedate, and transfer Timpa to a medical facility, which would have saved his life.  This is merely conjecture.  Plaintiffs have provided no evidence that the paramedics' access to Timpa or their ability to administer a sedative and promptly transport him were delayed by the Defendants' prone restraint.  Further, Plaintiffs misstate the requirements of the DPD General Orders.  While General Order 903.01 acknowledges that the five-man takedown is "*an* effective restraining hold for controlling violent suspects," the order does

---

[15] Dillard also actively encouraged Timpa to cooperate with the paramedic, stating "He's trying to help you out, okay? You're doing good, but you need to relax."  *Id.* at 8:44–8:49.

not mandate that officers "must use" or "shall use" this method exclusively.  Pltfs.' Appx. 6 –67 [157.1] (emphasis added).

Lastly, Plaintiffs address Vasquez and Dominguez in particular, claiming their jokes "served no direct purpose in securing Tony or obtaining medical attention."  Pltfs.' Resp. Brief 53 [156].  This allegation misses the mark.  While Vasquez and Dominguez's commentary may have been offensive, their banter and attitude are not evidence that that they "actually drew the inference" that they were doing substantial harm to Timpa by not doing more to obtain medical attention or that they "subjectively intended that harm to occur" to Timpa.  *See Thompson v. Upshur Co., Tex.*, 245 F.3d 447, 458 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.").  Because the evidence is insufficient to establish the elements of a denial of medical care claim, much less rebut the defense of qualified immunity, the Court grants Defendants summary judgment.

### C.  Bystander Liability Claims

To establish a section 1983 claim against an officer on a theory of bystander liability, a plaintiff must establish that the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (internal quotation omitted).  When defendants raise a qualified immunity defense to bystander liability claims, "the inquiry is whether, under the law in effect at the time of the arrest, the officers could have reasonably believed that they were not required to intervene."  *Deshotels v. Marshall*, 454 F. App'x 262, 269 (5th Cir. 2011).

MEMORANDUM OPINION AND ORDER – PAGE 25

Because the Court has already determined that the underlying right was not clearly established in this case, the right to have a bystander officer intervene to prevent a violation cannot be clearly established either. *See Goolsby v. District of Columbia*, 317 F. Supp. 3d. 582, 595 n.3 (D.D.C. 2018) ("If it was not clearly established that the principal officer was violating constitutional rights, it follows that it is not clearly established that the bystander officer should know the officer was violating constitutional rights. Consequently, it would not be clearly established that the bystander officer would be liable for a failure to intervene."); *see also Griffin v. City of Sugar Land, Tex.*, 2019 WL 175098, at *10 (S.D. Tex. 2019) (holding in part that because the plaintiff's excessive force claim was not based on a clearly established right, the plaintiff likewise could not establish bystander liability). The Court thus grants summary judgment on these claims.

### D.  Supervisor Liability Claim

To establish that an officer is subject to supervisor liability, plaintiffs must show that "(1) the supervisor failed to supervise or train the subordinate official; (2) a causal link between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis ex rel v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *McDonald v. McClellan*, 779 F. App'x 222, 227 (5th Cir. 2019) (internal quotations omitted). This usually requires that the plaintiff "demonstrate a pattern of violations and that the inadequacy of the [supervision] is obvious."

Plaintiffs suggest that Mansell showed indifference by looking through Timpa's wallet and phone and "completely abdicated his supervisory role by prematurely leaving the scene" to call Timpa's family.  Pltfs.' Resp. Brief 57 [156].  These actions do not show that Mansell's supervision was obviously problematic and fall far short of meeting the "stringent standard of fault" necessary to prove deliberate indifference.  *McDonald*, 779 F. App'x at 227.  Because Plaintiffs cannot show that any supervisory failure rises to the level of deliberate indifference, the Court grants summary judgment.

## CONCLUSION

Because the Court holds that qualified immunity bars Plaintiffs' excessive force and bystander liability claims and that the summary judgment evidence does not support Plaintiffs' denial of medical care and supervisor liability claims, the Court grants Defendants' motion for summary judgment on qualified immunity.

Signed July 6, 2020.

David C. Godbey
United States District Judge