PLAINTIFF'S EXHIBIT C

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

VICKI TIMPA, Individually, and as        )
Representative of the Estate of ANTHONY  )
TIMPA, and CHERYLL TIMPA Individually    )
as Next Friend of K.T., a minor child    )
                                         )
     Plaintiffs,                         )
                                         )Civil Action No.
vs.                                      )3:16-CV-03089-N
                                         )
DUSTIN DILLARD, DANNY VASQUEZ,           )
RAYMOND DOMINGUEZ, DOMINGO               )
RIVERA, KEVIN MANSELL, GLENN             )
JOHNSON, CRIMINAL INVESTIGATIVE          )
UNIT, LLC                                )
                                         )
     Defendants.                         )


     *************************************************
                         VIDEOTAPED
                      ORAL DEPOSITION OF
                       EMILY OGDEN, M.D.
                      SEPTEMBER 16, 2019
     *************************************************
```

  ORAL DEPOSITION OF EMILY OGDEN, M.D., produced as a witness at the instance of the Intervenor, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of September, 2019, from 1:27 p.m. to 7:05 p.m., before Dana Taylor, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Dallas County Southwestern Institute of Forensic Sciences, 2355 North Stemmons Freeway, Dallas, Texas 75207, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1        A.   Uh-huh.  Yes.  Sorry.
 2        Q.   And you say, in the first paragraph, that it's
 3   your opinion that he "died as a result of sudden cardiac
 4   death due to the toxic effects of cocaine and
 5   physiological stress associated with physical
 6   restraint."  Correct?
 7        A.   Yes.
 8        Q.   And when you talk about the physiological
 9   stress associated with physical restraint, you're
10   talking about the restraint by the Dallas police?
11        A.   Yes.
12        Q.   You state that, in the next paragraph, "The
13   mechanism of death in cases such as this is sometimes
14   referred to as excited delirium syndrome."  Correct?
15        A.   Yes.
16        Q.   Is that a phrase that you are familiar with
17   from your education, or is that a phrase that you've
18   learned while you were at the medical examiner's office?
19        A.   Both.
20        Q.   Okay.  So talking about your education, which
21   I, you know, kind of want to go back and do while we're
22   on that topic, where did you go to medical school?
23        A.   Texas A&M.
24        Q.   And what year did you graduate?
25        A.   2009.
```

Page 22

1  fight.  And then, as in this case, just became
2  unresponsive and died.  So that was my first exposure to
3  it.
4          And then, since then, I've seen several cases
5  being here.
6      Q.  So the first time that you became familiar with
7  the terminology of excited delirium syndrome was here at
8  SWIFS?
9      A.  I believe so.
10     Q.  So that's not something that you learned about
11 at A&M?
12     A.  I could have heard it during my psychiatry
13 rotation.  I -- I don't specifically remember learning
14 about it at that point.
15     Q.  And you don't remember learning it -- about it
16 at the University of South Carolina?
17     A.  No.
18     Q.  So your encounter -- or your residency in
19 forensic pathology, that is sort of like on-the-job
20 training?
21     A.  Yeah, it's -- it's a one-year intensive
22 training in just forensic pathology.
23     Q.  And does it involve textbooks and exams, or is
24 it just the clinical stuff?
25     A.  So it's mostly performing autopsies.  We do

Page 23

1  have two in-service tests during the course of that, and
2  then we take our board examinations following
3  completion, which I am board-certified in anatomic,
4  clinical, and forensic pathology.
5      Q.  Do you recall any of the textbooks or written
6  material that you used in any of your training that
7  addressed excited delirium syndrome?
8      A.  Yes.
9      Q.  And do you remember what that was?
10     A.  DiMaio has a book that I believe is called
11 Excited Delirium Syndrome, and that's the entire book.
12 And then also the Dolinak book will address it.  And
13 then DiMaio has a Forensic Pathology -- or I think it's
14 called Forensic Pathology.  So two DiMaio books and a
15 Dolinak.
16     Q.  Okay.  And are you aware of peer-reviewed
17 written material that refutes the validity of something
18 called excited delirium syndrome?
19     A.  Yes.
20     Q.  Okay.  So you understand there's a dispute, I
21 guess, between Dr. Vincent DiMaio, and others in the
22 world of pathology, as to the validity of that -- of
23 something called an excited delirium syndrome?
24     A.  Yes.
25     Q.  Okay.

