DANIEL WOHLGELERNTER, M.D

2299 Century Hill<br>
Los Angeles, CA. 90067<br>

_____

phone (310) 729-2202<br>
Fax (310) 492-9793<br>
Email: drdan@iheartdrdan.com

December 20, 2022

Geoff J. Henley
HENLEY & HENLEY, P.C.
2520 Fairmount Street
Suite 200
Dallas, Texas 75201

Re:  Timpa, et al v. Dustin Dillard, et al
CIVIL ACTION NO. 3:16-cv-03089-N

Decedent:  Anthony Alan Timpa    dob: 6-05-1984

Date of incident:  8-10-2016

Dear Attorney Henley :

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the director of the ICU and CCU at Providence- St. John's Hospital in Santa Monica, CA, and in my current position as Section Chief of Cardiology at Providence-St. John's.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of pathophysiology of cardiac arrest and specific types of arrhythmia, known as asystole & PEA (pulseless electrical activity), associated with cardiac arrest.  The knowledge base that I utilize has been formed by my 35 years of clinical practice and experience,  and my previous and ongoing review of clinical and experimental literature.

In November, 2022,  I was retained as an expert to review relevant materials and provide expert opinion on this matter, date of incident, August 10, 2016 and to consider and render expert opinion on whether the restraining process was contributory to the death of Mr. Anthony Timpa , and to rebut alternative opinions and theories regarding the cause of death.

I have reviewed the following materials:

1. plaintiff's complaint
2. Medical Examiner records, with autopsy report & autopsy photos
3. Dillard's Answer to Plaintiff's Complaint
4. Mansell's Answer to Plaintiff's Complaint
5. Rivera's Answer to Plaintiff's Complaint
6. Dominguez's Answer to Plaintiff's Complaint

force, and sedation, ultimately culminating in the death of the individual. There are no findings at autopsy that indicate ExDS as a cause of death, and if drugs are found in the toxicology screen, they are typically stimulants, and at recreational, rather than overdose, levels.

The diagnosis of ExDS is highly controversial when it is named as the primary cause of death in cases in which there is a history of restraint at the time of death. The symptoms of ExDS (agitation and delirium) are triggers for use of force and restraint by law enforcement, and use of force by law enforcement can be associated with increased risk of death due to positional/compression asphyxia.

Strömmer EMF, Leith W, Zeegers MP, Freeman MD. "The role of restraint in fatal excited delirium: a research synthesis and pooled analysis." Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92. The results of this study indicated that a diagnosis of ExDS and potentially fatal restraint are inextricably interwoven, and, that in the absence of aggressive restraint (i.e., manhandling, hog-tying, handcuffing), there is no evidence that ExDS is a stand-alone fatal condition. ExDS has been repeatedly rejected as a valid diagnosis by the American Medical Association, and the publishers of the DSM-5, the American Psychiatric Association. Indeed, in June of 2021, the American Medical Association formally announced their opposition to the diagnosis of ExDS.

**Cardiovascular disease**

The post-mortem examination of Mr. Timpa's heart revealed cardiomegaly (enlargement of the heart) and mild hypertrophy (increased thickness of heart muscle).

While the heart conditions found at autopsy are commonly linked to morbidity and death in the general population, the changes in Mr. Timpa's heart were likely present and evolving for many years, and do not indicate a significant increased risk of sudden cardiac death, in the absence of the restraint related asphyxia. There is no available medical information that indicates that Mr. Timpa was at imminent risk of any cardiac event at the time of his fatal encounter with the Dallas police. Moreover, the fact that the cardiac rhythm at the time of cardiac arrest was either PEA or asystole is incompatible with the theory that underlying heart disease was the culprit. The hypothesis that heart disease caused the cardiac arrest would only be plausible if the cardiac monitor at the time of the cardiac arrest showed ventricular tachycardia or ventricular fibrillation. PEA and asystole generally occur from underlying non-cardiac etiologies, whereas a ventricular arrhythmia ( VFib or VTach) occurs from a primary cardiac etiology.

**REBUTTAL OF OPINIONS EXPRESSED BY DR. MARK KROLL**

In his opinion report, Dr. Kroll states the following: "There are 3 intuitively appealing and often accepted theories for arrest-related and custodial deaths that are simply not supported by the peer-reviewed scientific literature. These are : compression asphyxia, restraint asphyxia, and positional (prone) asphyxia. They are basically 3 flavors of the same fundamental theory and they are all unsupported. Some continue to preach the anachronistic myth that prone positioning interferes with breathing. No matter how many studies have refuted this, it continues to be brought up."

The studies that Dr. Kroll cites do not replicate real-world conditions, in that these studies use healthy volunteers with a known testing endpoint; not a real-life struggle involving a person already in a compromised physiological state with an elevated need for oxygen. The experimental settings in the studies cited by Dr. Kroll have attempted to reproduce the impact of prone restraint; however, these experiments were performed on healthy volunteers. By contrast, agitated individuals, like Mr. Timpa,

are in a state of heightened oxygen demand and may have some element of preexisting metabolic acidosis. Restraint in the prone position may exacerbate these conditions via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to pulseless electrical activity (PEA) and asystolic cardiac arrest. Several studies mentioned by Dr. Kroll have focused on attempts to replicate prone restraint situations to assess an individual's capacity for ventilation under these conditions. These experimental, controlled models are limited by their inability to replicate real-world conditions and the uncontrolled situations in which prone restraint would ordinarily be applied. Most subjects in these experiments were healthy and not in a "fight-or-flight" state that would most likely occur during a confrontation with law enforcement officers. Data from trials involving healthy subjects in a controlled situation cannot be applied to an uncontrolled situation such as with Timpa who had cocaine in his system, and was involved in intense physical activity and, consequently, had an elevated need for oxygen, as a result of increased oxygen demand, and had need for unrestricted ventilatory function so as to have proper respiratory compensation for metabolic acidosis.

In addition to the Campbell article cited previously ("Thoracic weighting of restrained subjects during exhaustion recovery causes loss of lung reserve volume in a model of police arrest"), published trials from other groups identified significant decreases in lung capacity among participants held in a prone position. Parkes reported an average 24% drop in FVC (forced vital capacity) and a 27% drop in FEV1 (forced expired volume in one second) in a cohort of 14 healthy volunteers positioned in prone restraint. These findings were described as "significant." One participant in this study experienced a 57% drop in FEV1. The summary of this article states the following: "Small but significant numbers of people die during restraint following violent incidents. We used a repeated measures design to compare lung function in four restraint positions with a standing control position. Participants restrained flat on the floor, prone or supine, showed non-significant reductions in forced vital capacity (FVC) and forced expiratory volume FEV1 compared with the standing control position. Participants restrained face down with the body weight of the restraining persons pressed on their upper torso and/or in a flexed restraint position showed a significant reduction in lung function (mean reductions in FVC of 23.8% and 27.4% respectively). Some, but not all, prone restraint positions show significant restriction of lung function."

( Parkes J. "Sudden death during restraint: do some positions affect lung function?" Med Sci Law 2008; 48:137–141)

The opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

*Daniel Wohlgelernter* 

DANIEL WOHLGELERNTER, MD, FACC

8