

Mr. Geoff J. Henley
Henley & Henley, P.C.
2520 Fairmount Street, Suite 200
Dallas, Texas 75201

January 10, 2023

Report of Martin J Tobin MD, Professor of Medicine,
Loyola University of Chicago Stritch School of Medicine, PO Box 1356, Hines, IL 60141

Dear Mr. Henley,

This report contains my opinions on the case of Vicki Timpa et al. v. Dustin Dillard et al; No. 3:16-CV-03089-N. I have been retained by Henley & Henley, P.C., Dallas, and charges for my time are being donated to *Lamp for Haiti* charity. In reaching my opinions, I read the documents and watched the videos listed in Appendix #1. Appendix #2 contains a listing of timed events based on my viewing of the videos.

On Wednesday, August 10, 2016, Sergeant Kevin Mansell was assigned the case of Mr. Tony Timpa at 22:30:34 hours (Sergeant Mansell deposition). Sergeant Mansell arrived at the scene at 22:37, appended the call at 22:38:51, and team 533 arrived at 22:40. Five officers of the Dallas Police Department participated in the restraint of Mr. Timpa: Officer Dustin Dillard, Officer Danny Vasquez, Officer Domingo Rivera, Corporal Raymond Dominguez, and Sergeant Mansell. The timing of events listed in my report are not in actual real time but are instead based on the times of the Axon body camera of Officer Vazquez, which commenced recording approximately 38 seconds earlier than the body camera of Officer Dillard and 2 minutes 24 seconds before the body camera of Officer Rivera.

## Pivotal elements and utterances in the timeline

00:51   Mr. Tony Timpa: "You're gonna kill me. You're gonna kill me. You're gonna kill me"
01:27   Officer Dillard and Officer Vazquez turning Mr. Tony Timpa prone
01:28   Officer Dillard and Officer Vazquez have turned Mr. Timpa prone
             Off. Dillard's two hands and Off. Vazquez's left-hand press on Mr. Timpa's torso
01:29   Off. Dillard places his left knee on Mr. Timpa's torso, and it remains on Mr. Timpa's
                   torso until 15:36 (with exception of 3-sec interval between 14:29 and 14:32)
          Off. Vazquez places his left knee on Mr. Timpa's torso, and it remains on
                   Mr. Timpa's torso until 4:06
02:14   Off. Dillard places his right knee on Mr. Timpa's torso, and it remains on
                   Mr. Timpa's torso until 03:27
02:28   Paramedic visible in the frame (until 02:52)
03:02   Officer: "Don't need to be squirming man"
03:10   Mr. Timpa: "Please leave my feet alone"
04:28   Off. Vazquez working on handcuffs
05:43   Cpl. Dominguez and Off. Rivera restraining Mr. Timpa's legs
06:02   Officer: "He's squirming way too much"
06:09   Officer: "Stop, Tony, stop. You're going to have to stop squirming"
07:18   Mr. Timpa: "It hurts. Please take it off"

In their September 1999 commentary, Dr. Reay and Dr. Howard pointed out:
> "We still have concern regarding deaths that occur during restraint. From the work of Chan, we now know that the hogtied position should not produce serious physiological consequences. However, during street restraint maneuvers, the totality of events must be considered. In the process of rendering a person helpless to handcuff him or her in a prone position, the involved officers may be required to pile on the suspect, pinning the person to the ground with the partial or full weight of the officers and thus compressing and restricting ventilatory function. The physical condition of the person and the circumstances of restraint can make a difference, and each case must be evaluated with a careful consideration of events to identify respiratory interference during and after the takedown person is restrained" *(Reay-Howard-AJFMP-1999)*.

Dr. Reay became aware that his San Diego testimony was being misrepresented, and he sent a notarized statement to Ms. Charly D. Miller, which contained the following:

> "I readily acknowledged the value of these studies in the San Diego case of "Price vs. San Diego" which had many other features besides hog-tying in the restraint maneuvers used to control the victim. This has since been presented in law enforcement publications as my retraction of positional asphyxia as a cause of death, with particular reference to hogtying. Such is not the case! I still maintain that there are risks and hazards to restraint maneuvers including hog-tying and each case must be evaluated to assess the presence or absence of respiratory restriction in the light of the method of restraint. …
> The point is that street deaths are much different than controlled investigations. If 14% respiratory restriction by hog-tying is not viewed as clinically significant in normal people, it has to be evaluated in the context of the event where it may be significant" *(Reay-Miller-1998)*.

These commentaries by Dr. Reay are easily retrieved through the Internet, and it is difficult to understand why experts in legal cases defending police continue to misrepresent Dr. Reay's stance on positional asphyxia.

E.  **Excited delirium syndrome and misattributions**

In his expert report and during his deposition, Dr. Bird claims that Mr. Timpa's death was caused by excited delirium syndrome. Excited delirium syndrome is frequently offered as a reason for deaths in persons detained by police, yet proponents are unable to provide a credible explanation for how this syndrome causes a person to die. A number of putative processes have been invoked, such as abnormal dopamine function, heat-shock proteins, or myocardial channelopathy, but proponents have not presented credible scientific data for how these processes are the cause of sudden death among detainees in police custody *(DiMaio-Book)*.

