

Steven B. Bird, MD
6 Laurel Ridge Ln
Shrewsbury, Massachusetts 01545

November 1, 2019

Lindsay Gowin
City of Dallas
Dallas City Attorney's Office
1500 Marilla St, 7DN
Dallas, TX. 75201

Dear Ms. Gowin:

    I will begin my report by briefly summarizing the details of the case, then analyze and discuss the relevant issues and render my opinions. My opinions are based on my knowledge, experience and training in the fields of emergency medicine and medical toxicology, and a review of the records and other documentation. They are subject to revision should further information become available.

    I earned my Bachelor of Science degree in biology *cum laude* in 1991 from Yale University, where I was named a Yale University Richter Fellow. I worked in the laboratory of Professor Sydney Altman, Dean of Yale College and winner of the 1989 Nobel Prize in Chemistry. I was awarded my Doctor of Medicine degree by Northwestern University in 1995 and was also elected to the *Alpha Omega Alpha* national medical honor society (generally awarded to the top 10% of medical students nationally). Following medical school, I gained post-graduate training through residencies with the Naval Hospital San Diego (surgery) and the University of Massachusetts Medical School (emergency medicine). In addition, I completed a two-year fellowship in medical toxicology at the University of Massachusetts Medical School in 2004.

    I began my independent clinical career in the Department of Emergency Medicine at the University of Massachusetts Medical School in 2002. I was promoted to Assistant Professor of Emergency Medicine in 2004, to Associate Professor in 2010, and to full Professor in 2016. In addition, from 2012 until August 31, 2019, I served as Program Director of the Emergency Medicine Residency Program and as Vice Chair of Education for the Department of Emergency Medicine at the University of Massachusetts Medical School. I currently am the Chief Experience Officer (CXO) of UMassMemorial Healthcare and the University of Massachusetts Medical School. I work as an Attending Emergency Physician at the University of Massachusetts Medical Center, Marlborough Hospital, and Clinton Hospital. I am actively involved with numerous professional committees within the University of Massachusetts Medical School and its Department of Emergency Medicine and Division of Medical Toxicology, and in national and international scientific organizations, such as the Society for Academic Emergency Medicine, the American College of Emergency Physicians, and the American College of Medical

observed in the Ho study. In the heavy bag group, the baseline lactic acid was 1.44, which increased to 15.46 immediately after exercise, 17.22 at 2-minutes, and 17.33 at 10-minutes post-exercise.

In 1999 Hick published a case series of 5 restraint-associated deaths and briefly described 5 cases who did not die (Hick JL *et al*. Metabolic acidosis in restraint-associated cardiac arrest: a case series. Acad Emerg Med 1999;6:239-43). In the one fatality in which the patient was not intubated and ventilated (that is, put on a breathing machine), a blood gas analysis immediately upon cardiac arrest revealed a pH of less than 6.8, $pCO_2$ of more than 100 mm Hg, and non-detectable serum bicarbonate. Data from their other cases revealed similar severe acidosis, but because the patients were placed on breathing machines (or the blood gas analysis was done several minutes later), one cannot reliably comment on the $pCO_2$ results.

In other medical literature, both Reay (Reay DT *et al*. Positional asphyxia during law enforcement transport. The American journal of forensic medicine and pathology 1992;13:90-7) and Bell *et al*. (Bell MD *et al*. Positional asphyxiation in adults. A series of 30 cases from the Dade and Broward County Florida Medical Examiner Offices from 1982 to 1990. Am J Forensic Med Pathol 1992;13:101-7) have described a phenomenon sometimes called ''positional asphyxiation'', in which patients suffer a cardiac arrest while restrained. Importantly, Chan (Chan T *et al*. Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 2004 Sep;25(3):185-9) have shown that simply lying in the prone position with hands and feet tied together (known as a hog-tie) does not significantly change respiratory dynamics. Furthermore, similar hog-tie restraint with 50 pounds of weight on the back also does not change the ability to breathe. Lastly, there is no evidence to support a contention that had Mr. Timpa been placed on his back and had his extremities restrained that those actions would have prevented his death.

At no time in the videos, can Mr. Timpa be heard saying, "I can't breathe." In my experience, patients that are at risk of sudden death due to a metabolic acidosis without the ability to adequately ventilate (breathe) off the carbon dioxide say, "I can't breathe." Mr. Timpa can be heard yelling, grunting, and making other vocalizations throughout the video. But he never says, "I can't breathe."

According to Mr. Timpa's mother, he had been to a psychiatric appointment on the day of his death. Further details of Mr. Timpa's psychiatric disorders are not known to me. Since the early 1800s, it has been recognized that patients with severe untreated psychiatric disturbances such as schizophrenia can suddenly die. Calmeil's report of an uncommon, but life-threating psychosis with extreme hyperactivity and mounting fear leading to exhaustion and death was published in 1832. This was followed in 1849 by a report by Bell in which he described a clinical condition consisting of delusions, hallucinations, hyperactivity, and fever that had a 75 percent mortality rate. This has been termed "Bell's mania." Much more common in the pre-neuroleptic era of medicine (that is, before effect antipsychotic medications were available), authors found it remarkable that autopsies of these patients failed to reveal any clues to etiology or the cause of death. Beginning in the 1950s, the advent of neuroleptic drugs like chlorpromazine transformed psychiatric practice and reduced the incidence of Bell's Mania in institutionalized and unmedicated patients. However, the emergence of crack cocaine in the 1980's lead to a series of

6

case reports describing sudden death in cocaine users with extreme behavioral abnormalities similar to what had been reported by Bell and others 150 years earlier.

