IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | |
| JOE TIMPA, | § | |
| | § | Civil Action No. 3:16-CV-3089-N |
| *Intervenor-Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| DUSTIN DILLARD et al., | § | |
| | § | |
| *Defendants*. | § | |

---

**DEFENDANTS' WITNESS LIST**

---

TO THE HONORABLE COURT:

Defendants, Dustin Dillard, Raymond Dominguez, Kevin Mansell, and Danny Vasquez,

pursuant to Local Civil Rule LR 26.2 and the Court's Fourth Amended Scheduling Order (ECF

No. 225), file their witness list.

1

Respectfully submitted,

CITY ATTORNEY OF THE CITY OF DALLAS

Tammy L. Palomino
Interim City Attorney

s/ *Lindsay Wilson Gowin*
Senior Assistant City Attorney
Texas State Bar No. 24111401
lindsay.gowin@dallas.gov

J. Cheves Ligon
Senior Assistant City Attorney
Texas State Bar No. 24070147
john.ligon@dallas.gov

Tatia R. Wilson
Executive Assistant City Attorney
Texas State Bar No. 00795793
tatia.wilson@dallas.gov

7DN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
Telephone:   214-670-3519
Facsimile:    214-670-0622

*Attorneys for Defendants Dustin Dillard,*
*Raymond Dominguez, Kevin Mansell,*
*and Danny Vasquez*


## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the foregoing with the clerk of court for the U.S. District Court, Northern District of Texas, using the CM/ECF system which will notify all case participants registered for electronic notice of this filing. I further certify that to the extent applicable I have served all case participants not registered for electronic notice by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ *Lindsay Wilson Gowin*
Senior Assistant City Attorney

2

**DEFENDANTS' WITNESS LIST**

1.  **Witness:**            **Dr. Jeffrey J. Barnard, M.D.**
    Deposed:                Yes
    Testimony:              Expert; probable
    Direct Examination:     1.0 hours

    Dr. Jeffrey Barnard, M.D. is a clinical pathologist who serves as director and Chief Medical Examiner of the Office of the Dallas County Medical Examiner. Dr. Barnard will testify that he and his staff reviewed Dr. Ogden's Autopsy Report and concurred with Dr. Ogden's observations and findings and conclusions that there was no evidence indicating that Timpa's death was caused by mechanical asphyxia, or that he was unable to sufficiently breathe while being restrained by Dillard.

2.  **Witness:**            **Dr. Steven B. Bird, M.D.**
    Deposed:                Yes
    Testimony:              Expert; probable
    Direct Examination:     1.5 hours

    Dr. Steven Bird is a retained expert witness who will provide testimony concerning his training and experience as a physician who is board certified in emergency medicine and medical toxicology. Dr. Bird will provide expert opinion testimony on current knowledge and research regarding excited delirium, cocaine toxicity, symptoms associated with schizophrenia, the cause(s) of Mr. Timpa's death, the findings and conclusions of Dr. Emily Ogden, and the findings and conclusions of Dr. Kim Collins.

3.  **Witness:**            **Curtis Burnley**
    Deposed:                Yes
    Testimony:              Probable
    Direct Examination:     .5 hours

    Curtis Burnley (Burnley) is a Dallas Fire-Rescue Department (DF-R) paramedic who responded to the scene. He will testify about (1) his training and experience as a DF-R paramedic; (2) his involvement with Anthony Timpa (Timpa); (3) his recollection of the events and observations of the encounter between Timpa and Defendants; and (4) his interactions with DPD and DF-R personnel.

    Burnley will testify that on August 10, 2016, he along with DF-R paramedic James Flores (Flores) responded to a call on West Mockingbird Lane regarding a person requiring medical assistance. Upon arrival, Flores observed Timpa in handcuffs, lying on the ground, yelling, and screaming incoherently. Burnley and Flores attempted to assess Timpa's condition but Timpa would not stop moving and wriggled his body in a manner that made it difficult for them to do so. Because of Timpa's erratic behavior, Dallas police officers physically seized Timpa to prevent him from entering the roadway. Although Timpa continued to thrash, one of the paramedics succeeded in taking Timpa's vital signs, which were within normal range. At no time did Burnley perceive that Timpa was in medical distress or that he was being deprived of oxygen. Timpa yelled, screamed,

3

and wriggled for several minutes, and then suddenly became still. One of the paramedics injected Timpa with a sedative, but he did not respond. Timpa was placed on a gurney and into the ambulance, where CPR chest compressions were performed. DF-R personnel transported Timpa to Parkland Hospital where he was pronounced deceased shortly after arrival.

