IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| VICKI TIMPA, ET AL. § | |
|     Plaintiffs, § | |
| § | |
| V. § | CIVIL ACTION NO. 3:16-cv-03089-N |
| § | |
| DUSTIN DILLARD, ET AL. § | |
|     Defendants. § | |

**PLAINTIFFS' TRIAL BRIEF ON COMMENTS MADE BY DPD DEFENDANTS**

Plaintiffs file this brief pursuant to Federal Rules of Evidence 401, 402, 403.

**RELEVANT FACTS**

In 1995, the Department of Justice issued a nationwide bulletin to law enforcement indicating the lethality of prone restraint. Like many police departments, the Dallas Police Department has similar policies and procedures warning of the hazards of prone restraint. See, *e.g.,* DPD GEN ORD. 901.01 E; 902.01 D.1.; 902.02 G.1.; 905.00. "Do not place in a prone restraint as it could result in positional asphyxia." DPD GEN. ORD. 902.01 D.1.*;* DPD GEN. ORD. 902.02 G.1.In the General Orders and DPD Training, officers are were <u>repeatedly</u> warned that restrained subjects in crisis can die suddenly.[1] DPD further instructs officers to use a Team Take-Down Contact Control when multiple officers ae present who can control a "limb…until the subject can be handcuffed." DPD GEN. ORD. 903.01A., B. "A fifth officer can immobilize the subject's head, if necessary, to prevent injury. *Id.,* at B. During Timpa's restraint, Defendants made a lengthy list

---

[1] See *Timpa v. Dillard,* 20 F.4th 1020, 1031 (5th Cir. 2021)(" DPD training instructed that a subject in a state of excited delirium must, "as soon as possible[,] [be] mov[ed] ... to a recovery position (on [their] side or seated upright)," because the prolonged use of a prone restraint may result in a "combination of increased oxygen demand with a failure to maintain an open airway and/or inhibition of the chest wall and diaphragm [that] has been cited in positional asphyxia deaths." Dillard was also trained that "[i]f [the] subject suddenly calms, goes unconscious, or otherwise becomes unresponsive, ... [a] sudden cessation of struggle is a prime indicator that the subject may be experiencing fatal autonomic dysfunction (sudden death)."

PLAINTIFFS' TRIAL BRIEF ON COMMENTS
MADE BY DPD DEFENDANTS                                                                       Page 1 of 11

of comments, including ones *before* they asserted he was "asleep," during that period and *even* after they suspected Tony was dead. Defendant Dillard has been sued for excessive force. While Defendants Mansell, Vasquez and Dominguez remain charged in this action with bystander claims. Plaintiffs plead int this lawsuit that Defendants, "[r]ather than aid Tony in his time of critical need…continued to smother him" and then "mock and laugh at him" despite "his vocal pleas that they were going to kill him." *Plaintiffs' Fourth Amended Complaint,* ¶ 152. "Even worse, in the aftermath, Defendants Vasquez and Dominguez speciously maintained that their sophomoric jokes—including ones about waking up for school and having breakfast—were strategically employed to engage Tony." *Id.,* at ¶ 153. The two most senior officers set the tone of the officers' responses early in the engagement. As Sgt. Kevin Mansell rummaged through Tony's personal effects, he exclaimed "Yacht Club" with comedic amazement. Dillard. BWC 3:01. Elsewhere, he jokes about Timpa's "Murk-uh-deeze" (Mercedes).

**During Unconsciousness:** While Tony was unconscious there were a number of different conversations taking place around him. At one point, EMT Flores approaches Sgt. Mansell and asks, "So what's the plan" You're the HMFIC our here sir." [2] Dillard BWC 11:29/30. Mansell later led a discussion about who would get to drive the ambulance. Dillard BWC 11:39. More well known is the long exchange that began when Defendant Dillard suggested Timpa's unconsciousness was "sleeping." *Id.,* at 12:51-13:00. Defendants Vasquez and Dominguez began taunting Timpa with their mock conversation about waking up for school with breakfast. This riff lasted approximately a half minute. *Id.,* at 13:28-13:51. In the interim, Defendant Dillard remained

