IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, ET AL. | § | |
|     Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:16-cv-03089-N |
| | § | |
| DUSTIN DILLARD, ET AL. | § | |
|     Defendants. | § | |

### PLAINTIFFS' TRIAL BRIEF ON ADMISSIBILITY REFERENCES TO OTHER EXCESSIVE FORCE INCIDENTS

Plaintiffs file this brief pursuant to Federal Rules of Evidence 401, 402, 403 and 702.

### RELEVANT FACTS[1]

In their petition for *en banc* review of the Court of Appeals' holding that a jury could find that the DPD Defendants violated Tony Timpa's Constitutional rights, the Defendants asserted that this case "involves matters of exceptional purpose." *Appellee Dustin Dillard, Danny Vasquez, Raymond Dominguez and Kevin Mansell Petition for Rehearing En Banc,* at iv. (ECF Doc. 00516148124).

> Four years after the events at issue, the tragic death of George Floyd ignited a nationwide debate concerning authorities' use of prone restraints. Many police departments have changed their policies on prone restraints in response. These developments raise the question of whether, prior to the ongoing national debate, the law in this circuit clearly proscribed prone restraint with weight applied to a subdued subject's back such that every officer would have known such restraints are unlawful. *Id.*

Following the denial of *en banc* review, DPD Defendants petitioned the United States Supreme Court for review of the panel decision. Once more, Defendants urged that instances like the George Floyd murder were relevant for the Court's consideration. Floyd, they urge, "tragically

---

[1] Plaintiffs will provide only an abbreviated history of the facts, given the Court's familiarity.
PLAINTIFFS' TRIAL BRIEF ON ADMISSIBILITY
TO OTHER EXCESSIVE FORCE INCIDENTS                                    Page 1 of 8

lost his life when officers with the Minneapolis Police Department restrained him on his stomach while applying significant force to his neck." *Petition for Writ of Certiorari,* at xi. "Floyd's death ignited a nationwide debate concerning law enforcement's use of prone restraints." *Id.* citing Cert. Pet., in *Lombardo v. City of St. Louis*, No. 20-391, at 1. In their petition, DPD Defendants' cited to this Court's note of "the ongoing debated concerning prone restraints precipitated by Floyd's death, stating that it was 'aware that this case touches on issues that are currently of widespread public concern." *Id.* citing App. 39, n. 1.

> Nonetheless, this Court must decide the issues presented in accordance with pages of binding precedent from the Supreme Court and the Fifth Circuit, rather than the pages of today's newspaper. *Id.*

DPD Defendants further stated, "Although authorities' use of prone restraints has recently become a matter of public debate, such restraints have long been a common policing tool." *Id.*

In Motion in Limine No. 5, Defendants now seek to purge any reference to the Floyd killing or "other incidents involving the Dallas Police Department." (ECF No. 281).

## ARGUMENT AND AUTHORITIES

### A. Nationwide debate is relevant to qualified immunity.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. at 741. To determine whether a right is clearly established, an officer need have only "fair warning" that the officer conduct would violate the subject's rights. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

In their appeal for *en banc* review and their petition for certiorari, DPD Defendants appear

to maintain that they are unfairly being judged in a Post-George Floyd World. They urge that despite having received hundreds of hours of training and hundreds of pages of training materials before Tony Timpa's homicide. Defendants further state this, despite bulletins from the Department of Justice dating back to 1995; standards enunciated in organizations like the International Association of Police and their own General Orders. These standards existed long before the murder in Minneapolis. Thus, it defies reasonable credulity that Defendants could have watched the news of George Floyd's murder and conclude that there was a *new* Constitutional standard.

What made the George Floyd murder so different of course was that it was *filmed.* Just like when the Rodney King beating was caught on camera 29 years before, Floyd's murder was captured on the cellphones of onlookers. Police policy and practices had not changed. It was only that the public could now see specific instances of how policing actually occurs that ignited the debate. The police had long since known the bright-line hazards of prone restraint. They have had ample "fair warning" and the Court must bar DPD Defendants from urging implicit unfairness from the circumstances and aftermath of the Floyd murder.

