IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKI TIMPA, ET AL. | § | |
|     Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:16-cv-03089-N |
| | § | |
| DUSTIN DILLARD, ET AL. | § | |
|     Defendants. | § | |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE

Plaintiffs file this brief pursuant to the First Amendment and Seventh Amendment and Rule 3.07 of the State Bar of Texas Rules of Professional Conduct.

### RELEVANT FACTS

Plaintiffs filed the present action in November 2016.

It was not until the filing of the *Second Amended Complaint* that there was any reference to the body worn camera footage which allowed Plaintiffs to ascertain how Tony Timpa died and who were the specific actors involved. Until then, the City of Dallas had resisted providing such information to either Plaintiffs and independently to *Dallas Morning News* reporter, Cary Aspinwall. Despite having the BWC footage, Plaintiffs did not release such footage or other documents[1] until on or after July 29, 2019 when the Hon. Court ruled, following the dismissal of the Defendants' indictments that March, that there was no basis for "maintaining confidentiality" but "that the public has a compelling interest in understanding what truly took place during a fatal exchange between a citizen and law enforcement." (ECF No. 128).

---

[1] See the Order, (ECF No. 128, which states in pertinent part: "In an agreed protective order, the following information was designated as confidential: (1) body camera footage from three police officers at the scene of Mr. Timpa's death; (2) 911 recordings; (3) reports and written statements of the responding police officers and EMS workers; (4) scene photographs; and (5) reports and written and electronically recorded statements from the Internal Affairs Division and Special Investigation Unit regarding the incident. Protective Order.

> For both of those reasons, the Court holds that there is no longer good cause to shield the documents from public scrutiny. The Court therefore grants Plaintiffs' motion. The evidence identified above is no longer confidential and may be used or disseminated for any lawful purpose.

*Id.* Thereafter, motions practice and discovery continued until their cessation following the Court's grant of summary judgment and then renewal following the decisions of the Court of Appeals. Upon remand, there have been two additional scheduling orders with trial dates in March 2023 and then later for July 17, 2023.

In autumn 2022, before the anticipated trial setting, Plaintiffs counsel retained jury consultant, Jessica Brylo and her Denver-based firm, Trial Dynamics. **Exhibit "A," Declaration of Jessica Brylo.** With a law degree and a masters' degree in psychology from Duke University, Ms. Brylo and her firm provide attorneys' jury consulting services—including conducting mock trials and focus groups. Plaintiffs' counsel hired Ms. Brylo to do the latter. *Id.* During the month of November 2022, Ms. Brylo conducted two focus groups that had a combined total of **22 people**.

Focus group participants were drawn from the counties within the Dallas Division of Northern District and were excluded if they knew of any of the attorneys, parties, witnesses or decent Tony Timpa. All those who participated did not know any of the attorneys, parties, witnesses or Mr. Timpa. *Id.* Participants viewed significant samples the BWC footage to gauge their reactions. *Id.* After viewing the footage, none of the participants were familiar with the incident, but more than one suggested that the footage resembled the George Floyd incident.

On Friday, July 15, 2023, the Court conducted a pre-trial hearing and ruled on the parties' motions in limine. During the pre-trial, the Court referenced an editorial of *The Dallas Morning News* from the paper's editorial board that ran a week or so before. The Court expressed no disagreement with its content, but dismay over its timing. The Court raised concerns about the

potential the piece could affect the voir dire process but then referred to a series of trials related to the record-breaking Robert Allen "Stanford" Ponzi scheme which affected some 20,000 victims and involved frauds committed across the country and outside the United States.[2] As a result of the scope, notoriety and ubiquity of the Ponzi Scheme, counsel for all of the parties anticipated that the venire would be so aware of the frauds that extensive voir dire may necessary to determine juror bias. The Court noted that to the surprise of the parties that none in the venire seemed aware of the scheme. The Court then determined that additional questioning may be necessary during jury selection the following Monday.