1      A.   Which is why I did not feel comfortable putting
2   excited delirium syndrome as a cause of death.
3      Q.   Okay.  And that's why you said "The mechanism,
4   sometimes referred to as" --
5      A.   Right.
6      Q.   Okay.  So correct me if I'm wrong, but it
7   sounds like what you're saying is you've got someone
8   that has exhibited erratic behavior, that was on an
9   intoxicating substance, and that experienced
10  asphyxiation during restraint?
11           MS. GOWIN:  Objection.  Misstates her
12  testimony.
13     A.   I -- yeah, I did not say that he experienced
14  asphyxia during restraint.
15     Q.   (By Ms. Hutchison)  Okay.  Is it your testimony
16  that he did not experience as- -- asphyxia during
17  restraint?
18     A.   I can't say for sure that he did not, but I
19  don't think that was the main precipitating factor in
20  this.  I believe I have a sentence in here that says,
21  "Due to prone position and physical restraint, an
22  element of mechanical or pos- -- positional asphyxia
23  cannot be ruled out."
24     Q.   Okay.
25     A.   However, based on the fact that he is yelling,

1           A.   Yes.
2           Q.   So you don't treat people prior -- I mean, you
3    don't -- you don't treat anybody?
4           A.   Right.
5           Q.   Okay.  So going back to your conclusions that
6    you made, your -- the way you were taught about excited
7    delirium syndrome, or EDS as -- as some people call it,
8    that's not something that occurs outside of the
9    restraint process; correct?
10          A.   It can, but I think that the cases we hear
11   about, because the cases that are going to involve
12   death, they predominantly have some sort of restraint.
13          Q.   Okay.  Are you yourself aware of any death,
14   where someone has been alleged to have been in excited
15   delirium syndrome state, that was not linked to the
16   restraint process?
17          A.   I don't think so.
18          Q.   Okay.  And so when you say -- when you address
19   excited delirium syndrome in your report and you're
20   talking about it being a factor, you're talking about
21   the restraint by the police being a factor in
22   Mr. Timpa's death?
23          A.   Yes.
24          Q.   And so, if it's a factor in his death, if you
25   remove the restraint process, then it was likely that

1  without that?  I can't say that.
2      Q.  Well, are you saying that you believe that, by
3  some sort of massive coincidence, that Mr. Timpa would
4  have died in the manner and in the way and at the moment
5  he did if he had not been being restrained by police?
6      A.  I think he could have died that night getting
7  hit by a car in the middle of the street from the --
8  yeah, I -- I can't say that he wouldn't have died
9  without the restraint.
10     Q.  Okay.  And I understand that.  What I'm trying
11 to set aside is the -- the "could have" thing.  I mean,
12 any -- you -- you could leave here and get hit by a bus.
13     A.  But you're saying "could have."
14     Q.  No, I'm saying -- I'm saying --
15     A.  You're saying "would have."
16     Q.  Yes.
17     A.  I cannot say that he would not have died
18 without the restraint.  I am not going to say that.
19     Q.  Well, you're -- but you are saying that the
20 reason that he died as he did, when he did, was, in
21 part, due to the restraint?
22     A.  Yes.
23     Q.  Do you have an understanding as to the -- well,
24 let me strike -- let me strike that.  Let me rephrase
25 that question.

1            Let me go back to, first of all, the manner of
2     death, homicide.
3          A.   Yes.
4          Q.   What does that mean?
5          A.   So the fact that there was somebody physically
6     on top of him adding to the stress that he was
7     experiencing.  Homicide is basically death that occurred
8     due to another person.  So the fact that there was
9     somebody on top of him, in my mind, in this particular
10    situation, automatically makes it a homicide.
11         Q.   Okay.  That means that one or more of the
12    officers involved in restraining Mr. Timpa contributed
13    to his death?
14         A.   Yes.
15         Q.   And by making that finding, what you're saying
16    is the fact that -- well, strike that.
17              The -- the finding that you did, that one or
18    more of the officers involved in Mr. Timpa's restraint
19    contributed to his death, that was something that was
20    specifically signed off on and agreed to by all of the
21    other medical examiners?
22         A.   Yes.
23         Q.   With respect to the excited delirium syndrome
24    issue, was that a concept that was taught to you
25    specifically by anyone here at the medical examiner's