On page 30 (line 8) of his deposition, Dr. Bird stated:
> "Excited delirium has been known for over150 years and it's been known as other things such as Bell's Mania."

This statement is factually incorrect. Dr. Luther Bell was superintendent of the McLean Asylum for the Insane (a division of the Massachusetts General Hospital) between 1837 and 1858. In 1849,

Dr. Bell reported in the *American Journal of Insanity* that he had seen 40 cases of a grave form of mania across 12 years *(Bell-1849)*. He reported details of 10 case histories, involving 6 men and 4 women. The case histories exemplified mania of sudden onset combined with disorientation, confusion, and fluctuating consciousness characteristic of delirium. Three quarters of Dr. Bell's patients died, and autopsy did not reveal a convincing underlying cause. The duration of delirious mania in 6 patients (described in case histories) ranged from 12 days to 8 weeks (average duration, 25.5 days) *(Bell-1849)*. Dr. Bell's description of death occurring 25 days after hospital admission is diametrically different from individuals reported to have excited delirium who exhibit mental distress for only a matter of hours and die minutes after the application of restraint *(DiMaio-Book)*.

In the 170 years following Dr. Bell's article, few authors have reported on this condition. In 1980, Thomas Bond, MD, (Department of Psychiatry, McLean Hospital, Harvard), reported 3 case histories of patients with "acute delirious mania" distinguished by acute onset of irritability, insomnia, emotional withdrawal, features of hypomanic or manic syndrome (as defined by DSM-III criteria), and development of signs and symptoms of delirium *(Bond-AGP-1980)*. None of Dr. Bond's patients died. In 1999, Max Fink MD (Department of Psychiatry, SUNY Stony Brook), described 14 patients with "delirious mania," who featured acute onset of excitement, grandiosity, emotional lability, delusions, insomnia, disorientation, and altered consciousness *(Fink-BD-1999)*. None of Dr Fink's patients died. The clinical descriptions of acute delirious mania by Dr. Bond, Dr. Fink (and Dr. Bell) are completely different from the clinical description of detained individuals reported to have excited delirium syndrome *(DiMaio-Book)*.

No other example arises in the broad expanse of medicine where physicians base present-day scientific claims on a 170-year-old poorly documented clinical case series. The precise mechanism of death of Dr. Bell's patients is unknown. Subsequent reports of unexpected deaths in psychiatric patients document a high rate of institutional neglect *(Derby-PQ-1933; Davidson-AJP-1934; Shulack-PQ-1938)* and missed fatal diagnoses *(Regestein-JAMA-1977; Funayama-PM-2018)*. Many important medical disorders now recognized as causes of unexpected death in psychiatric patients *(Derby-PQ-1933; Davidson-AJP-1934; Shulack-PQ-1938; Regestein-JAMA-1977; Funayama-PM-2018)* had not been described in 1849. Descriptions of venothromboembolism and pulmonary embolism were first presented in the late 19th century *(McFadden-Ochsner-2002)*, histological methods for the diagnosis of myocardial infarction were introduced around the same time *(Jennings-Circ-Res-2013)*, and the sphygmomanometer necessary for documentation of blood pressure in the diagnosis of septic shock was not invented until 1896 *(O'Brien-JHH-1994)*. These and many other diseases could not have been detected in the poorly documented autopsies performed on Dr. Bell's patients in the 1840s. To equate death of detainees in police custody in the 21st century to the nature of death in Dr. Bell's patients of the 1840s far exceeds the bounds of scientific credibility.

Two groups of physicians make a diagnosis of excited delirium syndrome more than other doctors: medical examiners (pathologists) and emergency room physicians. Because every patient seen by a medical examiner is already dead, research investigations into the lethality of some medical condition are especially vulnerable to test-referral bias, a treacherous hazard in the design of scientific experiments *(Tobin-ICM-2006)*. Without explicit documentation of deliberative steps taken to ensure that test-referral bias did not occur, the scientific validity of medical-examiner conclusions on the mechanism of death in excited delirium syndrome is subject to major doubt *(DiMaio-Book; Stephens-AJFMP-2004)*.

Although articles on excited delirium are frequently written by emergency room physicians, such as Dr. Bird, these clinicians see relatively few patients with the general condition of delirium, as contrasted with intensive care physicians. About ⅓ of ICU patients exhibit delirium, and ½ to ¾ of patients on a mechanical ventilator exhibit delirium *(Wilson-Ely-Delirium-Nat-2020)*. In contrast, delirium is observed in 0.59% of patients seen in an emergency room *(Miner-AEM-2018)*.

Delirium is triggered by multiple factors in critically ill patients, such as sepsis, stroke, liver failure, drug use, surgery, and psychological stress *(Wilson-Ely-Delirium-Nat-2020)*. Patients exhibiting delirium may recover completely (usual outcome), transition to another organic brain syndrome or a non-organic mental disorder (schizophrenia, a rare event), or die *(Lipowski-1980-Kaplan-Textbook-p1368)*. If a patient dies during a bout of delirium, the underlying organic cause of death is expected to be uncovered by clinical assessment or autopsy (such as sepsis and its source) *(Lipsedge-MSL-2016)*. In other words, hospital and ICU patients die *with* delirium – not *because of* delirium.