Sudden and unexpected arrest-related death in the context of police use of force has been discussed for more than 30 years in the medical literature. Studies of these deaths began in the 1980s when Wetli and Fishbain noticed likenesses in the presentation of individuals intoxicated with cocaine who died during police restraint, such that they believed a new syndrome had been identified (Wetli CV and Fishbain DA. Cocaine-induced psychosis and sudden death in recreational cocaine users. Journal of Forensic Sciences, 1985;30:873-90). Wetli and Fishbain coined this syndrome excited delirium, which has since been defined as "… a state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, hostility, exceptional strength and endurance without apparent fatigue." (Morrison A and Sadler D. Death of a Psychiatric Patient During Physical Restraint. Excited Delirium – A Case Report. Med Sci Law 2001;41:46-50). Individuals who suffer restraint-related death are nearly all males, with a mean age of in the early 30s years. While many men are intoxicated with cocaine and/or methamphetamines at the time of their death, it is recognized that in many cases the cause was not cocaine, but rather underlying psychiatric illness (Hall CA *et al*. Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: Descriptive evaluation of a prospective, consecutive cohort. J Forensic Legal Med 2013;20:102-7). In the BWC footage, Mr. Timpa can be heard referring to the police officers as "officer" and saying things like "Don't kill me." Given this and the circumstances of the evening, I do not think that the police officers could have or should have been expected to recognize that Mr. Timpa was in a state of excited delirium.

The precise mechanism of lethality in excited delirium or Bell's Mania is unknown. There are some molecular hypotheses that loss of brain dopamine transporter function can trigger a lethal cascade of neural activities that progress to asphyxia and sudden cardiac arrest in the setting of severe acidosis.

During the autopsy of Mr. Timpa, no injuries to his neck were identified. The lack of any injury to his neck is consistent with BWC footage of the struggle and restraint. No "carotid hold" or any force at all was ever applied to Mr. Timpa's neck. Other than the superficial contusions and abrasions, the only other physical abnormality identified at autopsy was an enlarged heart (likely due to his chronic cocaine use).

Blood tests did reveal high concentrations of cocaine at autopsy. The medical examiner's autopsy report states that Mr. Timpa died as a result of the toxic effects of cocaine in conjunction with the physiologic stress of restraint. Further conditions that, in my opinion, lead to his death include excited delirium, and physiologic stress caused not only by the police restraint but also the anxiety-inducing circumstances surrounding his situation. Furthermore, Mr. Timpa was in a state of extreme physiologic and psychiatric stress before the officers ever arrived. The restraint was necessary for Mr. Timpa's immediate safety. The alternative would have been to allow Mr. Timpa to continue running into traffic, thereby endangering himself and others. The police officers, therefore, faced a choice between real and immediate danger to Mr. Timpa's life, and a statistically unlikely result of non-violent restraint.

Mr. Timpa had undoubtedly used cocaine sometime proximate to his death. Shortly before his death, Mr. Timpa told Mr. Johnson that he had used cocaine. The half-life of cocaine in the blood is on the order of 60-90 minutes (Stephens BG *et al*. Criteria for the interpretation of cocaine levels in human biological samples and their relation to the cause of death. Am J Forensic Med Pathol 2004;25:1-10). Cocaine is typically detectable for approximately 12 hours after use, while benzoylecgonine (the major metabolite of cocaine) is detectable for approximately 48-72 hours (Verstraete AG. Detection times of drugs of abuse in blood, urine, and oral fluid. Ther Drug Monit 2004;26:200-5). A wide range of blood and urinary cocaine and cocaine metabolite concentrations are observed following cocaine use. While it is generally true that cocaine concentrations do not correlate well with symptoms, Mr. Timpa told Mr. Johnson that he had used cocaine, and Mr. Timpa was acting irrationally and recklessly. These are consistent with recent cocaine use and cocaine intoxication. Further support for my opinion that Mr. Timpa used cocaine and that cocaine use was the likely cause of his enlarged heart, is the fact that Mr. Timpa had been to drug rehab several times. According to Mr. Timpa's girlfriend, the most recent rehab stay was from June 5-12, 2016. She also stated that he admitted to using cocaine, marijuana, methamphetamines, and un-prescribed Xanax.

## SUMMARY AND OPINION

Based upon all available records, my education, my training, and my experience, it is my opinion with a reasonable degree of medical certainty that Mr. ==Timpa died due to excited delirium as a consequence of his schizophrenia and cocaine toxicity.== It is also my opinion with a reasonable degree of medical certainty that Mr. Timpa was intoxicated with cocaine at the time of his death. Lastly, it is my opinion with a reasonable degree of medical certainty that the response of the officers to Mr. Timpa did not represent a deliberate indifference to his medical needs.

Sincerely,

Steven B. Bird, MD