Burnley will testify that at no time during the encounter did Timpa say he could not breathe nor did Burnley perceive that Timpa could not breathe, that he was struggling to breathe, or that Timpa was in a state of medical distress. Based on the facts and circumstances known to him, Burnley believed it was reasonable for Dallas police officers to physically seize Timpa to prevent him from harming himself and others and to allow the paramedics to render him aid.

4. **Witness:**              **Dustin Dillard**
   Deposed:                  Yes
   Testimony:                Probable
   Direct Examination:       2.0 hours

Dustin Dillard (Dillard) is a named defendant and was, at all relevant times, a police officer for the Dallas Police Department (DPD).  He will testify about (1) his training and experience as a certified peace officer for the State of Texas and as a Dallas police officer; (2) his knowledge of DPD's general orders directives concerning the use of force and control techniques in police incidents; (3) his recollection of the events surrounding his encounter with Timpa; (4) the facts and information provided to him by DPD personnel and persons at or near the scene of the encounter; (5) his observations of Timpa at the scene, including his perception of Timpa's physical appearance, actions, and demeanor; (6) the control techniques he used in response to Timpa's unlawful resistance and noncompliance to the officers' verbal commands; (7) his knowledge of the standards and requirements under the Fourth Amendment to the United States Constitution for seizure and use of force; (8) his opinions concerning whether the physical control techniques he used were consistent with DPD's use of force training and reasonable based on his perception of the facts and circumstances known at the time, and (9) the factual bases for his entitlement to the defense of qualified immunity.

Dillard will testify that on August 10, 2016, at approximately 10:30 p.m., he along with his partner that night, Officer Danny Vasquez (Vasquez), responded to a 911 call concerning a man, later identified as Anthony Timpa, causing a disturbance on West Mockingbird Lane. Comments on the call sheet indicated that Timpa had self-reported that he was schizophrenic and off his medication. DF-R paramedics Burnley, Flores, and Sgt. Kevin Mansell were on the scene when Dillard and Vasquez arrived. The paramedics were unable to take Timpa's vital signs or provide him with medical treatment because Timpa was behaving erratically and would not calm down. Dillard observed Timpa lying on the ground in handcuffs, close to the edge of the roadway near a bus stop that was a few feet from Mockingbird Lane and oncoming traffic and screaming incoherently. Timpa suddenly thrashed and attempted to get up from the ground, at which time Dillard positioned Timpa face-down on the ground to prevent him from rolling into the street. Timpa kicked, yelled, screamed, and struggled to get up for several minutes, preventing

4

the paramedics from rendering him aid. At all times, Dillard monitored Timpa's breathing and attempted to calm him through reassurance. After a short time, a paramedic succeeded in taking Timpa's vital signs. After that, Timpa stopped screaming, appeared to relax, and began making a snoring sound. A paramedic injected a sedative in Timpa's shoulder and he appeared to respond but remained calm and still. Dillard attempted to awaken Timpa but he was unresponsive. Dillard assisted the paramedics in putting Timpa on a gurney and into the ambulance. Once in the ambulance, Dillard assisted in performing cardiopulmonary resuscitation (CPR) chest compressions on Timpa.

Dillard will testify that based on his perception of the facts and circumstances, he believed that the technique he used to physically control Timpa was reasonable, necessary, and justified to prevent Timpa from harming himself or others and to assist the paramedics in rendering him aid. At no time did Dillard perceive that his application of force was inappropriate or that he restrained Timpa longer than was necessary or required for the paramedics to render aid. At no time did Dillard perceive that his actions in restraining Timpa impeded his flow of oxygen or in any way prevented his breathing. At no time did Timpa say that he could not breathe nor did Dillard perceive that Timpa could not breathe, that he was struggling to breathe, or that he was in medical distress. Dillard did not act with malice or evil intent or callous indifference to Timpa's constitutional rights.