---

[2] HMFIC:  Wiktionary 1. (*US* slang) *Initialism of*  head mother fucker in charge.
https://en.wiktionary.org/wiki/HMFIC citing Eric Partridge (2005), "HMFIC", in Tom Dalzell and Terry Victor, editors, *The New Partridge Dictionary of Slang and Unconventional English*, volume 1 (A–I), London; New York, N.Y.: Routledge, →ISBN, page 1008; see also The Urban Dictionary, HMFIC: the top boss or manager. *Usage:* "I can't approve that, you need to talk to the HMFIC."  https://www.urbandictionary.com/define.php?term=HMFIC.

kneeling on Tony and would remain there for several more minutes. Thereafter, more exchanges occur about a "Green Oaks Cocktail," a flippant reference to a treatment named for the in-patient mental health facility. Dillard BWC 14:25. When the Versed (Midazolam) is administered, EMT James Flores states that that he has a "gun" that will shoot the sedative. Corporal Dominguez gets excited about that notion, stating that officers would fight to respond to such "CIT calls" to see get shot by a tranquilizer gun. *Id.,* at 14:49-14:55.

### After Death Suspected

As Defendants lift Timpa onto a gurney, Defendant Dillard then asks if Tony is still living. "Is he knocked out? He ain't dead is he?" *Id. ,* 15:35/36. "He didn't just die down there did he?" *Id.,* at 15:43-44  Defendant Vasquez attempts to reassure him initially, stating, "I don't think he did." 15:46-47. "I hope I didn't kill him." 15:55-56. Dominguez then states, "What's all this 'we' shit?" *Id.,* at 15:59.  The officers then begin laughing as Vasquez then replies. "I love how this suddenly became a 'we'," before joking, "We ain't friends," as the three migrate toward the ambulance with Tony on the gurney. *Id.,* at 16:02-10.

### ARGUMENT AND AUTHORITIES

**A.  Words are integral to inquiries about seizures.**

The Fourth Amendment prohibits the use of excessive force arising in the context of an arrest or investigatory stop of a free citizen. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S., at 554, 100 S.Ct., at 1877. See also *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–1327, 75 L.Ed.2d 229 (1983) (opinion of WHITE, J.). As the Supreme Court has emphasized time and again,

>the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's ***words and actions*** would have conveyed that to a reasonable person.

*California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 1551-52, 113 L.Ed.2d 690 (1991) citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Words are particularly relevant when uttered by police officers because they are uttered under the color of authority. *Id.* What officers say at the scene is amply relevant.

**B.  Harassment and abusive behavior are integral to excessive force claims.**

"The overriding function of the Fourth Amendment is to protect ***personal privacy and dignity*** against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966) (***Emphasis added***). The Fourth Amendment prohibits the use of excessive force arising in the context of an arrest or investigatory stop of a free citizen. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). To state a claim for excessive force, a plaintiff must allege facts to support that an official used or caused to be used objectively unreasonable force against him. *Piedvache v. Ige,* 2016 WL 6516826 at *5 (D. Ha. Nov. 2, 2016) citing *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). "Beyond the specific prohibition of excessive force, the Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity and other harassing and abusive behavior that rises to the level of 'unreasonable seizure.'" *Id.* citing *Fontana v. Haskins*, 262 F.3d 871, 878-79 (9th Cir. 2001) (determining that police officer's "sexual verbal and physical predation against a handcuffed arrestee" on ride to police station violated Fourth Amendment). Apart from excessive force, we recognize that " harassing and abusive behavior" by an officer towards a detainee during a seizure can, in some cases, rise to the level of "unreasonable" for Fourth Amendment purposes. *Hicks v. Moore,* 422 F.3d 1246, 1253-54 (11th Cir. 2005; see also  *Alexis v. McDonald's Restaurants,* 67 F.3d 341, 354

(1st Cir.1995) (holding a rational factfinder could find Equal Protection violation based on evidence of racial animus and excessive force)

### C. All of the comments are relevant.

FRE 401 and 402 hold that evidence having "any tendency" to make a matter of consequence more or less probable is admissible. For several reasons, all of these remarks are directly probative to central matters of this litigation. It is well-settled law that all Fourth Amendment claims are assessed under the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). This is no less the case where, as here, officers arrest or otherwise seize a person without a warrant. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The DPD General Orders' use of force likewise considers the totality of circumstances for determining reasonable force. DPD GEN. ORD. 901.06B.4.