**B.  Other incidents are probative to witness credibility.**

*Daubert* familiarly holds that "vigorous cross-examination" and "presentation of contrary evidence" are essential to "attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As the means of ensuring scientific reliability, *Daubert* also provides "bedrock fairness." *Williams v. Syphan,* 2023 WL 1305084 at *5 (6th Cir. Jan. 31, 2023)(internal citations omitted).

**1.  Defendants' expert publicly stated his lack of research in prone restraint.**

In their *Daubert* motion, Plaintiffs provided the Court with the statement of Mark Kroll

when he was asked about his work in prone restraint by a Minneapolis broadcaster, KARE 11. Unwilling to defend his views on camera, Dr. Kroll emailed the TV station this message: **"I did some minimal research on this a few years ago and am no longer active in the area."** https://www.kare11.com/article/news/local/george-floyd/officers-get-mixed-messages-about-dangers-of-prone-restraint/89-41f41390-d513-4914-8c7e-799702070c82. Dr. Kroll could have said a number of different things about the Floyd incident, including just "no comment," but, instead, he downplayed his activities and distanced himself from ideas that he expounds upon in his report and his deposition testimony as an expert retained for that purpose. Allowing him to escape cross-examination on his bona fides and the very topic about which the public has now been acquainted would deprive Plaintiffs of a critical Seventh Amendment right and a faithful application of *Daubert.* 509 U.S. at 596.

### 2. Evidence of other instances is valuable impeachment.

Plaintiffs anticipate that Defendants will have a revolving door of use of force experts—including the Defendants themselves. Plaintiffs further anticipate that these experts will attempt to exonerate Defendants (and Defendants each other), making the "no reasonable officer" burden under *Graham v. Connor* unwieldy. Incidents like the Floyd murder thus are valuable means of comparison and impeachment—particularly given its near universal condemnation. Once again, *Daubert* requires that these experts be subject to the crucible of vigorous cross-examination.

Indeed, Defendants previously retained use of force expert Craig Miller who similarly testified on behalf of the *plaintiff* died of a heart attack during the execution of a no-knock warrant. See *Darden v. City of Fort Worth, Texas,* 880 F.3d 722 (5th Cir. 2018). Miller was confronted during his deposition about the similarity of the decedent's death there and that of Tony Timpa. Given decedent Jermaine Darden's size and the context of a drug raid, *Darden* presented a

circumstance for greater justification of force. Should Miller testify, he should be subject to cross-examination for his opinions in *Darden.* Given Miller's recent "possible" designation, though, DPD Defendants appear to have distanced themselves from *Darden's* expert. Nonetheless, given his retention, the facts of that case and the opinions that Defendants' expert rendered there must remain fair game.

### 3. Plaintiffs' expert testified in the George Floyd prosecution.

Federal Rule of Evidence 702 provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (**a**) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (**b**) the testimony is based on sufficient facts or data;
> (**c**) the testimony is the product of reliable principles and methods; and
> (**d**) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Plaintiffs' retained pulmonologist, Dr. Martin Tobin, who testified at length on the operations of breathing and the hazards of mechanical asphyxia during the criminal prosecution of Officer Derek Chauvin who was convicted and received a 22.5 year-sentence. By necessity, Dr. Tobin must testify about the Chauvin prosecution as it is a part of his expert knowledge and experience. FED. R. EVID. 702(a). In further reliance on his expertise, Dr. Tobin was slated to testify similarly in the trial of the three co-defendants who subsequently pleaded guilty following Chauvin's conviction. Dr. Tobin's *experience* of testifying for the State of Minnesota in the prosecution of Floyd's murderer is essential to his qualifications. FED. R. EVID. 702(a).

His understanding of physiological science that he testified about in the Chauvin prosecution that another court of law overseeing a trial of national importance has relied on his

testimony. Dr. Tobin's specialized knowledge related to the George Floyd case will absolutely aid the jury in this case because he well understands both the *similarities* and the *differences* in the physiological effects between the two restraints. While the overall mechanism of death is the same in each instance, Dr. Tobin is expected to testify that that were slight variations. Each subject was handcuffed, in prone restraint for an extraordinarily long time according to police practices. However, the world saw Chauvin's knee positioned higher on Floyd's back with greater pressure on his neck. By contrast, the footage depicts Dillard's knee somewhat lower on his back between the shoulder blades. Floyd was restrained for approximately 8 minutes and 46 seconds, while Dillard kneeled on the handcuffed Timpa for some 14 minutes and 7 seconds. Given the overlap of the facts and given the similar, if not identical, clinical and physiological principles Dr. Tobin applied in each case, it is hard to fathom how Dr. Tobin's testimony in the Floyd murder prosecutions would not relate to his credibility. Stated another way, the State of Minnesota determined that he was the most qualified to testify about the incident that triggered the national debate that Defendants themselves recite. Given Chauvin's conviction and the guilty pleas of his co-defendants, it is likewise evident that the judge and jury in the Chauvin prosecution likewise found Dr. Tobin's testimony reliable.