On July 17, 2023, the parties and their counsel appeared for jury selection. The Court expressed its anger concerning two stories that ran in *The Dallas Morning News*—one over the weekend—and another thereafter. Of particular concern to the Court was a front-page story "above the fold" that depicted Plaintiff Vicki Timpa. *The Dallas Morning News* is the metropolitan newspaper with a proclaimed print readership of less than 70,000 people and an online readership slightly larger for the Dallas-Fort Worth Metroplex, including Collin, Tarrant and surrounding counties. Dallas County has an estimated population of 2,600,840.[3] Along with Dallas County, the additional counties Ellis County (212,182); Rockwall (123,208); and Hunt (108,282) form the constituent counties for the Dallas Division of the Northern District of Texas with a total estimated population of 3,044,512.

---

[2] "SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme," SEC Press Release, Feb. 17, 2009; "SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme," SEC Press Release, Feb. 17, 2009; "Allen Stanford Sentenced to 110 Years in Prison for Orchestrating $7 billion Investment Fraud Scheme," U.S. Dept. of Justice Press Release, June 14, 2012.
[3] U.S. Census Bureau, July 1, 2022. https://www.census.gov/quickfacts/fact/table/huntcountytexas,rockwallcountytexas,elliscountytexas,dallascountytexas/PST045222.

## ARGUMENT AND AUTHORITIES

### A. Bad faith delay in filing.

Defendants' delay here defines bad faith. During the last sixty days, they have filed no motions to transfer. Yet, they file the present motion less than 12 hours before jury selection is set—all for the purpose of unconscionable delay and abhorrent obstruction. Defendants have no b basis for their delay. What is more clear, though, is that they have no basis for the present motion.

### B. Pre-Trial Publicity must saturate jury pool <u>and</u> create "carnival atmosphere.

Considerations concerning adverse pre-trial publicity arise primarily in <u>criminal</u> actions. The history largely dates back to the seminal cases of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and *Estes v. Texas,* 381 U.S. 532, 538, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The Supreme Court, the Fifth Circuit and many circuits have detailed the facts of those cases. *Skilling v. U.S.,* 561 U.S. 358, 380, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (refusing to reverse Enron CFO's conviction in trial in Houston where insider trading scandal occurred).

Given their relative antiquity, some history would be salutary. *Sheppard* pertained to the coverage of Sam Sheppard, accused of "bludgeoning his pregnant wife to death." The Supreme Court characterized the facts in *Sheppard* as so:

> [B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities. *Id.,* at 353, 355, 86 S.Ct. 1507. Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted. *Id.,* at 354, 86 S.Ct. 1507. But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id.,* at 358, 86 S.Ct. 1507.

*Skilling v. U.S.,* 561 U.S. at 380 citing *Sheppard,* 384 U.S. at 353-35. As the Supreme Court made

clear, *Sheppard's* months of pre-trial publicity *and* the bedlam at the courthouse during the time of trial created a "carnival atmosphere" that "pervaded the trial." *Id. Estes v. Texas* likewise suffered from the intrusiveness of the media during the trial with (cords and cameras). The Supreme Court has had many occasions to clarify this issue.

> In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." *Murphy v. Florida,* 421 U.S. 794, 798–799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).12 See also, *e.g., Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

*Skilling,* 561 U.S. at 380. Concerning pre-trial publicity itself, the Supreme Court emphasizes that the jury pool is not required to labor under a shroud of complete ignorance.

The Fifth Circuit has noted that "even the 'broad and intensive public awareness' stemming from notorious events like 'the battlefield execution of Vietnamese civilians by Lt. William Calley, Jr. ... and the high level conspiracy to cover up the Watergate break-in,' was held not to have created a presumption of juror prejudice...." *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 631 (5th Cir. 2008) (citations omitted). Rather, this presumption is reserved for "exceptional cases[.]"

There is such a large body of law <u>against</u> transfer that charts are more appropriate to illustrate how <u>extraordinary</u> the saturation must be. See **Exhibit "B."** The Supreme Court, the Fifth Circuit and several sister circuits have upheld denials of transfer where the media coverage *exponentially* exceeded the coverage of the present matter. The vast majority of the precedent addresses criminal actions—simply because several of the premises of a civil case are absent from a criminal prosecution. The Courts emphasize that the community is united against criminal actor and examine the coverage. In the present case, there have been a number of statements by the

Dallas County District Attorney, Defendants' criminal counsel *and* the Dallas Police Association attacking Plaintiffs' case and/or defending the officers' conduct. News reportage has also been neutral.