1      Q.  Okay.  And how much does a body decompose in
2   two-and-a-half days?
3      A.  It's going to depend on a lot of factors.  It's
4   going to depend on temperature.  It's going to depend on
5   how big the person is.  It's going to depend on if they
6   had any sort of infection going on that would raise
7   their body temperature when they -- before they died.
8      Q.  And based on, like I said, everything here,
9   from the time it took him to get to the hospital and
10  then, I guess, ultimately get over here, do y'all -- did
11  y'all put him in a refrigerator when he got here, or a
12  cold room?
13     A.  Yes.
14     Q.  And, based on your experience, how much
15  decomposition would you expect to see in somebody like
16  Mr. Timpa who would -- I guess, immediately went to the
17  hospital and came here?
18     A.  I'd say it was -- it was about what I would
19  expect for two-and-a-half days.
20     Q.  Did you discuss your testimony today with
21  your -- any of your colleagues before coming here?
22     A.  No.
23     Q.  How many death certificates do you think you've
24  signed off on that have had excited delirium as a cause
25  of death?

1  A. It might just be this one.
2  Q. At least the only other one you can recall
3  being involved with was when you were doing your
4  fellowship; is that correct?
5  A. Yes.
6  Q. And other than that, do you remember being
7  involved or even tangently or consulted with on a
8  excited delirium death?
9  A. Yeah. Any time anyone in this office gets one,
10  it's going to go through our -- our pending conference.
11  Q. Have you seen -- or have you seen other death
12  certificates that list excited delirium as the cause
13  that you did not sign off on?
14  A. I don't think anyone in this office is ever
15  going to put excited delirium as a cause.
16  Q. And why not?
17  A. It's -- I mean, it's kind of a vague term that
18  doesn't really get to what happened.
19  Q. And, I guess, your report in this at least
20  lists -- lists that potential -- or I'm sorry. I don't
21  want to -- to misstate what you say.
22      So, I guess, was excited delirium syndrome a
23  cause of death in this case?
24  A. No.
25  Q. No. And so what were the causes of death in

Page 73

1      Q.  Okay.  So you did not hear -- at least on your
2  review of the body cam footage, you did not hear any
3  snoring?
4      A.  No.
5      Q.  How many autopsies do you think you've
6  performed?
7      A.  So about 300 a year since 2013.
8      Q.  And what is based on your -- at least on your
9  training, what is "excited delirium syndrome"?
10     A.  So delirium is a state in which you're having
11  disordered thoughts, hallucinations.  Often times,
12  they'll think people are out to get them.  And then when
13  you add on to that agitation or physical violence,
14  that's what makes it excited delirium.
15     Q.  I know we talked about -- a little while ago
16  about engorging and stagnation.  Do you recall us
17  talking about the engorging and stagnation of blood?
18     A.  Yes.
19     Q.  Did you notice any engorging and stagnation in
20  any of the autopsy photos in this case?
21     A.  I would say that the lividity is, by
22  definition, stagnation of blood.  So on the -- on the
23  back, yes.
24     Q.  Any other place that you saw engorging or
25  stagnation of blood?

Page 76

1    Q.  As a local anesthetic?
2    A.  I don't know that they do that anymore.  I
3  know, when I was in undergrad, that we learned that they
4  used to do that with, like, nasal surgery.  But I didn't
5  know that they still use that.
6    Q.  And, if you know, if a cause of death is
7  excited delirium syndrome, what would be the manner of
8  death in a case like that?
9    A.  It would depend.  So, like, let's say, again,
10 that he's sitting on the side of the curb and -- and --
11 and drops dead.  I still think that he was exhibiting
12 signs of excited delirium syndrome.  But if nobody is
13 physically on him at the time, I'm going to call that an
14 accident.
15    Q.  And, I guess, in your professional opinion, do
16 you think Mr. Timpa would have died if he did not have
17 the police officers on his back?
18    A.  I can't say.  I can say he had a lot of risk
19 factors.
20         MS. HUTCHISON:  Object to the
21 responsiveness to everything after "I can't say."
22    Q.  (By Mr. Addison)  And if the cause of death was
23 cocaine -- I guess, the toxic results of -- of the
24 cocaine in his system, what would the manner of death
25 be?