Major medical organizations, such as the American Medical Association (AMA) and the World Health Organization (WHO), advise physicians not to employ the term excited delirium syndrome, arguing that it is not a sound medical diagnosis. The term, however, is still employed by some attorneys. Moreover, courts of law perform a gatekeeper function regarding the "admissibility" of expert testimony, based on whether the methodology of an expert is scientifically valid and can properly be applied to the facts in a case *(Daubert standard) (PHR-2022)*. Many courts (i.e., the presiding judge) have ruled that expert testimony on excited delirium syndrome should be *admitted* as *evidence* at trial—the onus then being on the opposing attorney to argue against the *persuasiveness* of the theory as credible evidence *(PHR-2022)*. When plaintiff attorneys have sought to exclude testimony on excited delirium syndrome, courts have pointed to three communities that generally accept it as a diagnosis: the American College of Emergency Physicians (ACEP), the National Association of Medical Examiners (NAME), and police departments *(PHR-2022)*.

In 2009, an ACEP Task Force published *The White Paper*, which made two major claims: excited delirium syndrome is a real medical disorder, and its diagnosis can be made when patients display 6 of 10 listed signs *(DeBard-2009)*. In June 2021, a new Task Force published a new report, stating that ACEP no longer recommended use of the term excited delirium *(Cole-ACEP-2021)*. In 2004, the National Association of Medical Examiners (NAME) published a Position Paper on certification of cocaine-related deaths and the role of excited delirium syndrome in causing such deaths *(Stephens-AJFMP-2004)*. This Position Paper provided a foundation that fostered the attribution of sudden death of detainees in custody to excited delirium syndrome by a growing number of medical examiners. In 2022, NAME president, Dr. Kathryn Pinneri, reversed its previous position *(PHR-2022)*, stating that

> "as an organization [NAME has] not formally 'recognized the condition [excited delirium syndrome] as a diagnosis.' The NAME Position paper on the Certification of Cocaine-Related Deaths *(Stephens-AJFMP-2004)* is no longer current and therefore does not reflect our position at this time" *(PHR-2022)*.

Critics of excited delirium syndrome focus primarily on the validity of the diagnosis, citing organizations such as the AMA, WHO, and the American Psychiatric Association (APA) and other bodies who proclaim that it is not a legitimate diagnosis. While I agree with this criticism, the labeling of the entity is not its greatest problem. Instead, the fundamental problem is the inability of proponents of excited delirium syndrome to explain how a non-organic (psychiatric-mental) disorder can cause somebody's death. Only two psychiatric conditions are known to cause death: anorexia nervosa, a chronic condition where death consequent to self-starvation is easy to understand, and lethal catatonia, an extremely rare psychiatric disorder, formerly viewed as universally fatal, but, given the survival of many present-day patients, the disorder is currently termed malignant catatonia *(Castillo-AJP-1989; Daniels-NCN-2009)*. Writing on death of patients with delirium, the noted London psychiatrist, Dr. Maurice Lipsedge, emphasizes

> "the cause of the patient's death is not their psychiatric disorder or their agitated behaviour, but a grave underlying medical condition."

Lipsedge adds that

> "in the absence of an underlying physical cause for an acute behavioural disturbance," a claim that "delirium" is the cause of death becomes self-contradictory" *(Lipsedge-MSL-2016)*.

The distinction between organic disorders and non-organic (functional) psychiatric disorders is crucial in understanding causation of death in persons who are suspected to have excited delirium syndrome or a related condition. By definition, there is no identifiable underlying organic pathological disease in patients with a primary functional psychiatric condition *(Lipsedge-MSL-2016)*. Dr. Barnard, Dallas Chief Medical Examiner, is apparently unaware of this crucial distinction. On page 126 of his deposition, Dr. Bernard stated:

> "someone has an organic disease such as schizophrenia."

Schizophrenia is emblematic of functional psychiatric disorders and is not an organic disease.

The most detailed research study on excited delirium syndrome is that conducted by Dr. Strömmer and colleagues and published in August 2020 – subsequent to the expert reports and depositions in the Timpa case *(Strömmer-FSMP-2020)*. After searching the world literature, these investigators identified 168 published cases of excited delirium syndrome. Of the total 168 cases, 104 died (62%) and 64 survived (38%). Among the 104 deaths, some form of restraint was documented in 90%, and there was documentation of no restraint in only two deaths (2%). Based on their rigorous scientific analysis, Dr. Strömmer and colleagues concluded that use of restraint was the key factor in deciding whether or not somebody with excited delirium lived or died *(Strömmer-FSMP-2020)*.

## References (listed in the order first cited in this report)

Nolan JP, Soar J, Cary N, Cooper N, Crane J, Fegan-Earl A, Lawler W, Lumb P, Rutty G. Compression asphyxia and other clinicopathological findings from the Hillsborough Stadium disaster. Emerg Med J. 2021 Oct;38(10):798-802.