5.    **Witness:**            **Raymond Dominguez**
Deposed:              Yes
Testimony:            Probable
Direct Examination:   1.5 hours

Raymond Dominguez (Dominguez) is a named defendant and was, at all relevant times, a senior corporal for DPD.  He will testify about (1) his training and experience as a certified peace officer for the State of Texas and as a Dallas police officer; (2) his knowledge of DPD's general orders directives concerning the use of force and duty to intervene in police incidents; (3) his recollection of the events surrounding his encounter with Timpa; (4) the facts and information provided to him by DPD personnel and persons at or near the scene of the encounter; (5) his observations of Timpa at the scene, including his perception of Timpa's physical appearance, actions, and demeanor; (6) his perception of the control techniques Dillard used in response to Timpa's unlawful resistance and noncompliance to the officers' verbal commands; (7) his knowledge of the standards and requirements under the Fourth Amendment to the United States Constitution for seizure and use of force; (8) his opinions concerning whether the physical control techniques Dillard used were consistent with DPD's use of force training and reasonable based on his perception of the facts and circumstances known at the time, and (9) the factual bases for his entitlement to the defense of qualified immunity.

Dominguez will testify that on August 10, 2016, at approximately 10:30 p.m., he responded to a 911 call concerning a man, later identified as Timpa, causing a disturbance on West Mockingbird Lane. The DPD dispatcher related that the suspect was off his medication. When Dominguez arrived, Dillard, Vasquez, Sgt. Kevin Mansell, Officer Domingo Rivera, and DF-R paramedics Burnley and Flores were at the location.

5

Dominguez observed Timpa in handcuffs and lying on the ground, close to the edge of the roadway near a bus stop that was a few feet from Mockingbird Lane and oncoming traffic and Dillard and Vasquez restraining Timpa. Timpa was yelling, screaming, and kicking his feet trying to get up. Dominque retrieved flex cuffs and placed them on Timpa's feet to prevent him from kicking. Timpa yelled, screamed, and struggled to get up for several minutes, but a paramedic succeeded in taking his vital signs. Timpa stopped screaming and appeared to relax and make what appeared to be a snoring sound. Dominguez believed that Timpa had fallen asleep and attempted to awaken him, but Timpa was unresponsive. Dominguez assisted the paramedics in putting Timpa on a gurney and into the ambulance. Once in the ambulance, Domingue assisted in performing CPR chest compressions on Timpa.

Dominguez will testify that based on his perception of the facts and circumstances, he believed that it was reasonable and lawful for Dillard to restrain Timpa by applying pressure on Timpa's upper back and shoulder area to keep him from entering active traffic lanes on Mockingbird Lane and to allow the paramedics to render him aid. At no time did Dominguez perceive that Dillard's application of force was excessive to the need or objectively unreasonable. At no time did Dominguez perceive that he had a duty to intervene or an opportunity to intervene to prevent Timpa from harm. Dominguez did not act with malice or evil intent or callous indifference to Timpa's constitutional rights.

6. **Witness:**               **James Flores**
   Deposed:               Yes
   Testimony:             Probable
   Direct Examination:   .75 hours

James Flores is a Fire Rescue Officer and paramedic for the Dallas Fire-Rescue Department (DF-R). He will provide testimony regarding (1) his training and experience as a DF-R paramedic; (2) his encounter with Timpa; (3) his observations of the encounter between Timpa and Defendants; and (4) his interactions with DPD and DF-R personnel.