### 1. Courts consider the totality of circumstances in Fourth Amendment claims.

#### a. Comments of the officers are integral part of the totality of circumstances.

When analyzing the totality of circumstance excessive force claims, words matter. *Johnson v. Morel,* 876 F.2d 477, 480 (5th Cir.1989) (en banc) (per curiam)(holding that an officer's harassment, humiliation, ridicule, and handcuffing of an arrestee so tightly that the handcuffs left permanent scars created a genuine issue of material fact as to the use of excessive force). Similarly, the following statements were held relevant to proving excessive force: "Look at him, you would think that we killed him, but all we did was just whip his ass." *Ford v. Sanders,* 2008 WL 11515721 at *2 (E.D. Penn. Feb. 20, 2008) citing FED. R. EVID. 402. The entire circumstances of Tony's death cannot be divorced from the officers' words. The "humiliation" and "ridicule" are integral to the totality of the circumstances. *Morel,* 876 F.2d at 480.

### b. Comments are relevant to Defendants' training.

Defendants' comments well illustrate how little they adhered to the dictates of their training. Defendants' contention that Tony was "asleep" itself must be weighed against training that officers had to pay attention to a subject's consciousness. Training materials and the General Orders repeatedly emphasize that subjects can suddenly die. There are no warnings about slumber, just death. Their failure to recognize (and take seriously) Timpa's lack of consciousness thoroughly undermines any contention that they followed their training or DPD's General Orders. Furthermore, the Department dispatched five officers to the scene because it was a "CIT" call. Defendants were supposed to perform a "five-man takedown" whereby as a team they could safely apprehend Timpa and maneuver him for transport. Defendants did nothing of the sort.

### c. Comments are relevant to deadly force.

In the context of deadly force, "[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Manis v. Lawson,* 585 F.3d 839, 843 (5th Cir.2009) citing *Bazan v. Hidalgo Cnty.,* 246 F.3d 481, 493 (5th Cir.2001) (citing *Fraire v. City of Arlington,* 957 F.2d 1268, 1276 (5th Cir.1992). It bears emphasizing, the Fifth Circuit held here that a "jury could find that [Dillard's] use of force constituted 'deadly force.'" *Timpa v. Dillard,* 20 F.4th 1020, 1033 (5th Cir. 2021). Indeed, the Court of Appeals further stated the "[o]fficers make no argument that the use of asphyxiating pressure was necessary to maintain control of a subdued subject." *Id.,* at 1034. The Fifth Circuit concluded, "In other words, the record supports the inference that, for at least five minutes, Timpa was subjected to force unnecessary to restrain him." *Id.* Given that a jury could find that during this five-minute period Tony Timpa was subject to *deadly force* while remaining motionless it is absolutely essential that the jury be apprised of how the officers assessed any risks.

Entirely absent from their conversations were statements about deadly furtive gestures or excited warnings of a weapon, for example. To the contrary, there are only jokes and sidebars.

The Fifth Circuit also took great pains to emphasize the use of force "*after* Timpa had been restrained and lacked the ability to pose a risk of harm or flight." *Id.* (*Emphasis in original*); see also *Rockwell v. Brown,* 664 F.3d 985, 991 (5th Cir. 2011). The Court of Appeals rejected the notion that Timpa posed any threat, explicitly noting that this case does "not present the paradigmatic circumstances of 'an officer arriv[ing] at the scene with little or no information and [having] to make a split-second decision.'" *Id.,* at 1029. The Court of Appeals emphasized that the officers *knew* that Timpa had himself initiated the 9-1-1 call indicating he was in a crisis. *Id. Timpa v. Dillard* emphasized the actual minute count:

> Approximately nine minutes into the restraint, Timpa was cuffed at both the wrists and the ankles, his lower legs had stopped moving, and he was surrounded by five officers, two paramedics, and two private security guards—most of whom were mulling about while Dillard maintained his bodyweight force on Timpa's upper back. *Id.,* at 1030.