His experience and observations in the Floyd case help buttress his views about Timpa's demise as they provide more facts and data. FED. RULE EVID. 702(b). Besides employing many of the same mathematical calculations in determining the impact in each victim's respiratory system, Dr. Tobin also noted some of the same clinical signs of mortality, for example, myoclonic twitches that Timpa manifest in his arm and Floyd expressed in a leg. These are facts that would further help the jury understand the nature and timing of Timpa's death.

Given the strong similarities of the two homicides, Defendants cannot show that there is a

danger of *unfair* prejudice that *substantially outweighs* the probative value of this testimony. Dr. Tobin's intimate experience with the Floyd case and his myriad calculations relating to Timpa's demise—many of which he also made in the Floyd case—well illustrates the rigor of his method and its replicability. These facts, too, are relevant to Dr. Tobin's credentials and credibility.

### C. Other incidents are relevant to exemplary damages.

"[P]unitive or "exemplary" damages have long been a part of Anglo–American law. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 25, 111 S.Ct. 1032, 1047, 113 L.Ed.2d 1 (1991). Exemplary damages function to deter and punish. *Ratner v. Sioux Natural Gas Corp.,* 719 F.2d 801, 804 (5th Cir. 1983). "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S. Ct. 1589, 1599, 134 L.Ed.2d 809 (1996). "As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Id.* citing *Day v. Woodworth,* 13 How. 363, 371, 14 L.Ed. 181 (1852).

Reprehensibility is not measured in a vacuum. Courts emphasize the *degree* of reprehensibility. *Gore,* 517 U.S. at 575. As a result, reprehensibility must be considered in a larger social context, including one where the "public has a strong interest in police misconduct," *Morrow,* at *4, an "ugly and expensive syndrome" that undermines the public trust. *Marsalis,* 202 F.R.D. at 238. The DPD Defendants are correct that their liability cannot be proved by the conduct of third parties in Dallas or elsewhere. Plaintiffs' ample proof of their guilt and do not require the aid of guilt by association. But the suggestion that Plaintiffs, their counsel or witnesses be barred from making *any* reference to George Floyd's killing or matters like that is as unwieldy as it is cynical. DPD Defendants urged to both the Fifth Circuit and the U.S. Supreme Court—and

Plaintiffs anticipate that they will continue to urge—that Defendants have fallen prey to some unfairness in the aftermath of the Post-Floyd World. Such a conclusion does not reflect the reality of their training, General Orders or better practice standards—but that does not deter them from brandishing that badge of resentment. To the extent that they do and to place this particular instance of an "ugly syndrome" in the proper social context, reference should well be made to other instances *when relevant* and *instructive* to the trier of fact.

## CONCLUSION

Plaintiffs do not seek to prove Defendants' guilt and liability by the acts of third parties committed elsewhere. They do insist on the right to present all relevant comparative evidence and conduct vigorous cross-examination of defense witnesses. Sound impeachment may require reference to acts done elsewhere. Likewise, Defendants' reprehensible conduct—killing and laughing about it—must be placed in a larger social context. .

Respectfully submitted,

By: */s/  Geoff J. Henley*
Geoff J. Henley
Texas Bar No. 00798253
ghenley@henleylawpc.com
**HENLEY & HENLEY, P.C.**
2520 Fairmount, Suite 200
Dallas, Texas  75201
Tel. (214) 821-0222
Fax. (214) 821-0124

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 12th day of July 2023, a true and correct copy of the foregoing was served on all counsel of record via electronic submission through the ECF system pursuant to the Federal Rules of Civil Procedure.

/s/  *Geoff J. Henley*
Geoff J. Henley