### 1. An impartial jury is readily obtainable in community the size of Dallas Division.

Few scandals rocked the nation like "Enron," which became the byword for greed and corporate production.[4] As such indicted CFO Jeffrey Skilling moved to transfer his criminal prosecution from Houston because of the intense, daily coverage related to the trial. In refusing to grant a new trial predicated admittedly overwhelming pre-trial publicity, the Supreme Court analyzed a number of factors that distinguished the Enron prosecution from *Sheppard, Estes* and *Rideau.* At the forefront of considerations is jury pool size:

> First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In *Rideau,* for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. App. 627a. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain. See *Mu'Min v. Virginia,* 500 U.S. 415, 429, 111 S.Ct. 1899, 114 L.Ed.2d

---

[4] See "Enron scandal," https://en.wikipedia.org/wiki/Enron_scandal. The **Enron scandal** was an accounting scandal involving Enron Corporation, an American energy company based in Houston, Texas. Upon being publicized in October 2001, the company declared bankruptcy and its accounting firm, Arthur Andersen – then one of the five largest audit and accountancy partnerships in the world – was effectively dissolved. In addition to being the largest bankruptcy reorganization in U.S. history at that time, Enron was cited as the biggest audit failure….Shareholders filed a $40 billion lawsuit after the company's stock price, which achieved a high of US$90.75 per share in mid-2000, plummeted to less than $1 by the end of November 2001.[2] The U.S. Securities and Exchange Commission (SEC) began an investigation, and rival Houston competitor Dynegy offered to purchase the company at a very low price. The deal failed, and on December 2, 2001, Enron filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Enron's $63.4 billion in assets made it the largest corporate bankruptcy in U.S. history until the WorldCom scandal the following year.[3]Many executives at Enron were indicted for a variety of charges and some were later sentenced to prison, including Lay and Skilling. Arthur Andersen was found guilty of illegally destroying documents relevant to the SEC investigation, which voided its license to audit public companies and effectively closed the firm. By the time the ruling was overturned at the U.S. Supreme Court, Arthur Andersen had lost the majority of its customers and had ceased operating. Enron employees and shareholders received limited returns in lawsuits, despite losing billions in pensions and stock prices.

>493 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [D.C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year"); *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1044, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

*Id.,* 561 U.S. at 382. Few comparisons are more apt than the jury pools within the Houston Division of the Southern District of Texas and our own. Dallas and Harris County have similar population sizes, as each are the large metropolitan areas of the same state. More than two decades after its catastrophic $63 billion bankruptcythat roiled the S&P 500, the natural gas market writ large, major pension funds, and tens of thousands of investors and retirees and a decade after the Supreme Court's decision in *Skilling,* the Enron case still returns 11,500,000 references on Google. If publicity were gauged by maritime terms, Enron was the largest of whales. By comparison, this case—though socially significant—was a guppy in terms of actual publicity.

### 2. *The Dallas Morning News* lacks market penetration to saturate jury pool.

It cannot be emphasized enough that decisions like *Sheppard* and *Rideau* arose decades ago in sparsely populated areas where single news sources were the *only* news sources within a half days drive. That world has long passed. In the present case, the Court observed that one story ran on the front page "above the fold." The Court's vigilance must be placed in the actual context of *The Dallas Morning News's* actual readership. Hard data indicates that the print version of the City's paper of record is read by less than 2.5 percent of the population of the pertinent jury pool. Though the epitaph of all metro dailies have not yet been written, undertakers have been collecting moribund newspapers since the 1990's. *And that was before the rise of social media, the dawn rise of cable news and the all-day, all-night unrelenting news cycle.* The volume of 24-hour daily competition from so many national *vs.* international, traditional media *vs.* social media sources;

cable *vs.* network; and conservative *vs.* progressive sources eviscerates *any* persuasive value of decisions like *Rideau* rooted in rural contexts where some specific news organ—often conspicuously owned by a known and well-regarded community pillar—had a grip on a supermajority of the affected population. In the current era of paywalls and declining newspaper readership, such power would not be within the pages of a metro daily, no matter how reasonably or traditionally revered, like *The Dallas Morning News*.