1     A.   Yes.
2     Q.   Do you know of any specialties at all that take
3  the position that excited delirium is legitimate, other
4  than the pathologists and the emergency room doctors?
5     A.   I don't know.
6     Q.   Do you know if any of the other medical groups
7  contest that excited delirium is a legitimate syndrome,
8  other than pathologists and emergency room doctors?
9     A.   I don't -- I don't think people would want to
10  test this.  I don't think it would be ethical to test
11  this to see if it's a real thing.
12     Q.   So you -- you're not aware of anything that has
13  tested whether or not excited delirium is actually a
14  real thing?
15     A.   I don't know how you would do that, no.
16     Q.   And you're not aware of any scientific method
17  that's ever been used to test whether or not excited
18  delirium is a real thing?
19     A.   Correct.
20     Q.   And with respect to the number of people that
21  have allegedly died from excited delirium, you're not
22  aware of anyone who's ever allegedly died from excited
23  delirium that was not being restrained by the police at
24  the time of death; correct?
25     A.   In my experience of maybe three people, no.

1      Q.   Now, of the people that you're aware of that
2   did die from -- allegedly from excited delirium while
3   they were being restrained by the police, are you saying
4   you have experience of three people that you have
5   performed autopsies on?
6      A.   No.
7      Q.   You have -- what is your experience of three
8   people?
9      A.   So the things that I've heard about either in
10  our conferences or that I've had to sign off on the
11  autopsy.
12     Q.   Now, on the autopsies that you say you've
13  signed off on, you say there are -- I guess there's two,
14  other than Mr. Timpa, that were alleged to have been
15  excited delirium?
16     A.   I -- I am speculating as to the number that I'm
17  saying.  I know there was one when I was a fellow.
18  That, I know for sure.  And I would not have signed that
19  because I was a fellow.
20     Q.   So out of all of the autopsies you've done, the
21  only one you've actually signed off on where it was
22  alleged to have been excited delirium was Anthony Timpa?
23     A.   That's the only one I know, yes.
24     Q.   And how many have you done?
25     A.   Excited delirium or --

1          Q.   Autopsies.
2          A.   -- autopsies?
3               Somewhere around 1,600.
4          Q.   And out of those 1,600 that you've done, have
5     any of those -- did any of those 1,600 die where one of
6     the factors was drug use?
7          A.   Yes.
8          Q.   And, yet, excited delirium was not part of the
9     discussion relating to cause or manner of death?
10         A.   Correct.
11         Q.   And of the one that you think that you might
12    have reviewed when you were a fellow, do you remember
13    when that took place?
14         A.   No.
15         Q.   Do you remember who the physician was that did
16    the autopsy?
17         A.   No.
18         Q.   Do you remember how the person was restrained
19    at the time they died?
20         A.   No.
21         Q.   You say that you have done other autopsies
22    where you have diagnosed -- or not diagnosed -- where
23    you have determined that asphyxia was related to the
24    manner or cause of death?
25         A.   Yes.

```
 1   police was on his back?
 2       A.  Yes.
 3       Q.  Okay.  Back to everybody dies from a heart
 4   stoppage.  So, I mean, saying that he died because his
 5   heart stopped doesn't really tell you anything?
 6       A.  No.  No, that's what --
 7       Q.  Okay.
 8       A.  Yeah, I -- I didn't -- I don't like putting
 9   that, and it's not typical of me to put "sudden cardiac
10   death" because I hate it when people put "cardiac
11   arrest" because that tells me nothing.
12       Q.  Right.
13       A.  So...
14       Q.  Okay.  And so the fact that Mr. Timpa died from
15   a cardiac arrest doesn't really educate you on the cause
16   or manner?
17       A.  Right.  If it had just said that, that tells me
18   nothing.
19       Q.  So with respect to excited delirium syndrome,
20   what is your understanding of what the odds are that
21   anyone would die from that without being physically
22   restrained by the police?
23       A.  I don't know the answer to that.
24       Q.  And you don't know the number of people who
25   have died in police custody from excited delirium
```