Flores will testify that on August 10, 2016, he along with Fire Rescue Officer Curtis Burnley responded to a medical emergency at 1720 West Mockingbird Lane. Upon arrival, Flores observed a combative Timpa in handcuffs, lying on the ground, yelling, and screaming incoherently. Flores and Burnley attempted to take Timpa's vital signs but were unable to because of his erratic movements, which included kicking, jerking, thrashing, and twisting his body. Dillard gained control of Timpa and restrained him face-down, thereby allowing the paramedics to assess his condition and provide Timpa with medical treatment. Flores took Timpa's vital signs and they were within normal range. At no time did Flores perceive that Timpa was experiencing excited delirium, a decrease in respiratory function, or that he was in medical distress. Timpa yelled, screamed, and remained combative for several minutes and then suddenly became still. Flores believed that Timpa had tired himself out but then realized that he was unconscious and not breathing. Flores and Burnley began CPR chest compressions on Timpa with the help of Dillard and Dominguez and transported Timpa to Parkland Hospital where he was pronounced deceased shortly after arrival.

Flores will testify that he did not observe any police officer use excessive force on Timpa. At no time did Timpa say he could not breathe nor did Flores perceive that Timpa could not breathe, that he was struggling to breathe, that Timpa was experiencing excited delirium, or that he was in a state of medical distress. Based on the facts and circumstances known to him, Flores believed it was reasonable for Dallas police officers to physically seize Timpa to prevent him from harming himself and others and to allow the paramedics to provide him with medical treatment.

7. **Witness:**                    **Sam Hanson**
   Deposed:                        Yes
   Testimony:                      Expert; probable
   Direct Examination:   1.0 hours

Sam Hanson is a senior corporal in the Dallas Police Department. He will testify about his training and experience as a certified peace officer for the State of Texas and as a uniformed Dallas police officer; his training and experience as a Crisis Intervention Training instructor at the Dallas Police Academy; the use of force and crisis intervention training taught by DPD. Hanson will offer the following opinions: that a reasonable police officer on the scene could have perceived that Timpa was resisting based on his erratic movements, including kicking, jerking, thrashing, and twisting his body; that Timpa's actions created a danger to himself and others; that a reasonable police officer facing the same circumstances could have believed that it was reasonable to restrain Timpa in a prone position to (1) keep him from endangering him himself and others by re-entering the roadway and obstructing traffic, and (2) keep him still to facilitate his medical assessment and treatment by the paramedics. Hanson will testify further that a reasonable officer under the circumstances could have believed that they should rely on and follow a paramedic's instruction on how to handle a patient, that Dillard did not use lethal force, that Dillard's prone restraint of Timpa was reasonable under the facts and circumstances known to him at the time; and that Dillard's use of force was consistent with DPD training on the use of force. Hanson will also provide opinions concerning whether the body-worn camera video footage provides evidence that supports the conclusion that Timpa's death was caused by mechanical asphyxia, or that he was unable to sufficiently breathe while being restrained by Dillard.

8. **Witness:**                    **Kitrell Heiden**
   Deposed:                        No
   Testimony:                      Possible
   Direct Examination:   .5 hours

Kitrell Heiden observed Timpa running into traffic on West Mockingbird Lane before Defendants arrived. He will testify that on August 10, 2016, he observed two security officers chasing Timpa, who was running into traffic on West Mockingbird Lane. The security guards apprehended Timpa, placed him in handcuffs, and kept him on the ground. DPD and DF-R personnel arrived. DF-R personnel attempted to provide Timpa with medical attention, but he continued to behave irrationally.  It appeared that Timpa tried to get up and run back into traffic when DPD officers took control of him.  The officers put Timpa on a gurney and into the ambulance. Heiden was walking away from

the scene when he heard Mansell react to the news that Timpa was unresponsive.

9. **Witness:**          **Ewelina Johnson**
   Deposed:              No
   Testimony:            Probable
   Direct Examination:   .75 hours

Fredrick Johnson was with Timpa on the evening of his encounter with Defendants. Johnson will testify that he met Timpa for the first time on August 10, 2016, at a Gas Pipe store, and began a conversation. Timpa shared with Johnson that he had used heroin, methamphetamines, cocaine, and marijuana that night. The men went to the New Fine Arts on West Mockingbird Lane, where they rented a room and engaged in sex. Timpa began to act strange and called 911. Johnson left to use the restroom.  When he returned to the room Timpa had barricaded himself inside and would not allow Johnson to enter. Johnson went to Timpa's vehicle to retrieve his personal belongings. Johnson observed Timpa run out of New Fine Arts and into traffic on Mockingbird. It appeared that Timpa was trying to get struck by a vehicle. Johnson left the area.