Here, there was (a) *never* any threat of <u>serious harm</u> to Defendants from the handcuffed Timpa nor (b) *any* threat of *any* harm during the several minutes of Tony's motionless death and unconsciousness. The BWC footage shows in graphic technicolor that Dillard remained on top of a handcuffed man long after he was unconscious while the officers "mulled about" joking around and failing to intervene. The scenes would have no context if all we had large gaps of silence.

**2. Comments are relevant to bystander claims.**

To prove their claims against Mansell, Dominguez and Vasequez, Plaintiffs must prove they (1) knew that a fellow officer was violating Tony Timpa's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Hamilton v. Kindred,* 845 F.3d 659, 663 (5th Cir. 2017) citing *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013); *Randall v.*

*Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002); compare *Greene v. DeMoss,* 2022 WL 3716201 at *4 (5th Cir. Aug. 29, 2022) citing *Hamilton v. Kindred,* 845 F.3d 659, (5th Cir. 2017)( adding fourth element present at the incident).

Defendants' comments certainly showed their knowledge of Dillard's constitutional violation. Their *post-mortem* comments showed a high degree of self-serving interest. According to Dominguez and Vasquez, they are not a "we" who killed Tony Timpa. Dillard, they urge through their joking, did the killing all by himself. Such distancing is highly probative.

The officers' comments further illustrate that they were <u>present</u> at the scene as some Fifth Circuit precedent requires. See *Greene, supra.* No less important, those comments directly relate to reasonableness and urgency. The officers' utter lack of seriousness shows the complete absence of urgency on *their* part—rather than *Graham's* tense and rapidly evolving paradigm. The comments are entirely in concert with the footage that shows Dominguez, Vasquez and, at times, Mansell standing over Timpa and doing nothing to save his life. Once again, *Timpa v. Dillard* is relevant. The Fifth Circuit noted that Defendants did "not contend that Vasquez or Dominguez lacked reasonable opportunity to intervene." *Id.,* at 1039.

> Indeed, both officers stood by, observed Timpa suddenly lose consciousness, expressed surprise, and then made jesting comments. That both officers "stood by and laughed" while Dillard continued to kneel on an incapacitated arrestee supports an inference of "acquiescence in the alleged use of force."

*Timpa,* 20 F.4th at 1039 citing *Hale v. Townley,* 45 F.3d 914, 917-19 (5th Cir. 1995)(finding that laughter by defendant-officer who "stood by and laughed while another officer assaulted plaintiff" supported inference of "acquiescence in the alleged use of excessive force.:) The officers' comments are categorically pertinent to showing that they chose not to act. During several critical points of the incident, the officers expressed far more interest in cracking wise than preventing

Dillard from killing Tony Timpa. Nowhere do you hear them remonstrating Dillard, for example. Instead, they joke about breakfast food, who gets to ride in what vehicle and other matters. All of their taunts and jests are acutely probative to illustrating *how* and *why* they chose not to act.

### 3.  Comments are relevant for Vasquez and Dominguez's "strategy".

Defendants Vasquez and Dominguez have attempted to explain their mockery as a strategy to engage Timpa whom they asserted might be overly dramatic or feigning sleep.[3] Implicitly they state that they were interrogating Timpa while in their custody. See *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1993)("interrogation includes 'any words or actions on the part of the police ... that the police should know are likely to elicit an incriminating response.'"). The taunts, they urge, were made to elicit a response from Timpa. Though Plaintiffs find this explanation extraordinary for more than one reason, the Defendants have clearly urged it as mitigation and evidence of their professionalism. And while Plaintiffs may further view these explanations as insincere and/or outright falsehoods, a jury may theoretically embrace Defendants' story that these comments were the result of sound police practices. In either event, they have a tendency to prove a matter of consequence more *or* less likely as FRE 402 provides.