Plaintiffs, though, have marshalled more than statistical proof of improbable unfairness to the Defendants. Though the compulsion would be understandable, the Court does not have to hypothecate about prejudice to Defendants despite the remote statistical likelihood, because Plaintiffs have already informally proven otherwise. Quite by accident,[5] Plaintiffs collected concrete empirical proof that the Court could empanel a jury that is wholly unfamiliar with the incident of underlying this litigation. As Plaintiffs' jury consultant Jessica Brylo makes plain, **22 people** were readily found who were wholly unfamiliar with the facts of the litigation. Indeed, the recruiter charged with assembling the focus group reported no difficulty in the least in finding the adequate sample size. What is more, none of the focus group participants had their memories jogged once they saw the footage depicting restraint from some seven years before. Stated another way, participants simply had no inkling about Tony Timpa's demise.

### 3.  There has been no record of *actually prejudicial* content.

Not all coverage is created equally. Indeed, not all *adverse coverage* is created equally bad. Indeed, the legal standard is not unflattering coverage. That is not the standard. Pre-trial

---

[5] As the Court can well imagine, Plaintiffs did not expend the resources for the focus groups for the present purpose but to ascertain juror attitudes about liability and damages. Some of the latter findings, in particular, were conveyed to Defendants.

publicity—much like FRE 403—looks to the dangers of <u>unfair prejudice</u>. As the Supreme Court explained, "[A]lthough news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.,* 561 U.S. at 382. To date, there has been no assessment of the precise nature of *any* of the news coverage that has occurred between the release of the bodycam footage years ago to the present.

Such an analysis, unlike considerations related to the volume coverage and the size of the community, requires subjective scrutiny of the disseminated content. To meet the burdens, DPD Defendants must show that the bias actually reached the <u>jury box</u> not some scant percentage of the Metroplex. That is an impossible burden when we are talking about coverage that reaches far less than 5 percent of the relevant population base. Even more difficult can fatal bias arise when the event depicted is buried beneath the memories of two rancorous presidential elections, a life-altering pandemic, non-stop partisan discord; the first European war in half century; coverage of excessive force incidents with African-American victims. Moreover, the last three weeks of statewide gavel to gavel coverage of the impeachment proceedings of the state attorney general. More relevant to most DFW audiences, though, has been the spike in coverage of the Dallas Cowboys defense that smothers quarterbacks and ball carriers.

More than anything, though, present audiences simply get their news from social many social media sources which largely ignore local news coverage.

**4. Coverage must exceed the sensationalism inherent the event.**

Print accounts, in particular, have no ability to eclipse the most potent proof of this action. Though Plaintiffs have every confidence in the superior weight of the medical science that they have marshalled, no one would deny the probative potency of the BWC footage so closely

scrutinized by the Court of Appeals and all of the parties' experts. But even the footage broadcasts occasioned episodically over seven years by contrary tidal events— including its release years after Timpa's death, three Defendants' indictments, the same three Defendants' dismissal, an adverse summary judgment, a favorable ruling from the Fifth Circuit Court and finally near the eve of a long-awaited trial—never delivered the hammer blow of prejudice in *Rideau, Sheppard* or *Estes.*

Puitting aside that all such cases are <u>criminal</u> and that <u>Federal Rule of Criminal Procedure 21</u> has no <u>civil</u> counterpart, there is no basis for Defendants to complain. In those rare, remote instances where pre-trial publicity resulted in actual reversible prejudice, something <u>in addition</u> to merely adverse publicity had to occur. The recurrent worry has been that some actor, typically state or federal authorities, would employ news organs to disseminate otherwise inadmissible evidence, such as extraneous offenses. Broadcasts of confessions are likewise treated with greater scrutiny. See *Rideau, supra; United States v. Chagra,* 669 F.2d 241, 251–252, n. 11 (C.A.5 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded."). Here, there have been no confessions by Defendants. Here, DPD Defendant have never even accused Plaintiffs (or their counsel) of doing anything of the kind. Likewise, Defendants have never accused Plaintiffs of disseminating information that would likely prohibitions concerning settlement discussions.