10. **Witness:**         **Fredrick T. Johnson**
    Deposed:             No
    Testimony:           Probable
    Direct Examination:  .5 hours

Fredrick Johnson was with Timpa on the evening of his encounter with Defendants. Johnson will testify that he met Timpa for the first time on August 10, 2016, at a Gas Pipe store, and began a conversation. Timpa shared with Johnson that he had used heroin, methamphetamines, cocaine, and marijuana that night. The men went to the New Fine Arts on West Mockingbird Lane, where they rented a room and engaged in sex. Timpa began to act strange and called 911. Johnson left to use the restroom.  When he returned to the room Timpa had barricaded himself inside and would not allow Johnson to enter. Johnson went to Timpa's vehicle to retrieve his personal belongings. Johnson observed Timpa run out of New Fine Arts and into traffic on Mockingbird. It appeared that Timpa was trying to get struck by a vehicle. Johnson left the area.

11. **Witness:**         **Glenn Johnson**
    Deposed:             No
    Testimony:           Possible
    Direct Examination:  .5 hours

Glenn Johnson is one of the security guards who restrained Timpa before Defendants arrived on the scene. He will testify that on August 10, 2016, he was traveling on West Mockingbird Lane when Timpa waved him down and requested help. Johnson stopped to assist but Timpa stated that Johnson was not a real cop, that he was trying to kill him, and ran into the street. Johnson observed Timpa run a DART bus and try to get on it, and then proceed to run in the street. Sammie Washington, a security guard at New Fine Arts, tried to assist but Timpa ran away from Johnson and Washington and back into the street. Timpa then fell to the ground, at which time Johnson and Washington removed Timpa

from the street and placed him in handcuffs. Timpa continued to kick and scream that Johnson and Washington were trying to kill him. Timpa continued to push himself into the street, and Johnson kept pulling him back into the grass. DPD and DFR personnel arrived. Timpa would not allow DF-R paramedics to check him and he remained combative, kicking at the officers. Timpa appeared to have tired himself out or fallen asleep. DPD and DF-R personnel put him on a gurney and inside the ambulance.

12. **Witness:**              **Dr. Mark W. Kroll, Ph.D.**
    Deposed:                   Yes
    Testimony:                 Expert; probable
    Direct Examination:   1.5 hours

Dr. Mark Kroll is a retained expert witness who will provide testimony concerning his training and experience as a biomedical engineer.  Dr. Kroll will provide expert opinion testimony on current knowledge and research regarding positional and mechanical asphyxia, the effects of restraint in a prone position, the cause of Mr. Timpa's death, the findings and conclusions of Dr. Emily Ogden, and the findings and conclusions of Dr. Kim Collins.

13.    **Witness:**            **Kevin Mansell**
       Deposed:                Yes
       Testimony:              Probable
       Direct Examination:   1.5 hours

Kevin Mansell (Mansell) is a named defendant and was, at all relevant times, a sergeant of police for DPD.  He will testify about (1) his training and experience as a certified peace officer for the State of Texas and as a Dallas police officer; (2) his knowledge of DPD's general orders directives concerning the use of force and duty to intervene in police incidents; (3) his recollection of the events surrounding his encounter with Timpa; (4) the facts and information provided to him by DPD personnel and persons at or near the scene of the encounter; (5) his observations of Timpa at the scene, including his perception of Timpa's physical appearance, actions, and demeanor; (6) his perception of the control techniques Dillard used in response to Timpa's unlawful resistance and noncompliance to the officers' verbal commands; (7) his knowledge of the standards and requirements under the Fourth Amendment to the United States Constitution for seizure and use of force; (8) his opinions concerning whether the physical control techniques Dillard used were consistent with DPD's use of force training and reasonable based on his perception of the facts and circumstances known at the time, and (9) the factual bases for his entitlement to the defense of qualified immunity.