### D.  Comments are also relevant for exemplary damages.

From the outset, Plaintiffs have sought exemplary damages. See *Plaintiffs' Second Amended Complaint.* (ECF No. 36). Like charges elsewhere, the Fifth Circuit Pattern Jury instructs jurors to consider the "reprehensibility" of the Defendants' conduct. See *BMW of N. Am., Inc. v. Gore,* 517 U.S. 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); Pattern Jury Instructions Fifth Circuit (2014) § 15.7. "To determine the degree to which conduct is reprehensible, the Supreme

---

[3] See "Dallas police officers: Mocking Tony Timpa was 'strategy'," *The Dallas Morning News,* Aug. 2, 2019, https://www.dallasnews.com/news/investigations/2019/08/02/dallas-police-officers-mocking-tony-timpa-was-strategy/

Court has instructed us to consider whether (1) the harm was physical or merely economic, (2) the conduct evinced a reckless disregard of the health or safety of others, (3) the target was vulnerable, (4) the conduct involved repeated actions or was an isolated incident, and (5) the harm was the result of intentional malice, trickery, or deceit." *Cooper v. Morales,* 535 Fed. Appx, 425, 432 (5th Cir. 2013) citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417-429, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Reprehensibility evidence includes but is not limited to whether there was "deceit, cover-up, insult, intended or reckless injury." PJI § 15.7. Here, the remarks are absolutely germane to "insult" and "reckless injury." Moreover, the *State Farm* factors establish that the insults were particularly reprehensible because they relate to (1) physical (*i.e.* death) rather than only economic harm; (2) conduct that evinced a reckless disregard of the health and safety of others; (3) a vulnerable person (handcuffed and zip-tied). Indeed, Vasquez and Dominguez's subsequent claim of "strategy" is further relevant to "deceit" and "cover-up." FRE 402's impetus to consider evidence having *any* tendency to a matter in controversy cannot be ignored.

### E. FRE 403 does not bar the admission the comments.

FRE 403 bars the admission of evidence whose probative value is ***substantially outweighed*** by the danger of ***unfair prejudice.*** FED. R. EVID. 403. Defendants cite zero authority indicating that FRE 403 bars their comments. The cases Defendants cite only relate to claims that comments *alone* are actionable. Plaintiffs have alleged and proved that Defendants killed Tony Timpa. Indeed, there is no fact issue that this is not a HOMICIDE. Dr. Ogden's death certificate states it was a "Homicide." All three of Plaintiffs' medical experts and their use of force expert confirm it was a homicide; indeed, even Defendants' own expert, Dr. Steven Bird, states it was "technically" a homicide. As a result, there can be no unfairness in admitting statements that relate to Tony's Fourth Amendment rights concerning life, liberty and "dignity". *Schmerber,* 384 U.S.

at 86; *Morel,* 876 F.2d at 480; *Fontana*, 262 F.3d at 878-79; *Hicks,* 422 F.3d at 1253-54; *Alexis,* 67 F.3d at 354. The entire circumstances of Tony's death cannot be divorced from the officers' words. The "humiliation" and "ridicule" are integral to the totality of the circumstances. *Morel,* 876 F.2d at 480. They are relevant and fair for the jury to consider. These were the comments of Defendants and no one else. There can be nothing unfair about holding one responsible for one's words as well his deeds.

                                      Respectfully submitted,

By:    */s/ Geoff J. Henley*
        Geoff J. Henley
        Texas Bar No. 00798253
        ghenley@henleylawpc.com
        **HENLEY & HENLEY, P.C.**
        2520 Fairmount, Suite 200
        Dallas, Texas 75201
        Tel. (214) 821-0222
        Fax. (214) 821-0124

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this the 6th day of July, 2023, a true and correct copy of the foregoing was served on all counsel of record via electronic submission through the ECF system pursuant to the Federal Rules of Civil Procedure.

                                      */s/ Geoff J. Henley*
                                      Geoff J. Henley