Nor can Defendants actually complain of prejudice *pervading* the community. This case has not pitted Defendants against the community *per se*—certainly not its authorities. It has been the Timpa that has had that struggle exclusively.Through their criminal defense counsel and their union leadership, in particular, Defendants have unequivocally urged their guilt in broadcast and

newspaper accounts. Giving further force to these claims of innocence were the exculpations of the county's highest ranking law enforcement representative, District Attorney John Creuzot. The latter's clemency and extrajudicial remarks belies any notion of adverse prejudice pervading the community. In sum, Defendants have not and cannot identify actually disseminated information establishing reversible prejudice. While Defendants may not like periodic reminders of Timpa's death, that is *not* the standard for showing harm.

### 5. Northern District has repeatedly been locus for high-profile trials.

"[P]re-trial —even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). The Earle Cabell Courthouse is no stranger to lurid crime trials and high stakes litigation in the public square. In *U.S. v. Lipscomb,* 299 F.3d 303 (5th Cir. 2002), the Fifth Circuit reversed the district judge's *sua sponte* transfer to Amarillo of the bribery trial of the lightning rod Black city councilmember Al Lipscomb.

Perhaps nowhere is the more apparent than *Vodicka v. Ermatinger,* 2021 WL 2917035 (N.D. Tex. July 12, 2021)*,* a Section 1983 action filed by a murder suspect against two DPD detectives. The underlying facts as depicted in *D Magazine* were sensational, macabre and unforgettable. In the wake of volatile probate litigation, attorney Ira Tobolowsky was found dead in his garage, having been lit on fire with some kind of accelerant. Though the partner of an adverse litigant, was suspected, the case lingered because of a lack of witnesses. Vodicka sought to transfer venue based pre-trial publicity.

Representing the two detectives, the Dallas City Attorneys' Office led, in part, by the very same lead counsel in this action vigorously *and* successfully opposed transfer of action to the Houston Division of the Southern District of Texas. Just as so many litigants before and after them

have, the Dallas City Attorneys' Office relied on *Skilling,* emphasizing the extraordinary nature of transfer. Relying on *Mayola v. Alabama*, 623 F.2d 992, 1000 (5th Cir. 1980), *Broussard* and others, Judge Boyle explained that a handful of recent news stories is wholly inadequate to meet the threshold of saturation. Most important, though, prejudice is NOT presumed. The court has to identify it from prospective jurors. That is accomplished with extensive voir, additional jurors or multiple panels.

## CONCLUSION

Defendants have to more than show that there has been news coverage of Tony Timpa's killing. Again, their eleventh hour effort is simply bad faith. They have to do more than show that there has been completely one-sided depictions of the same. They have demonstrate the requisite magnitude of pervasive prejudice as to preclude this Court from *ever* finding six or more impartial jurors. Plaintiffs have already identified **22** who had not even heard about Timpa's killing, much less had been so thoroughly familiar as to have rendered a conclusion. Though Defendants have flatly failed to do more than make conclusory claims of prejudice, Plaintiffs have shown that an impartial jury can readily be sought with appropriate voir dire. **It bears emphasizing that juries in criminal actions always have to be instructed to ignore that has been arrested and indicted for the offense for which he is tried.** Voir dire is the answer. Defendant's motion must be **DENIED**.

Respectfully submitted,

By: */s/ Geoff J. Henley*
Geoff J. Henley
Texas Bar No. 00798253
ghenley@henleylawpc.com
**HENLEY & HENLEY, P.C.**
2520 Fairmount, Suite 200
Dallas, Texas  75201
Tel. (214) 821-0222
Fax. (214) 821-0124

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this the 6th day of July, 2023, a true and correct copy of the foregoing was served on all counsel of record via electronic submission through the ECF system pursuant to the Federal Rules of Civil Procedure.

/s/ *Geoff J. Henley*
Geoff J. Henley