Mansell will testify that on August 10, 2016, at approximately 10:30 p.m., he responded to a 911 call concerning a man, later identified as Timpa, causing a disturbance on West Mockingbird Lane. The comments on the call sheet indicated that Timpa was schizophrenic and off his medication. When Mansell arrived, he saw Timpa on the ground in the grassy area between Mockingbird and a bus stop bench and two security guards standing near him. Timpa was yelling, screaming, and kicking his feet in the air. Timpa rolled toward the street, and Mansell and the security guards moved him back

from the roadway. Dillard, Vasquez, Rivera, Dominguez, Burnley, and Flores soon arrived at the scene. Timpa again rolled toward Mockingbird, and Dillard and Vasquez restrained him to keep him out of the roadway and to facilitate the paramedics' medical assessment of Timpa. Dominguez and Rivera put flex cuffs on Timpa's ankles to prevent him from kicking. The officers applied only the amount of force necessary to gain control of Timpa, who was not complying with verbal commands, to prevent him from entering the roadway and to allow the paramedics to perform their medical assessment and treatment of Timpa. At no time did Timpa say he could not breathe nor did Mansell perceive that Timpa could not breathe, that he was struggling to breathe, or that Timpa was in medical distress. Mansell briefly stepped away from Dillard and Timpa to call Timpa's family members to obtain information about Timpa's medical condition and medications. When Mansell returned, he learned that Timpa had become still and unresponsive.

Mansell will testify that based on his perception of the facts and circumstances, he believed that it was reasonable and lawful for Dillard to restrain Timpa by applying pressure on Timpa's upper back and shoulder area to keep him from entering active traffic lanes on Mockingbird Lane and to allow the paramedics to render him aid. At no time did Mansell perceive that Dillard's application of force was excessive to the need or objectively unreasonable. At no time did Mansell perceive that he had a duty to intervene or an opportunity to intervene to prevent Timpa from harm. Mansell did not act with malice or evil intent or callous indifference to Timpa's constitutional rights.

14. **Witness:**        **Dr. Jeffrey Metzger**
    Deposed:            Yes
    Testimony:          Expert; probable
    Direct Examination: 1.0 hours

Dr. Jeffrey Metzger is Chief of Emergency Services and Parkland Hospital and former Medical Director for the Dallas Police Department. He will testify about his training experience and offer the following opinions: (1) the application of force by  Dillard to physically control Timpa was not unreasonable; (2) Dillard's use of force was consistent with DPD training; (3) a reasonable police officer on the scene could have perceived that Timpa was resisting based on his failure to follow the officers' verbal commands and his erratic movements, including kicking, jerking, thrashing, and twisting his body; (4) Timpa's actions created a danger to himself and others; (5) a reasonable police officer under the same facts and circumstances could have believed that it was reasonable for Dillard to believe that restraining Timpa in a prone position was necessary and justified to keep Timpa from re-entering the roadway and obstructing traffic and to assist the paramedics in rendering him aid; (6) a reasonable officer under the same facts and circumstances could have believed that it was proper to follow the paramedic's instructions on how to handle a patient on the scene; (7) Dillard did not use lethal force; and (8) the video evidence of Defendants' encounter with Timpa does not support the conclusion that Timpa died from mechanical asphyxia, or that he was unable to sufficiently breathe while Dillard restrained him.

**15. Witness:**                **Craig R. Miller**
Deposed:                    Yes
Testimony:                Expert; possible
Direct Examination:   1.0 hours

Craig Miller is a retained expert witness who will provide testimony concerning his training and experience as a peace officer.  He will opine on the following issues: the standards and requirements under the Fourth Amendment for detention, arrest, and use of force; whether it was reasonable for Defendants to conclude that Timpa was a danger to himself and others; whether it was reasonable for Dillard to believe that restraint of Timpa was necessary for him to be medically assessed and treated by the paramedics; whether the force used by Dillard to restrain Timpa was reasonable under the facts and circumstances known to him; whether Dillard's use of force to restrain Timpa constituted deadly force; whether other officers faced with the same or similar circumstances could have acted in the same or similar manner as did Dillard in his restraint of Mr. Timpa and Vasquez, Dominguez, and Mansell in their response to that use of force; and whether a reasonable police officer faced the same or similar circumstances could have believed that the actions of Defendants were lawful.

**16. Witness:**                **Dr. Emily Ogden, M.D.**
Deposed:                    Yes
Testimony:                Expert; probable
Direct Examination:   1.5 hours

Dr. Emily Ogden, M.D. is a clinical pathologist who serves on the staff of the Office of the Dallas County Medical Examiner.  Dr. Ogden will testify that she performed the autopsy on Timpa and found no evidence indicating that his death was caused by mechanical asphyxia, that he was unable to sufficiently breathe while being restrained by Dillard, or evidence that Dillard used significant or substantial weight to restrain Timpa. Dr. Ogden will testify further that it was reasonable based on Timpa's conduct for Defendants to perceive that Timpa presented a danger to himself and others; that a diagnosis of excited delirium is typically determined after death; and that a reasonable police officer would not have known that Timpa was in a state of excited delirium based on his behavior at the scene.

**17. Witness:**                **Dr. Helen Reynolds, Ph.D.**
Deposed:                    No
Testimony:                Expert; probable
Direct Examination:   1.0 hours

Dr. Helen Reynolds is a retained expert witness who is an economic consultant.  She will offer expert opinion testimony concerning the conclusions presented in the report authored by the Plaintiffs' economic damages expert(s); all categories and amounts of economic damages alleged by the Plaintiffs, including actual damages, medical damages, loss of wages, economic damages based on pain and suffering and mental anguish, and economic damages based on an alleged loss of quality of life; and the value and computation of damages based on household service.

18.   **Witness:**          **Domingo Rivera**
      Deposed:              Yes
      Testimony:            Probable
      Direct Examination:   .5 hours

Domingo Rivera is a Dallas police officer who responded to the scene. He will testify about (1) his training and experience as a certified peace officer for the State of Texas and as a Dallas police officer; (2) his recollection of the events surrounding his encounter with Timpa; (3) his observations of Timpa at the scene, including his perception of Timpa's physical appearance, actions, and demeanor; and (4) his perception of the control techniques the officers used in response to Timpa's unlawful resistance and noncompliance to the officers' verbal commands, whether they were consistent with DPD's use of force training, and whether they were reasonable based on his perception of the facts and circumstances known at the time.

Rivera will testify that on August 10, 2016, at approximately 10:30 p.m., he responded to a 911 call concerning Timpa causing a disturbance on West Mockingbird Lane. Rivera observed Timpa in handcuffs and lying on the ground, close to the edge of the roadway near a bus stop that was a few feet from Mockingbird Lane and oncoming traffic and Dillard and Vasquez restraining Timpa. Timpa was yelling, screaming, and kicking his feet trying to get up. Rivera and Dominguez put flex cuffs on Timpa's ankles to prevent him from kicking. Rivera then left to find Timpa's vehicle to try and find information about his medical condition and medications. At no time did Rivera hear Timpa say he could not breathe, nor did Rivera perceive that Timpa could not breathe, that he was struggling to breathe, or that Timpa was in medical distress.

Rivera will testify that based on his perception of the facts and circumstances, he believed that it was reasonable and lawful for Dillard to restrain Timpa by applying pressure on Timpa's upper back and shoulder area to keep him from entering active traffic lanes on Mockingbird Lane and to allow the paramedics to render him aid.  At no time did Rivera perceive that Dillard's application of force was excessive to the need or objectively unreasonable. At no time did Rivera perceive that Dominguez, Mansell, and Vasquez had a duty to intervene or an opportunity to intervene to prevent Timpa from harm.

19.   **Witness:**          **Danny Vasquez**
      Deposed:              Yes
      Testimony:            Probable
      Direct Examination:   1.5 hours

Danny Vasquez is a named defendant and was, at all relevant times, a Dallas police officer.  He will testify about (1) his training and experience as a certified peace officer for the State of Texas and as a Dallas police officer; (2) his knowledge of DPD's general orders directives concerning the use of force and duty to intervene in police incidents; (3) his recollection of the events surrounding his encounter with Timpa; (4) the facts and information provided to him by DPD personnel and persons at or near the scene of the

encounter; (5) his observations of Timpa at the scene, including his perception of Timpa's physical appearance, actions, and demeanor; (6) his perception of the control techniques Dillard used in response to Timpa's unlawful resistance and noncompliance to the officers' verbal commands; (7) his knowledge of the standards and requirements under the Fourth Amendment to the United States Constitution for seizure and use of force; (8) his opinions concerning whether the physical control techniques Dillard used were consistent with DPD's use of force training and reasonable based on his perception of the facts and circumstances known at the time, and (9) the factual bases for his entitlement to the defense of qualified immunity.

Vasquez will testify that on August 10, 2016, at approximately 10:30 p.m., he along with Dillard responded to a 911 call concerning Timpa, causing a disturbance on West Mockingbird Lane. Comments on the call sheet indicated that Timpa had self-reported that he was schizophrenic and off his medication. DF-R paramedics Burnley, Flores, and Sgt. Kevin Mansell were on the scene when Vasquez and Dillard arrived. The paramedics were unable to take Timpa's vital signs or provide him with medical treatment because Timpa was behaving erratically and would not calm down. Vasquez observed Timpa lying on the ground in handcuffs, close to the edge of the roadway near a bus stop that was a few feet from Mockingbird Lane and oncoming traffic and screaming incoherently. Timpa suddenly thrashed and attempted to get up from the ground, at which time Dillard positioned Timpa face-down on the ground to prevent him from rolling into the street. Timpa kicked, yelled, screamed, and struggled to get up for several minutes, preventing the paramedics from rendering him aid. Vasquez switched out the handcuffs, while Dillard monitored Timpa's breathing and attempted to calm him through reassurance. After a short time, a paramedic succeeded in taking Timpa's vital signs. At no time did Timpa say he could not breathe, nor did Rivera perceive that Timpa could not breathe, that he was struggling to breathe, or that Timpa was in medical distress. Timpa stopped screaming, appeared to relax, and began making a snoring sound. A paramedic injected a sedative in Timpa's shoulder, and he appeared to respond but remained calm and still. The officers attempted to awaken Timpa, but he was unresponsive. Vasquez assisted the paramedics in putting Timpa on a gurney and into the ambulance.

Vasquez will testify that based on his perception of the facts and circumstances, he believed that it was reasonable and lawful for Dillard to restrain Timpa by applying pressure on Timpa's upper back and shoulder area to keep him from entering active traffic lanes on Mockingbird Lane and to allow the paramedics to render him aid. At no time did Vasquez perceive that Dillard's application of force was excessive to the need or objectively unreasonable. At no time did Vasquez perceive that he had a duty to intervene or an opportunity to intervene to prevent Timpa from harm. Vasquez did not act with malice or evil intent or callous indifference to Timpa's constitutional rights.

13

20.   **Witness:**            **Sammie Washington**
      Deposed:              No
      Testimony:            Possible
      Direct Examination:   .5 hours

Sammie Washington, at all relevant times, was a security guard at Terron Security Company was assigned to the New Fine Arts business on West Mockingbird Lane. He will testify that on August 10, 2016, the manager alerted him of a disturbance at the location involving Anthony Timpa and another male. Washington observed Timpa run away from the building, into traffic on Mockingbird Lane and attempt to climb on a DART bus. He observed DPD officers arrive and attempt to control Timpa. He did not observe any Dallas police officers use inappropriate force against Timpa or perceive that the force used to restrain Timpa was excessive to the need or unreasonable based on the facts and circumstances known to him at the time.

21.   **Witness:**            **Custodian of Records, Dallas Fire-Rescue Department**
      Deposed:              No
      Testimony:            Possible
      Direct Examination:   .25 hours

If necessary, a custodian of records will be called to authenticate exhibits in the custody of the Dallas Fire-Rescue Department.

22.   **Witness:**            **Custodian of Records, Dallas Police Department**
      Deposed:              No
      Testimony:            Possible
      Direct Examination:   .25 hours

If necessary, a custodian of records will be called to authenticate exhibits in the custody of the Dallas Police Department.